Michael V. Nixon (OR Bar # 893240) (*pro hac vice* application pending)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA
Phoenix Division

| | | |
|---|---|---|
| Apache Stronghold, a 501(c)(3) nonprofit organization, | ) ) ) | No. 2:21-cv-00050-CDB |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| United States of America, | ) ) ) | MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION |
| Sonny Perdue, Secretary, U.S. Department of Agriculture (USDA), | ) ) ) | |
| Vicki Christensen, Chief, USDA Forest Service, | ) ) | |
| Neil Bosworth, Supervisor, USDA Forest Service, Tonto National Forest, and | ) ) ) ) | |
| Tom Torres, Acting Supervisor, USDA Forest Service, Tonto National Forest, | ) ) ) | |
| Defendants. _____ | ) ) | |

Plaintiff Apache Stronghold hereby moves this honorable Court for a temporary restraining order to preserve the *status quo* by preventing Defendants from publishing a Final Environmental Impact Statement ("FEIS") on the "Southeast Arizona Land Exchange and Resolution Copper Mine Project" and from conveying the parcel(s) of land containing Oak Flat, as referenced in the Complaint in this matter, until such time as the Court adjudicates the Plaintiff's request for a preliminary injunction in this case. There is no other adequate remedy at law, and time is of the essence to prevent manifest injustice, treaty violations, land theft, and illegal and unconstitutional human rights abuses by the defendants, including the annihilation of Plaintiff Apache Stronghold and its Western Apache members' religious exercise and beliefs.

Plaintiff presents very serious questions going to the merits, the balance of hardships tips sharply in favor of the plaintiff, and the injunction is in the public interest. Furthermore, Plaintiff is likely to suffer irreparable harm in the absence of temporary relief.

This motion is supported by the Complaint and by the declarations of Plaintiff's counsel Clifford Levenson; John R. Welch, Ph.D.; Naelyn Pike; Wendsler Nosie, Sr., Ph.D.; Cranston Hoffman, Jr.; and the attached Memorandum of Points and Authorities.

Dated: January 13, 2021                    Respectfully submitted,

/s/ Michael V. Nixon
Michael V. Nixon (OR Bar # 893240)
(*pro hac vice* application pending)
101 SW Madison Street #9325
Portland OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

/s/ Clifford Levenson
Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

## MEMORANDUM OF POINTS AND AUTHORITIES

**INTRODUCTION**

The defendant United States of America, by and through its Department of Agriculture agency, the Forest Service, suddenly and unexpectedly stated to a news reporter on or about January 4, 2021, that the Forest Service now intends to publish a Final Environmental Impact Statement ("FEIS") on the "Southeast Arizona Land Exchange and Resolution Copper Mine Project" this coming Friday, January 15, 2021.[1]

> *Just the other day, the Forest Service publicly stated for the first time that the Forest Service will publish the Final Environmental Impact Statement ("Final EIS" or "FEIS") for the Southeast Arizona Land Exchange and Resolution Copper Mine ("SALE-RCM") on this coming Friday, January 15, 2021.*[2]

---

[1] "The final EIS and draft Record of Decision (ROD) presently are scheduled to be published in the Federal Register on January 15, 2021. Visit Resolution Copper Timeline (link is external) for more information." From United States Department of Agriculture, National Forest Service, Tonto National Forest, Resolution Copper Project and Land Exchange Environmental Impact Statement webpage, https://www.resolutionmineeis.us/documents/nez-2014 accessed January 8, 2021. See also, "Current Status (as of Jan. 4, 2021)" https://www.resolutionmineeis.us ("The final EIS and draft Record of Decision are scheduled to be published in the Federal Register on January 15, 2021.").

[2] "Trump To Approve Land Swap For Rio Tinto's Resolution Copper Project," Ernest Scheyder, Reuters (January 4, 2021) ("The U.S. Forest Service will publish a final

Declaration of Naelyn Pike, ¶ 7, p.3.

That mere act of publication will immediately enable the Forest Service to attempt to convey a 2,422-acre parcel of "Forest Service land" to an entity owned entirely by foreign mining corporations, Rio Tinto and BHP, pursuant to a mandate in Section 3003 of the "National Defense Authorization Act of 2015 ("the NDAA"),[3] also known as "CRomnibus"[4]

But the passage of the NDAA was based on a grave and profoundly erroneous assumption that raises a very serious question. Evidence shows United States does not own that land. It is Western Apache land under the 1852 Treaty of Santa Fe. This is just one of the compelling reasons why the defendants must be immediately restrained.

---

environmental impact statement for the mine on Jan. 15, a necessary step to complete the land exchange, said Tom Torres, acting supervisor of the Tonto National Forest, where the mine would be built."). Article accessed on January 10, 2021, for citation at https://www.msn.com/engb/news/world/trump-to-approve-land-swap-for-rio-tintos-resolution-copper-project/ar-BB1ct2gu .

[3] H.R.3979 - Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Public Law No: 113-291 https://www.congress.gov/bill/113th-congress/house-bill/3979/text | https://www.congress.gov/113/plaws/publ291/PLAW-113publ291.pdf .

[4] See, "Get on the cromnibus: what this odd phrase has to do with the US budget," Tom McCarthy, The Guardian (December 12, 2014) https://www.theguardian.com/us-news/2014/dec/12/cromnibus-odd-phrase-budget-battle-spending-bill . And see, "Senate passes spending bill, ends government shutdown threat," By David Lawder and Amanda Becker, Reuters (December 13, 2014) https://www.reuters.com/article/us-usa-congress-budget/senate-passes-spending-bill-ends-government-shutdown-threat-idUSKBN0JR0I820141214 . See also, "Crowd protests copper mine on sacred lands," Apache Messenger/Indianz.com (December 22, 2014) https://www.indianz.com/News/2014/015978.asp

There is evidence that the land at risk is not owned by the United States of America and the United States has no right to that land, nor any power or legitimate authority to convey it to anyone. Furthermore, it is a traditional Western Apache religious property where they preserve and exercise their rights to their religious freedom and their religious beliefs, as they have since time immemorial. Religious freedom protects the rights of individuals to observe their faith at all times. See *Burwell v. Hobby Lobby*, 573 U.S. 682 (2014).

The Defendants must be immediately restrained and enjoined from publishing that triggering predicate document—the FEIS—and the Defendants must also be restrained and enjoined from any subsequent attempt to convey the subject land at risk. The Forest Service's recent threat to publish the FEIS—which can then be immediately followed upon publication by unimpeded agency action to attempt a conveyance of the land at risk—is already causing intense distress, disturbance, disruption, and interference with quiet use and enjoyment, and other harms to Apache Stronghold and its members, including to their First Amendment Rights to the Free Exercise of Religion, and their religious rights as also protected by the Religious Freedom Restoration Act ("RFRA").

The land belongs to the Western Apache tribes pursuant to the 1852 "Treaty Between the United States of America and the Apache Nation of Indians." Furthermore, since time immemorial that particular 2,422-acre parcel of Apache land contains a portion of what has been and still is sacred Western Apache religious grounds—Chi'chil Biłdagoteel (a 40-acre area commonly known as "Oak Flat")—and it is a Western Apache traditional cultural property and sacred place included within the 4,309-acre are

officially listed in the U.S. Department of the Interior's National Register of Historic Places as the Chi'chil Biłdagoteel National Historic District.[5]

As the U.S. Department of the Interior, National Park Service explains:

"The National Register of Historic Places is the official list of the Nation's historic places worthy of preservation. Authorized by the National Historic Preservation Act of 1966, the National Park Service's National Register of Historic Places is part of a national program to coordinate and support public and private efforts to identify, evaluate, and protect America's historic and archeological resources." [6]

The land now at risk from unrestrained federal agency action, alienation, and harm, is actually owned by the Western Apache tribes of the greater Apache Nation, who reserved their rights in fee to that land and its environs pursuant to the terms of the 1852 Treaty Between the United States and the Apache Nation of Indians (also commonly referred to as "The 1852 Treaty of Santa Fe" or "Treaty of Santa Fe" or "The Santa Fe Treaty"). See the Declaration of John R. Welch, Ph.D. which accompanies this Motion. As Dr. Wendsler Nosie has declared in his declaration of January 11, 2021:

*Even though the United States has tried to steal Oak Flat away from us, we have never given up or sold that Treaty land. Our traditional Apache religion does not even allow us to do such a bad thing as that. Oak Flat is ours and always has been since time immemorial, long before the United States of America ever existed.*

Declaration of Wendsler Nosie, Sr., Ph.D. ¶ 2 p.2.

Here is a summary of the material facts contained within Dr. Welch's Declaration:

---

[5] See "San Carlos Apache Tribe welcomes designation at sacred Oak Flat," Indianz.com (March 18, 2016) https://www.indianz.com/News/2016/03/18/san-carlos-apache-tribe-welcom.asp . See also, National Park Service National Register Database, 16000002 Chi'chil Bildagoteel Historic District, Listed 3/4/2016 (access via https://www.nps.gov/subjects/nationalregister/database-research.htm ).

[6] Ibid.

MOTION FOR TRO AND PRELIMINARY INJUNCTION                                               6

The Western Apaches and the United States entered into a Treaty in 1852 that was subsequently ratified. Declaration of John R. Welch, Ph.D. ("Welch Dec."), ¶ 10 , p. 4. The 1852 Apaches' Treaty has never been amended or rescinded. Id. Several Treaty Articles recognize Apache Land territory.  Welch Dec., ¶ 11 , p. 4. Treaty Article 9 states, "that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in Apache territory such laws." Id.

The federal government, through the U.S. Smithsonian Institution, Bureau of American Ethnology, created a map, of the Western Apaches' Treaty Territory in 1899. Welch Dec., ¶ 12, p. 5. Dr. Welch placed an arrow at the location of Oak Flats, on the copy of the 1899 Map, which is shown on page of Dr. Welch's Declaration.  See, Welch Dec. p. 5 (Map1).  The noted location shows the site as being clearly within the general center of the Western Apache's Arizona Territorial Lands. Id. Further, Chi'chil Biłdagoteel (Oak Flat) is at the center of the proposed Resolution Mine's impacts.  Welch Dec. at ¶ 20, p. 7.

Some of Arizona's Tribal Lands' claims were resolved by the Indian Claims Commission, ("the Commission.").  The Commission in the 1960's used Docket 22, for addressing claims to compensation for lands taken by the United States from tribes representing Apache.  Welch Dec., ¶ 14, p. 6. The circumstances the Federal Government, through the Commission, may have attempted to "quiet" Apaches' reserved treaty rights or aboriginal land title, principally through providing compensation for aboriginal lands, defined by the Commission as lands subjected to "exclusive tribal use

MOTION FOR TRO AND PRELIMINARY INJUNCTION                                                                7

and occupation from "time immemorial."  Id. at ¶ 14, p. 6.

No evidence exists in the Commission proceedings, or elsewhere, of any change or diminishment in the Apaches' reserved treaty rights to the Western Apaches' Treaty Territory.  Id. at ¶ 15, p. 6. Also, no evidence exists that the United States compensated the Apache treaty rights holders for Chi'chil Biłdagoteel (Oak Flat).  Id.

Oak Flat is Apache land, as it has been for centuries and is not owned by the United States of America or any other entity or person.  Id. The Commission's rules prohibited the recognition of tracts used by multiple Indian peoples as aboriginal lands of any single claimant group, id. at ¶ 21, p. 9, thus the Commission did not identify this tract as aboriginal lands, as it was "everyman's" land.  Id. While the Commission's proceedings in Docket 22-D resulted in compensation to the San Carlos and White Mountain Apache Tribes for the taking of millions of acres of Apache their lands, the lands for which the Western Apache tribes received compensation did not include Chi'chil Biłdagoteel (Oak Flat).   Id. at ¶ 22 & fn. 7, p. 9.

The defendants know that the Oak Flat's ground was a place where multiple tribes would inhabit and gather peaceably.  Id. at ¶ 19 & fn. 5, p. 7.  Oak Flat, is a primary activity area for a much larger cultural landscape.  Id. at ¶ 27, p. 11. Apache cultural experts, knowledge holders representing other regional tribes, and professional archaeologists have recognized Oak Flat as a local hub for at least ten centuries of residence, food gathering, and ceremonial activity.  Id. at ¶ 27, pp. 11-12. Pottery fragments, engravings on boulders and cliff faces, roasting areas, and remnants of diverse house structures and other activity areas surround the grove and contribute to Chi'chil

Biłdagoteel Oak Flat historical significance, sense of place, and what is referred to as potency. Id. at ¶ 27, p. 12.

Multiple tribes' oral histories, historical documents, and archaeological studies obliged the U.S. Forest Service to nominate, and the Keeper of the U.S. National Register to list, Chi'chil Biłdagoteel in the National Register of Historic Places. Id. at ¶ 28, p. 12. Chi'chil Biłdagoteel's landforms, springs, woodlands, canyons, and religious sites collectively embody and define a 4,309-acre cultural landscape of past and ongoing use by and high significance to Western Apache people. Id. at ¶ 28, p. 12.

The 4,309-acre National Register District encompasses the entirety of the 2,422-acre parcel of the Western Apaches' Treaty Territory and Western Apache ancestral land proposed for the land exchange. Id. at ¶ 29, p. 12. Besides their high disdain for destruction to further personal profit, many traditional Western Apache people also view such reckless behavior as extremely dangerous intrusions of secular concerns into highly sensitive and sacred domains of limitless natural and supernatural forces. Id. at ¶ 30, p. 12.

That is consistent with traditional Apache ways, as Declarant Cranston Hoffman, Jr., an Apache Traditional Practitioner and Medicine Man who conducts the Apache Holy Grounds Ceremony, explains:

> *To have a land exchange occur at Oak Flat and to have destruction of this spiritual place by mining—these actions will have a direct, negative effect on me and members of the Holy Ground group who assist me in conducting these ceremonies. The prayers we have offered will be disrupted, the negative things extracted will resurface and we believe that these negative elements will come back to hurt us, our loved ones, and/or our tribal community. Our religious beliefs in the good that we do by conducting prayers at a special, holy place will be broken. We*

MOTION FOR TRO AND PRELIMINARY INJUNCTION                                                9

> *do not want this for our People, for our Future and for Ourselves. Just as I served to defend this Country as a soldier in the Army, I serve my People to defend our traditional Apache Way of Life as an Apache Medicine Man who conducts the Apache Holy Grounds Ceremony at Oak Flat. I request that our declarations be heard and considered fairly and in good faith.*

Declaration of Cranston Hoffman, Jr. ¶12, p.3.

And, Naelyn Pike shares that understanding and belief system with the Court from Apache women's perspective:

> *We believe that the place the ceremony takes place is the life thread forever connecting the place and the girls who have their ceremony there, and their direct connection to the land. The destruction of Oak Flat will not only destroy the land, water, plants, animals, cultural history, historical artifacts, and Apache religious beliefs seated there, but it will also harm these girls' life and their connection to their rebirth.*

Declaration of Naelyn Pike ¶ 12 pp.5-6.

> *Even though the United States has tried to steal Oak Flat away from us, we have never given up or sold that Treaty land. Our traditional Apache religion does not even allow us to do such a bad thing as that. Oak Flat is ours and always has been since time immemorial, long before the United States of America ever existed.*

Nosie Decl., ¶ 2 p.2.

**The Ninth Circuit Standards for Motions for Temporary Restraining Order**

The standards for a temporary restraining order and a preliminary injunction are essentially the same. See, e.g., *Nken v. Holder*, 556 U.S. 418, 434 (2009); *Wash. v. Trump*, 847 F.3d 1151, 1164 (9th Cir. 2017). A plaintiff seeking a preliminary injunction must show "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The standard does not require a plaintiff to show that it is more likely than not that

it will win on the merits, it must only show that there is a "'substantial case for relief on the merits.'" *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir. 2012) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011)).

The Ninth Circuit applies a "sliding scale" approach, in which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). When a plaintiff has met this standard, a court may issue an injunction to preserve the environmental *status quo* pending a final decision on the merits. *Western Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204, 1218–19 (D. Idaho 2018).

Unless the Court grants the injunctive relief requested here, Apache Stronghold and its Western Apache members will definitely suffer serious harm because destruction of Apache religious freedom and religious beliefs cannot be mitigated, is not fungible, and cannot be commodified.

Furthermore, since the publication of the FEIS will immediately enable the defendants to convey Oak Flat away, the only way to protect the plaintiff's legal interests in the land and in their Constitutional rights is for the Court to issue an order to maintain the *status quo*, pending a final decision on the merits of the serious claims and serious questions in this case.

There is no mandate on the defendants to publish the FEIS this Friday, or any day this month, or next. As recently as this past July the proposed publication date was April

2021, and just a few months before that the proposed publication date was a year from now, in December 2021.

In deciding whether to grant a motion for TRO, courts look to substantially the same factors that apply to a court's decision on whether to issue a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A plaintiff seeking a preliminary injunction generally must show that: (1) he or she is likely to succeed on the merits; (2) he or she is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his or her favor; and (4) that an injunction is in the public interest. *Id.* at 20 (rejecting the Ninth Circuit's earlier rule that the mere "possibility" of irreparable harm, as opposed to its likelihood, was sufficient, in some circumstances, to justify a preliminary injunction).

The Supreme Court's decision in *Winter*, however, did not disturb the Ninth Circuit's alternative "serious questions" test. *All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127, 1131-32 (9th Cir. 2011). Under this test, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132. Thus, a preliminary injunction may be granted "if there is a likelihood of irreparable injury to plaintiff; there are serious questions going to the merits; the balance

of hardships tips sharply in favor of the plaintiff; and the injunction is in the public interest." *M.R. v. Dreyfus*, 697 F.3d 706, 725 (9th Cir. 2012).

In considering irreparable harm for a contested TRO, the Court is not limited only to harm that may occur before a preliminary injunction motion can be heard. Instead, when a plaintiff seeks preliminary injunctive relief, the Court may look to whether the plaintiff has shown a likelihood of irreparable harm occurring between the time of the motion and when a final decision on the merits can be entered. Additionally, "a temporary restraining order serves a purpose different from that of a preliminary injunction. 'The purpose of a temporary restraining order is to preserve an existing situation *in statu quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction.'" *Garcia v. Yonkers Sch. Dist.*, 561 F.3d 97, 107 (2d Cir. 2009) (quoting *Pan Am. World Airways, Inc. v. Flight Eng'rs' Int'l Ass'n, PAA Chapter*, 306 F.2d 840, 842-43 (2d Cir. 1962)).

**PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF**

A temporary restraining order and an injunction should issue because irreparable injury to Plaintiffs' interests will occur from alienating the Oak Flat land and all it contains, spiritually and environmentally (those are not separate aspects but parts of a whole), from the Western Apaches by the mere conveyance. The Supreme Court has noted that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Where a proposed action

will harm a plaintiff environmental group's members' ability to "view, experience, and utilize" an area in its undisturbed state, they suffer irreparable harm. *See Cottrell*, 632 F.3d at 1135 (irreparable injury from logging that would harm plaintiffs' ability to enjoy area in its undisturbed state).

This applies precisely to the Western Apaches relationship to Oak Flat in many truly profound ways as Naelyn Pike, Dr. Wendsler Nosie, and Cranston Hoffman, Jr., have declared at the outset of this case. And the message is consistent with what the Western Apaches have been sharing with the world ever since this terrible project was proposed many years ago.

> *If the Land Exchange is permitted to move forward through finalization of a flawed Draft Environmental Impact Statement ("DEIS") process, the mining corporation and TNF, both acknowledge that the mine will cause a vast subsidence in the earth, destroying our Sacred Oak Flat, our religion, and*
> *with that, destroying our ability to have and preserve our traditional Apache way of prayers, our religious beliefs and ceremonies, and our religious Apache way of life.*

Nosie Decl., ¶ 12 p. 5.

And it certainly also applies to fundamental human rights and rights guaranteed in the U.S. Constitution, such as the Free Exercise of Religion, the Right to Petition for Redress and for Remedy, and the Right to Due Process and to have adequate and effective notice. Reasonable steps must be taken to give potentially interested parties notice of an action and an opportunity to respond and notice by publication—or online news reports, as in this case—may be insufficient if the names and addresses of non-resident parties are available. See, *e.g.*, *Mullane v. Central Hanover Bank & Trust*, 339 U.S. 306, 315 (1950):

> "But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness, and hence the constitutional validity of, any chosen method may be defended on the ground that it is, in itself, reasonably certain to inform those affected."

Apache Stronghold and its spokesperson, former San Carlos Apache Tribe Councilman and Chairman Dr. Wendsler Nosie, Sr., have been involving themselves with the Forest Service officials running this copper mine project from the very beginning, and they are well known to the responsible Forest Service officials at the Tonto National Forest:

> *We said for years, Resolution Copper's mining operations will have devastating impacts on our history, our culture, our religious practices, and the natural resources and environment of this area, especially the region's water supply.*
>
> *\*\*\*\**
>
> *The analysis of the Tribal Values and Concerns focuses the impacts of the proposed Land Exchange and Resolution Copper Mine on the past without recognizing the current presence of religious and cultural practices that have endured at Oak Flat for centuries. This erasure of Native Americans in contemporary terms perpetuates the genocidal history of America.[7]*

Nosie Decl., ¶ 15 p. 5.

At an injunction hearing we can hear all about how familiar the Tonto National Forest was with Apache Stronghold and its members, especially Dr. Nosie. It is scandalous after all that has preceded in the land exchange scheme and latest big copper

---

[7] See, *e.g.*, "Earth, Wind and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874," Welch, John R., Sage Open Journal, vol.7, no.4 (October-December 2017).
Available online at https://journals.sagepub.com/doi/full/10.1177/2158244017747016 .

MOTION FOR TRO AND PRELIMINARY INJUNCTION                                             15

mine prospect in Arizona, that the defendants would pull such a horrible stunt as their January 4th sneak attack FEIS news.

**THE BALANCE OF HARMS WEIGHS IN FAVOR OF AN INJUNCTION**

To determine whether injunctive relief is appropriate, courts apply a "traditional balance of the harms analysis." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 737 (9th Cir. 2001). "[W]hen environmental injury is 'sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment.'" *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988) (quoting *Amoco Prod.*, 480 U.S. at 545).

In *Cottrell*, the Ninth Circuit found the balance of hardships between the parties tipped in favor of an environmental plaintiff and enjoined a 1,652-acre timber sale. 632 F.3d at 1134–38. The court determined the plaintiff suffered harm not only because the timber sale would eliminate the plaintiff's ability to enjoy the subject lands in their undisturbed state, but because it had been deprived of its ability to participate in the administrative appeals process, which could have resulted in significant changes to the proposed project. *Id.* at 1137–38.

"In *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510, 92 S.Ct. 609, 611, 30 L.Ed.2d 642 (1972), we recognized that the right of access to the courts is an aspect of the First Amendment right to petition the Government for redress of grievances….going to a judicial body for redress of alleged wrongs…stands apart from other forms of action directed at the alleged wrongdoer." *Bill Johnson's Restaurants, Inc.*

*v. National Labor Relations Board*, 461 U.S. 731, 741 (1983). See, Cover, Benjamin Plener, "The First Amendment Right to a Remedy," 50 Yale Law Rev. 1741 (2017)("This Article fills this gap in First Amendment theory by presenting the first systematic account of the right to petition the courts that expands the concept of court access from procedural forum access to substantive remedial access — guaranteeing the right of a legally injured person to obtain a meaningful remedy.").

**AN INJUNCTION IS IN THE PUBLIC INTEREST**

It is indisputable that the public interest of all Americans would be disserved and betrayed if the Forest Service were to convey land away to foreign conglomerates that the United States did not own but was instead Western Apache land held and managed in trust by the Forest Service as the federal land management agency and trustee. And the Ninth Circuit has "held time and again that the public interest in preserving nature and avoiding irreparable injury outweighs economic concerns." *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007), *vacated on rehearing en banc on other grounds*, 537 F.3d 981 (9th Cir. 2008).

**CONCLUSION**

For the reasons stated above, on behalf of its traditional Western Apache members Apache Stronghold respectfully requests that this honorable Court issue the prayed for relief as requested in the Motion for Temporary Restraining Order and Preliminary Injunction.

Plaintiff also respectfully request that, if the Court grants the motion for injunctive relief, the Court waive the bond requirement of Rule 65(c). Exercise of the Court's discretion to waive bond is warranted because the Native American cultural and religious preservation organization here seeks to enforce essential and significant public rights and basic human rights and a substantial bond requirement would have a chilling effect on future efforts to vindicate public interests and basic human rights. *See, e.g.*, *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Ag'y*, 766 F.2d 1319, 1325 (9th Cir. 1985); *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

Dated: January 13, 2021					Respectfully submitted,


						/s/ Michael Nixon
						Michael V. Nixon (OR Bar # 893240)
						(*pro hac vice* application pending)
						101 SW Madison Street #9325
						Portland OR 97207
						Telephone: 503.522.4257
						Email: michaelvnixon@yahoo.com


						/s/ Clifford Levenson
						Clifford Levenson (AZ Bar # 014523)
						5119 North 19th Avenue, Suite K
						Phoenix, AZ 85015
						Telephone: 602.258.8989
						Fax: 602.544.1900
						Email: cliff449@hotmail.com

						*Attorneys for Apache Stronghold*