JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

TYLER M. ALEXANDER (CA Bar No. 313188)
REUBEN S. SCHIFMAN
Trial Attorneys
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
Alexander: (202) 598-3314
Schifman: (202) 305-4224
tyler.alexander@usdoj.gov
reuben.schifman@usdoj.gov

*Attorneys for Defendants*

## THE UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA
## TUCSON DIVISION

| | |
|---|---|
| Apache Stronghold,<br><br>             Plaintiffs,<br><br>v.<br><br>United States of America, *et al.,*<br><br>             Defendants. | CIVIL NO. 2:21-cv-00050-CDB<br><br>**OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |

1

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 2

    I.    The Tonto National Forest ................................................................................. 2

    II.   The Southeast Arizona Land Exchange and Conservation Act ................... 3

STANDARD OF REVIEW ............................................................................................. 3

ARGUMENT ..................................................................................................................... 4

    I.    Plaintiffs Lack Standing for Several of their Claims ................................... 4

        a.    Apache Stronghold lacks standing to press the rights of a non-party tribe ........................................................................................ 5

        b.    Apache Stronghold lacks standing to challenge publication of notice of the FEIS ................................................................... 7

    II.   Plaintiff Has No Likelihood of Success on the Merits ................................ 8

        a.    Plaintiff is not likely to succeed on its Due Process claim ............... 9

        b.    Plaintiff is not likely to succeed on its Petition Clause claim ......... 11

        c.    Plaintiff is not likely to succeed on its Breach of Trust claim ........ 13

        d.    Plaintiff has not shown a "substantial burden" on their religious exercise and thus is not likely to succeed on the merits of its RFRA claim ............................................................... 16

            i.   Plaintiff and its members Have Not Been Denied a Government Benefit Based on their Religious Beliefs .................................... 19
            ii.  Plaintiff Has Not Been Coerced to Change Its Religious Beliefs Religious Beliefs ............................................................. 20

        iii.   Construction on public lands is, as a matter of law, not a "substantial burden" on religion ...................................... 21

        e.    Plaintiff is not likely to succeed on the merits of the Free Exercise Clause claims ......................................................... 24

    III.  Plaintiffs Face No Immediate, Irreparable Harm From the Land Transfer ............................................................................................. 27

i

IV.    The Balance of Hardships and Public Interest Weigh Against an
       Injunction ................................................................................... 28

CONCLUSION ....................................................................................... 29

1

## TABLE OF AUTHORITIES

2

3 **Cases**

4 *All. for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................ 3, 28
5

6 *Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40 (1999)................................................................................ 10

7 *Am. Motorcyclist Ass'n v. Watt,*
8   714 F.2d 962 (9th Cir. 1983) ............................................................... 29

9 *Am. Trucking Associations, Inc. v. City of Los Angeles,*
    559 F.3d 1046 (9th Cir. 2009) ............................................................. 29
10

*Amoco Prod. Co. v. Vill. of Gambell,*
11   480 U.S. 531 (1987).............................................................................. 27

12 *Arbaugh v. Y & H Corp.,*
13   546 U.S. 500 (2006)................................................................................ 5

14 *Bd. of Regents of State Colleges v. Roth,*
    408 U.S. 564 (1972).............................................................................. 10
15

16 *Borough of Duryea, Pa. v. Guarnieri,*
    564 U.S. 379 (2011).............................................................................. 12

17 *Bowen v. Doyle,*
18   880 F. Supp. 99 (W.D.N.Y. 1995)........................................................ 30

19 *Boyd v. Etchebehere,*
    No. 17-16750, 2018 WL 3569027 (9th Cir. July 25, 2018) ................. 25
20

21 *Burwell v. Hobby Lobby Stores, Inc.,*
    134 S. Ct. 2751 (2014).......................................................................... 16

22 *Callahan v. Woods,*
23   736 F.2d 1269 (9th Cir. 1984) ............................................................. 19

24 *Camp v. U.S.,*
    *BLM,* 183 F.3d 1141 (9th Cir. 1999) ............................................... 9, 11
25

26 *Canatella v. Stovitz,*
    365 F. Supp. 2d 1064 (N.D. Cal. 2005)................................................ 12

27 *Castro Rivera v. Fagundo,*
    310 F. Supp. 2d 428 (D.P.R. 2004) ..................................................... 11
28

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah (Lukumi)*,
    508 U.S. 520 (1993)..................................................................... 25, 26, 27

*City of Boerne v. Flores*,
    521 U.S. 507 (1997)............................................................................... 16, 17

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ..................................................................................... 5

*Dusenbery v. United States*,
    534 U.S. 161 (2002).................................................................................... 11

*Emp't Div., Dep't of Human Res. of Or. v. Smith*,
    485 U.S. 660 (1988) .................................................................................. 19

*Employment Division v. Smith.*,
    494 U.S. 872 (1990).................................................................................. 16

*Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947) ...................................................................................... 19

*Fernandez v. Mukasey*,
    520 F.3d 965 (9th Cir. 2008) .................................................................... 25

*Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*,
    915 F. Supp. 2d 1138 (C.D. Cal. 2012) ..................................................... 3

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) .................................................................... 28

*Givens v. Newsom*,
    459 F. Supp. 3d 1302 ............................................................................... 12

*Gladstone Realtors v. Vill. of Bellwood*,
    441 U.S. 91 (1979).................................................................................... 6

*Golden Hill Paugussett Tribe of Indians v. Weicker*,
    39 F.3d 51 (2d Cir. 1994) .......................................................................... 6

*Gros Ventre Tribe v. United States*,
    469 F.3d 801 (9th Cir. 2006) .................................................................... 14

*Guam v. Guerrero*,
    290 F.3d 1210 (9th Cir. 2002) .................................................................. 18

*Gunn v. Minton*,
    568 U.S. 251 (2013).................................................................................... 4

*Hackford v. Babbitt*,
    14 F.3d 1457 (10th Cir. 1994) ................................................................... 6

*Hall v. United States Dep't of Agric.*,
No. 20-16232, 2020 WL 7777888 (9th Cir. Dec. 31, 2020) ........................... 8

*Heald v. D.C.*,
259 U.S. 114 (1922) ............................................................................................ 6

*Houchins v. KQED, Inc.*,
438 U.S. 1 (1978) ............................................................................................. 12

*Inter Tribal Council of Arizona, Inc. v. Babbitt*,
51 F.3d 199 (9th Cir. 1995) ............................................................................ 14

*James v. Watt*,
716 F.2d 71 (1st Cir. 1983) ............................................................................... 6

*Jones v. Flowers*,
547 U.S. 220 (2006) ......................................................................................... 11

*Jones v. Williams*,
791 F.3d 1023 (9th Cir. 2015) ........................................................................ 25

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375, 114 S. Ct. 1673, 128 L.Ed.2d 391 (1994) ................................. 4

*La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*
(*"La Cuna II"*),
No. CV 11-00400 DMG, 2013 WL 4500572 at *10 (C.D. Cal. Aug. 16, 2013) .......... 20

*La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior*
(*"La Cuna III"*),
No. 2:11-cv-00395-ODW, 2012 WL 2884992, *7 (C.D. Cal. July 13, 2012) ........ 20, 21

*Lands Council v. McNair*,
537 F.3d 981 (9th Cir. 2008) ............................................................................ 4

*Lane v. Peña*,
518 U.S. 187 (1996) ......................................................................................... 18

*Lone Wolf v. Hitchcock*,
187 U.S. 553 (1903) ......................................................................................... 15

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ....................................................................................... 5, 7

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988) ................................................................................... 22, 23

*Marceau v. Blackfeet Hous. Auth.*,
455 F.3d 974 (9th Cir. 2006) .......................................................................... 14

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ........................................................................................... 27

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ................................................................................................ 9

*McDonald v. Smith,*
    472 U.S. 479, (1985) ............................................................................................. 12

*McGirt v. Oklahoma,*
    140 S. Ct. 2452 (2020) .......................................................................................... 15

*Minnesota State Bd. for Cmty. Colleges v. Knight,*
    465 U.S. 271 (1984) .............................................................................................. 12

*Monsanto Co. v. Geertson Seed Farms,*
    561 U.S. 139 (2010) ................................................................................................ 4

*Morongo Band of Mission Indians v. FAA,*
    161 F.3d 569 (9th Cir. 1998) ................................................................................ 14

*Morton v. Mancari,*
    417 U.S. 535 (1974) .............................................................................................. 30

*Mullane v.Cent. Hanover Bank & Tr. Co.,*
    339 U.S. 306, (1950) ...................................................................................... 10, 11

*Munaf v. Geren,*
    553 U.S. 674 (2008) ................................................................................................ 3

*Navajo Nation v. U.S. Forest Serv.,*
    535 F.3d 1058 (9th Cir. 2008) .................................... 17, 18, 19, 20, 21, 22, 24

*Navajo Nation v. United States Dep't of the Interior,*
    No. CV-03-00507-PCT-GMS, 2019 WL 3997370 (D. Ariz. Aug. 23, 2019) ............. 15

*Nken v. Holder,*
    556 U.S. 418 (2009) .............................................................................................. 29

*O'Bannon v. Town Court Nursing Ctr.,*
    447 U.S. 773 (1980) .............................................................................................. 10

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
    762 F.2d 1374 (9th Cir. 1985) .............................................................................. 28

*Oklevueha Native Am. Church of Haw., Inc. v. Holder,*
    676 F.3d 829 (9th Cir. 2012) ................................................................................ 18

*Powers v. Sec'y, Fla. Dep't of Corr.,*
    691 F. App'x 581 (11th Cir. 2017) ....................................................................... 28

*Prairie Band of Potawatomi Indians v. Pierce.*,
  253 F.3d 1234 (10th Cir. 2001) ................................................................. 30

*Raines v. Byrd*,
  521 U.S. 811 (1997) .................................................................................... 5

*Robinson v. Salazar*,
  838 F. Supp. 2d 1006 (E.D. Cal. 2012) .................................................... 13

*Ruiz–Diaz v. United States*,
  703 F.3d 483 (9th Cir. 2012) .................................................................... 21

*San Jose Christian Coll. v. City of Morgan Hill*,
  360 F.3d 1024 (9th Cir. 2004) .................................................................. 27

*Seneca Constitutional Rights Org. v. George*,
  348 F. Supp. 51 (W.D. N.Y. 1972) ............................................................. 6

*Seneca-Cayuga Tribe of Oklahoma v. Oklahoma*,
  874 F.2d 709 (10th Cir. 1989) .................................................................. 30

*Sherbert v. Verner*,
  374 U.S. 398 (1963) ............................................................................ 17, 19

*Sierra Forest Legacy v. Rey*,
  577 F.3d 1015 (9th Cir. 2009) .................................................................... 3

*Singh v. Carter*,
  185 F. Supp. 3d 11 (D.D.C. 2016) ............................................................ 28

*Singleton v. Wulff*,
  428 U.S. 106 (1976) .................................................................................. 5, 6

*Smith v. Ark. State Highway Emps., Local,*
  *1315*, 441 U.S. 463 (1979) ...................................................................... 12

*Snoqualmie Indian Tribe v. FERC*,
  545 F.3d 1207 (9th Cir. 2008) .............................................................. 22, 24

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ............................................................................. 4, 5

*Stevens Cty. v. U.S. Dep't of Interior*,
  507 F. Supp. 2d 1127 (E.D. Wash. 2007) ........................................... 10, 11

*Stidhem v. Schwartz*,
  No. 2:15-CV-00379-TC, 2017 WL 6887139 (D. Or. Oct. 23, 2017) .......... 25

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................ 7, 8

vii

*Tenacre Found. v. I.N.S.*,
   892 F. Supp. 289 (D.D.C. 1995) ............................................................. 28

*Thomas v. Gay*,
   169 U.S. 264 (1898) ............................................................................... 15

*Twin Rivers Paper Co. LLC v. SEC*,
   934 F.3d 607 (D.C. Cir. 2019) ............................................................. 4, 5

*U.S. ex rel. Chunie v. Ringrose*,
   788 F.2d 638 (9th Cir. 1986) .................................................................... 2

*Uintah Ute Indians v. United States*,
   28 Fed. Cl. 768 (1993) ........................................................................... 14

*United States v. California*,
   436 U.S. 32 (1978) ................................................................................... 2

*United States v. Lara*,
   541 U.S. 193 (2004) ............................................................................... 16

*United States v. Mitchell*,
   463 U.S. 206 (1983) ............................................................................... 18

*United States v. Navajo Nation*,
   537 U.S. 488 (2003) ............................................................................... 15

*United States v. Nordic Vill., Inc.*,
   503 U.S. 30 (1992) ................................................................................. 18

*United States v. Oakland Cannabis Buyers' Co-op.*,
   532 U.S. 483 (2001) ............................................................................... 29

*United States v. Sherwood*,
   312 U.S. 584 (1941) ............................................................................... 18

*United States v. White Mountain Apache Tribe*,
   537 U.S. 465 (2003) ............................................................................... 15

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*,
   454 U.S. 464 (1982) ................................................................................. 5

*Warth v. Seldin*,
   422 U.S. 490 (1975) ................................................................................. 6

*Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*,
   443 U.S. 658 (1979) ................................................................................. 6

*Wayte v. United States*,
   470 U.S. 598 (1985) ............................................................................... 12

1

2

*Williams v. Mukasey*,
    531 F.3d 1040 (9th Cir. 2008) ........................................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .......................................................................... 3, 4, 27, 28

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) ................................................................................... 17, 21

*WMX Techs., Inc. v. Miller*,
    197 F.3d 367 (9th Cir. 1999) .............................................................................. 12

**Statutes**

16 U.S.C. § 539p ................................................................................................ 1, 3

16 U.S.C. § 539p(a) ................................................................................................. 7

16 U.S.C. § 539p(b)(2) ............................................................................................ 3

16 U.S.C. § 539p(c)(1) ............................................................................................ 8

16 U.S.C. § 539p(c)(10) ..................................................................................... 3, 8

16 U.S.C. § 539p(c)(2) ............................................................................................ 3

16 U.S.C. § 539p(c)(3) ............................................................................................ 3

16 U.S.C. § 539p(c)(5) ............................................................................................ 3

16 U.S.C. § 539p(c)(9)(B) ....................................................................................... 8

16 U.S.C. § 539p(d)(1) ............................................................................................ 3

16 USC § 539p(c)(3)(B) ......................................................................................... 26

42 U.S.C. § 2000bb(a)(5) ...................................................................................... 22

42 U.S.C. § 2000bb(b) .......................................................................................... 17

42 U.S.C. § 2000bb(b)(1) ...................................................................................... 17

42 U.S.C. § 2000bb–1(a)m (b) ............................................................................. 17

5 U.S.C. § 701(b)(1)(A) ........................................................................................ 15

5 U.S.C. § 706(2)(B) ............................................................................................... 7

**Rules**

Fed. R. Civ. P. 12(h)(3) ........................................................................................... 7

**Other Authorities**

139 Cong. Rec. S14461 (daily ed. Oct. 27, 1993) ................................................ 24

ix

H.R. Rep. No. 103–88 (1993) ............................................................................ 17

S. Rep. No. 103–111, *reprinted in* 993 U.S.C.C.A.N. 1892 ..................................... 17, 18

Treaty of Peace, Friendship, Limits, and Settlement With the Republic of Mexico,
9 Stat. 922 (1848) ...................................................................................... 2

U.S. CONST. Amend. I.................................................................................... 12

**INTRODUCTION**

The Southeast Arizona Land Exchange and Conservation Act, 16 U.S.C. § 539p, directs the United States Forest Service to carry out a land exchange with Resolution Copper. Congress, not the Forest Service, made that decision, and it did so in 2014. Now, over six years after the law's passage and on the eve of the exchange, Plaintiff seeks the extraordinary relief of a preliminary injunction, arguing that the exchange violates tribal property rights or, alternatively, that Congress's decision to exchange the real property of the United States violates Plaintiff's members' constitutional and statutory rights to practice their religion free from government interference.

No relief should issue. First, Plaintiff lacks standing to press the purported property or treaty rights of Indian Tribes not before the Court. Even where Plaintiff may have standing, its claims fail. Because Plaintiff has failed to identify a cognizable property interest in the lands at issue, it has not been deprived due process. Even if Plaintiff had identified a property interest, Plaintiff had the opportunity to participate in the administrative process that resulted in the Final Environmental Impact Statement (FEIS). Plaintiff's Petition Clause claim is defective because the government has not restricted Plaintiff's members' associational or speech interests and, again, Plaintiff had the opportunity to participate in the administrative process. Plaintiff's breach of trust claim fails for at least three reasons: (1) the basis of this claim is a purported right held by a Tribe, not Plaintiff; (2) the land at issue is not held in trust for the benefit of an Indian Tribe; and (3) as a matter of law, an action by Congress cannot breach a tribal trust. Finally, Plaintiff's Religious Freedom Restoration Act and Free Exercise Clause claims fail because the government's disposition of its own property cannot—as a matter of law—create a substantial burden on Plaintiff's members' religious exercise. That each of Plaintiff's claims fail on the merits ends the Court's inquiry.

As to the equities, Plaintiff has not demonstrated an imminent, irreparable harm from the land transfer itself. Plaintiff's feared harm flows from mining activity that is not authorized or carried out by the Forest Service and is years away. Moreover, the equities

1

favor the government, as Congress has determined that the public interest is served by the development of mineral resources in Arizona and the acquisition of the conservation lands. There is no basis for this Court to set aside the reasoned decision of Congress.

Because Plaintiff has no likelihood of success on the merits, and because the public interest favors allowing the land transfer to go forward, this Court should deny Plaintiff's motion.

## STATEMENT OF FACTS

### I.   <u>The Tonto National Forest</u>

The Treaty of Guadalupe Hidalgo, signed on February 2, 1848 and entered into force on May 30, 1848, brought an end to the Mexican–American War. 9 Stat. 922 (1848); *U.S. ex rel. Chunie v. Ringrose,* 788 F.2d 638, 641 (9th Cir. 1986). In that treaty, Mexico ceded land in the present-day state of Arizona—including the Oak Flats area at issue here—to the United States. 9 Stat. 922 (1848)*; United States v. California,* 436 U.S. 32, 34 n. 3 (1978) (stating that, under the Treaty, "all nongranted lands previously held by the Government of Mexico passed into the federal public domain"). The United States has never alienated title to the lands at issue in this suit.

The Tonto National Forest—which includes Oak Flat—was created out of public reserve land of the United States in 1905 and expanded by proclamation of President Theodore Roosevelt on January 13, 1908. Ex. B. Today, the forest contains over 2.9 million acres, ranging from Sonoran Desert cacti and flat lands to the highlands of the Mogollon Rim. It is the largest national forest in Arizona, the seventh largest nationally, and is heavily used, with approximately three-million visitors annually. While mostly contiguous, the forest does have several inholdings,[1] including four for which title will be acquired in the land exchange with Resolution Copper: (1) the 148-acre Tangle Creek Parcel; (2) the 147-acre Turkey Creek Parcel; (3) the 149-acre Cave Creek Parcel; and (4) the 640-acre East Clear Creek Parcel.

---

[1] Inholdings are private lands surrounded by National Forest System land.

**II.    The Southeast Arizona Land Exchange and Conservation Act**

In December, 2014, President Obama signed the Southeast Arizona Land Exchange and Conservation Act. 16 U.S.C. § 539p. The Act directs the Forest Service to exchange 2,422 acres on the Tonto National Forest to Resolution Copper for 5,459 acres of conservation lands. *Id.* § 539p(b)(2),  (d)(1). The Act requires, *inter alia*, that the Forest Service: (1) engage in "consultation with affected Indian tribes," *id.* § 539p(c)(3); (2) obtain appraisals of the land to be exchanged, *id.* § 539p(c)(4); (3) issue special permits to Resolution Copper; (4) prepare a final environmental impact statement (FEIS) to inform future agency decision making associated with the exchange, *id.* § 539p(c)(9); and (5) convey title to the exchanged land "[n]ot later than 60 days after the publication of the [FEIS] . . . ."  *Id.* § 539p(c)(10) .

On January 15, 2021, the Forest Service published the FEIS. The land exchange will not go forward any sooner than 55 days from the date of publication. Ex. A ¶ 7. A subsidence event caused by mining at Oak Flat is not imminent. *Id.* ¶ 8.

**STANDARD OF REVIEW**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). To obtain a preliminary injunction, a plaintiff must establish that (1) it is likely to prevail on the merits of its substantive claims, (2) it is likely to suffer imminent, irreparable harm absent an injunction, (3) the balance of equities favors an injunction, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20, 22-23.; *accord Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).[2]  This

---

[2] The Ninth Circuit has also articulated an alternate formulation of the *Winter* test, suggesting that injunctive relief is appropriate where plaintiffs can show "serious questions" going to the merits and that "the balance of hardships tips sharply" towards the plaintiffs. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). To the extent that the "serious questions" formulation is different that the "likelihood" standard, *see e.g. Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F.

3

exacting standard applies with full force to environmental cases. *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *Lands Council v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc)). Failure to demonstrate any one of the required elements precludes preliminary relief. *Winter*, 555 U.S. at 24.

## ARGUMENT

Initially, Plaintiff lacks standing for several of its claims, and so this Court must dismiss those claims for want of jurisdiction. Even if Plaintiff has standing, its claims fail. Finally, while Defendants do not question the sincerity of Plaintiff's religious and historical connection to the lands at issue, Congress has decided this land exchange should go forward, and any construction, mining or ground disturbance at the site is not imminent. Plaintiff cannot meet its burden for the "extraordinary remedy" of a preliminary injunction, and this Court should deny Plaintiff's motion.

## I.   Plaintiffs Lack Standing for Several of their Claims

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L.Ed.2d 391 (1994)). Under the Constitution "the 'judicial Power of the United States' is limited to 'Cases' or 'Controversies,' U.S. Const. art. III, §§ 1-2, and the requirement of standing is 'rooted in the traditional understanding of a case or controversy.'" *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 612–13 (D.C. Cir. 2019) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016)).

The "'irreducible constitutional minimum' of standing" requires that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Lujan v.*

Supp. 2d 1138, 1141 n.6 (C.D. Cal. 2012) (declining to apply the serious questions standard), Plaintiff here has not satisfied its burden under either standard.

1     *Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). The standing inquiry is "especially

2     rigorous" where "reaching the merits of the dispute would force [the court] to decide

3     whether an action taken by one of the other two branches of the Federal Government was

4     unconstitutional," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013)

5     (quoting *Raines v. Byrd*, 521 U.S. 811, 819-20 (1997)), and where the "plaintiff's

6     asserted injury arises from the government's allegedly unlawful regulation (or lack of

7     regulation) of *someone else*," *Defs. of Wildlife*, 504 U.S. at 562. "The party invoking

8     federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at

9     561; *see also Twin Rivers Paper Co.*, 934 F.3d at 613 (same). Absent subject-matter

10    jurisdiction, the court must dismiss a case. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500,

11    506–07 (2006); Fed. R. Civ. P. 12(h)(3).

12
13          **a. Apache Stronghold lacks standing to press the rights of a non-party tribe.**

14        "To establish injury in fact, a plaintiff must show that he or she suffered 'an

15    invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

16    imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548

17    (quoting *Defs. of Wildlife*, 504 U.S. at 560). Adherence to these requirements "tends to

18    assure that the legal questions presented to the court will be resolved, not in the rarified

19    atmosphere of a debating society, but in a concrete factual context conducive to a realistic

20    appreciation of the consequences of judicial action." *Valley Forge Christian Coll. v. Ams.*

21    *United for Separation of Church & State*, 454 U.S. 464, 472 (1982).

22        Whether a plaintiff "alleges that [the defendant] violated *his* statutory rights"

23    rather than "the statutory rights of other people" is a question of "particularization" for an

24    Article III injury. *Spokeo, Inc.*, 136 S. Ct. at 1548. Plaintiff thus cannot assert claims on

25    behalf of other individuals or entities. *See Singleton v. Wulff,* 428 U.S. 106, 114 (1976)

26    ("Ordinarily, one may not claim standing in this Court to vindicate the

27    constitutional rights of some third party") (citations and internal quotation

28    omitted); *Golden Hill Paugussett Tribe of Indians v. Weicker,* 39 F.3d 51, 58 (2d Cir.

1    1994) (standing requires that "plaintiff assert its own legal rights, and not those

2    of third parties"). "This principle of third-party standing 'limit[s] access to the federal

3    courts to those litigants best suited to assert a particular claim.'"  *Gladstone Realtors v.*

4    *Vill. of Bellwood*, 441 U.S. 91, 100 (1979)). Moreover, the third-party standing principle

5    "also recognizes that ... the third-party right-holder may not in fact wish to assert the

6    claim in question." *Id.* (citing *Singleton v. Wulff*, 428 U.S. 106, 116 (1976)). Courts have

7    consistently applied the third party standing doctrine to litigants' constitutional

8    claims. *See, e.g., Warth v. Seldin,* 422 U.S. 490, 95 (1975); *Heald v. D.C.,* 259 U.S. 114,

9    123 (1922) (plaintiff challenging a statute on constitutional grounds must demonstrate

10   that the unconstitutional nature of the statute injures plaintiff and that the plaintiff is

11   "within the class of persons" with respect to whom the act is unconstitutional).

12          Plaintiff lacks standing because it is attempting to assert the rights of others—

13   namely, the rights of the federally-recognized Indian Tribe or Tribes that it alleges,

14   incorrectly, own the land in question in this suit. Plaintiff is a 501(c)(3) non-profit that

15   has as its members tribal members; however, insofar as the asserted injury is based on the

16   interests of a Tribe rather than the individual tribal members or organization's interests,

17   Plaintiff has not been injured and has no standing to remedy the Tribes' asserted injuries.

18   This is because tribal property interests and governmental authority flow from reserved

19   treaty rights and are secured to recognized Indian Tribes as distinguished from individual

20   Indians (or nonprofits that include such Indians as members). *See Washington v.*

21   *Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 679

22   (1979). Numerous cases hold that tribal members lack standing to sue to protect a Tribe's

23   rights. *See, e.g., Golden Hill Paugussett Tribe*, 39 F.3d at 54 n.1 (members could not

24   assert Tribe's claim to land); *Hackford v. Babbitt*, 14 F.3d 1457, 1466 (10th Cir. 1994)

25   (member lacks standing to sue as to tribal asset); *James v. Watt*, 716 F.2d 71, 72 (1st Cir.

26   1983) (individual Indians had no standing to assert tribal rights to land), *cert. denied*, 469

27   U.S. 1209 (1984) (citations omitted); *Seneca Constitutional Rights Org. v. George*, 348

28   F. Supp. 51, 59 (W.D. N.Y. 1972) ("it is established that a tribe has full authority to use

and dispose of tribal property and that no individual Indian has an enforceable right in the property") (citations omitted). Thus, Plaintiff as a nonprofit organization rather than a Tribe as has no standing to assert any claim on behalf of federally-recognized Tribes.

**b. Apache Stronghold lacks standing to challenge publication of notice of the FEIS.**

Plaintiff's Complaint alleges that the Forest Service violated the Fifth Amendment's guarantee of due process and the First Amendment's petition clause by publishing the FEIS without first providing Plaintiff with adequate notice of the agency's intent to publish. ECF No. 1 ¶¶ 43-44, 47. In other words, Plaintiff challenges publication of the FEIS as "contrary to [a] constitutional right." 5 U.S.C. § 706(2)(B). As discussed below, Plaintiff's claim fails on the merits. But more fundamentally, Plaintiff's claim fails because no order from this Court vacating or setting aside the FEIS can redress Plaintiff's actual source of alleged injury: the land transfer.

In order to have standing to sue, Plaintiffs must show that it is likely, as opposed to merely speculative, that a favorable judicial decision will prevent or redress their alleged injury-in-fact. *Summers v. Earth Island Inst.,* 555 U.S. 488, 493 (2009). "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citations omitted). In certain contexts, plaintiffs may press procedural injuries. But those claims cannot proceed in the absence of a redressable injury-in-fact; "a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers*, 555 U.S. at 496.

As this Court has already held, "[t]he sale of the land at issue (and the subsequent mining project) is the action that will allegedly harm Plaintiff . . . ." Jan. 14, 2021 Order, ECF No. 13 at 3. The decision to carry out that land exchange was made by Congress, not the Forest Service. *See* 16 U.S.C. § 539p(a) ("The purpose of this section is to authorize, direct, facilitate, and expedite the exchange of land between Resolution Copper and the

United States."), (c)(1) ("the Secretary is authorized *and directed* to convey to Resolution Copper all right, title, and interest of the United States in and to the Federal land" (emphasis added)), (c)(10) ("Not later than 60 days after the date of publication of the final environmental impact statement, the Secretary *shall* convey all right, title, and interest of the United States in and to the Federal land to Resolution Copper" (emphasis added)). As Plaintiff itself admits, ECF No. 1 ¶ 31, now that the FEIS has been published, the land exchange must go forward within 60 days. 16 U.S.C. § 539p(c)(10). That, too, was decided by Congress, and the Forest Service has no discretion to halt the land exchange or alter its timing.

It is true that the timing of the land exchange keys off of the publication date of the FEIS. *Id.* But the exchange is not contingent on the FEIS. Rather, as Congress has made plain, the purpose of the FEIS is not to inform the land exchange, but to serve:

> as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals for the construction of associated power, water, transportation, processing, tailings, waste disposal or other ancillary facilities.

*Id.* § 539p(c)(9)(B). In other words, Congress mandated preparation of the FEIS to guide future agency decisions related to mining on the exchanged property, not to inform or constrain the Forest Service's obligation to carry out the exchange itself. For this reason, any claim against the FEIS itself—constitutional or otherwise—cannot secure to Plaintiff the relief it seeks: a halt to the land exchange. Plaintiff's alleged injuries-in-fact cannot be redressed by an order vacating or remanding the FEIS, and for this reason Plaintiff lacks standing to press those theories.

## II.    Plaintiff Has No Likelihood of Success on the Merits

Courts deny preliminary relief where a plaintiff is not likely to succeed on the merits. *See, e.g.*, *Hall v. United States Dep't of Agric.*, No. 20-16232, 2020 WL 7777888, at *5 (9th Cir. Dec. 31, 2020) (affirming denial of injunctive relief, finding "likelihood of success on the merits is determinative, so we confine our analysis to that factor."). Such

8

is the case here. Even if Plaintiff had demonstrated sufficient standing for all of its claims—and it has not—those claims each suffer fatal flaws such that Plaintiff is unlikely to succeed on the merits and its request for injunctive relief should be denied on that basis.

### a. Plaintiff is not likely to succeed on its Due Process claim.

Plaintiff first alleges the Federal Defendants violated Plaintiff's due process rights by failing to provide Plaintiff with notice of the publication of the FEIS. This claim fails. Plaintiff lacks a protected liberty or property interest in the publication of the FEIS sufficient to implicate the due process clause. Moreover, the Forest Service's publication of notice in the Federal Register and on a publicly-accessible website created exclusively for this project[3]—the culmination of a years-long environmental review process involving numerous opportunities for public comment—provided notice well above the minimum required under the Due Process clause. *See Camp v. U.S. BLM,* 183 F.3d 1141, 1145 (9th Cir. 1999) ("publication in the Federal Register is legally sufficient notice to all interested or affected persons…") (internal quotation marks omitted).

The Fifth Amendment of the United States Constitution imposes "constraints on government decisions which deprive individuals of 'liberty' or 'property' interests." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (citing U.S. Const. amend V). In this case, Plaintiff has identified no valid deprivation of any property or liberty interest, thus Plaintiff has failed to adequately plead a violation of their due process rights. Moreover, Plaintiff has been accorded sufficient process through the years-long EIS process that encompassed numerous public comment periods and culminated in a publically-available notice in the Federal Register. No additional process is due and Plaintiff's Due Process claim is not likely to succeed.

---

[3] The FEIS is an official publication of the Forest Service. It is publically available at https://www.resolutionmineeis.us/, is admissible under Rule 803(8), and is self-authenticating under Rule 902(5).

1    A claim for violation of procedural due process has two components. First,

2    plaintiffs must show that a protected interest was taken. Second, they must show that the

3    procedural safeguards surrounding the deprivation were inadequate. *See Bd. of Regents of*

4    *State Colleges v. Roth*, 408 U.S. 564, 568–69 (1972). If government action does not

5    deprive an individual of a protected interest, the due process guarantee does not require

6    any hearing or process whatsoever—even if the challenged action adversely affects that

7    individual in other ways. *See e.g., O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773

8    (1980). Thus, "[o]nly after finding the deprivation of a protected interest" by the state

9    may the Court proceed to consider plaintiff's allegations regarding procedural defects in

10   the application of the federal acknowledgment regulations to its petition. *See also Am.*

11   *Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).

12   A property interest protected by the due process clause "results from a legitimate

13   claim of entitlement created and defined by an independent source, such as state or

14   federal law." *Board of Regents of State Colleges,* 408 U.S. at 577; *Stevens Cty. v. U.S.*

15   *Dep't of Interior*, 507 F. Supp. 2d 1127, 1136 (E.D. Wash. 2007). Plaintiff does not claim

16   that it owns the property in question, under federal law such as a treaty, however. Instead,

17   Plaintiff claims "The Western Apaches through their 1852 Treaty continue to have

18   ownership interests in the lands proposed to be exchanged by the Defendants." Complaint

19   p. 17; TRO at 6 ("The land . . . is actually owned by the Western Apache tribes of the

20   greater Apache Nation. Plaintiff is not one of the Federally-recognized Tribes or

21   successors to the signatories of the 1852 treaty."). Plaintiff therefore lacks a protected

22   property interest, even if it were correct—and it is not—that the "Western Apaches" have

23   ownership interests in the property in question.

24   Moreover, even if Plaintiff did have a protected property interest, the publication

25   of the notice in the Federal Register, on top of Plaintiff's ability to participate in the

26   public comment and other aspects of the EIS process more than suffices for due process

27   and the notice requirements thereof. "*Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S.

28   306, (1950), and its progeny provide the 'appropriate analytical framework' for

10

considering the adequacy of notice of government action." *Williams v. Mukasey*, 531 F.3d 1040, 1042 (9th Cir. 2008) (quoting *Dusenbery v. United States,* 534 U.S. 161, 167–68 (2002)). Under that framework, "due process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Jones v. Flowers,* 547 U.S. 220, 226 (2006) (quoting *Mullane,* 339 U.S. at 314). As a general rule, "publication in the Federal Register is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Camp,* 183 F.3d at 1145 (internal quotation marks omitted). Such notice was given here, and this comes on top of the numerous opportunities for comment inherent in the EIS process, including at the scoping stage and after publication of the Draft EIS. Additionally, public notification of the FEIS availability was provided in the Tonto National Forest's Schedule of Proposed Actions, which was updated in early December 2020 that showed the FEIS would be made available in January of 2021.[4]  This process adequately protected Plaintiff's rights. *See, e.g.*, *Castro Rivera v. Fagundo*, 310 F. Supp. 2d 428, 434 (D.P.R. 2004), *aff'd Castro-Rivera v. Fagundo*, 129 F. App'x 632 (1st Cir. 2005) (EIS process "clearly comport[s] with minimum constitutional safeguards"); *Stevens Cty. v. U.S. Dep't of Interior*, 507 F. Supp. 2d 1127, 1137 (E.D. Wash. 2007). In sum, Plaintiff is not entitled to additional process and is not likely to succeed on its Due Process Claim.

### b.  Plaintiff is not likely to succeed on its Petition Clause claim

Plaintiff's second claim is that the notice Federal Defendants provided is "woefully inadequate to provide Plaintiff Apache Stronghold and its members a fair opportunity to defend their rights and to effectively petition the government for redress and remedy." ECF No. 1 ¶ 47. Not only have the Federal Defendants not prohibited

---

[4] The Schedule of Proposed Actions is maintained on the public forest website in accordance with current FS policy (FSH 1909.15) to inform the public about proposed and ongoing projects.

1    Plaintiff from petitioning the government, the Federal Defendants have actively

2    encouraged and provided a forum. As discussed above, Plaintiff and the public at large

3    had numerous opportunities to participate in the years-long EIS process. No more is

4    required under the Petition Clause.

5            The First Amendment protects "the right of the people ... to petition the

6    Government for redress of grievances." U.S. CONST. Amend. I; *see also Borough of*

7    *Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 382 (2011). The right to petition is "an assurance

8    of a particular freedom of expression," and is "generally subject to the same

9    constitutional analysis" as the right to free speech. *Wayte v. United States,* 470 U.S. 598,

10   610 n. 11 (1985) (noting that although "the right to petition and the right to free speech

11   are separate guarantees, they are related and generally subject to the same constitutional

12   analysis"); *Canatella v. Stovitz*, 365 F. Supp. 2d 1064, 1077 (N.D. Cal. 2005).

13           Accordingly, the protections afforded by the Petition Clause have been limited by

14   the Supreme Court to situations implicating an individual's associational or speech

15   interests. *See McDonald v. Smith*, 472 U.S. 479, 482–85, (1985); *WMX Techs., Inc. v.*

16   *Miller*, 197 F.3d 367, 372 (9th Cir. 1999). The Petition Clause "does not impose any

17   affirmative obligation on the government to listen, to respond to or ... to recognize"

18   grievances. *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465

19   (1979); *see also Minnesota State Bd. for Cmty. Colleges v. Knight*, 465 U.S. 271, 283

20   (1984) (observing that "the Constitution does not grant to members of the public

21   generally a right to be heard by public bodies making decisions of policy"). Thus,

22   "[t]here is no constitutional right to have access to particular government information, or

23   to require openness from the bureaucracy." *Houchins v. KQED, Inc.*, 438 U.S. 1, 14

24   (1978); *Givens v. Newsom*, 459 F. Supp. 3d 1302, 1315 (E.D. Cal.), *appeal dismissed*,

25   830 F. App'x 560 (9th Cir. 2020).

26           Plaintiff's argument that it lacked time to "effectively petition the government for

27   redress and remedy," ECF No. 1 ¶ 47, ignores the years of opportunity to comment that

28

predated the EIS discussed above and the limited scope of the Petition Clause. Plaintiff cannot succeed on this claim.

### c. Plaintiff is not likely to succeed on its Breach of Trust claim

Plaintiff's third claim is that the land in question "was to have been managed in trust for the Western Apaches" under the terms of an 1852 treaty and that the land exchange is a breach of trust. ECF No. 1 ¶ 54. This argument fails on numerous levels. As discussed above, the property that forms the basis of Plaintiff's breach of trust claim belongs not to the Plaintiff but rather (accepting *arguendo* Plaintiff's theory) to non-Party Tribes, and so even if Plaintiff had the right of it, it would lack standing to assert this claim. Further, as explained below, the land in question is simply not held in trust for the benefit of Plaintiff or any federally-recognized Tribe. Nor has Plaintiff identified any trust-creating statute or regulation, yet another fatal defect. Finally, the act of Congress at issue in this case cannot—as a matter of law—constitute a breach of trust.

First, Plaintiff's breach of trust claim fails because the land in question is not trust property—that is, it is not held in trust for the benefit of an Indian Tribe. Plaintiff alleges that the land in question "*was to have been* managed in trust for the Western Apaches" ECF No. 1 ¶ 53 (emphasis added), but not that it ever "was" or today "is" held in trust for the benefit of a Tribe. Indeed, Plaintiff identifies no authority that purported to place the property in question in trust for a particular Tribe. The 1852 treaty certainly does not do so. Ex. C. The Treaty only states in general terms that "the government of the United States shall at its earliest convenience designate, settle, and adjust [the Apache's] territorial boundaries. . ." *Id.* But the Treaty does not designate or settle those boundaries, and certainly does not do so in a way that designates the property in question as land held in trust for the benefit of a Tribe. At least two federal courts, in parsing identical language in treaties signed with other tribal groups, have concluded this language does "not recognize title because the boundaries of aboriginal lands were to be settled in the future . . . . the treaty does not designate, settle, adjust, define, or assign limits or boundaries to the Indians. It leaves such matters to the future." *Robinson v. Salazar*, 838 F. Supp. 2d

1006, 1022 (E.D. Cal. 2012); *Uintah Ute Indians v. United States,* 28 Fed. Cl. 768, 789 (1993).

That the land at issue is not held in trust for any Tribe is fatal to Plaintiff's claim. In rejecting a similar claim the Ninth Circuit held that, and in contrast to cases where the United States undertook duties to manage tribal land, there is no duty to manage non-tribal land for the benefit of Tribes:

> [U]nlike [Supreme Court cases], where the tribes sought to impose a specific fiduciary obligation on the United States to manage timber located on *tribal* land, the Tribes here seek to impose a duty on the government to manage resources that exist off of the Reservation. Essentially, this amounts to a duty to regulate third-party use of non-Indian resources for the benefit of the Tribes. We are not aware of any circuit or Supreme Court authority that extends a specific *Mitchell*-like duty to non-tribal resources. Indeed, as we recently stated in *Marceau,* the government does not bear complete fiduciary responsibility unless it has "take[n] full control of a *tribally-owned* resource and manage[d] it to the exclusion of the tribe."

*Gros Ventre Tribe v. United States*, 469 F.3d 801, 812–13 (9th Cir. 2006) (quoting *Marceau v. Blackfeet Hous. Auth.,* 455 F.3d 974, 984 (9th Cir. 2006)) (emphasis in original); *see also Inter Tribal Council of Arizona, Inc. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995) (denying breach of trust claim where property at issue "is not properly the subject of a trust corpus. The off-reservation school was not part of Indian lands. . . . Tribes have no interest in the School Property, which was owned and controlled by the United States government.").

*Gros Venture* stands for the propositions that a breach of trust claim requires a tribal trust corpus, and also that "unless there is a specific duty that has been placed on the government with respect to Indians, the government's general trust obligation is discharged by the government's compliance with general regulations and statutes not specifically aimed at protecting Indian Tribes." *Gros Ventre Tribe*, 469 F.3d at 810 (*quoting Morongo Band of Mission Indians v. FAA*, 161 F.3d 569, 574 (9th Cir. 1998)) (cleaned up). In other words, to state a cognizable claim of breach of trust against the government, a Tribe must "identify a substantive source of law that establishes specific

fiduciary or other duties, and allege that the Government has failed to perform those duties." *United States v. Navajo Nation*, 537 U.S. 488,506 (2003) (holding "[t]he Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute.").

Thus, Plaintiff must (1) identify property held in trust and (2) allege a substantive source of law that creates the specific duty that it alleges the government has violated, or that at least "permits a fair inference that the Government is subject to duties as a trustee." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 474 (2003). *See also Navajo Nation v. U.S. Dep't of the Interior*, No. CV-03-00507-PCT-GMS, 2019 WL 3997370, at *2 (D. Ariz. Aug. 23, 2019). Because the Plaintiff has not identified a specific trust property or a trust-creating statute or regulation, its breach of trust claim fails.

Finally, even had the Plaintiff identified a trust-creating statute, Congress's action cannot itself be a breach of trust. First, no statute waives the United States' sovereign immunity for claims alleging a Congressional breach of a governmental trust. True to its name, the Administrative Procedure Act only provides for review of final *administrative agency* action, not Congressional action. 5 U.S.C. § 701(b)(1)(A). Absent a valid waiver of sovereign immunity, this Court lacks jurisdiction to hear this claim. Second, while this Court may of course enjoin the operation of an unconstitutional statute, an alleged breach of a treaty or tribal trust presents a political question, not a constitutional one. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462 (2020) ("This Court long ago held that the Legislature wields significant constitutional authority when it comes to tribal relations, possessing even the authority to breach its own promises and treaties." (citing *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903))); *Lone Wolf*, 187 U.S. at 565 ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."); *Thomas v. Gay*, 169 U.S. 264, 271 (1898) ("It is well settled that an act of congress may supersede a prior treaty, and

that any questions that may arise are beyond the sphere of judicial cognizance, and must be met by the political department of the government.").

Congress's power to legislate in the realm of Indian affairs is "plenary and exclusive," *United States v. Lara*, 541 U.S. 193, 200 (2004) (citations omitted), and Plaintiff's claim that Congress, through the Southeast Arizona Land Exchange and Conservation Act, has breached a fiduciary duty is not cognizable.

> **d.  Plaintiff has not shown a "substantial burden" on their religious exercise and thus is not likely to succeed on the merits of its RFRA claim.**

Plaintiff's fifth[5] claim is "[t]he Mandate and the Defendants' threatened execution of the Mandate violate Plaintiffs' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*" ECF No. 1 ¶ 78. Because Plaintiff has not alleged a government action that "substantially burdens" their religious exercise and because the action Plaintiff objects to is the disposition of federal property, they are not likely to succeed on the merits of their RFRA claim.

In 1993, Congress enacted RFRA in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). In *Smith*, the Supreme Court addressed whether the Free Exercise Clause of the First Amendment allowed the state of Oregon to deny unemployment benefits to two members of the Native American Church who were fired from their jobs because of their sacramental, yet state-law prohibited use of peyote. *Id.* As the Court later explained, *Smith* "held that, under the First Amendment, 'neutral, generally applicable laws may be applied to religious practices even when not supported by a compelling governmental interest.'" *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 514 (1997)). In so holding, *Smith* departed from the Court's previously employed compelling interest test articulated in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406

---

[5] Federal Defendants address Plaintiff's fourth and sixth claims together in the following section as they both concern the Free Exercise Clause of the First Amendment.

16

U.S. 205 (1972), which, "would have asked whether Oregon's prohibition substantially burdened a religious practice, and, if it did, whether the burden was justified by a compelling government interest." *Boerne*, 521 U.S. at 513 (specifically referencing *Sherbert*). This reduced level of scrutiny by the Court prompted Congress to pass, and President Clinton to sign into law, RFRA.

Under RFRA, the "[g]overnment shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb–1(a), (b).[6]

RFRA does not define "substantial burden," but consistent with Congress's purpose of "restor[ing] the compelling interest test" of *Sherbert* and *Yoder*, courts look to pre-*Smith* cases in construing the term. 42 U.S.C. § 2000bb(b)(1). Under those cases, "a 'substantial burden' is imposed only when individuals are [either 1] forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or [2] coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008) (en banc). "[P]re-*Smith* case law makes it clear that strict scrutiny does not apply to government actions involving . . . the use of the Government's own property

---

[6] 42 U.S.C. § 2000bb(b) states: "The purposes of this chapter are (1) to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; and (2) to provide a claim or defense to persons whose religious exercise is substantially burdened by government." *See also* S. REP. NO. 103-111, at 2, 8–9 (1993 (explaining the purpose of RFRA); H.R. REP. NO. 103-88, at 1–5 (1993) (same).

or resources," including management of public lands. *See* S. Rep. No. 103-111, at 9 (1993); *Navajo Nation*, 535 F.3d at 1069-79.[7]

To establish a prima facie RFRA claim, a plaintiff must allege that a government action "substantially burden[s]" the plaintiff's exercise of religion. *Navajo Nation*, 535 F.3d at 1068 (citation omitted). Under governing Ninth Circuit precedent, "a 'substantial burden' is imposed," just as under the Free Exercise Clause of the U.S. Constitution in two limited circumstances, namely:

> only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*). Any burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a "substantial burden" within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases.

*Id.* at 1070 (citing *Sherbert* and *Yoder*). An alleged effect on an individual's subjective, emotional experience, or claimed "diminishment of spiritual fulfillment—serious though it may be"—falls short of a "substantial burden" cognizable under RFRA. *Id.*; *see also Guam v. Guerrero*, 290 F.3d 1210, 1222 (9th Cir. 2002) (a "substantial burden" requires "substantial pressure on an adherent to modify his behavior and to violate his beliefs," including potential sanctions) (citations omitted). Because Plaintiff's members have not been denied a government benefit nor been coerced to change their religious beliefs, they have not demonstrated a "substantial burden" under RFRA or the Free Exercise Clause.

---

[7] RFRA contains a limited waiver of the United States' sovereign immunity. *Oklevueha Native Am. Church of Haw., Inc. v. Holder*, 676 F.3d 829, 840 (9th Cir. 2012). But if a plaintiff has not met their burden of demonstrating their religious exercise has been "substantially burdened" under RFRA, they are not within its waiver and the RFRA claim must be dismissed for want of subject matter jurisdiction. *See United States v. Mitchell*, 463 U.S. 206, 212 (1983).

*i.      Plaintiff and its Members Have Not Been Denied a Government
Benefit Based on their Religious Beliefs.*

Plaintiff does not adequately allege—nor can it demonstrate—that it or its members were forced to choose between following the tenets of their religion and receiving a government benefit. As the Ninth Circuit explained in *Navajo Nation,* the Supreme Court's decision in *Sherbert* is the prototypical example of this type of claim. 535 F.3d at 1070. *Sherbert* involved the denial of unemployment compensation solely based on the applicant's inability to work on a Saturday because she was a Seventh Day Adventist. 374 U.S. at 399-401. Thus, under the "governmental benefit" theory, a RFRA claim exists only where a plaintiff must make a choice antithetical to the principles of his or her religion in order to receive some sort of government benefit, typically a benefit derived under public welfare legislation. *See id.* at 410 (holding that "no State may exclude … the members of any other faith, because of their faith, or lack of it, from receiving the benefits of public welfare legislation") (quoting *Everson v. Bd. of Educ.*, 330 U.S. 1, 16 (1947) (internal quotation marks omitted)); *see also Emp. Div., Dep't of Human Res. of Or. v. Smith*, 485 U.S. 660, 663 (1988) (unemployment compensation); *Callahan v. Woods*, 736 F.2d 1269, 1271 (9th Cir. 1984) (social security benefits).

Here, neither Plaintiff's Complaint, nor its standing declarations identifies any government benefit that Plaintiff or its members would receive if they changed or disavowed their religious beliefs or practices. Plaintiff may argue that it is denied the "benefit" of access to the land in question, or the benefit that the land is managed as they would prefer (*i.e.*, without the transfer or associated impacts). In addressing a similar claim regarding access to land, a court in this Circuit reasoned:

> Plaintiffs additionally allege that they are being denied a government benefit…namely, access to the land. Denial of a government benefit, however, only implicates RFRA if the denial is a response to Plaintiffs' religious practices or, in other words, if a governmental benefit were "conditioned . . . upon conduct that would violate the Plaintiffs' religious beliefs."

*La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior* ("*La Cuna II*")*,* No. CV 11-00400 DMG (DTBx), 2013 WL 4500572, at *10 (C.D. Cal. Aug. 16, 2013) (quoting *Navajo Nation*, 535 F.3d at 1063). Yet, Plaintiff has not provided any evidence that the land exchange was proposed or the mine[8] is being built *in response* to Plaintiff's religious practices. Similarly, the *La Cuna* court also dismissed a RFRA claim where the plaintiffs alleged denying them access to land burdened their religion, holding that "[a]lleging that the Project impedes Plaintiff's access to a religious site is simply not enough to suggest that the Plaintiffs are deprived of the kind of benefit protected by RFRA." *La Cuna de Aztlan Sacred Sites Prot. Circle Advisory Comm. v. U.S. Dep't of the Interior* ("*La Cuna III*"), No. 2:11-cv-00395-ODW, 2012 WL 2884992, *7 (C.D. Cal. July 13, 2012). The Court should reach the same result here. There is no evidence that any official has denied Plaintiff or its members a public benefit based on their religious beliefs.

>  ii.      *Plaintiff Has Not Been Coerced to Change Its Religious Beliefs.*

Plaintiff also cannot demonstrate that it or its members are being "forced . . . or coerced to act contrary to their religious beliefs under the threat of civil or criminal sanctions. . . ." *Navajo Nation*, 535 F.3d at 1070. *Yoder* provides the prototypical example of a situation where individuals were forced to violate their religious beliefs under threat of sanction, and there is no conduct even closely analogous to that case here.

In *Yoder*, defendants, who were members of the Amish religion, were prosecuted for violating a law that required their children to attend school, under the threat of criminal sanctions for the parents. *Yoder*, 406 U.S. at 207–08. The defendants sincerely believed their children's attendance in high school was "contrary to the Amish religion and way of life." *Id.* at 209. The Supreme Court reversed the defendants' convictions,

---

[8] No mining will take place on National Forest System lands and the Forest Service is not authorizing mining. Rather, mining will be confined to the lands patented to Resolution Copper, although the Forest Service may authorize some related facilities to operate on National Forest System land following the appropriate review and permitting process.

holding the application of the compulsory school-attendance law to the defendants
"unduly burden[ed]" the exercise of their religion, in violation of the Free Exercise
Clause. *Id.* at 207, 220. The Court held that the Wisconsin law "affirmatively compel[led
the defendants], under threat of criminal sanction, to perform acts undeniably at odds
with fundamental tenets of their religious beliefs." *Id.* at 218.

There is simply no analogue to *Yoder* in this case. There is no allegation that
Federal Defendants have threated Plaintiff with any criminal sanction whatsoever. Nor
can Plaintiff demonstrate that Federal Defendants have somehow coerced Plaintiff into
taking an action that violates their beliefs. *Cf. Ruiz-Diaz v. United States*, 703 F.3d 483,
486 (9th Cir. 2012) (explaining the nature of the "forced choice" captured in RFRA's
substantial burden component and finding plaintiffs' RFRA claim non-meritorious
because "the challenged regulation does not affect their ability to practice their religion");
*Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1213–15 (9th Cir. 2008) (finding no
substantial burden where plaintiffs failed to allege government action "coerce[d] them
into a Catch-22 situation").

> ### iii. Construction on public lands is, as a matter of law, not a "substantial burden" on religion.

Plaintiff has not demonstrated that it has either been denied a public benefit or that
its members have been forced to violate their religion under threat of criminal sanction.
But even if it had, the Supreme Court's decision in *Lyng v. Northwest Indian Cemetery
Protective Ass'n*, 485 U.S. 439 (1988), is fatal to Plaintiff's claim that proposed land
exchange or mine project "substantially burdened" their religion by impacting Oak Flats,
which is federal property.

In *Lyng,* Indian tribes challenged the Forest Service's approval of plans to
construct a logging road in the Chimney Rock area of the Six Rivers National Forest in
California. *Id.* at 442–43. The tribes contended the construction would interfere with their

free exercise of religion by disturbing a sacred area. *Id.*[9] The area was an "integral and indispensable part" of the tribes' religious practices, and a Forest Service study concluded the construction "would cause serious and irreparable damage to the sacred areas." *Id.* at 442 (citations and internal quotation marks omitted).

The Supreme Court rejected the Indian tribes' Free Exercise Clause challenge. The Court held the government plan, which would "diminish the sacredness" of the land to Indians and "interfere significantly" with their ability to practice their religion, did not impose a burden "heavy enough" to violate the Free Exercise Clause. *Id.* at 447–49. The plaintiffs were not "coerced by the Government's action into violating their religious beliefs" (as in *Yoder*), nor did the "governmental action penalize religious activity by denying [the plaintiffs] an equal share of the rights, benefits, and privileges enjoyed by other citizens" (as in *Sherbert*). *See id.* at 449. The *Lyng* Court, with language equally applicable to this case, further stated:

> The Government does not dispute, and we have no reason to doubt, that the logging and road-building projects at issue in this case could have devastating effects on traditional Indian religious practices.
>
> …
>
> Even if we assume that ... the [logging] road will "virtually destroy the ... Indians' ability to practice their religion," the Constitution simply does not provide a principle that could justify upholding [the plaintiffs'] legal claims. However much we might wish that it were otherwise, government simply could not operate if it were required to satisfy every citizen's religious needs and desires.
>
> …
>
> No disrespect for these practices is implied when one notes that such beliefs could easily require *de facto* beneficial ownership of some rather spacious tracts of public property.
>
> …

---

[9] As the Ninth Circuit observed in *Navajo Nation*, "[t]hat *Lyng* was a Free Exercise Clause, not RFRA, challenge is of no material consequence. Congress expressly instructed the courts to look to pre-*Smith* Free Exercise Clause cases, which include *Lyng*, to interpret RFRA." 535 F.3d at 1071 n.13 (citing 42 U.S.C. § 2000bb(a)(5) (parenthetical sentence omitted)).

> The Constitution does not permit government to discriminate against religions that treat particular physical sites as sacred, and a law prohibiting the Indian respondents from visiting the Chimney Rock area would raise a different set of constitutional questions. *Whatever rights the Indians may have to the use of the area, however, those rights do not divest the Government of its right to use what is, after all, its land.*

*Id.* at 451–53 (citation omitted) (last emphasis added). Thus, binding Supreme Court precedent provides that actions the government takes on its own land do not constitute a "substantial burden" on religious exercise.

Like the plaintiffs in *Lyng*, the Plaintiff here challenges a land exchange and project, conducted on the government's own land, on the basis that the project will diminish their spiritual fulfillment. Even were we to assume, as did the Supreme Court in *Lyng*, that the government action in this case will "virtually destroy the ... Indians' ability to practice their religion," *id.* at 451 (citation omitted), there is nothing to distinguish the road-building project in *Lyng* from the land exchange here. *Lyng* was not overturned by RFRA, and indeed legislative history confirms that its holding was meant to be incorporated into the Act's understanding of "substantial burden."  As Senator Hatch explained, RFRA

> does not effect [sic] [Lyng], a case concerning the use and management of government resources, because, like Bowen v. Roy, the incidental impact on a religious practice does not "burden" anyone's free exercise of religion. In Lyng, the court ruled that the way in which government manages its affairs and uses its own property does not impose a burden on religious exercise. Unless a burden is demonstrated, there can be no free exercise violation.

139 Cong. Rec. S14,470 (daily ed. Oct. 27, 1993) (statement of Sen. Orrin Hatch); *see id.* (statement of Sen. Daniel Inouye) (RFRA will not address "the circumstance in which Government action on public and Indian lands directly infringes upon the free exercise of a native American religion."). Immediately following these remarks, the Senate passed RFRA, *id.* at S14,471; the identical legislation was enacted as Public Law 103-141.

Construing RFRA in light of pre-*Smith* case law, courts in this Circuit have consistently and correctly held that "a 'substantial burden' is imposed only when

individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1069-70.

Many other cases in this Circuit have affirmed *Lyng*'s holding. For instance, in *Snoqualmie Indian Tribe v. F.E.R.C.*, the plaintiffs alleged that a proposed hydroelectric dam would, among other things, deny them access to waterfalls necessary for their religious experiences. 545 F.3d at 1213. The Ninth Circuit found that:

> [t]he Tribe's arguments that the dam interferes with the ability of tribal members to practice religion are irrelevant to whether the hydroelectric project either forces them to choose between practicing their religion and receiving a government benefit or coerces them into a Catch-22 situation: exercise of their religion under fear of civil or criminal sanction.

*Id.* at 1214. *Lyng* and the Ninth Circuit precedent following it make clear that government activity on its own land does not constitute a "substantial burden" under RFRA. Such a burden is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*). As neither circumstance is present here, Plaintiffs' RFRA claim cannot succeed.

**e. Plaintiff is not likely to succeed on the merits of the Free Exercise Clause claims.**

Plaintiff's free exercise claims, counts four and six, are also not likely to succeed on the merits. Plaintiff's fourth count alleges that the mandate "imposes a substantial burden on Plaintiff Apache Stronghold and its members' religious exercise." ECF No. 1 ¶ 67. And Plaintiff's sixth count alleges "Defendants promulgated the Mandate in order to suppress the religious exercise of Plaintiff Apache Stronghold and its Western Apache members. . ." *Id.* ¶ 85.

To state a free exercise claim, just as with the RFRA claim discussed above, a plaintiff "must show that the government action in question substantially burdens the

[plaintiff's] practice of [its] religion." *Jones v. Williams*, 791 F.3d 1023, 1031 (9th Cir. 2015); *Boyd v. Etchebehere*, 732 F. App'x 608 (9th Cir. 2018) (mem.) (same); *Stidhem v. Schwartz*, No. 2:15-cv-00379-TC, 2017 WL 6887139, at *3 (D. Or. Oct. 23, 2017), *report & recommendation adopted*, No. 2:15-cv-00379-TC, 2018 WL 358496 (D. Or. Jan. 10, 2018). As argued above, Plaintiffs' religious exercise has not been "substantially burdened" as a matter of law. The Ninth Circuit has held that a plaintiff's "failure to demonstrate a substantial burden under RFRA necessarily means that [it has] failed to establish a violation of the Free Exercise Clause, as RFRA's prohibition on statutes that burden religion is stricter than that contained in the Free Exercise Clause." *Fernandez v. Mukasey*, 520 F.3d 965, 966 n.1 (9th Cir. 2008) (per curiam). Because Plaintiff has not alleged a substantial burden on their religious exercise as a matter of law, their free exercise claim cannot succeed.

Plaintiff additionally alleges, however, that the Act was not a "neutral" action, and instead was intentionally discriminatory and was promulgated out of animus towards and a desire to suppress Plaintiff's religion. ECF No. 1 ¶ 85. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah* (*Lukumi*), 508 U.S. 520 (1993)).

In *Lukumi*, the Court elaborated on the Free Exercise Clause case law's distinction between "neutral [laws] of general applicability" which need only withstand rational basis review, and those that are not neutral and "must be justified by a compelling government interest and must be narrowly tailored to advance that interest." 508 U.S. at 531-32. *Lukumi* explained that a law is not neutral or generally applicable if the State has "attempt[ed] to target . . . religious practices." *Id*. at 535; *see also id*. at 524 (noting that laws have an "impermissible object" where they apply "only with respect to conduct motivated by religious beliefs"). Factors relevant to the assessment of governmental neutrality include "the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of

the decisionmaking body." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (quoting *Lukumi*, 508 U.S. at 540).

      Here, there are no statements, legislative history, or any information whatsoever indicating an intent by agency decisionmakers to target Plaintiff's religious exercise. Rather, the historical background and series of events leading to the decision point to a much more obvious explanation for why the FEIS was issued: to provide for "economically sound and stable domestic mining, minerals, and metal and mineral reclamation industries and the orderly and economic development of domestic mineral resources, reserves, and reclamation of metals and minerals to help ensure satisfaction of industrial, security, and environmental needs." FEIS at 9. The FEIS itself discusses how the process for its development considered "spiritual, religious, and tribal identity; opportunities for solitude; and opportunities to continue traditional cultural practices and ceremonies." FEIS at 40.[10] Moreover, the Act directs the Forest Service to "consult with Resolution Copper and seek to find mutually acceptable measures to—(i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section." 16 U.S.C. § 539p(c)(3)(B).

      The Free Exercise case law is clear that if a law is of general application and is not targeted at religion, it is subject only to rational basis scrutiny, even though it may have an incidental effect of burdening religion. *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1031-32 (9th Cir. 2004); *Lukumi*, 508 U.S. at 535 (An "adverse

---

[10] For example, during the environmental review, an ethnographic study was completed titled "Ethnographic and Ethnohistoric Study of the Superior Area, Arizona" (Hopkins et al. 2015). The study identified places of traditional religious or cultural importance to Tribes within and adjacent to the area of Resolution Copper's proposed action, Oak Flat, and the Superstition Wilderness Area. Members of the San Carlos Apache Tribe, Tonto Apache Tribe, White Mountain Apache Tribe, Yavapai-Apache Nation, Fort McDowell Yavapai Nation, Yavapai-Prescott Indian Tribe, Gila River Indian Community, Salt River Pima-Maricopa Indian Community, Hopi Tribe, and Pueblo of Zuni contributed to the study. This study was used in the FEIS analysis.

1    impact will not always lead to a finding of impermissible targeting."). Such is the case

2    here. The Act and FEIS are "neutral" towards religion and in no way built to target

3    Plaintiff's religious exercise. Under rational basis review, a law will pass constitutional

4    muster unless it is not rationally related to a legitimate governmental interest. Here, the

5    governmental interest in supporting economic development of mineral resources and

6    obtaining the conservation lands for integration into the National Forest System is more

7    than sufficient to survive rational basis review.

8    **III.    Plaintiffs Face No Immediate, Irreparable Harm From the Land Transfer**

9          Plaintiff has failed to demonstrate that irreparable harm is likely to result in the

10   absence of an injunction. The mere "possibility" of harm is insufficient. *Winter*, 555 U.S.

11   at 22. This is so even where environmental damage is alleged. *See Amoco Prod. Co. v.*

12   *Vill. Of Gambell*, 480 U.S. 531, 544–45 (1987). So too, with alleged harms to religious

13   interests. *See, e.g.*, *Tenacre Found. v. I.N.S.*, 892 F. Supp. 289, 294 (D.D.C.

14   1995), *aff'd*, 78 F.3d 693 (D.C. Cir. 1996); *Singh v. Carter*, 185 F. Supp. 3d 11, 22

15   (D.D.C. 2016).

16         Plaintiff's brief and declarations refer to future mining activity on the property,

17   *see, e.g.*, ECF No. 7 at 9, 14, but there is no explanation or argument for how the mining

18   project—which will not occur on National Forest System land or be authorized by the

19   Forest Service—threatens an imminent harm. The FEIS states, at ES-3.2, that the surface

20   crater is not expected to break through until six years after mining begins. *See also* Ex. A

21   ¶ 8. Plaintiff would have ample opportunity to advance whatever rights it has and to seek

22   to halt mining activity before this occurs.

23         Plaintiff's delay in filing suit and seeking emergency injunctive relief also

24   seriously undermines its allegation of imminent, irreparable harm. *See Garcia v. Google,*

25   *Inc.*, 786 F.3d 733, 746 (9th Cir. 2015) (en banc); *Oakland Tribune, Inc. v. Chronicle*

26   *Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a

27   preliminary injunction implies a lack of urgency and irreparable harm[.]"); *Powers v.*

28   *Sec'y, Fla. Dep't of Corr.*, 691 F. App'x 581, 583 (11th Cir. 2017) (denying injunction on

the basis of delay in case concerning RFRA sister statute). Congress approved the land exchange in December 2014. Plaintiff was aware of the impacts of the land exchange shortly thereafter, and certainly after the scoping period of the FEIS which discussed the scope of the proposed exchange. Yet Plaintiff did not file suit until now, six years later and on the eve of the exchange. ECF No. 1. Had Plaintiff promptly filed suit upon learning of the land exchange or its impacts on Plaintiffs' interests this case could have been fully briefed on summary judgment by now, with adequate time for the parties and the Court to fully address the merits of the case. But Plaintiff did not, and its lack of urgency further undermines its assertion of imminent harm.

Plaintiff failed to meet its burden to establish that imminent, irreparable harm is likely. The Court should deny the motion on this basis alone. *Winter*, 555 U.S. at 22; *Cottrell*, 632 F.3d at 1131.

## IV.    **The Balance of Hardships and Public Interest Weigh Against an Injunction**

Plaintiff's failure to show either irreparable harm or likelihood of success on the merits is reason enough to deny their motion for preliminary injunction. The Court need not go further to consider the balance of equities and public interest, since the Plaintiff's showing of entitlement to a preliminary injunction has already failed. *See Nken v. Holder*, 556 U.S. 418, 435–36 (2009) ("Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party."). But should the Court proceed to these factors, the balance of the equities and the public interest favor denying preliminary injunctive relief.

First, in passing the law that created the land exchange, Congress has determined that facilitating copper mining in Arizona and expanding the Tonto National Forest—a Forest which services multiple public purposes including proving recreation opportunities and habitat conservation—is in the public interest. *See, e.g.*, *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 967 (9th Cir. 1983) (affirming denial of an injunction that would have enjoined Congressional act providing for protection of public land in California).

1   The equities thus favor the Federal Defendants under the principle that "a court sitting in

2   equity cannot ignore the judgment of Congress." *United States v. Oakland Cannabis*

3   *Buyers' Co-op.*, 532 U.S. 483, 497 (2001) (internal citation and quotation marks

4   omitted); *accord Am. Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046,

5   1059 (9th Cir. 2009) (holding district court abused its discretion when it failed to

6   properly weigh "the public interest represented in Congress' decision . . . ."). Where

7   Congress has affirmatively spoken on a matter—here, the land transfer—it is in accord

8   with the public interest to not frustrate Congress's intent. *Id.* (citations omitted); *see also*

9   *Nken*, 556 U.S. at 436 (noting that "prompt execution of removal orders" serves the

10  public interest by furthering "the streamlined removal proceedings" established by

11  Congress (internal quotation omitted)).

12          Second, the federal government has a long-recognized policy of "furthering Indian

13  self-government." *Morton v. Mancari*, 417 U.S. 535, 551 (1974). In analyzing whether

14  injunctive relief advances the public interest, courts consider whether an injunction

15  furthers this policy. *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234,

16  1253 (10th Cir. 2001) (finding that "tribal self-government may be a matter of public

17  interest"); *Seneca-Cayuga Tribe of Okla. v. Oklahoma*, 874 F.2d 709, 716 (10th Cir.

18  1989) (affirming grant of injunction where "injunction promotes the paramount federal

19  policy that Indians develop independent sources of income and strong self-government");

20  *Bowen v. Doyle*, 880 F. Supp. 99, 137 (W.D.N.Y. 1995) (finding "the public's interest

21  and the interests of [an Indian tribe] coincide" insofar as "there is a strong federal policy

22  favoring tribal self-government [and] tribal self-sufficiency"). Here, allowing Plaintiff to

23  pursue claims on behalf of Federally-recognized Tribes that the Tribes themselves

24  decline to pursue would not further Indian self-government. This policy consideration

25  also suggests Plaintiff's request for injunctive relief is not in the public interest.

26                                          **CONCLUSION**

27          Each of Plaintiff's merits claims fails: Plaintiff cannot assert the alleged rights of

28  another, the land exchange does not violate the Constitution or Plaintiff's statutory rights,

and Plaintiff had ample notice and opportunity to participate in the administrative

process. Moreover, Congress has determined that the land exchange and development of

the Resolution Copper mine is in the public interest. Plaintiff is not entitled to the

extraordinary relief it seeks, and this Court should deny Plaintiff's motion for a

preliminary injunction.

Submitted this 21st day of January, 2020,


JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Tyler M. Alexander*
TYLER M. ALEXANDER
REUBEN S. SCHIFMAN
Trial Attorneys
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
Alexander: (202) 598-3314
Schifman: (202) 305-4224
tyler.alexander@usdoj.gov
reuben.schifman@usdoj.gov

30

# Exhibit A

1   PAUL E. SALAMANCA
    Deputy Assistant Attorney General
2   United States Department of Justice
    Environment and Natural Resources Division
3

4   TYLER M. ALEXANDER (CA Bar No. 313188)
    Trial Attorney
5   Natural Resources Section
6   150 M St. NE, Third Floor
    Washington, D.C. 20002
7   (202) 598-3314
8   tyler.alexander@usdoj.gov

9
    *Attorneys for Defendants*
10
                **THE UNITED STATES DISTRICT COURT**
11                    **DISTRICT OF ARIZONA**
                       **PHOENIX DIVISION**
12

13
    Apache Stronghold,                     CIVIL NO. 2:21-cv-00050-CDB
14
                                           **DECLARATION OF**
15          Plaintiff,                     **TRACY PARKER**

    v.
16
    United States of America, *et al.,*
17
18          Defendants.

19

20

21

22

23

24

25

26

27

28

I, Tracy V.L. Parker, state as follows:

1.     I am the Southwest Regional Director for Lands and Minerals for the United States Department of Agriculture, Forest Service ("Forest Service"). I have held this position since 2014. I have 30 years of experience with the Forest Service. I have held positions at all levels of the organization, with increasing levels of responsibility with the Lands and Minerals Program, including working at the National Headquarters in Washington, D.C.

2.     In my role as Regional Lands and Minerals Director, I oversee the delivery of the Forest Service's Southwest Region's Lands program, which includes implementation of the Southeast Arizona Land Exchange and Conservation Act, set forth in Section 3003 of the Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, signed into law on December 19, 2014, as Public Law (P.L.) 113-291; and codified at 16 U.S.C. § 539p ("Act").

3.     I make this declaration based on my personal knowledge, my experience working for the Forest Service, and information made available to me in my official capacity.

4.     I am familiar with the above-captioned lawsuit and the Motion for Temporary Restraining Order and Preliminary Injunction filed by Plaintiff. I am also familiar with the Resolution Copper Project and Land Exchange ("Project"), including the land exchange mandated by Congress pursuant to the Act.

5.     On January 15, 2021, the Forest Service published the Final Environmental Impact Statement ("FEIS") for the Project.

6.     After publication of the FEIS for the Project, the Secretary of Agriculture, acting by and through the Forest Service, is directed by the Act to convey all right, title, and interest of the United States in and to the Federal land, as defined in the Act, to Resolution Copper.

7.     Due to the several steps left to close on the land exchange, including but not limited to, executing a land exchange agreement, receiving the appraisal for the Federal

land, reviewing the Federal land appraisal, and drafting detailed escrow instructions, Resolution Copper and the Forest Service will not exchange deeds to the Federal and non-Federal lands, as defined in the Act, any sooner than 55 days after the publication of the FEIS.

8.      Additionally, with respect to subsidence effects to the surface of the exchange parcel caused by underground mining activities, the FEIS at ES-3.2 states that "[t]he subsidence zone at the Oak Flat Federal Parcel would break through the surface at mine year 6…" (*i.e.*, the FEIS effects analysis projects that a surface crater will start to appear six years after active mining commences).

        I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 21st day of January, 2021.

Tracy Parker

2

# Exhibit B

Case 2:21-cv-00660-SPL Document 18-2 Filed 01/22/21 Page 47 of 55

*L P*
*Boundaries_Tonto*
*Proc. # 795*

Jan. 13, 1908

Tonto N.F., 2nd Proc.
Proc. #795, 1-13-08

### TONTO NATIONAL FOREST

#### ARIZONA

(SECOND PROCLAMATION)

#### By the President of the United States of America

# A Proclamation

WHEREAS, it appears that the public good would be promoted by adding to the Tonto National Forest certain lands, within the Territory of Arizona, which are in part covered with timber, and by also including therein the area heretofore reserved and set apart as the Pinal Mountains National Forest;

Now, therefore, I, THEODORE ROOSEVELT, President of the United States of America, by virtue of the power in me vested by the Act of Congress, approved June fourth, eighteen hundred and ninety-seven, entitled, "An Act Making appropriations for sundry civil expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and ninety-eight, and for other purposes," do proclaim that the Tonto National Forest is hereby enlarged to include the said additional lands, and that the boundaries of the aforesaid National Forest are now as shown on the diagram forming a part hereof;

Excepting from the force and effect of this proclamation all lands which are at this date embraced in any legal entry or covered by any lawful filing or selection duly of record in the proper United States Land Office, or upon which any valid settlement has been made pursuant to law, if the statutory period within which to make entry or filing of record has not expired; and also excepting all lands which at this date are embraced within any withdrawal or reservation for any use or purpose with which this reservation for forest uses is inconsistent: Provided, that these exceptions shall not continue to apply to any particular tract of land unless the entryman, settler, or claimant continues to comply with the law under which the entry, filing, or settlement was made, or unless the reservation or withdrawal with which this reservation is inconsistent continues in force; not excepting from the force and effect of this proclamation, however, any part of the National Forest hereby enlarged which may have been withdrawn to protect the coal therein, but this proclamation does not vacate any such coal land withdrawal; and provided that these exceptions shall not apply to any land embraced in any selection, entry, or filing, which may have been permitted to remain of record subject to the creation of a permanent reservation; and provided also that since the withdrawal made

by this proclamation and any withdrawal heretofore made for national irrigation works are consistent, both shall be effective upon the land withdrawn, but the withdrawal for national irrigation works shall be the dominant one and may, when necessary, be changed to a withdrawal for irrigation from such works.

Warning is hereby given to all persons not to make settlement upon any of the lands reserved by this proclamation, unless and until they are listed by the Secretary of Agriculture and opened to homestead settlement or entry by the Secretary of the Interior under the Act of Congress, approved June eleventh, nineteen hundred and six, entitled, "An Act To provide for the entry of Agricultural lands within forest reserves:" Provided, that lands heretofore restored to settlement or entry under the provisions of the foregoing act shall be excepted from the force and effect of this proclamation.

**In Witness Whereof,** I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington this 13th day of January, in the year of our Lord one thousand nine hundred [SEAL.] and eight, and of the Independence of the United States the one hundred and thirty-second.

## THEODORE ROOSEVELT

By the President:
    Elihu Root
      *Secretary of State.*

[No. 795.]



# TONTO NATIONAL FOREST
## ARIZONA
GILA AND SALT RIVER MERIDIAN AND BASE

FOREST SERVICE, U.S. DEPT. OF AGRICULTURE
1907

NATIONAL FOREST BOUNDARY
ADDITION FROM PUBLIC LANDS
FORMERLY IN PINAL MOUNTAINS NATIONAL FOREST

[DIAGRAM FORMING A PART OF PROCLAMATION
DATED JANUARY 13, 1908.]

Exhibit C




DATE DOWNLOADED: Fri Jan 15 16:11:35 2021
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

ALWD 6th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

APA 7th ed.
Treaty with the Apaches, 10 Stat. 979 (1852).

Chicago 7th ed.
"Apaches: Treaty with the Apaches," U.S. Statutes at Large 10, no. Main Section
(1852): 979-982

McGill Guide 9th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).


AGLC 4th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

MLA 8th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852). HeinOnline.

OSCOLA 4th ed.
Treaty with the Apaches, . 10 Stat. 979 (1852).

Provided by:
DOJ Libraries

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.
-- To obtain permission to use this article beyond the scope of your license, please use:
   *Copyright Information*

# FRANKLIN PIERCE,

### PRESIDENT OF THE UNITED STATES OF AMERICA:        July 1, 1852.

#### TO ALL AND SINGULAR TO WHOM THESE PRESENTS SHALL COME, GREETING:

Whereas a Treaty was made and concluded at Santa Fé, New Mexi- | Preamble.
co, on the first day of July, in the year of our Lord one thousand eight
hundred and fifty-two, by and between Col. E. V. Sumner, U. S. A.,
commanding the 9th Department, and in charge of the Executive Office
of New Mexico, and John Greiner, Indian Agent in and for the Terri-
tory of New Mexico, and acting Superintendent of Indian Affairs of said
Territory, representing the United States, and Cuentas Azules, Blancito,
Negrito, Captain Simon, Captain Vuelta, and Mangus Colorado, chiefs,
acting on the part of the Apache nation of .Indians, situate and living
within the limits of the United States, which treaty is in the words fol-
lowing, to wit:

Articles of a Treaty made and entered into at Santa Fé, New Mexico,
on the first day of July in the year of our Lord one thousand eight
hundred and fifty-two, by and between Col. E. V. Sumner, U. S. A.,
commanding the 9 Department and in charge of the Executive Office of
New Mexico, and John Greiner, Indian Agent in and for the Territory
of New Mexico, and acting Superintendent of Indian Affairs of said
Territory, representing the United States, and Cuentas, Azules, Blancito,
Negrito, Capitan Simon, Capitan Vuelta, and Mangus Colorado, chiefs,
acting on the part of the Apache Nation of Indians, situate and living
within the limits of the United States.

ARTICLE 1.   Said nation or tribe of Indians through their authorized | Authority of
Chiefs aforesaid do hereby acknowledge and declare that they are law- | United States
fully and exclusively under the laws, jurisdiction, and government of the | acknowledged.
United States of America, and to its power and authority they do hereby
submit.

ARTICLE 2.   From and after the signing of this Treaty hostilities | Peace to exist.
between the contracting parties shall forever cease, and perpetual peace
and amity shall forever exist between said Indians and the government
and people of the United States; the said nation, or tribe of Indians, | The Apaches
hereby binding themselves most solemnly never to associate with or give | not to assist
countenance or aid to any tribe or band of Indians, or other persons or | other tribes in
powers, who may be at any time at war or enmity with the government | hostilities.
or people of said United States.

ARTICLE 3.   Said nation, or tribe of Indians, do hereby bind them- | Good treat-
selves for all future time to treat honestly and humanely all citizens of | ment of citizens
the United States, with whom they may have intercourse, as well as all | of the United
persons and powers, at peace with the said United States, who may be | States by na-
lawfully among them, or with whom they may have any lawful intercourse. | tions at peace with them.

ARTICLE 4.   All said nation, or tribe of Indians, hereby bind them- | Cases of ag-
selves to refer all cases of aggression against themselves or their property | gression on them
and territory, to the government of the United States for adjustment, and | to be referred to
to conform in all things to the laws, rules, and regulations of said govern- | government.
ment in regard to the Indian tribes. | Laws to be conformed to.

ARTICLE 5.   Said nation, or tribe of Indians, do hereby bind them- | Provisions
selves for all future time to desist and refrain from making any " incur- | against incur-
sions within the Territory of Mexico " of a hostile or predatory character; | sions into Mexi-
and that they will for the future refrain from taking and conveying into | co.

Case 2:21-cv-00065-SPL Document 19-23 Filed 01/22/21 Page 53 of 65

captivity any of the people or citizens of Mexico, or the animals or property of the people or government of Mexico; and that they will, as soon as possible after the signing of this treaty, surrender to their agent all captives now in their possession.

*Persons injuring the Apaches to be tried and punished.* ARTICLE 6. Should any citizen of the United States, or other person or persons subject to the laws of the United States, murder, rob, or otherwise maltreat any Apache Indian or Indians, he or they shall be arrested and tried, and upon conviction, shall be subject to all the penalties provided by law for the protection of the persons and property of the people of the said States.

*Free passage over the Apache territory.* ARTICLE 7. The people of the United States of America shall have free and safe passage through the territory of the aforesaid Indians, under such rules and regulations as may be adopted by authority of the said States.

*Military posts, agencies, and trading houses to be established.* ARTICLE 8. In order to preserve tranquillity and to afford protection to all the people and interests of the contracting parties, the government of the United States of America will establish such military posts and agencies, and authorize such trading houses at such times and places as the said government may designate.

*Territorial boundaries to be adjusted.* ARTICLE 9. Relying confidently upon the justice and the liberality of the aforesaid government, and anxious to remove every possible cause that might disturb their peace and quiet, it is agreed by the aforesaid Apache's that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in their territory such laws as may be deemed conducive to the prosperity and happiness of said Indians.

*Presents to the Apaches.* ARTICLE 10. For and in consideration of the faithful performance of all the stipulations herein contained, by the said Apache's Indians, the government of the United States will grant to said Indians such donations, presents, and implements, and adopt such other liberal and humane measures as said government may deem meet and proper.

*When treaty to be binding.* ARTICLE 11. This Treaty shall be binding upon the contracting parties from and after the signing of the same, subject only to such modifications and amendments as may be adopted by the government of the United States; and, finally, this treaty is to receive a liberal construction, *How construed.* at all times and in all places, to the end that the said Apache Indians shall not be held responsible for the conduct of others, and that the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians.

In faith whereof we the undersigned have signed this Treaty, and affixed thereunto our seals, at the City of Santa Fé, this the first day of July in the year of our Lord one thousand eight hundred and fifty-two.

WITNESSES:

| | |
|---|---|
| F. A. CUNNINGHAM, *Paymaster, U. S. A.* | E. V. SUMNER, [SEAL.] *Bvt. Col. U. S. A. com'g 9th Dept. In charge of Executive Office of New Mexico.* |
| J. C. McFERRAN, *1st Lt. 3d Inf. Act. Ast. Adj. Gen.* | JOHN GREINER, [SEAL.] *Act. Supt. Indian Affairs, New Mexico.* |
| CALEB SHERMAN. | CAPITAN VUELTA, his x mark [SEAL.] |
| FRED. SAYNTON. | CUENTAS AZULES, his x mark [SEAL.] |
| CHAS. McDOUGALL, *Surgeon, U. S. A.* | BLANCITO ———, his x mark [SEAL.] |
| S. M. BAIRD, *Witness to the signing of Mangus Colorado.* | NEGRITO ———, his x mark [SEAL.] |
| JOHN POPE, *Bvt. Capt. T. E.* | CAPITAN SIMON, his x mark [SEAL.] |
| | MANGUS COLORADO, his x mark [SEAL.] |

AND WHEREAS the said Treaty having been submitted to the Senate of the United States, for its constitutional action thereon, the Senate did, on the twenty-third day of March, one thousand eight hundred and fifty-

Case 2:21-cv-00066-SPL Document 19-23 Filed 01/22/21 Page 55 of 65

three, advise and consent to the ratification of its articles, by a resolution in the words and figures following, to wit:

IN EXECUTIVE SESSION, SENATE OF THE UNITED STATES,
*March 23d, 1853.*

· *Resolved,* (two thirds of the Senators present concurring,) That the Senate advise and consent to the ratification of the Articles of a Treaty made and entered into at Santa Fé, New Mexico, on the first day of July, in the year of our Lord, 1852, by and between Colonel E. V. Sumner, United States Army, commanding the 9th Department, and in. charge of the Executive Office of New Mexico, and John Greiner, Indian Agent in and for the Territory of New Mexico, and acting Superintendent of Indian Affairs of said Territory, representing the United States, and Cuentas Azules, Blancito, Negrito, Capitan Simon, Capitan Vuelta, and Mangus Colorado, chiefs, acting on the part of the Apache nation of Indians, situate and living within the limits of the United States.

Attest —                     ASBURY DICKINS, *Secretary.*

Now, therefore, be it known, that I, FRANKLIN PIERCE, President of the United States of America, do, in pursuance of the advice and consent of the Senate, as expressed in their resolution of the twenty-third day of March, one thousand eight hundred and fifty-three, accept, ratify, and confirm the said treaty.

In testimony whereof, I have caused the seal of the United States to be herewith affixed, having signed the same with my hand.

Done at the city of Washington, this twenty-fifth day of March, in the year of our Lord one thousand eight hundred and fifty-three, and of the Independence of the United States the seventy-seventh.

[L. S.]

FRANKLIN PIERCE.

BY THE PRESIDENT:

W. L. MARCY, *Secretary of State.*

Case 2:21-cv-00068-SPL Document 19-23 Filed 01/22/21 Page 56 of 65

**August 26, 1852.** BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

WHEREAS a Supplementary Commercial Convention between the United States of America and His Majesty the King of the Netherlands, was concluded and signed by their Plenipotentiaries, in this city, on the twenty-sixth day of August last, which Supplementary Convention is, word for word, as follows:—

*Preamble.*

The United States of America and His Majesty the King of the Netherlands, being desirous of placing the commerce of the two countries on a footing of greater mutual equality, have appointed as their plenipotentiaries for that purpose: that is to say: the President of the United States of America, Daniel Webster, Secretary of State of the United States, and His Majesty the King of the Netherlands, François Mathieu Wenceslas Baron Testa, Commander of the Royal Grand Ducal Order of the Crown of Oak of Luxembourg, Knight of the Royal Order of the Lion of the Netherlands, and of the Grand Ducal Order of the White Falcon, third class; Counsellor of Legation, and His Majesty's Chargé d'Affaires to the Government of the United States of America; who, after having communicated to each other their respective powers, found in good and due form, have agreed that, for and in lieu of the first and second articles of the treaty of commerce and navigation, signed at Washington on the 19th of January, 1839, between the high contracting parties, the following articles shall be substituted:

*Negotiators.*

*Vol. viii. p. 524.*

De Vereenigde Staten van Amerika en Zÿne Majesteit de Koning der Nederlanden, den handel, tusschen de beide landen wenschende, te brengen op eenen voet van grootere wederkeerige gelykheid, hebben daartoe tot hunne Gevolmagtigden benoemd, te weten: de President der Vereenigde Staten van Amerika, Daniel Webster, Secretaris van Staat der Vereenigde Staten; en Zÿne Majesteit de Koning der Nederlanden, Francois Mathieu Wenceslas Baron Testa, Kommandeur der Orde van de Eikenkroon van Luxemburg, Ridder der Orde van den Nederlandschen Leeuw, Ridder der groot Kertogelÿke Orde van den Witten Valk, 3d klasse, Raad van Legatie en Hoogstdeszelfs Zaakgelastigde bÿ de Regering der Vereenigde Staten van Amerika; dewelke, na elkander hunne in goeden en behoorlÿken vorm bevondene wederzÿdsche volmagten te hebben medegedeeld, zÿn overeengekomen dat, voor en ter vervanging van het eerste en tweede artikel van het handels-en scheepvaartverdrag, den 19 January, 1839, te Washington, tuschen de hooge contracterende partyen geteekend, de volgende artikelen zullen worden in de plaats gesteld:

### ARTICLE I.

*Provisions respecting duties.*

Goods and merchandise, whatever their origin may be, imported into or exported from the ports of the United States, from and to any other country, in vessels of the Netherlands, shall pay no higher or other duties than shall be levied on the

### ARTIKEL I.

Goederen en koopwaren, overschillig welke derzelver herkomst zÿ, met Nederlandsche schepen wordende in of nit gevoerd, in of de havens der Vereenigde Staten, van en naar elk ander land, zullen geene hoogere noch andere regten betalen,