Michael V. Nixon, *pro hac vice*
(OR Bar # 893240)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 358287)
5119 North 19th Avenue
Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Phoenix Division

| | |
|---|---|
| Apache Stronghold,<br>    a 501(c)(3) nonprofit organization,<br><br>            Plaintiff,<br>  v.<br><br>United States of America, et al.<br><br>            Defendants. | No. 2:21-cv-00050-PHX-SPL<br><br>**CORRECTED AMENDED REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br>(Oral Argument Requested) |

## INTRODUCTION

The Western Apache members of Plaintiff Apache Stronghold hope to continue to use, enjoy, and believe in Chi'chil Biłdagoteel ("Oak Flat") and all it contains naturally and supernaturally as a Western Apache Holy Ground. This includes being able to worship at the Oak Flat religious shrine, a religious heritage from and until time

1

immemorial, and to be able to do so until their deaths as well as to provide that opportunity for their children, grandchildren, and future offspring. Among the Apache Stronghold members holding to this hope are Dr. Wendsler Nosie, a direct descendant of a signatory of the 1852 Treaty of Santa Fe between the United States of America and the Apache Nations ("1852 Treaty of Santa Fe" or "the 1852 Treaty"), along with his granddaughter, Naelyn Pike, and other members of his extended family.

Plaintiff's members' religious worship at this Holy Ground place and the surrounding sacred areas is in jeopardy of being lost forever.[1] Defendants would deny the Western Apache members of Apache Stronghold their aboriginal rights and treaty rights in the land that contains Chi'chil Biłdagoteel, deny their statutory and constitutional rights to religious freedom, deny their constitutional rights to redress and remedy, deny their due process rights, and deny the benefits of the trust responsibility that the United States assumed in illegally forcing the Apaches off their treaty land. Defendants erroneously assert that Apache Stronghold lacks standing to enforce those treaty rights and aboriginal title because it is not a Tribe, but those rights inure directly to its Western Apache members pursuant to the 1852 Treaty of Santa Fe.

Along with the additional facts presented, Plaintiff relies on and incorporates all the facts that Plaintiff presented in its opening Motion for Temporary Restraining Order and Preliminary Injunction, Doc. 7 (and those attached declarations), and at the Court hearing on February 3rd.

---

[1] 2,463 acres of this site have been designated as the Chi'chil Biłdagoteel ("Oak Flat") National Historic District by the National Park Service based on the Western Apaches' cultural values, including their religious exercises and religious beliefs there.

2

# THE PLAINTIFF HAS STANDING

Because Apache Stronghold's individual members have standing, Apache Stronghold has organizational standing. The United States argues that Apache Stronghold lacks standing because it is not a Tribe, but the Treaty of 1852 was between the United States and the Western Apache peoples, not with any particular Tribe because that is not how the Apache peoples' place-oriented and related social organizations, clans, and family groups even regarded themselves.

Apache Stronghold co-founder, Dr. Wendsler Nosie, Sr., is a member of the Stiniye clan of the Bedonkohe band of Apaches, the band of Geronimo,[2] and is a descendant of Mangas Coloradus, one of the Apache signatories of the 1852 Treaty. Naelyn Pike is Dr. Nosie's granddaughter and one of the Western Apache members of Apache Stronghold. Cranston Hoffman, Jr., is of the Tanasgizen Clan ("Washed People") on his mother's side and of the Tiis tu ayeh Clan ("Cottonwood Sticking in the Water") on his father's side. See Declaration of Cranston Hoffman, Jr. at paragraphs 3-8, pp.2-3.

Dr. Nosie and his family, and Cranston Hoffman, Jr., are among the intended beneficiaries of his direct ancestor's agreement with the United States. Dr. Nosie has a preeminent right of standing to enforce his direct ancestor's agreement with the defendant United States. And, the Defendants' assertions regarding standing based on participation in any administrative processes are inappropriate and misguided. This case is not before this Court pursuant to the judicial review provisions of the Administrative Procedures Act (5 U.S.C. 701, et seq.).

---

[2] See Declaration of Wendsler Nosie, Sr., Ph.D, at p.4.

But the most glaring error in Defendants' Response is the glancing misuse and minimization of the very recent and spectacular landmark U.S. Supreme Court decision and opinion in *McGirt v. Oklahoma*, ___ U.S. ___, 140 S.Ct. 2452 (2020). *McGirt* made it abundantly clear that even a single individual Native American and enrolled member of a federally recognized Indian tribe can assert his treaty rights and the aboriginal land title rights of his people.

Furthermore, Indian Claims Commission ("ICC") decisions are not an exclusive remedy for treaty land rights claims, and ICC decisions do not extinguish aboriginal title. See, *e.g.*, *Pueblo Jemez v. United States*, 790 F.3d 1143 (10th Cir. 2015). "[T]he Indian right of occupancy is considered as sacred as the fee-simple of the whites and may only be extinguished by Congress." See *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 345-347 (1941).

**TRUST RESPONSIBILITY**

"While the Court has ruled that the United States' liability for breach of trust may be limited by Congress, it has also concluded that certain obligations are so fundamental to the role of a trustee that the United States must be held accountable for failing to conduct itself in a manner that meets the standard of a common law trustee. This is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. 'One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets.'" Secretary of the Interior Order No. 3335, "Reaffirmation of the Federal Trust Responsibility to Federally Recognized Indian Tribes and Individual Indian

4

Beneficiaries," August 20, 2014, at p.2 of 6 (citing *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (internal citations omitted)).[3]

## STANDARD OF REVIEW FOR PRELIMINARY INJUNCTIONS

The Ninth Circuit uses the "serious questions" test when deciding environmental and land altering type preliminary injunctions. Defendants ignore the "serious questions" test. The full test is:

---

[3] "Sec. 2 **Authority.** This Order is issued pursuant to the U.S. Constitution, treaties, statutes, Executive Orders, and other Federal laws that form the foundation of the Federal-tribal trust relationship and in recognition of the United States' trust responsibility to all federally recognized Indian tribes and individual Indian beneficiaries.

Sec. 3 **Background.** The trust responsibility is a well-established legal principle that has its origins with the formation of the United States Government. In the modem era, Presidents, Congress, and past Secretaries of the Interior have recognized the trust responsibility repeatedly, and have strongly emphasized the importance of honoring the United States' trust responsibility to federally recognized tribes and individual Indian beneficiaries." *Id*. at 1.

See also *id*. at 2: "Presidential Commitments to the Trust Responsibility. Since this country's founding, numerous Presidents have expressed their commitment to upholding the trust responsibility. In the historic Special Message on Indian Affairs that marked the dawn of the self-determination age, President Nixon stated "[t]he special relationship between Indians and the Federal government is the result of solemn obligations which have been entered into by the United States Government ... *[T]he special relationship ... continues to carry immense moral and legal force. To terminate this relationship would be no more appropriate than to terminate the citizenship rights of any other American*." Public Papers of the President: Richard M. Nixon, Special Message on Indian Affairs (July 8, 1970) (emphasis added).

And see, *id*. at 3: Recently, Congress passed a joint resolution recognizing the "*special legal and political relationship Indian tribes have with the United States and the solemn covenant with the land we share*" and acknowledged the "*long history of depredations and ill-conceived polices by the Federal government regarding Indian tribes*" and offered "an apology *to all Native peoples* on behalf of the United States." 111th Cong. 1st Sess., S.J. Res 14 (Apr. 30, 2009) (emphasis added). Accessed January 23, 2021, online at https://www.doi.gov/sites/doi.gov/files/migrated/news/pressreleases/upload/Signed-SO-3335.pdf

5

> Serious questions going to the merits and a balance of hardships tip[ping] sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest.

*Alliance for the Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011), (*as amended*).

Concurring, Judge Mosman compared likelihood of the harm with likelihood of success tests in justifying the reduced "serious questions" test; "[A] district court at the preliminary injunction stage is in a much better position to predict the likelihood of harm than the likelihood of success." *Id*. at 1139.  Defendants' never actually address this lessened standard in their argument, only giving it glancing conclusionary mention in footnote 2.  See: "II. Plaintiff Has No Likelihood of Success on the Merits," Doc. 18 at 8.

## ARGUMENT

**I.    Apache Stronghold has organizational standing.**

Because Apache Stronghold's individual members have standing, Apache Stronghold has organizational standing. Organizations have the standing to assert the rights of their members. *E.g.*, *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951); *NAACP v. Alabama ex rel Patterson*, 357 U.S. 449 (1958); *NAACP v. Button*, 371 U.S. 415 (1963); *Brotherhood of Railroad Trainmen v. Virginia*, 377 U.S. 1 (1964); *United Mine Workers v. Illinois State Bar Ass'n*, 389 U.S. 217 (1967); *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576 (1971).

The United States argues that Apache Stronghold lacks standing because it is not a Tribe, but the Treaty of 1852 was between the United States and the Western Apache people, not with any particular Tribe. Dr. Wendsler Nosie, Sr., a co-founder of Apache Stronghold, is a descendant of Mangas Coloradas, one of the Apache signatories of the

1852 Treaty. See Declaration of Wendsler Nosie, Sr., Ph.D. Dr. Nosie is among the intended beneficiaries of his direct ancestor's agreement with the United States.

The Defendants' assertions regarding standing based on participation in any "administrative processes" are inapplicable, as this case is not before this Court pursuant to the judicial review provisions of the Administrative Procedures Act (5 U.S.C. 701, et seq.).

## II. Apache Stronghold is entitled to a preliminary injunction.

### A. Absent an injunction, Apache Stronghold and its members are very likely to suffer irreparable harm.

As Justice Brennan observed,

> "In marked contrast to traditional Western religions, the belief systems of Native Americans do not rely on doctrines, creeds, or dogmas. Established or universal truths—the mainstay of Western religions—play no part in Indian faith. Ceremonies are communal efforts undertaken for specific purposes in accordance with instructions handed down from generation to generation. Commentaries on or interpretations of the rituals themselves are deemed absolute violations of the ceremonies, whose value lies not in their ability to explain the natural world or to enlighten individual believers but in their efficacy as protectors and enhancers of tribal existence. Where dogma lies at the heart of Western religions, Native American faith is inextricably bound to the use of land. The site-specific nature of Indian religious practice derives from the Native American perception that land is itself a sacred, living being. See Suagee, *American Indian Religious Freedom and Cultural Resources Management: Protecting Mother Earth's Caretakers*, 10 Am. Ind. L. Rev. 1, 10 (1982)."

*Lyng v. Northwest Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 460-461 (1989) (Brennan, J., dissenting).

It is with this enlightened knowing of sacred places that the Court should view the irreparable harm factor. In the short term, if the land exchange conveyance of the Oak Flat parcel is allowed to occur, Plaintiff and its members will lose the protections of the

First Amendment's constitutional guarantee of the free exercise of religion and the statutory protections of RFRA because the land would then be in the hands of a private party. *Hall v. American Nat. Red Cross*, 86 F.3d 919,921 (9th Cir. 1996), *cert. denied*, 519 U.S. 1010 (1996)(Congress did not intend to have RFRA extend beyond the reach of 1st Amendment liability). See also, *Havasupai Tribe v. United States Forest Service*, 752 F.Supp. 1471, 1486 (D.Ariz. 1990), *affirmed sub. nom., Havasupai Tribe v. Robertson*, 943 F.3d 32 (9th Cir. 1991).

  This use of the Holy Ground in the near future especially includes, Sunrise Ceremonies (a young woman's 'coming of age' ceremony). Cranston Hoffman Jr. states: "To have a land exchange occur at Oak Flat and to have destruction of this spiritual place by mining-these actions will have a direct, negative effect on me and members of the Holy Ground group who assist me in conducting these ceremonies." Declaration of Cranston Hoffman Jr., (Doc. 7-3 ¶ 12, p. 3). Further, as time proceeds, the Plaintiff's Holy Ground will end up being at the bottom of crater that is about one thousand feet deep and almost two miles across.[4] This is an irreparable injury and no money damages can compensate Apache Stronghold and its members.

  The Tenth Circuit has held that the irreparable harm element is satisfied where a plaintiff alleges a violation of RFRA. *Kikumura v. Hurley*, 242 F.3d 950, 963 (2001)("courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA"). Also, "[w]hen an alleged Constitutional right is involved, most

---

[4] As stated by Defendants' representative, the subsidence is estimated not to begin for six years after mining starts. Doc. 18-1, Decl. of Tracy Parker, ¶ 8, p. 4 But the crater will then grow to its full size as noted in forty-one years.

8

courts hold that no further showing of irreparable injury is necessary." 11A Charles Allen Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure S. 2948.1 (2d ed. 1995).

### B. An Injunction Is In The Public Interest

Another requirement is that the injunction be in the public interest. Defendants claim that Congress's desire, as well as a policy of Indian self-government are two ways that Defendants' prove that they have the edge for the public interest test. Doc. 18 at 28-29. This is countered by the Ninth Circuit's frequent holdings "that preserving nature and avoiding irreparable injury outweighs economic concerns." *Lands Council v. McNair*, 494 F.3d 771, 780 (9th Cir. 2007), *vacated on rehearing en banc on other grounds*, 537 F.3d 981 (9th Cir. 2008). And injunctions for federal land exchanges are clearly appropriate. *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 815 (9th Cir. 1999).

### C. There Are Serious Questions Going to the Merits

As noted herein, the likelihood of prevailing on the merits is reduced to the moving party showing that there are serious questions going to the merits. Plaintiff presents two of its claims which it believes present serious questions on the merits. The first of the several serious questions is most serious: "Does the United States really own the land that it proposes to exchange?" Secondly: "Does Apache Stronghold have a viable claim under the RFRA?"

### D. Issues which have Serious Questions Going to the Merits

#### 1. The Land Ownership Dispute

Evidence shows that the answer is "No." See Declaration of John R. Welch, Ph.D., at p.4, 11. The Western Apaches still hold their aboriginal title to the land that contains the Oak Flat parcel, as the Plaintiff asserts in the Complaint and in the motion for injunctive relief. Plaintiff Apache Stronghold includes many Western Apache members of the San Carlos Apache and White Mountain Apache Tribes. The Defendants bear the burden of proving by clear and convincing evidence that the United States has the right of ownership to convey the land.[5] A trial is necessary to determine the factual answer to that most serious question.

Depriving Apache Stronghold of this right in the land is an irreparable injury and no money damages can compensate Apache Stronghold and its members. The balance of hardships tips sharply in favor of the Plaintiff, and the injunction is in the public interest because the public interest in having the Defendants honor its 1852 treaty with the Apaches and respect their aboriginal title rights is the paramount compelling governmental and public interest, and predates this proposed copper mine and the statute presuming any rights in the land to give away to a private mining conglomerate.

**2. The Religious Freedom Restoration Act Claim – The Supreme Court's Decisions in *Hobby Lobby* and *Little Sister of the Poor* Causes Defendants' Substantial Burden Reliance to be Too Narrow, Which Raises Serious Questions for Plaintiff's RFRA Claim.**

Defendants' challenge Plaintiff's Religious Freedom Restoration Act, (RFRA), as amended,[6] 42 U.S.C. § 2000bb, et seq., claim in three ways. RFRA claims proceed in two

---

[5] See, *e.g.*, 25 U.S.C. §194. Trial of right of property; burden of proof.
[6] See, Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 114 Stat. 803, Pub.L. 106-274.

10

parts, with a shifting of the burdens.[7]  The test is: (1) What is the "exercise of religion" in which the tribal members engage with respect to the [proposed impacted area]...? (2) What "burden," if any, would be imposed on that exercise of religion if the proposed [action] ... went forward? (3) If there is a burden, would the burden be "substantial"? (4) If there would be a substantial burden, can the "application of the burden" to the tribal members be justified as "in furtherance of a compelling governmental interest" and "the least restrictive means of furthering that compelling governmental interest"?

*Navajo Nation v. U.S. Forest Serv.*, 479 F.3d 1024, 1033-34 (9th Cir. 2007)(*rev.on other grds.*, *en banc*, *cert. denied*, 556 U.S. 1281 (2009)).

### a. *Hobby Lobby* decoupled RFRA from First Amendment pre-*Smith* precedents.

The Supreme Court cases, unaddressed by Defendant, implicitly vacate the narrow construction of substantial burden in *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058 (9th Cir. 2008)(*en banc*), *cert. denied*, 556 U.S. 1281 (2009).[8]

*Burwell v. Hobby Lobby, Inc. (Hobby Lobby)*, 573 U.S. 682 (2014) concerned closely held corporations whose owners had religious objections to certain forms of contraception services that were allowed to be covered by their employees' health care

---

[7] Section 3, 42 U.S.C. § 2000bb-1(a), begins with its general clause of: "Government shall not substantially burden a person's exercise of the religion even if the burden results from a rule of general applicability, except as provided in (b)." Subsection (b) states that the Government may substantially burden the person's interest "only if it demonstrates that the application of the burden...is...in furtherance of a compelling government interest."  *Id*. at (1).

[8] *Navajo Nation*'s test was cited in 2019 in *California v. U.S. Department of Health & Human Services*, 941 F.3d 410. (*judgment vacated and remanded sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. Calif., for further consideration in light of Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. ____, 140 S.Ct. 2367, 207 L.Ed.2d 819 (2020)).

plans. While certain religious and non-profit employers were allowed to be exempt from needing to cover those services in their plans, the closely held corporations were not allowed to join that group of organizations (certified parties). In finding a new class of religious practitioners under RFRA for these businesses, the Supreme Court discussed how RFRA interpretations could not be bound by pre-*Smith*[9] cases. The Court held:

> [No one] can explain why Congress did that [deleted prior reference to the First Amendment tie in RFRA's amendments] if it wanted to tie RFRA coverage tightly to the specific holdings of our pre-*Smith* free-exercise cases. Moreover, as discussed, the amendment went further, providing that the exercise of religion "shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." § 2000cc–3(g). It is simply not possible to read these provisions as restricting the concept of the "exercise of religion" to those practices specifically addressed in our pre-Smith decisions.
>
> ****
>
> [T]he results would be absurd if RFRA merely restored this Court's pre-*Smith* decisions in ossified form and did not allow a plaintiff to raise a RFRA claim unless that plaintiff fell within a category of plaintiffs one of whom had brought a free-exercise claim that this Court entertained in the years before *Smith*. For example, we are not aware of any pre-*Smith* case in which this Court entertained a free-exercise claim brought by a resident noncitizen. Are such persons also beyond RFRA's protective reach simply because the Court never addressed their rights before Smith?

*Id*. at 714-716.

While the Court was dealing with the extent of creating a new harmed RFRA plaintiff class, there is no reason to believe that it would not extend its RFRA interpretation's decoupling with earlier First Amendment cases holdings regarding a narrow substantial burden test. In fact it has done just that.

      b. ***Little Sisters of the Poor* and the judgment it overruled exemplify a broader substantial burden test than *Navajo Nation*.**

---

[9] *Employment Div. Dep't of Human Resources v. Smith*, 494 U.S. 872 (1990).

12

While *Hobby Lobby* did not succinctly discuss any specific burden definition, it revisited that case's issue in *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 140 S.Ct. 2367 (2020)("*Little Sisters*"). *Little Sisters* was appealed from the Third Circuit and reversed. However, in reversing, the Court did not find that the Third Circuit's definition of substantial burden was erroneous, just that that court had applied it erroneously. The substantial burden test applied by the Third Circuit was an "Either-Or" test, and the Third Circuit panel had developed the correct test but provided the wrong answer to the test.

To show a substantial burden, "(1) a follower is forced to choose between following the precepts of his religion and forfeiting benefits otherwise generally available to other [persons] versus abandoning one of the precepts of his religion in order to receive the benefit; or (2) the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Pennsylvania v. President U.S.*, 930 F.3d 543, 572 (2019).[10]

It is obvious that the "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." is a much more lenient test to prove a substantial burden than the *Navajo Nation* test that Defendants' rely on. That test refutes Defendants' two arguments that Plaintiff cannot succeed on the merits because it cannot show a substantial religious burden, because Plaintiff has not been

---

[10] *Little Sisters* used a slightly differently stated test: "First, would non-compliance have substantial adverse practical consequences? 573 U.S. at 720–723, 134 S.Ct. 2751. Second, would compliance cause the objecting party to violate its religious beliefs, *as it sincerely understands them*? *Id.* at 723–726." *Id.* at 2391.

13

denied a government benefit, or it has not been coerced to change its [members] religious beliefs. Doc. 18 at 19-20. It is this "coercion test" that has been modified by the Supreme Court. The *Yoder* case that the *Navajo Nation* majority relied on concerned Amish parents who would be criminally liable if they did not send their children of a certain age to Wisconsin schools. *See, Navajo Nation*, at 1069-70. There is no criminal liability attaching to Plaintiff's members by the Defendants' action of attempting to trade away Plaintiff's member Apaches' Holy Ground and surrounding sacred lands. But, there is a substantial pressure on any Apache worshiper to substantially modify his behavior and to violate his beliefs. As noted above, these worshipers will be fenced out, and ultimately the Holy Ground and the surrounding sacred sites will be sunk about one feet lower into the ground, making those religious shrines irreparably damaged and inaccessible for worship.

### c. *Mockaitis'* Burden is an Example of a Similar Worship-Related Burden Found by the Ninth Circuit based on a Third-Party's Violation of the Sanctity of the Religious Ceremony

The most similar religious substantial burden case to this case is found in *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1996), *overturned on other grds*, *City of Boerne v. Flores*, 521 U.S. 507 (1997). There, under the guise of a criminal investigation, the jail recorded a Catholic priest's sacrament with one of the prisoners. The court found:

> A substantial burden is imposed on [the Archbishop's] free exercise of religion as the responsible head of the archdiocese of Portland by the intrusion into the Sacrament of Penance by officials of the state, an intrusion defended in this case by an assistant attorney-general of the state as not contrary to any law. Archbishop George has justifiable grounds for fearing that without a declaratory judgment and an injunction in this case the administration of the Sacrament of Penance for which he is responsible in his archdiocese will be made odious in jails by the intrusion of law enforcement officers.

*Id*. at 1531.

As in *Mockaitis*, the victim of the religious burdening is not an alleged criminal parishioner that could forego a benefit, or incur a punishment, but rather a religious leader who was prevented from carrying out one of his faith's most sacred services. The equivalent to the Priest Mockaitis in this case would be any of the three Plaintiff representatives, but especially Mr. Hoffman, as he is a Holy Ground leader. Hoffman Declaration (Doc. 7-1) at paragraph 5, p.1; and paragraphs 9-12, pp.2-3.

Also, while the majority in *Navajo Nation* elected not to follow *Mockaitis*, because among other things, it did not define what substantial benefit means, at a minimum it evidences some broader form of substantial burden beyond the narrow two classes that *Navajo Nation* staked out. As noted, the pressure can be indirect. That is, it doesn't need to be the government or a government agency itself causing the pressure. *Thomas v. Review Board of the Indiana Empl. Security Div*., 450 U.S. 707, 718 (1981). ("Although such compulsion may be indirect, the infringement upon free exercise is nonetheless substantial."). Here the prohibiting use of and the ultimate land subsidence burden on the Apaches is much more substantial than a part-time use of recycled water being sprayed on a mountain ski slope. Furthermore, on its facts, the seasonal use of reclaimed water for snowmaking at a mountain resort is not equivalent to massive land alterations that drop a holy site one thousand feet down below the surface of the earth, collapsing the holy site into the bottom of a two-mile wide giant crater.

Finally, before leaving RFRA, in *International Church of Foursquare Gospel v. City of San Leandro*, 873 F.3d 1059, 1066-1070 (9th Cir. 2011)(decided under the

Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, et seq. ("RLUIPA")), the Court recognized that the right of "a place of worship…consistent…with theological requirements" is "at the very core of the free exercise of religion." This interpretation, along with the lessened test approved in *Little Sisters*, raises a serious question going to the merits sufficient for the Court to grant Apache Stronghold an injunction in this case.[11]

**Defendants' Reliance on *Lyng* and Congressional Floor Statements for Interpreting the Later Amended & Expanded RFRA is in Err, and Actually Supports Plaintiff's Raising of a Serious Question Going to the Merits.**

**1.  *Lyng* is Inapplicable to Expanded RFRA Rights as to Federal Lands**

Defendants contend that "*Lyng* and the Ninth Circuit precedent following it hold that government activity on its own land cannot constitute a substantial burden under RFRA." Doc. 18 pp. 21-24. However, in *Navajo Nation* the Defendants' attorney stated when questioned at oral argument about the challenged activity on Forest Service land stated:

> "Q.- So, the use of government land has the potential under RFRA to impose a substantial burden?
>
> Ans.- It is possible that certain activities on certain government land can still substantially burden religious activities.
>
> Q.- And would it then violate RFRA if there were no compelling state interest?
>
> Ans.- Correct. Yes."

---

[11] Plaintiff herein notes to the Court that fencing is a common practice for mining companies, both to keep the property safe from intruders around heavy equipment, minimizing their liability for accidents, as well as to prevent trespassing.  *See, Havasupai Tribe v. United States Forest Service*, 752 F.Supp. 1471, 1486 (D.Ariz. 1990), *affirmed sub. nom., Havasupai Tribe v. Robertson*, 943 F.3d 32 (9th Cir. 1991).

16

*Id*. at 1096 (J. Fletcher, with J. Pregerson and J. Fisher dissenting, *en banc*).

In the intervening twenty years, and with the passage of RFRA, the Defendants' position has changed, and *Lyng* is distinguishable on that point. Other cases also have found actions affecting government lands can be actionable under RFRA. See*, United States v. Hoffman*, 436 F.Supp.3d 1272, 1286 (D.Ariz. 2020)(failing to follow U.S. argument that RFRA does not apply on federal lands).

RFRA preliminary injunctions have issued for interference with worshipping at sacred sites. *See, Comanche Nation v. United States*, No. CIV-08-849, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008)(enjoining U.S. military base's large building construction which was within the Native Americans viewshed of their sacred place, Medicine Bluffs).

**2. Defendants' Use of Congressional Floor Statements Is Improper.**

Defendants attempt to use floor statements from two Senators to argue that RFRA will not apply to "management of governments resources" (Sen. Hatch), Doc. 18 at 23, and "RFRA will not address the circumstances in which Government action on public and Indian lands…infringes upon the free exercise of a native American religion" (Sen. Inouye). *Id*. However, both of those potential restrictions were not included in RFRA. Committee Reports, much less floor language, that cannot be tied to a specific statutory provision cannot be credited nor relied on. See *Shannon v. U.S.*, 512 U.S. 573, 583 (1994)("We are not aware of any case, however...[and none offered] in which we have

17

given authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute.").



**The Storm - Apache, 1906**

A scene in the high mountains of Apache-land just before the breaking of a rainstorm. Print caption by Edward S. Curtis, *The North American Indian*, Portfolio I, Plate no. 9, 1907.

***Usen, the Creator***

*We are vanishing from the earth, yet I cannot think we are useless or Usen would not have created us.  He created all tribes of men and certainly had a righteous purpose in creating each.*

> *For each tribe of men Usen created He also made a home. In the land created for any particular tribe He placed whatever would be best for the welfare of that tribe.*
>
> *When Usen created the Apaches He also created their homes in the West. He gave them such grain, fruits, and game as they needed to eat. To restore their health when disease attacked them He made many different herbs grow. He taught them where to find these herbs, and how to prepare them for medicine. He gave them a pleasant climate and all they needed for clothing and shelter was at hand.*
>
> *Thus it was in the beginning: the Apaches and their homes each created for the other by Usen himself. When they are taken from these homes they sicken and die. How long will it be until it is said, there are no Apaches?*



Geronimo, *Geronimo's Story of His Life*, 1906, 15-16.

## CONCLUSION

Therefore, as to a substantial burden, the last test Plaintiff must meet under RFRA, as in each of the issues presented in the motion for an injunction, Plaintiff raises a serious question, will suffer irreparable injuries with the balance of hardships tipping sharply in Plaintiff's favor. Plaintiff Apache Stronghold is likely to prevail on the merits and an injunction here and now is in the public interest in protecting treaty rights, aboriginal title

rights, federal trust responsibilities, and Apache Stronghold members' statutory rights under RFRA.

Dated: February 1, 2021        Respectfully submitted,

 /s/ Michael V. Nixon
Michael V. Nixon, *pro hac vice*
(OR Bar # 893240)
101 SW Madison Street #9325
Portland OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

_____
Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com