Michael V. Nixon, *pro hac vice*
(OR Bar # 893240)
101 SW Madison Street # 9325
Portland, OR 97207
Telephone: 503.522.4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar # 358287)
5119 North 19th Avenue
Suite K
Phoenix, AZ 85015
Telephone: 602.258.8989
Fax: 602.544.1900
Email: cliff449@hotmail.com

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Phoenix Division

| | | |
|---|---|---|
| Apache Stronghold,<br>　　a 501(c)(3) nonprofit organization,<br><br>　　　　　　　Plaintiff,<br>v.<br><br>United States of America, et al.<br><br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 2:21-cv-00050-PHX-SPL<br><br>**PLAINTIFF'S**<br>**PROPOSED FINDINGS OF**<br>**FACT AND CONCLUSIONS**<br>**OF LAW AND ORDER**<br>**FOR A PRELIMINARY**<br>**INJUNCTION**<br>(No Bond Required) |

*I. Introduction:*

　　Before the Court is the Motion for Preliminary Injunction filed by Plaintiff in conjunction with its application for a Temporary Restraining Order.  Doc. 7. After notice to the Defendants, the Motion for a Temporary Restraining Order, Doc. No. 13, was denied on January 13, 2021; the Court issued in its order scheduling deadlines, and after

granting a joint extension of time, scheduled a February 3, 2021 hearing on the preliminary injunction motion.

The hearing commenced on February 3, 2021 and concluded that same day.

The Court has now reviewed the exhibits and considered the hearing testimony, the governing law, ands the arguments of counsel.  Having done so, the Court issues the following order.

*II. Summary of Claims and Defenses:*

Plaintiff's claims in this action are based on the land selected for the land exchange set to proceed on or about March 11, 2021, per the representations of the Defendants that the land exchange would not be attempted until fifty-five days from the date that the Final Environmental Impact Statement ("FEIS") of the Southeast Arizona Land Exchange and Proposed Resolution Copper Mine was made available to the public on January 15, 2021. This traded land will be a portion of a planned future copper mining site. While the actual mine opening is northwest of the area in dispute, a massive subsidence crater will result which will engulf the prime religious site, Oak Flat, and over two thousand acres of the Historic District. The land is sometimes referred to herein as the Oak Flat areas, which has been listed as the Chi'chil Bildagoteel Historic District in the National Register of Historic Places since 2017.  This listing occurred because of the District's cultural and religious significance to many tribes and particularly because of its ongoing importance as a Western Apache traditional cultural property ("TCP").

Plaintiff asserts five claims of relief, two of which it uses to support its Motion for Preliminary Injunction: 1) a violation of the Religious Freedom and Restoration Act

("RFRA"), as amended, 42 U.S.C. § 2000bb et seq., based on the allegation that the proposed land exchange substantially interferes with the exercise of Plaintiff's Western Apache members' religious beliefs; and 2) the proposed land exchange falls within territory reserved to the Western Apaches by the 1852 Treaty of Santa Fe.  Plaintiff seeks a permanent injunction prohibiting the land exchange as structured and intended.

In its request for a preliminary injunction, Plaintiff seeks to enjoin the Defendants from continuing work on the final aspects per the mandate of the Southeast Arizona Land Exchange and Proposed Resolution Copper Mine, 16 U.S.C. § 539p, as well as prevent the land exchange until this case can be heard on the merits. Defendants ask the Court to deny the preliminary injunction, arguing that Plaintiff do not have standing on the land ownership claim and cannot satisfy the requirements for a preliminary injunction on either claim. Defendants also contend that the proposed Land Exchange is required by Congress, pursuant to the Southeast Arizona Land Exchange and Conservation Act. Defendants do not show any harm would take place by the issuance of an injunction.

*III. Preliminary Injunction Standards:*

A preliminary injunction serves to preserve the status quo pending a final determination of the case on the merits. *Textile Unlimited v. A. BMH & Co. Inc.*, 240 F.3d 781, 786 (9th Cir. 2001)("A preliminary injunction is not a preliminary adjudication on the merits: it is an equitable device for preserving the status quo and preventing the irreparable loss of rights before judgment.").  The standard does not require a plaintiff to show that it is more likely than not to win on the merits, it must only show that there is a "'substantial case for relief on the merits.'" *Lair v. Bullock*, 697 F.3d 1200, 1204 (9th Cir.

2012) (quoting *Leiva-Perez v. Holder*, 640 F.3d 962, 968 (9th Cir. 2011)). The Ninth Circuit applies a "sliding scale" approach, in which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). Federal government land exchanges with private entities are appropriate for injunctions. *Muckleshoot Indian Tribe v. U.S. Forest Service*, 177 F.3d 800, 815 (9th Cir. 1999).

Because Plaintiff in this case asserts two claims for preliminary injunctive relief, the Court must determine whether Plaintiff can satisfy these requirements as to either claim. That determination requires consideration of the elements of the claims asserted and the applicable burden of proof. Defendants argue for the traditional standard of "likelihood of success on the merits" test, but I elect to use the less stringent "serious questions" test, as is available in this circuit.

*b. The RFRA Claims:*

The RFRA claims are asserted by Plaintiff on behalf of its Western Apache members. Plaintiff alleges that any land exchange that would allow the Oak Flat area to become private property would substantially interfere with the exercise of Plaintiff's members' personal religious beliefs as a Western Apache; likewise, Plaintiff also alleges that the future mining operation would substantially interfere with its members' exercise of its religious beliefs by destroying its members' sacred sites.

RFRA provides that the government "shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). To establish a *prima facie* claim under the RFRA, a plaintiff must prove: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion. 42 U.S.C. § 2000bb-1(a).  A plaintiff must establish his *prima facie* case by a preponderance of the evidence. *Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal (Gonzalez v. O Centro),* 526 U.S. 418, 428-29 (2006) (citing *Ashcroft v. American Civil Liberties Union,* 542 U.S. 656, 666, 124 S.Ct. 2783 2004)).

 RFRA defines "exercise of religion" as "a religious exercise," as defined in 42 U.S.C. § 2000cc-5." 42 U.S.C. § 2000bb-2(4). Section 2000cc-5 defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). The exercise of Native American traditional religious practices has been recognized as constituting an "exercise of religion" for purposes of RFRA. *See, e. g. Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008)(*en banc*), *cert. denied*, 556 U.S. 1281 (2009). Defendants do not challenge Plaintiff's RFRA claim based on the latter two elements of the claim, they only challenge the element of showing a substantial burden.

RFRA does not define "substantial burden." The Supreme Court has defined the term by stating that a governmental action which substantially burdens a religious exercise is one where: "the non-compliance ha[s] substantial adverse practical consequences, [*Burwell v. Hobby Lobby, Inc.*,] 573 U.S. at 720–723," and the "compliance cause[s] the objecting party to violate its religious beliefs, *as it sincerely*

understands them. *Id.* at 723–726." *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania* ("Little Sisters")*,* 573 U.S., ___, 140 S.Ct. 2367, 2389 (2020)(*J. Alioto concurring)*. That case regarded applying an agency rule, but a more appropriate definition for this situation is the definition that almost mirrors the *Little Sister*s definition that was applied in the case below in the Third Circuit. That case defined substantial burdening as "the government puts substantial pressure on an adherent to substantially modify his behavior and to violate his beliefs." *Pennsylvania v. President U.S.* ("Pennsylvania"), 930 F.3d 543, 572 (3ʳᵈ Cir. 2019)(*reversed on other grounds*, *Little Sisters* (2020)). The Defendants' argue for a much narrower definition which requires the affected party to lose a benefit or have some threat of legal coercion occur because of the person exercising her religious beliefs. *Navajo Nation*, at 1070.

I would normally follow *Navajo Nation*'s definition as controlling law for determining RFRA's substantial burden test. The *Navajo Nation*'s test relies <u>solely</u> on the two pre-*Smith* cases of *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526 (1972)*. Id.*   However, the Supreme Court has since admonished the lower courts to not narrowly follow the "specific" holdings of its pre-*Smith* "ossified" cases to limit religious believers' RFRA claims. *Burwell v. Hobby Lobby, Inc.* ("Hobby Lobby"), 573 U.S. 682, 716 (2014). The Court also notes that "the amendment went further, providing that the exercise of religion 'shall be construed in favor of a broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution.' § 2000cc-3(g)." *Id*. at 714. Also, in *Hobby Lobby*, the Court expanded the traditional class of persons protected for

their religious beliefs because their entities were not traditional religious organizations, but closely held businesses.

If I were to follow *Navajo Nation* here, I would be perpetuating the use of the ossified cases to narrow religious protections that the Supreme Court admonished against. Therefore, in this instance, with the proposed conveyance of the land in question to a private business which is not required to abide by RFRA, and the ultimate planned and expected destruction of the sacred site, I hold that the appropriate current substantial burden definition should be the one found in *Pennsylvania*.   That is, that the government's action would significantly burden a plaintiff's religious beliefs if that conduct puts substantial pressure on the religious follower to substantially modify their behavior and to violate their beliefs.

I also find that the case of *Mockaitis v. Harcleroad*, 104 F.3d 1522 (9th Cir. 1996), *overturned on other grds*, *City of Boerne v. Flores*, 521 U.S. 507 (1997) is relevant here. There, a Catholic priest was recorded in one of his sacraments he performed with a prisoner by a jailer.  While *Mockaitis* was a First Amendment of the Constitution Free Exercise of Religion case, it further justifies the *Pennsylvania* test.  The *Mockaitis* holding indicates that the harm was to a higher church official, rather than the lay practitioner or priest, and there was no benefit lost or coercion applied to the official. Rather, it was an affront on the religious practice itself.  This further supports my decision to find a definition that is greater than the passé *Navajo Nation* definition.

If a *prima facie* case is shown, the burden shifts to the government to demonstrate that the "application of the burden to the person" is 1) "in furtherance of a compelling

governmental interest;" and 2) "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The government must satisfy this burden by a preponderance of the evidence. *Gonzalez v. O Centro,* at 429.

Plaintiff' RFRA allegations emphasize that Oak Flat has historically been the focus of sacred Apache traditional religious practices, and it continues to have religious significance at the present time. More specifically, Plaintiff contends that the entire National Historic District has traditionally been an area in which religious practitioners gather to pray, gather plants for use in healing and religious ceremonies, and engage in sacred observances.

Defendants argue that the land exchange, especially as to those lands that are within the National Historic District, does not substantially burden Plaintiff's members' ability to exercise their religious beliefs.  They base their argument on the fact that Plaintiff's members will not lose a benefit or be coerced by threat of a civil or criminal penalty in any form.  Defendants also rely on *Northwest Indian Cemetery Protective Association v. Lyng* ("Lyng"), 485 U.S. 439, 108 S.Ct. 1319 (1988) for two propositions. First, they say it, by itself, set a substantial burden test that Plaintiff cannot succeed on because the facts are nearly identical and the case has not been overturned.  Second, Defendants rely on it to claim that RFRA can never be applied to federal land decisions.

One major change that took place with RFRA is that it changed the religious burden that the Government can impose before it becomes liable for a violation.  In *Lyng*, because it was an alleged Constitutional violation, the harm had to prohibit the religious exercise entirely.  However, as mentioned *supra*, the Government conduct need only

"significantly burden" the religious exercise.  This fact alone is sufficient to distinguish *Lyng* on this issue in this matter.

Second, Defendants rely on *Lyng*, for the proposition that RFRA can never apply to federal land decisions.   This is too narrow an interpretation for *Lyng*.   As, Judge Fletcher noted in his dissent in *Navajo Nation*:

> It is hardly an open question whether RFRA applies to federal land. For good reason, none of the defendants argued that RFRA is inapplicable to actions on federal land. There is nothing in the text of RFRA that says, or even suggests, that such a carve-out from RFRA exists. No case has ever so held, or even suggested, that RFRA is inapplicable to federal land.
>
> The majority opinion uses silence of the briefs in this case as an excuse to treat the applicability of RFRA to federal land as an open question.

*Navajo Nation*, at 1095.

For these reason, and the briefing submitted about the Defendants' counsel conceding that RFRA would apply on Defendants' land, I find that RFRA can apply in this matter.

*b. The Land Dispute Claims*

The Treaty claim is asserted by Plaintiff on behalf of its Western Apache members. The Plaintiff's members, who are Western Apaches, through their 1852 Treaty with the United States of America, ("the Treaty"), allege that they have ownership interests in the portion of the lands proposed to be conveyed away in a land swap by the Defendants with a private mining company. Those lands particularly include, but are not limited to, the "Oak Flat Parcel." And the "Oak Flat Parcel" of the proposed Resolution Copper Mine Project is located right near the middle of the Western Apaches' 1852 Treaty lands, as mapped in 1899.  This is the same 2,422 acres discussed in the RFRA

claim.    Plaintiff alleges because of the Treaty provisions, the United States is not owner in fee of this portion of the land it is trying to convey.  Plaintiff now argues that descendents of Apache Chiefs that signed the Treaty also have a right to enforce the Treaty.  Two of those descendants are Dr. Wendsler Nosie, Jr., along with his granddaughter Naelyn Pike.  Each of them are members of the Plaintiff organization.

Defendants raise a variety of defenses as to why the Plaintiff cannot enforce the provisions of the Treaty.  These include that the Plaintiff does not have standing because they argue that only federal-recognized Indian Tribes can enforce treaty rights.  And, that just being a member of such an Indian Tribe does not grant the person standing to sue on behalf of the Tribe.  Defendants mistakenly argue that Plaintiff was somehow involved in challenging the Final Environmental Impact Statement ("FEIS"), however viewing the Complaint and Plaintiff's arguments, that is in err.  Defendant does not make an argument that the terms of the Treaty are not enforceable, however it does claim that Congress has spoken about the disposition of the land in question, even if it is Western Apache aboriginal lands, and Congress can amend Treaties when it elects to.

It is clear that Plaintiff has representational standing to pursue any claims that its members can pursue.  *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977).

So, the question for the Court is two-fold: 1.) can direct decedents from a signatory of an Indian Treaty enforce the terms of the Treaty; and 2,) whether a person who is from a class of Indian decedents enforce a Treaty completed by his tribal

ancestors?  The law has changed after the case of *McGirt v. Oklahoma*, ___ U.S. ___, 140 S.Ct. 2452 (2020).

*IV. Findings of Fact*

1.  The Apache nation and the United States entered into a Treaty in 1852 that was subsequently ratified.

2.  The 1852 Treaty is the only ratified treaty with the Western Apaches and it has never been amended or rescinded.

3.  Treaty Article 1 recognizes "Said nation or tribe of Indians through their authorized Chiefs" as Treaty parties, including Dr, Nosie.

4.  Article 4 binds Apaches (not tribes) "to refer all cases of aggression against themselves or their property and territory, to the government of the United States"

5.  Article 7 binds Apaches to give "people of the United States of America . . . free and safe passage through the territory of aforesaid Indians."

6.  Article 8 authorizes the U.S. establish "military posts and agencies, and . . . trading houses"

7.   Treaty Article 9 states, "that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in Apache territory such laws as may be deemed conducive to the prosperity and happiness of said Indians."

8.  Article 10 authorizes U.S. to provide "donations, presents, and implements"

9.  Article 11 states: the "Treaty shall be binding . . . . [and] receive a liberal construction . . . to the end that the said Apache Indians shall not be held responsible for the

conduct of others, and that the government of the United States shall so legislate and act as to secure the permanent prosperity and happiness of said Indians."

10. The U.S., through the Smithsonian Institution, Bureau of American Ethnology, created and published in 1899 a map of the Western Apaches' Treaty Territory.

11. Dr. Welch testified to inserting a visual arrow at the location of Oak Flats, on the copy of the 1899 Map, Plaintiff's Exhibit 1.

12. The noted map location shows the site as being clearly within the Western Apaches' Treaty Territory.

13. Further, Chí'chil Bildagoteel (Oak Flat) National Register Historic District is in and adjacent to the center of the proposed Resolution Mine's impacts.

14. Some of Arizona's Tribal Lands' claims were resolved by the Indian Claims Commission, ("the Commission.").

15. From 1949 until about 1973, the Commission used Docket 22, for addressing claims to compensate Apache and relate Tribes for lands taken without due authorization or by the United States.

16. The Federal Government, through the Commission, attempted to end Apaches' aboriginal land title by providing compensation for aboriginal lands, defined by the Commission as lands subjected to "exclusive tribal use and occupation from 'time immemorial.'"

17. Dr. Welch found no evidence in Commission proceedings, or elsewhere, of any change or diminishment in the Apaches' reserved treaty rights to the Western Apaches' Treaty Territory.

18. Dr. Welch found no evidence that the United States compensated the Apache Treaty rights holders for Chí'chil Bildagoteel (Oak Flat).

19. Oak Flat is Apache land, as it has been for centuries and is not owned by the United States of America or any other entity or person.  .

20. The Defendants know that the Oak Flat's ground was a place where multiple tribes would inhabit and gather peaceably.

21. Rules adopted by the Commission, not the authorizing statute, (Indian Claims Commission Act of 1946), prohibited the recognition of tracts used by multiple Indian peoples as aboriginal lands of any single claimant group,

22. The Commission, in Docket 22-E, identified all or most of the Oak Flat tract as Yavapai aboriginal lands even though it was also used more frequently and extensively by Apaches.

23. The Commission's proceedings in Docket 22-D resulted in compensation to the San Carlos and White Mountain Apache Tribes for the taking of millions of acres of their lands; the lands for which the Western Apache tribes received compensation did not include Chí'chil Bildagoteel (Oak Flat).

24. The Commission erroneously recognized Chí'chil Bildagoteel (Oak Flat), in Docket 22-E as land exclusively used and occupied by the Yavapai Tribe. Yavapai and Apache customarily shared food gathering areas.

25. Oak Flat, is the primary activity hub for a much larger Western Apache cultural landscape.

26. Apache cultural experts, knowledge holders representing other tribes, and

professional archaeologists have recognized Oak Flat as a local hub for at least ten centuries of residence, food gathering, and ceremonial activity.

27. Pottery fragments, engravings on boulders and cliff faces, roasting areas, and remnants of diverse house structures and other activity areas surround the Emory oak grove and contribute to Chí'chil Bildagoteel historical significance, sense of place, and what is referred to as potency.

28. Multiple tribes' oral histories, historical documents, and archaeological studies obliged the U.S. Forest Service to nominate, and the Keeper of the U.S. National Register to list, Chí'chil Bildagoteel in the National Register of Historic Places.

29. Chí'chil Bildagoteel's landforms, springs, woodlands, canyons, and religious sites collectively embody and define a 4,309-acre cultural landscape of past and ongoing use by and significance to Western Apache people.

30. The 4,309-acre National Register District encompasses the entirety of the 2,422-acre parcel of the Western Apaches' Treaty Territory and Western Apache ancestral land proposed for the land exchange.

31. In addition to their high disdain for destruction to further personal profit, many Western Apache people also view such reckless behavior as extremely dangerous intrusions of secular concerns into highly sensitive and sacred domains of limitless natural and supernatural forces.

32. Western Apache spiritual practice, especially the Sunrise Dance and other Holy Ground ceremonies, exist for the benefit of all of Creation, not just Apaches.

33. The Chi'chil Bildagoteel ("Oak Flat") National Historic District was entered into the

1   National Register of Historic Places in 2017.

2   34. The significance of Oak Flat to Native Americans, and particularly the Western

3   Apache, far predates 1848, the first time the United States claimed jurisdiction over the

4   area.

5   35. The Apaches were using the Oak Flat land before the Treaty of 1852.

6   36. Testimony from two Apaches, and Dr. John Welch, establishes that Oak Flats and its

7   surrounding area remain a sacred site for the Apache people, and a site of significant

8   aspects of traditional Apache religious practices for many Apaches.

9   37. Testimony from Plaintiff's members, including that of Dr. Nosie, Jr., a member of the

10   Western Apache "Tribe" and traditional religious practitioner, explained the importance

11   Oak Flat.

12   38. Testimony from members of the Apaches, Dr. Wendsler Nosie, and Naelyn Pike as

13   well as expert testimony from Dr. John Welch, Simon Fraser University, Professor of

14   Resource and Environmental Management (Welch also directs the Landscape and Site

15   Preservation Program at Archaeology Southwest, a non-profit) described the traditional

16   religious practice of the Apache people as an intensely private spiritual experience that is

17   inextricably intertwined with the natural and supernatural environment.

18   39. Traditional practitioners resist disclosing the location or association of sacred sites,

19   and generally treat such information as confidential.  Apache spiritual practices

20   emphasize respect for all of Creation and rarely involve disturbance of the natural

21   environment. Western Apaches oral histories and religious tradition include many

22   references to specific site and or locations, including Oak Flat.  Testimony during the

hearing made clear that Oak Flat National Register Historic District that is a primary focus for this case, is considered sacred by many Western Apache people and continues to be used for traditional religious purposes. Plaintiff's member Dr. Nosie testified that his traditional religious practice as it relates to Oak Flat involves a physical and spiritual required presence at the site.  These religious beliefs are unavailable at other locations. See also, Hoffman's Declaration at ¶¶ 10-11 p. 3. (a leader in the Holy Ground ceremonies).

40**.**  Testimony from Dr. Welch, and Dr. Nosie relying on the Defendants' prediction of land subsidence, indicated that the Crater created after about 40 years would be larger and deeper than the meteor crater near Winslow Arizona.

*V. Conclusions of Law*

In light of the foregoing findings of fact, and the principles of law set forth in Section III, *supra,* the Court makes the following conclusions of law.

1. Plaintiff has made a clear showing of its entitlement to preliminary injunctive relief, and have established each element necessary for the issuance of such relief, as set forth below.

a) Serious Questions Going to the Merits.

Plaintiff has demonstrated serious questions going to the merits of its RFRA claim. The evidence clearly shows that Oak Flat is Holy Ground and the land surrounding the area up to the boundaries of the National Historic District has been historically, and continues today to be, religious sites of the Apache people

1    Further, this area is the situs of traditional Apache religious practices. The

2  practices engaged in by the Western Apache people in this land area constitute the sincere

3  exercise of religion as defined under the RFRA. The mere trading of this site–if indeed it

4  is truly owned by defendant United States–to Resolution Copper, a private corporation,

5  will impose a substantial burden on the traditional religious practices of the Apache

6  people at Oak Flat, and the surrounding land within the Historical District.

7    The traditional religious practices of the Apache people are inextricably

8  intertwined with the natural environment. Its sacred ceremonies are intensely private. As

9  these practices relate to Oak Flat, the transfer of property as is planned, and the

10  subsequent control and mining in the area will which will destroy Oak Flat as it now

11  exists.  This all results from the pending land exchange.  The specific evidence if land

12  ownership goes to the mining company will be fencing to prohibit trespassing.  And

13  ultimately the Historic District, which also encompasses Oak Flat Holy Ground, will be

14  at the bottom of a 1000 foot crater that is twice as large as the meteor crater near

15  Winslow Arizona. And such extensive exclusion and destruction of the sacred sites

16  because of the land exchange will constitute the Defendants asserting substantial pressure

17  on these Western Apaches to substantially modify their behavior and soon be violating

18  their beliefs.  This is the test for applying a substantial burden on the traditional religious

19  practices and beliefs of the Plaintiff's members. Thus, the evidence amply demonstrates

20  the substantial likelihood that Plaintiff can satisfy the first three elements of a claim under

21  the RFRA, or at least raise serious issues going to the merits on its part of the claim and

22  accordingly, make out a *prima facie* case under the Act.

1  Defendants' arguments that RFRA does not apply to federal lands as a defense to

2  their compliance with RFRA is not accepted.  RFRA does apply to federal lands as both

3  noted in the statute, and as has been found by the case law.

4  Once a *prima facie* case is established, the RFRA burden of proof shifts to the

5  government to demonstrate that the substantial burden imposed upon Plaintiff is in

6  furtherance of a compelling governmental interest, and that the government's action is the

7  least restrictive means of furthering that compelling governmental interest.

8  The record is utterly devoid, of what compelling governmental interest the United

9  States will accomplish by the land transfer for a copper mine to be excavated by the

10  Resolution Copper mining company. Further, even if the Defendants were to have a

11  compelling interest, the record is silent that the planned transfer, which will likely cause

12  the ultimate destruction of the site, as it currently exists, is the least restrictive means of

13  furthering a compelling governmental interest. Thus, since it is unlikely that Defendants

14  can meet their burden under the RFRA, there is a serious question going to the merits,

15  and a substantial likelihood that Plaintiff will prevail on the merits of its RFRA claim.

16  The conclusion regarding the likelihood of success, or at least raising serious

17  questions on the RFRA claim satisfies the first element of the standard for preliminary

18  injunctive relief, however, the Court also concludes that Plaintiff has demonstrated

19  serious questions on its claim that Defendants have not fully considered the fact that the

20  land may remain Western Apache Treaty Lands and not be able to be transferred by the

21  Defendants for the land exchange.

22

As set forth in more detail in section III(b), *supra,* the 1852 Treaty reserving the Western Apaches' lands remains in effect and has never been amended or rescinded. Furthermore, no has been evidence presented demonstrating by clear and convincing proof that the aboriginal title of the Western Apaches has been legally extinguished. In fact, the Plaintiff presented persuasive evidence through the Declaration of John R. Welch, Ph.D. and Dr. Welch's testimony at the preliminary injunction hearing. The evidence submitted during the preliminary injunction hearing substantially demonstrates Defendants' actions were contrary to the letter and the spirit of the 1852 Treaty with the Western Apaches.

The 1852 Treaty at Article 9 states: "that the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries, and pass and execute in Apache territory such laws as may be deemed conducive to the prosperity and happiness of said Indians." The Supreme Court has made clear that "[t]his Court will construe a treaty with Indians as they understood it and as justice and reason demand." *U.S. v. Winans*, 198 U.S. 371 (1905).

In *Winans*, the Court held that the Treaty with the Yakima of 1855, negotiated and signed at the Walla Walla Council of 1855, as well as treaties similar to it, protected the individual Indians' rights to fishing, hunting, and other land uses and privileges pursuant to the terms of the Treaty of 1855. Under the terms of that particular treaty—terms less clear in the reservation of title to or interests or the estates in land for the parcel in question in the present Apache Stronghold case—the Supreme Court stated:

"The right of taking fish at all usual and accustomed places in common with the citizens of the Territory of Washington and the right of erecting temporary buildings for curing them, reserved to the Yakima Indians in the Treaty of 1859, *was not a grant of right to the Indians, but a reservation by the Indians of rights already possessed and not granted away by them.* The rights so reserved imposed a servitude on the entire land relinquished to the United States under the treaty and which, as was intended to be, was continuing against the United States and its grantees, as well as against the state and its grantees."

****

And we have said we will construe a treaty with the Indians as "that unlettered people" understood it, and "as justice and reason demand, in all cases where power is exerted by the strong over those to whom they owe care and protection," and counterpoise the inequality "by the superior justice which looks only to the substance of the right, without regard to technical rules." 119 U.S. 1; 175 U.S. 1. How the treaty in question was understood may be gathered from the circumstances."

*Id.* At 380-381 (citing Choctaw Nation v. United States, 119 U.S. 1 (1886); and *Jones v. Meehan*, 175 U.S. 1 (1899)(emphasis added).[1]

---

[1] *Winans* was also cited by the Ninth Circuit in *U.S. v. Washington*, 520 F.2d. 676, 684-685 (9th Cir. 1975), *cert. denied sub. nom.*, 423 U.S. 1086 (1976):

> The treaties were "not a grant of rights to the Indians, but a grant of rights from them a reservation of those not granted." *United States v. Winans*, 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905). The extent of that grant will be construed as understood by the Indians at that time, taking into consideration their lack of literacy and legal sophistication, and the limited nature of the jargon in which negotiations were conducted. *See id.* at 380, 25 S.Ct. 662.  Although ceding their right to occupy the vast territories in which they had been accustomed to roam unimpeded, the Indians reserved their traditional right to fish at their accustomed places. They granted the white settlers the right to fish beside them. In a sense, the treaty cloaks the Indians with an extraterritoriality while fishing at these locations. Although present Indian status is not understood in terms of tribal sovereignty, recalling past acceptance of that concept aids in perceiving the Indians' understanding of the effect of the treaties which they signed. They retained the right to continue to fish as they were accustomed. Certainly, they did not understand that in permitting other citizens access to their
> traditional fishing areas they were submitting to future regulations calculated to benefit those other citizens.

In *Jones v. Meehan*, the Supreme Court made this very clear:

"A treaty between the United States and an Indian tribe must be construed not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.

When the United States, in a treaty with an Indian tribe, and as part of the consideration for the cession by the tribe of a tract of country to the United States, make a reservation to a chief or other member of the tribe of a specified number of sections of land, whether already identified or to be surveyed and located in the future, the treaty itself converts the reserved sections into individual property; the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple, and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty, or of an act of Congress, have expressly or impliedly prohibited or restricted its alienation."

*Id.* at 1.

b. Irreparable Harm to the Movant if the Injunction is Denied.

Absent preliminary injunctive relief, the land exchange will proceed.  That action will transfer 2,422 acres into private ownership. That land is all within the National Historic District and includes Plaintiff's Holy Ground, Oak Flat. The placing of the Holy Ground and other sacred sites of the Western Apaches into private holdings would impose on their traditional religious practices as detailed *supra,* would constitute irreparable harm.

c. The Threatened Harm to the Movant Must Outweigh any Harm to the Opposing Party if the Injunction is Granted.

The Court is not insensitive to possible economic future harm Defendants and its exchanger mining company estimate will occur in the event of delay.  Defendant has not argued that it will even experience an economic harm in its briefing.  However, any monetary damages Defendants may incur if an injunction issues pale in comparison to the

prospect of irreparable harm to sacred lands and centuries-old religious beliefs and traditions which would occur absent injunctive relief.

d) Issuance of the injunction would not be adverse to the public interest.

The protection and preservation of historic landmarks and traditional cultural and religious practices tied to such lands, consistent with expressions of public policy such as the RFRA is not contrary to the public interest.  Here, even in light of the transfer being required by Congress within sixty days of the publication of the FEIS.  It is implied that that FEIS if it is legally challenged would need to be found to comply with Federal Law. Until that occurs, the sixty days should not begin to run. If that occurs, the Court will once again revisit this issue.

2. In light of the factual findings set forth in § IV *supra,* and the conclusions of law outlined above, a preliminary injunction pursuant to Fed.R.Civ.P. 65 should issue enjoining Defendants, during the pendency of this action, from commencing any further work toward or continuing transfer of the 2,422 acres of property of the land exchange that lie within the Chi'chil Bildagoteel National Historic District, which includes the Holy Ground of Oak Flat.

3. In light of the findings and conclusions set forth herein, the security bond to be posted is not required in light of the non-profit nature of the Plaintiff.

*ORDER*

It is therefore ordered, adjudged, and decreed that Plaintiff's Motion for Preliminary Injunction is GRANTED.

Defendants are hereby preliminarily enjoined from commencing or continuing with any actions related or concerning the land exchange with Resolution Copper regarding any of the land designated within the National Historic Preservation District that includes the Oak Flat Holy Ground.  This injunction applies to Defendants and its agents and employees and those otherwise acting on behalf of Defendants. This injunction shall remain in full force and effect until this action can be determined on the merits or until further order of the Court.

Pursuant to Fed.R.Civ.P. 65(c) Plaintiff does not need to post a bond. Exercise of the Court's discretion to waive bond is warranted because the Native American cultural and religious preservation organization here seeks to enforce essential and significant public rights and basic human rights and a substantial bond requirement would have a chilling effect on future efforts to vindicate public interests and basic human rights. *See, e.g.*, *Cal. ex rel. Van de Kamp v. Tahoe Reg'l Planning Ag'y*, 766 F.2d 1319, 1325 (9th Cir. 1985); *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th Cir. 1975).

IT IS SO ORDERED.