JEAN E. WILLIAMS
Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

TYLER M. ALEXANDER (CA Bar No. 313188)
REUBEN S. SCHIFMAN
Trial Attorneys
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-4224
reuben.schifman@usdoj.gov
tyler.alexander@usdoj.gov

*Attorneys for Defendants*

**THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA
PHOENIX DIVISION**

| | |
|---|---|
| Apache Stronghold,<br><br>Plaintiffs,<br>v.<br><br>United States of America, *et al.*,<br><br>Defendants. | CIVIL NO. 2:21-cv-00050-SPL<br><br>**Federal Defendants' Closing Brief** |

In 2014, Congress decided to exchange National Forest System land for other lands in Arizona. The government does not dispute Plaintiff's members' historical and spiritual connection to the lands to be exchanged; as was plain at the hearing, those connections are sincere. But, at bottom, Plaintiff cannot succeed in this litigation because its legal theories are fundamentally flawed. Initially, neither Plaintiff nor its members are a party to the 1852 Treaty with the Apache, and so lack standing to assert any rights conveyed therein. Even if they had standing, the 1852 Treaty plainly does not convey title to Oak Flat, and Plaintiff has not identified any other document conveying title or placing Oak Flat into trust. Even had Plaintiff established that the Western Apache at one time had aboriginal title over Oak Flat, that title was extinguished long ago, certainly no later than when those lands were incorporated into the National Forest System. Finally, Plaintiff's Religious Freedom Restoration Act ("RFRA") and Free Exercise Clause claims fail because as a matter of law, the government's disposition of its own property does not impose a "substantial burden" on Plaintiff's members' religious exercise.

As noted in Federal Defendants' opposition and at argument, Plaintiff has no likelihood of success on its claims, has not demonstrated any imminent irreparable harm, and the public interest does not favor an injunction. Plaintiff's Motion should be denied.

## I. Plaintiff lacks standing to assert a Tribe's treaty claim to Oak Flat.

A treaty between the United States and an Indian tribe "is essentially a contract between two sovereign nations." *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n,* 443 U.S. 658, 675 (1979). The Supreme Court has long held that in entering into treaties with tribes, the United States "deal[s] with the nation, tribe, or band, and [has] never, so far as is known to the court, entered into . . . treaties with individual Indians . . . ." *Blackfeather v. United States*, 190 U.S. 368, 377 (1903). As with any other treaty between two sovereigns, "[i]t is well established that individuals have no standing . . . in the absence of a protest by the sovereigns involved." *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir. 1990), *cert. denied,* 498 U.S. 878 (1990); *see also Mora v. New York*, 524 F.3d 183, 201 & n.25 (2d Cir. 2008) (collecting cases from ten

1

circuits holding that there is a presumption that treaties "do not create privately enforceable rights in the absence of express language to the contrary"). The rule applies to treaties with Indian tribes as well. *See, e.g.*, *Hebah v. United States*, 428 F.2d 1334, 1337 (Ct. Cl. 1970) ("The very great majority of Indian treaties create tribal, not individual, rights");[1] *Burley v. United States*, No. 18-934L, 2019 WL 2563401, at *4 (Fed. Cl. June 19, 2019) (dismissing claims "Because plaintiff lacks standing to assert tribal claims of the Ponca Indians. . . .").

Thus, had the Treaty of 1852—or any other treaty—provided for any tribal interests in the land at issue, those interests would vest not in Plaintiff, but in a federally-recognized Indian tribe. Plaintiff therefore does not have standing for any of its treaty-based claims. *See* Opp'n to Pl.'s Mot. for Prelim. Inj. 4-8, ECF No. 18; *see, e.g.*, *Attakai v. United States*, 746 F. Supp. 1395, 1402 (D. Ariz. 1990) (holding that individual members of tribe did not have standing to challenge denial of access to sites with tribal significance); *Benally v. Hodel*, 940 F.2d 1194, 1199–1200 (9th Cir. 1991).

Plaintiff argues "the most glaring error in Defendants' Response" is the minimization of the Supreme Court's decision in *McGirt v. Oklahoma*, 140 S.Ct. 2452 (2020). Pl's. Am. Reply 4, ECF No. 36. Plaintiff alleges this case "made it abundantly clear that even a single individual Native American and enrolled member of a federally recognized Indian tribe can assert his treaty rights and the aboriginal land title rights of his people." *Id.* In fact, *McGirt* did not concern aboriginal title at all and is irrelevant here. The case was an appeal by McGirt, an enrolled member of the Seminole Nation of Oklahoma, who was convicted in an Oklahoma state court of sexual assault. Under the Major Crimes Act "[a]ny Indian who commits" certain enumerated offenses "shall be

---

[1] *Hebah* recognized a narrow exception—not applicable here—for individual claims based on a unique treaty clause where the United States agreed to compensate individual Indians for acts done by "bad men" entering the reservation. *See, e.g.*, *Cheyenne & Arapaho Tribes v. United States*, No. 20-143, 2020 WL 7251080, at *7 (Fed. Cl. Dec. 9, 2020).

2

subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States" so long as the offense was within "the Indian country." 18 U.S.C. § 1153(a). The issue before the Supreme Court was whether McGirt committed his crimes in "Indian country," thus depriving Oklahoma state courts of jurisdiction under the Major Crimes Act. The Supreme Court concluded that McGirt's crimes occurred within "Indian country" as they were within the boundaries of the reservation Congress had established for the Creek Indians, and that Congress had never expressly diminished the boundaries of the reservation. 140 S. Ct. at 2460. The case did not concern aboriginal title and did not involve a claim over land brought by an individual Indian tribal member. It has no bearing on this case and certainly does not stand for the proposition for which Plaintiff cites it. The law is clear that any right a tribe may have to Oak Flat must be brought by that tribe, not Plaintiff.

**II.  The Treaty of 1852 did not grant any Tribe title, including aboriginal title, to Oak Flat.**

Even if Plaintiff had standing, the 1852 Treaty did not give any Tribe or individual title to Oak Flat.

The Court has long held that "the interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellin v. Texas*, 552 U.S. 491, 506 (2008). The text at issue here says: "the government of the United States shall at its earliest convenience designate, settle, and adjust [the Apache's] territorial boundaries. . ." 1852 Treaty Art. 9, Defs.' Ex. 101, ECF No. 17-1. The Treaty does not designate or settle such boundaries. The Indian Claims Commission, in evaluating this Treaty said it "was intended primarily as a treaty of peace, not a settlement of conflicting claims. Subsequently, all parties violated the terms of the Treaty of Santa Fe and no one is in position to assert any benefits or rights hereunder." 19 Indian Cl. Comm'n Dec. 212, 238-39 (1968) (ICC Docket Nos. 30A, 48A Findings of Fact). The ICC also found that "Notwithstanding the undertaking of the United States by the terms of said Treaty of July 1, 1852 (10 Stat. 979) to designate, settle and adjust the territorial boundaries of the Apaches, this obligation

3

was never carried out by the United States." *Id*. at 239. At least two other federal courts have also concluded "the treaty does not designate, settle, adjust, define, or assign limits or boundaries to the Indians. It leaves such matters to the future." *Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1022 (E.D. Cal. 2012); *Uintah Ute Indians v. United States*, 28 Fed. Cl. 768, 789 (1993).

Nor does the Treaty provide for any tribe to retain "aboriginal title." Aboriginal title "means mere possession not specifically recognized as ownership by Congress." *Tee–Hit–Ton Indians v. United States*, 348 U.S. 272, 279 (1955). It is not a property right but amounts to "a right of occupancy which the sovereign grants and protects against intrusion by third parties" but which may be terminated at any time "without any legally enforceable obligation to compensate the Indians." *Id*. A tribe seeking to establish aboriginal title has "the burden of proving 'actual, exclusive, and continuous use and occupancy for a long time' of the claimed area." *Native Vill. of Eyak v. Blank*, 688 F.3d 619, 622 (9th Cir. 2012) (*quoting Sac & Fox Tribe v. United States*, 383 F.2d 991, 998 (Ct. Cl. 1967)). "Use . . . alone isn't sufficient to prove exclusive possession." *Id*. at 623. A "tribe or group must exercise full dominion and control over the area, such that it possesses the right to expel intruders, as well as the power to do so." *Id*.; *see also Strong v. United States*, 518 F.2d 556, 560-62 (Ct. Cl. 1975).

No right to aboriginal title or other title is created by the 1852 Treaty. Nor was any right to title provided by any other authority cited by Plaintiff, nor has Plaintiff established that the Western Apache exclusively occupied Oak Flat. Indeed, from the Federal Defendants' initial review, the Oak Flat Parcel appears to lie within the judicially established aboriginal territory of the Yavapai Apache, as determined in ICC Docket 22-E. 15 Indian Cl. Comm'n Dec. 193 (1965). The ICC in 1969 awarded the Yavapai Apache $5,100,000 for the aboriginal land area detailed in Docket 22-E. 20 Indian Cl. Comm'n Dec. 361, 372 (1969). Another Tribe's use of the Oak Flat parcel would be fatal to a claim of aboriginal title to that area by the San Carlos or White Mountain

4

Apache Tribes. *Native Vill.,* 688 F.3d at 622; *see also Pueblo of Jemez v. United States*, 350 F. Supp. 3d 1052, 1093 (D.N.M. 2018).

### III. Regardless, aboriginal title was extinguished long ago.

Congress' power to extinguish aboriginal title is supreme, "whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise...." *United States v. Santa Fe Pacific R.R. Co.,* 314 U.S. 339, 347 (1941).

The Indian Claims Commission was established by Congress in 1946, 25 U.S.C. § 70 (1946), to award compensation for taking of Indian lands by the federal government. *Id.* § 70a(4). "The 'chief purpose of the Act [establishing the Commission] was to dispose of the Indian claims problem with finality.'" *United States v. Dann*, 470 U.S. 39, 45 (1985) (quoting H.R. Rep. No. 79-1466 at 10 (1945)). Consistent with this purpose, courts in this Circuit have repeatedly held that payment of a Commission award of compensation for a taking of aboriginal lands conclusively establishes that the aboriginal title has been extinguished. *United States v. Dann*, 873 F.2d 1189, 1194 (9th Cir. 1989); *United States v. Gemmill*, 535 F.2d 1145, 1149 (9th Cir. 1976); *United States v. Pend Oreille Pub. Util. Dist. No. 1*, 926 F.2d 1502, 1507–08 (9th Cir. 1991).

The San Carlos Apache Tribe, White Mountain Apache Tribe, and "the Western Apache and each group and band thereof" filed a complaint with the Commission seeking compensation for the taking of ancestral lands. 21 Indian Cl. Comm'n Dec. 189, 198 (1969), Defs.' Ex. 102, ECF No. 17-1. The ICC awarded these plaintiffs $4,900,000. 28 Indian Cl. Comm'n Dec. 399, 419 (1972), Defs.' Ex. 103, ECF No. 17-1. Under binding law of this circuit, any claims of the "Western Apache" to aboriginal title over any ancestral lands have been extinguished. Moreover, "reservation of lands for forest purposes effectively extinguishes Indian title." *Havasupai Tribe v. United States*, 752 F. Supp. 1471, 1478 (D. Ariz. 1990), *aff'd sub nom. Havasupai Tribe v. Robertson*, 943 F.2d 32 (9th Cir. 1991). Thus even absent the ICC judgment, it is clear that any aboriginal title was extinguished when Oak Flat became part of the National Forest.

1 **IV.     Any aboriginal title claim is time barred.**

2          Congress enacted the ICCA in 1946, 60 Stat. 1049, to "transfer from Congress to
3  the Indian Claims Commission the responsibility for determining the merits of native
4  American claims." *Dann*, 470 U.S. at 45 (citation omitted) The ICCA gave the
5  Commission "sweeping" authority to consider "all possible accrued claims" against the
6  United States. *Navajo Tribe v. New Mexico*, 809 F.2d 1455, 1465 (10th Cir. 1987); *see*
7  *also* ICCA § 2, 60 Stat. at 1050. The ICCA's jurisdiction over all Indian claims against
8  the United States was thus broad and exclusive. *Navajo Tribe*, 809 F.2d at 1464-70.

9          Congress also included a strict statute of limitations under which any pre-August
10 13, 1946 claims against the United States not brought before August 13, 1951, would be
11 forever relinquished. Section 12 of the ICCA provided that: "[N]o claim existing before
12 such date but not presented within such period may thereafter be submitted to any court
13 or administrative agency for consideration, nor will such claim thereafter be entertained
14 by the Congress." 60 Stat. at 1052; *Navajo Tribe*, 809 F.2d at 1461.

15         Furthermore, under ICCA § 22, payment of a claim under the ICCA bars suit
16 against the United States for any claims "touching any of the matters" presented before
17 the Commission. "[P]ayment of any claim, after its determination in accordance with this
18 Act, shall be a full discharge of the United States of all claims and demands touching any
19 of the matters involved in the controversy." ICCA § 22(a), 60 Stat. at 1055.

20         Here, any claim to aboriginal title existed prior to 1946, and thus the ICCA
21 forecloses any attempt to present this claim to this Court. *See, e.g., Navajo Tribe*, 809
22 F.2d at 1464-70. Given this clear statutory command and the comprehensive nature of the
23 ICCA, courts have repeatedly recognized that Congress expressly deprived the district
24 courts of jurisdiction over claims that could have been presented to the Commission. *See,*
25 *e.g., id.*; *Paiute-Shoshone Indians of Bishop Cmty. v. City of Los Angeles*, 637 F.3d 993,
26 998 (9th Cir. 2011); *Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs*, 570 F.3d 327
27 (D.C. Cir. 2009).

28

### V. Neither *Hobby Lobby* nor *Sisters of the Poor* overturned *Navajo Nation*.

Plaintiff has not shown a "substantial burden" under RFRA as a matter of law and its RFRA claim fails on this basis. ECF No. 18 at 16-24. RFRA itself provides no explicit definition of "substantial burden." However, the Ninth Circuit has consistently held that under RFRA "a 'substantial burden' is imposed **only** when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1069-70 (9th Cir. 2008) (emphasis added) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)); *see also Ruiz–Diaz v. United States,* 703 F.3d 483, 486 (9th Cir. 2012) (explaining the nature of the "forced choice" captured in RFRA's substantial burden component). The Ninth Circuit has reiterated this standard repeatedly, most recently in 2016: "[A] substantial burden under RFRA exists in a context such as this one '**only** when individuals are ... coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions....'" or "force[d] to choose between following the tenets of their religion and receiving a governmental benefit," *Oklevueha Native Am. Church Of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1016 & n.1 (9th Cir. 2016) (emphasis added, citing *Navajo Nation*, 535 F.3d at 1070), *cert. denied*, 137 S. Ct. 510 (2016).

Similarly, in the *La Cuna* case, which involved a claim by tribal members over access to federal property, the court concluded: "In this case, like in *Lyng*, *Navajo Nation*, and *Snoqualmie*, the undisputed facts show that Plaintiffs were neither (a) forced to choose between following their religious precepts or obtaining a governmental benefit (*Sherbert*), nor (b) coerced into abandoning their religious precepts by threat of sanction (*Yoder*)." No. EDCV 11-1478-GW, 2014 WL 12597035, at *7 (C.D. Cal. June 20, 2014). As the *La Cuna* court observed, "[c]entral to all of these cases, and to Free Exercise cases generally, are notions of *coercion* or *compulsion* to act against religious precepts. Without it, there can be no Free Exercise Clause violation—or, in the words of

7

1 RFRA, no 'substantial burden'—even if the governmental conduct has a significant
2 incidental impact on a person's religious exercise." 2014 WL 12597035, at *7 (collecting
3 cases).
4       Plaintiff has not demonstrated that Federal Defendants are taking any coercive
5 action of the type identified in the caselaw—either forcing them to choose between
6 practicing their religion and receiving a government benefit or coercing them not to
7 exercise their religion for fear of sanction. Instead, Plaintiff argues that the Supreme
8 Court has *sub silentio* overturned *Navajo Nation* and redefined the meaning of
9 "substantial burden" under Supreme Court case law. Not so.
10       First, Plaintiff misinterprets *Hobby Lobby* to hold that RFRA is somehow now
11 divorced from the pre-*Smith* cases that RFRA explicitly mentions in its text or announced
12 some new interpretation of "substantial burden." ECF No. 36 at 10-12. This is not what
13 the Court held. Instead, the Court merely rejected as "absurd" the argument that because
14 no pre-*Smith* case "squarely held that a for-profit corporation has free-exercise rights,
15 RFRA does not confer such protection." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S.
16 682, 713, 716 (2014). But that argument has no bearing whatsoever on this case, and the
17 Court's larger opinion fits squarely within the pre-*Smith* framework described above and
18 in both *Hobby Lobby* and *Navajo Nation*.
19       In *Hobby Lobby* as in *Sherbert*, the plaintiffs were coerced to act contrary to their
20 religious beliefs under threat of sanction: if the *Hobby Lobby* plaintiffs did not comply
21 with a government mandate they would "pay a very heavy price—as much as $1.3
22 million per day." *Id.* at 691. The Court reasonably concluded such a sanction constituted
23 a "substantial burden." Thus *Hobby Lobby* is merely one in a long string of cases
24 affirming that a substantial burden can exist under RFRA in the *Sherbert* or *Yoder*
25 circumstances—when the government directly coerces an individual to violate their
26 religious beliefs by threatening a sanction or withholding a benefit otherwise provided by
27 law. *See, e.g.*, *United States v. Lee*, 455 U.S. 252, 254 (1982) (statute required plaintiffs
28 to pay Social Security taxes or face sanction); *Thomas v. Review Bd. of Ind. Emp. Sec.*

8

*Div.*, 450 U.S. 707, 712 (1981) (law denied plaintiff unemployment benefits on basis of religion); *Sherbert*, 374 U.S. at 399–400; *Yoder*, 406 U.S. at 207. The other case Plaintiff relies on, *United States v. Hoffman*, also easily fits into this framework, as in that case "Defendants face criminal sanctions for exercising their religious beliefs." 436 F. Supp. 3d 1272, 1286 (D. Ariz. 2020). No such sanction exists in this case nor is one imminent.

Nor did *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania* ("Little Sisters") redefine "substantial burden." 140 S. Ct. 2367 (2020). Like *Hobby Lobby*, *Little Sisters* concerned the Patient Protection and Affordable Care Act of 2010 (ACA), 124 Stat. 119. The requirement of the ACA at issue in *Little Sisters* obligated certain employers to provide contraceptive coverage to their employees through their group health plans. The Departments that administered the relevant ACA provision exempted certain employers who have religious and conscientious objections from this agency-created mandate. The Third Circuit concluded that "the Departments lacked statutory authority to promulgate these exemptions." *Id*. at 2373. The Supreme Court's holding in the case was quite narrow: "the Departments had the authority to provide exemptions from the regulatory contraceptive requirements for employers with religious and conscientious objections." *Id*. Accordingly the Court reversed the Third Circuit's judgment. The definition of "substantial burden" was not at issue and was not a basis of the Court's holding.

## VI. *Lyng* is fatal to Plaintiff's RFRA claim.

Even if Plaintiff had otherwise demonstrated a "substantial burden," its suit would nonetheless be barred by *Lyng*. ECF No. 18 at 21. The facts of this case are directly analogous to *Lyng* and Plaintiff's attempts to distinguish the case are unavailing. *Lyng*— and the many cases in this Circuit that have expressly followed it, such as *Navajo Nation*—remain binding. As a matter of law, selling, exchanging, or otherwise managing federal land does not constitute a "substantial burden" on a third party's religion under RFRA. Without a substantial burden Plaintiff has not come within RFRA's waiver of sovereign immunity and its RFRA and Free Exercise claims must be dismissed. *Lyng*

explicitly held that construction on the government's own property did not impose a burden sufficient to violate the Free Exercise Clause. *Lyng v. Nw. Indian Cemetery Protective Ass'n*, 485 U.S. 439, 447 (1988). Plaintiff has cited no binding case to hold otherwise. This Circuit has followed *Lyng* in *Navajo Nation*, where plaintiffs also challenged a project on the government's own land. 535 F.3d at 1072. The *Navajo Nation* court concluded "there is nothing to distinguish [the case from] the road-building project in *Lyng* …. We simply cannot uphold the Plaintiffs' claims of interference with their faith and, at the same time, remain faithful to *Lyng*'s dictates." *Id*. The same result has been followed in this Circuit and throughout the country and should be in this case as well. *See, e.g.*, *La Cuna De Aztlan*, 2014 WL 12597035, at *7; *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 91–92 (D.D.C. 2017).

## CONCLUSION

For the reasons stated above, as well as for the reasons stated at argument and in Defendants' Opposition, Plaintiff has not shown a likelihood of success on the merits, an imminent irreparable harm, or that the equities are in its favor. This Court should deny Plaintiff's Motion for a Preliminary Injunction.

Submitted this 5th day of February, 2021,

JEAN E. WILLIAMS
Deputy Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

*/s/ Reuben S. Schifman*
TYLER M. ALEXANDER
REUBEN S. SCHIFMAN
Trial Attorneys
Natural Resources Section
150 M St. NE, Third Floor
Washington, D.C. 20002
(202) 305-4224
reuben.schifman@usdoj.gov
tyler.alexander@usdoj.gov
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I, Reuben S. Schifman, hereby certify that on February 5, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and copies will be sent electronically to the registered participants as identified in the Notice of Electronic Filing.

*/s/ Reuben Schifman*
REUBEN S. SCHIFMAN