# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

## Phoenix Division

| | |
|---|---|
| Apache Stronghold, | No. 2:21-CV-00050-PHX-SPL |
| Plaintiff, | |
| vs. | **AMICUS BRIEF OF RAMON RILEY, THE MORNING STAR INSTITUTE, AND THE MICA GROUP** |
| United States of America, et al., | |
| Defendants. | |

Michalyn Steele
(Pro Hac Vice Pending)
Professor of Law
Brigham Young University
J. Reuben Clark Building
Provo, Utah 84602
steelem@law.byu.edu
Telephone: (801) 422-3239

Stephanie H. Barclay (Pro Hac Vice)
Associate Professor of Law
Director, Religious Liberty Initiative
Notre Dame Law School
3120 Eck Hall of Law
Notre Dame, IN 46556
stephanie.barclay@nd.edu
Telephone: (574) 631-6898

*Counsel for Amici*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................ii

INTERESTS OF AMICI CURIAE........................................................ 1

SUMMARY OF THE ARGUMENT....................................................... 3

   I.   The U.S. Government has a History of Callousness and Coercion
Regarding Indigenous Sacred Sites ................................................. 5

   II.   The Planned and Anticipated Physical Destruction of Oak Flat, an
Indigenous Sacred Site, Constitutes a Substantial Burden under RFRA...... 10

CONCLUSION ...................................................................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Burwell v. Hobby Lobby Stores, Inc.,*
   134 S. Ct. 2751 (2014) ............................................................................... 11, 20

*Comanche Nation v. United States,*
   No. CIV-08-849, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008) .................... 19

*Gonzales v. O Centro Espirita Benef-icente Uniao do Vegetal,*
   546 U.S. 418 (2006) ........................................................................................ 13

*Greene v. Solano County Jail,*
   513 F.3d 982 (9th Cir. 2008) ...................................................................... 11, 12

*Haight v. Thompson,*
   763 F.3d at 560 (6th Cir. 2014) ...................................................................... 12

*Holt v. Hobbs,*
   135 S. Ct. 853 (2015) ........................................................................... 11, 13, 16

*In re Can-ah-couqua,*
   29 F. 687 (D. Alaska 1887) ............................................................................. 18

*Int'l Church of Foursquare Gospel v. City of San Leandro,*
   673 F.3d 1059 (9th Cir. 2011) ......................................................................... 12

*Lyng v. Nw. Indian Cemetery Protective Ass'n,*
   485 U.S. 439 (1998) ................................................................................... 20, 21

*Nance v. Miser,*
   700 F. App'x 629 (9th Cir. 2017) .................................................................... 13

*Navajo Nation v. U.S. Forest Serv.,*
   535 F.3d 1058 (9th Cir. 2008) ............................................................... *passim*

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ........................................................................................ 11

*Slockish v. U.S. Fed. Highway Admin.,*
   No. 08-cv-01169, 2018 WL 2875896 (D. Or. June 11, 2018) ............................ 8

*Thomas v. Review Bd. of Ind. Employment Security Div.,*
   450 U.S. 707 (1981) ........................................................................................ 16

*Village of Bensenville v. FAA,*
    457 F.3d 52 (D.C. Cir. 2006) ................................................................. 22

*Warsoldier v. Woodford,*
    418 F.3d 989 (9th Cir. 2005) ................................................................. 12

*Wisconsin v. Yoder,*
    406 U.S. 205 (1972) ...................................................................... 11, 18

*Yellowbear v. Lampert,*
    741 F.3d 48 (10th Cir. 2014) ................................................................ 12

**Statutes**

42 U.S.C. § 2000bb-1 ................................................................................ 10

42 U.S.C. § 2000bb-3 ................................................................................ 22

**Other Authorities**

U.S Forest Serv., *Final Environmental Impact Statement: Resolution Copper
    Project and Land Exchange* .............................................................. 4, 15

Alex Tallchief Skibine, *Towards a Balanced Approach for the Protection of
    Native American Sacred Sites*, 17 Mich. J. Race & L. 269 (2012) .............. 5, 13

Charla Bear, American Indian Boarding Schools Haunt Many, NPR
    (May 12, 2008, 12:01 AM), https://perma.cc/7WF9-44FD ............................. 18

Erik Ortiz, *Ancient Native American Burial Site Blasted for Trump Border
    Wall Construction*, NBC News (Feb. 12, 2020, 6:13 PM),
    https://perma.cc/K5CY-NWDU ............................................................... 8

Eugene Volokh, *The Individualistic American Law of Religious Exemptions*,
    Washington Post (Jan. 19, 2015), www.washingtonpost.com/news/volokh-
    conspiracy/wp/2015/01/19/the-individualistic-american-law-of-religious-
    exemptions ............................................................................... 16

Fed. Agencies Task Force, American Indian Religious Freedom Act
    Report (1979) .............................................................................. 5

Margaret D. Jacobs, *A Battle for the Children: American Indian Child Removal
    in Arizona in the Era of Assimilation*, 45 J. Ariz. Hist. 31 (2004) ................ 18

National Register Database and Research Ref. # 16000002, NAT'L PARK SERV.,
    https://www.nps.gov/subjects/nationalregister/database-research.html .... 9, 15

Native Burial Sites Blown Up for US Border Wall, BBC News (Feb. 10, 2020),
  https://perma.cc/DC56-Z4DQ ...............................................................................8

*Outcry as Trump officials to transfer sacred Native American land to miners*,
  The Guardian, https://www.theguardian.com/environment/2021/jan/16/
  sacred-native-american-land-arizona-oak-flat ...........................................8, 10

Pillars of Islam, Oxford Islamic Stud. Online,
  https://perma.cc/58QS-USYY ...............................................................................6

Plaintiffs' Objections to Magistrate's Findings and Recommendations,
  *Slockish*, No. 08-cv-01169 (D. Or. Apr. 22, 2020) .............................................8

Sacred Grove, The Church of Jesus Christ of Latter-Day Saints,
  https://perma.cc/LF4N-NXFA ..............................................................................6

Smithsonian Institution, https://library.si.edu/digital-
  library/author/smithsonian-institution-bureau-american-ethnology
  (accessed February 10, 2021) ...............................................................................9

Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for
  Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294 (2021) ..................5, 7, 22, 23

The Quran (Maulawi Sher 'Ali trans., 4th ed. 2015) ...........................................6

The Shrine Today, Shrine of Mariapoch,
  https://perma.cc/3TWQ-ASVR .............................................................................6

Western Wall, Encyclopedia Britannica (Sept. 16, 2020),
  https://perma.cc/X4B5VRQ2 ................................................................................6

**INTERESTS OF AMICI CURIAE**

*Amici* are a Tribal Leader and Cultural Resource Expert, and Native American cultural heritage and rights organizations.

Ramon Riley is a respected Apache elder who serves as the White Mountain Apache Tribe's Cultural Resource Director, NAGPRA Representative, and Chair of the Cultural Advisory Board. Letters he sent to the federal government regarding Oak Flat have been attached as Exhibit A to this Amicus Brief. Riley has spent most of his life and career working to maintain Apache cultural knowledge and pass it down to future generations. As part of that work, he has spent the last two decades working to defend Oak Flat. He opposes the proposed mining project for Oak Flat, because he believes it is wrong to "destroy sacred land that made us who we are." Ex. A at 14.

The Morning Star Institute is a national Native American rights organization founded by Suzan Shown Harjo (Cheyenne and Hodulgee Muscogee.) The Institute organizes observances and ceremonies across the country to mark National Prayer Days to Protect Native American Sacred Places. The first National Prayer Day was held on June 20, 2003, on the grounds of the U.S. Capitol and nationwide to emphasize the need for Congress to enact legislation to protect Native sacred places. At that event, Harjo said the following: "Many Native American sacred places are being damaged because Native nations do not have equal access under the law to defend them. All other

1

people in the United States have the First Amendment to protect their churches. Only traditional Native Americans cannot get into the courthouse through the Freedom of Religion Clauses. That simply must change as a matter of fairness and equity." Harjo served as Congressional liaison for Indian Affairs in the Carter administration and later as president of the National Congress of American Indians. On November 24, 2014, Harjo received the Presidential Medal of Freedom, the United States' highest civilian honor.

The MICA Group (Multicultural Initiative for Community Advancement) is a nonprofit organization that has worked with hundreds of Tribal Nations throughout the country on cultural revitalization and other projects. MICA envisions a world in which Indigenous and minority cultures have a voice, equitable resources, and the capacity to flourish, and Indigenous knowledge systems are recognized as inherently valuable world resources. America's Indigenous sacred sites include 10,000-year-old medicine wheels carved in the bedrock, standing stones, breathtaking cave paintings, intaglios, soaring sacred mountains, mounds, and a miraculous oak forest, Oak Flat, in the middle of the desert. MICA believes that America's own Indigenous places should be treated as irreplaceable world treasures, like Stonehenge, the Pyramids, Machu Picchu, and the Lascaux cave paintings. MICA and its Cultural Resource Fund, a $10 million grant fund dedicated to supporting and protecting Tribal languages, cultures, and places, have partnered with 52 Tribal Nations to protect their

significant Indigenous sites.[1]

The *Amici* in this case discuss how the substantial burden analysis under Religious Freedom Restoration Act (RFRA) ought to be addressed, should this Court reach that issue.

## SUMMARY OF THE ARGUMENT

Meaningful access to sacred sites is a necessary part of the religious exercise of many Indigenous peoples. But tribes have been repeatedly denied such access by the federal government, and thus repeatedly thwarted in their efforts to engage in these central practices of their religions. In many instances, that access has been irrevocably denied and those efforts permanently thwarted by the total destruction of Indigenous sacred sites. Indeed, the colonial, state, and federal governments of this Nation have been desecrating and destroying Native American sacred sites since before the Republic was formed. Now Chi'chil Biłdagoteel, called Oak Flat in English, is at risk of suffering the same fate, a risk the Government fully acknowledges and a fate it has all but sealed.

An Environmental Impact Statement, rushed through by the outgoing Administration, acknowledges that "[p]hysical . . . impacts on . . . tribal sacred sites . . . would be immediate, permanent, and large in scale." 2 U.S Forest Serv.,

---

[1] *Amici* state that no party's counsel authored the brief in whole or in part; no party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting the brief.

*Final Environmental Impact Statement: Resolution Copper Project and Land Exchange* § 3.12.4.10 [hereinafter "*FEIS*"].[2] Further, once the mining operations commence, the "cultural properties cannot be reconstructed" or "fully mitigated," "[s]acred springs would be eradicated," changes will "permanently affect the ability of tribal members to access . . . special interest areas for cultural and religious purposes," and this will constitute an "irreversible loss." 3 *FEIS* § 3.14.4.9. In other words, the Government acknowledges that its actions will result in the complete and irreversible physical destruction of a religious site, and that that destruction will totally prevent the religious exercise that has occurred there for centuries. Such a loss constitutes a substantial burden under the Religious Freedom Restoration Act (RFRA).

The Government's arguments to the contrary regarding RFRA misinterpret or ignore the applicable case law, would eviscerate protections for Indigenous peoples, and give disfavored treatment for sacred sites compared to other forms of religious exercise. This Court should decline the Government's invitation to set precedent regarding the substantial burden analysis that would increase catastrophic consequences for Native peoples already facing widespread destruction of their most sacred places. There may be difficult issues in some disputes over sacred sites on government property. But where, as here, the Government acknowledges its actions will result in physical and irreversible

---

[2] All six volumes of the Final Environmental Impact Statement are available at https://www.resolutionmineeis.us/documents/final-eis.

destruction of a site altogether, the substantial burden analysis should not be one of them.

## I. The U.S. Government has a History of Callousness and Coercion Regarding Indigenous Sacred Sites.

For many Native peoples, they are people *of* a particular place, and their particular homelands and landscapes are inextricably tied to their identity as peoples.[3] So, too, are particular places inextricably tied to spiritual and cultural rites and identity. As Professor Alex Skibine and others have noted: "Native American religions are land based."[4] To deprive tribal people of access to certain sites, or to compromise the integrity of those sites, is to effectively prohibit the free exercise of their religion. There is no adequate substitute and no adequate compensation for the deprivation. The religion is, for all intents and purposes, banned because the specific sites involved are so integral to the rites and beliefs of the people.

While the use of sacred sites is an integral element of worship for many Indigenous peoples,[5] the importance of sacred sites is not wholly unique to them. The Western Wall in Jerusalem is the most holy site in the world for Jewish

---

[3] Much of the material in this Section is drawn from the following article: Stephanie Hall Barclay & Michalyn Steele, *Rethinking Protections for Indigenous Sacred Sites*, 134 Harv. L. Rev. 1294 (2021).

[4] Alex Tallchief Skibine, *Towards a Balanced Approach for the Protection of Native American Sacred Sites*, 17 Mich. J. Race & L. 269, 270 (2012).

[5] *See* Fed. Agencies Task Force, American Indian Religious Freedom Act Report, at i, 51 (1979) ("The attachment of the Native American people to the land is a fact well noted in American history.").

people.[6] The Shrine of Our Lady of Mariapoch, in Burton, Ohio, is a place of pilgrimage for Byzantine and Hungarian-American Catholics.[7] Members of the Church of Jesus Christ of Latter-day Saints find great religious significance in places like the Sacred Grove in upstate New York.[8] Among the five pillars of Islam is the Hajj, encouraging every able-bodied Muslim to make a pilgrimage to Mecca—the holiest city for Muslims—at least once in her lifetime.[9] Practitioners of many and varied religious faiths escape the mundane to commune with the Divine in specific places set aside and sanctified for that purpose.

But what *is* perhaps unique about sacred sites for Indigenous peoples in countries such as the United States is the extent of the obstacles that government has created and maintains to inhibit use of these sacred sites by Native peoples. These obstacles, both historic and contemporary, have resulted in significant interference with Indigenous spiritual practices related to particular sites—often operating as an effective prohibition on these practices.

---

[6]   Western Wall, Encyclopedia Britannica (Sept. 16, 2020), https://perma.cc/X4B5-VRQ2.

[7]   *See* The Shrine Today, Shrine of Mariapoch, https://perma.cc/3T WQ-ASVR.

[8]   Sacred Grove, The Church of Jesus Christ of Latter-Day Saints, https://perma.cc/LF4N-NXFA.

[9] The Quran 2:126 (Maulawi Sher 'Ali trans., 4th ed. 2015) (significance of the Kaaba shrine); *id.* 2:197-203 (instructions for pilgrimage); *id.* 3:97-98 (importance of Mecca); *see also* Pillars of Islam, Oxford Islamic Stud. Online, https://perma.cc/58QS-USYY.

Conflicts arise regarding use of sacred sites largely because so many of these sites are located on what is now government property. Indigenous peoples are then often placed in the difficult position of being beholden to the Government to continue to engage in centuries-old practices and ceremonies. And the Government came to acquire much of this land by ignoring treaties or simply confiscating additional land.[10] For example, at the time of the Dawes Act or General Allotment Act of 1887, 76 Indian tribes held around 138 million acres secured by treaty and executive order. By 1934, after implementation of the allotment policy, tribes had been divested of nearly 100 million additional acres of their remaining lands through opening so-called "surplus" lands to non-Indian settlement and government confiscation.[11]

For many Indigenous peoples, the reality of government divestiture of land means that their most sacred sites are completely within the government's control. And, unfortunately, the government has not often been a respectful neighbor, much less a faithful steward of these sacred spaces. At the hands of both public and private actors, graves have been despoiled, altars decimated, and sacred artifacts crassly catalogued for collection, display, or sale.[12] Nor is this

---

[10] Plaintiff Apache Stronghold asserts that Oak Flat is another such instance, wherein the government has ignored an 1852 treaty that contemplated Apache claims to land in the southwest and 1899 Smithsonian-prepared maps that depicted Oak Flat as within Apache lands. *See* Complaint ¶ 21.

[11] *See* Barclay & Steele, 1311-12.

[12] *See id.*

callous destruction simply a troubling relic of the past. Within the past several years, Indigenous sacred sites have been bulldozed,[13] developed for commercial interests, and even blown up.[14]

Chi'chil Biłdagoteel, called Oak Flat in English, is just the latest episode in this unfortunate saga. An area of land east of present-day Phoenix, Arizona, Oak Flat is sacred to numerous Native American peoples, including the ancestors of today's O'odham, Hopi, Zuni, Yavapai, and Apache tribes. Ex. A at 15. For more than 1,000 years it has been a place where Native peoples have lived, gathered, and held religious ceremonies. Welch Decl. ¶ 27 p. 11-12. The area contains hundreds of Indigenous archaeological sites, Apache burial grounds, ancient petroglyphs, medicinal plants, and numerous sacred sites.[15] As Mr. Riley describes, Chi'chil Biłdagoteel remains today an active site of prayer, the harvesting of sacred plants, and the conducting of religious ceremonies, and is revered as a place where holy springs flow from the earth and where holy beings reside. Ex. A at 15-16.

---

[13] *See Slockish v. U.S. Fed. Highway Admin.*, No. 08-cv-01169, 2018 WL 2875896, at *1 (D. Or. June 11, 2018); *see also* Plaintiffs' Objections to Magistrate's Findings and Recommendations at 17-18, *Slockish*, No. 08-cv-01169 (D. Or. Apr. 22, 2020).

[14] Native Burial Sites Blown Up for US Border Wall, BBC News (Feb. 10, 2020), https://perma.cc/DC56-Z4DQ; Erik Ortiz, *Ancient Native American Burial Site Blasted for Trump Border Wall Construction*, NBC News (Feb. 12, 2020, 6:13 PM), https://perma.cc/K5CY-NWDU.

[15] *Outcry as Trump officials to transfer sacred Native American land to miners*, The Guardian, https://www.theguardian.com/environment/2021/jan/16/sacred-native-american-land-arizona-oak-flat.

The 40-acre grove of old-growth Emory Oaks that comprise Oak Flat, as well as nearly 4,000 additional acres surrounding it, are listed in the National Register of Historic Places as the Chi'chil Biłdagoteel Historic District. Welch Decl. ¶¶ 28-29 p. 12. Chi'chil Biłdagoteel has been on the National Register since 2016, where it is recognized by the federal government as a place of national significance.[16] But the Government's involvement with Oak Flat neither started nor ended in 2006, and it has not always been so positive.

In 1852 the Apaches signed a treaty with the U.S. Government that recognized their territorial rights in several articles, see Motion for TRO at 7, and in 1899 that territory was set out on a map, prepared by the Smithsonian Institution's Bureau of American Ethnology,[17] showing Oak Flat comfortably within Apache territory. Welch Decl. ¶ 12. The significance of these articles is a contested issue in this case. But what is clear is that the Government, without the input of Native peoples—whether through the 1848 Treaty of Guadalupe Hidalgo between the United States and Mexico or otherwise—has in this instance claimed land long occupied and held sacred by Native peoples. That claim was not so absolute at first. Indeed, in 1955, President Eisenhower

---

[16] *See* National Register Database and Research Ref. # 16000002, NAT'L PARK SERV., https://www.nps.gov/subjects/nationalregister/database-research.html.
[17] The Bureau of American Ethnology (or BAE, originally named the Bureau of Ethnology) was established in 1879 by an act of Congress for the purpose of transferring archives, records and materials relating to the Indian of North American from the Interior Department to the Smithsonian Institution. *See* https://library.si.edu/digital-library/author/smithsonian-institution-bureau-american-ethnology (accessed February 10, 2021).

declared Oak Flat off limits to mining. But President Nixon added a loophole 16 years later that would allow mining if the land was first transferred to private owners. Complaint ¶ 21.

That transfer, to mining companies Rio Tinto and BHP Billiton, was enabled by a last-minute rider to a 2014 appropriations bill. *Id.* Repeated efforts over several years by a number of Senators to save Oak Flat on account of its religious significance fell short. *Id.* And last month, the outgoing Administration rushed through a Final Environmental Impact Statement[18] that acknowledges that the future mining operations will result in a crater over 1,000-foot-deep, two miles wide at Oak Flat. *Id.* ¶ 40.

## II. The Planned and Anticipated Physical Destruction of Oak Flat, an Indigenous Sacred Site, Constitutes a Substantial Burden under RFRA.

RFRA provides that the "[g]overnment shall not substantially burden a person's exercise of religion" unless the government "demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a), (b). RFRA claims

---

[18] *Outcry as Trump officials to transfer sacred Native American land to miners*, The Guardian, https://www.theguardian.com/environment/2021/jan/16/sacred-native-american-land-arizona-oak-flat ("[T]he administration sped up the environmental approval process for the transfer by a full year. During a meeting with environmental groups, regional Forest Service officials attributed the accelerated timeline to 'pressure from the highest levels' of the US Department of Agriculture, though the government says it is only because the work was finished more quickly than expected.").

proceed in two parts. First, the Plaintiff must show that their "exercise of religion" has been "substantially burdened." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (en banc). Second, "the burden of persuasion shifts to the government" to satisfy strict scrutiny—i.e., to prove that burdening the Plaintiff's religious exercise is "the least restrictive means" of furthering a "compelling governmental interest." *Id.* The purpose of this framework is to provide "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014).

The Supreme Court has long recognized that government imposes substantial burdens on religious exercise when it makes voluntary religious exercise more costly or difficult, through things like threatened government penalties or denials of government benefits.[19] But courts have recognized that the substantial burden requirement is even more easily satisfied when government makes the voluntary religious exercise physically impossible, by taking away the choice altogether.

For example, in *Greene v. Solano County Jail*, 513 F.3d 982, 988 (9th Cir. 2008), a prison refused to allow an inmate to attend worship services with other prisoners. The Ninth Circuit noted that the prison was not merely giving the

---

[19] *Sherbert v. Verner*, 374 U.S. 398, 399-401 (1963) (state denied unemployment compensation to a Seventh-day Adventist who declined to accept work on her Sabbath); *Wisconsin v. Yoder*, 406 U.S. 205, 207-08, 218 (1972) (government threatened a fine for families who kept Amish children out of school); *Holt v. Hobbs*, 135 S. Ct. 853, 862 (2015) (requiring a Muslim prisoner to either shave the beard he grew for religious reasons or else face disciplinary action).

inmate a "false choice" between forgoing his religious practice or suffering prison discipline. *Id.* Instead, it was stopping his religious practice entirely. *Id.* The court had "little difficulty" concluding that "an outright ban on a particular religious exercise is a substantial burden." *Id.*; *see also Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) ("physically forc[ing an inmate] to cut his hair" would constitute a substantial burden); *Yellowbear v. Lampert*, 741 F.3d 48, 51-52 (10th Cir. 2014) (Gorsuch, J.) ("it d[idn]'t take much work to see that" making religious exercise physically impossible "easily" resulted in a substantial burden by removing any "degree of choice in the matter"); *Haight v. Thompson*, 763 F.3d at 560, 565 (6th Cir. 2014) ("[t]he greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)").

Likewise, in *International Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1066-70 (9th Cir. 2011), the government refused to let plaintiffs build a church at the only site in the city that would accommodate their religious practices. The Ninth Circuit recognized that the right to "a place of worship . . . consistent with . . . theological requirements" is "at the very core of the free exercise of religion." *Id.* (citation omitted). It therefore held that preventing plaintiff from building a place of worship could constitute a substantial burden. *Id.* at 1061, 70. All of these cases involve the same kind of substantial burden—one in which the government has not made an individual's choice to exercise religion more difficult (through fines or denials of benefits), but

has taken away the choice all together.[20]

The physical destruction the government anticipates at Oak Flat will likewise take away any choice Mr. Riley and Plaintiff witnesses have to continue performing their religious exercise at this sacred site. Based on the destruction that will occur at Oak Flat, religious exercise for individuals like Mr. Riley and other Plaintiff witnesses will be made physically impossible. As scholars have acknowledged, Native American religions are "land based," Skibine, *supra* at 270, and the Apache religion of Mr. Riley and other Plaintiff witnesses is no exception. In that religion, Chi'chil Biłdagoteel is land where spiritual powers are physically located, and thus land where religious ceremonies and prayers *must* take place to be effective. "Chi'chil Biłdagoteel is a place of perpetual prayer and the location for eternal ceremonies that must take place there to benefit from and demonstrate religious obligation, responsibility, and respect for the powers at and of Chi'chil Biłdagoteel." Ex. A at 15.

Some of these ceremonies have been described in testimony before this Court. Perhaps most vividly, Ms. Naelyn Pike described the Sunrise Ceremony,

---

[20] Although *Greene* and *International Church of Foursquare Gospel* involve claims made under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), as opposed to RFRA, the Supreme Court and Ninth Circuit have held that RLUIPA and RFRA impose "the same standard." *Holt*, 135 S. Ct. at 860; *Nance v. Miser*, 700 F. App'x 629, 630 (9th Cir. 2017). Thus, courts routinely rely on RLUIPA cases to interpret RFRA and vice versa. *Holt*, 135 S. Ct. at 860 (RLUIPA case relying on RFRA precedent); *Gonzales v. O Centro Espirita Benef-icente Uniao do Vegetal*, 546 U.S. 418, 436 (2006) (RFRA case relying on RLUIPA precedent).

a coming-of-age ceremony for Apache women that represents the Apache creation story. That ceremony relies on tools taken directly from the oaks of Oak Flat, and involves "direct" spiritual "connection to the land" of Chi'chil Biłdagoteel. Hearing of Feb. 3, 2021 Transcript at 44-45. That connection, and thus the continued existence of Oak Flat, is necessary for the ceremony and thus to the exercise of the Apache religion. As Ms. Pike testified, "if we don't have that connection to Nahgosan, the earth, and to Oak Flat, then we are dead inside. We can't call ourselves Apache." *Id.* at 45.

But the Sunrise Ceremony is just part of the religious exercise that occurs at Chi'chil Biłdagoteel. The Apache believe that the Ga'an, spiritual beings akin to angels in the Judeo-Christian tradition, messengers between Usen, the Creator, and the physical world, reside at Oak Flat. *Id.* at 52. All this renders Oak Flat a place "uniquely endowed with holiness and medicine"—from the "holy beings and powers" inscribed on cliffs and boulders, to the acorns that grow on the old-growth Emory oaks, the Apaches' "actual Trees of Life"; from sacred burial sites of Apache warriors, akin to Arlington National Cemetery, to "the sacred spring waters that flow[] from the earth with healing powers not present elsewhere"—and thus a place that "cannot be replaced" if the Apache religion is to continue. Ex. A at 15-16.

These oaks and acorns, burials and springs, and holy beings—particularly the red Ga'an—come from the very ground of Chi'Chil Biłdagoteel. Hearing Tr.

14

at 52. But if the mining operations go forward as planned, that ground will be nothing but a 1,000 foot deep, two mile wide hole. As the Government acknowledges, this hole will swallow the oaks and acorns, bury graves and springs, and destroy or drive away the red Ga'an, who the U.S. Department of the Interior National Park Service's National Register of Historic Places database lists as a "Significant Person[]" at the site.[21] But the damage will be permanent and devastating long before the crater forms. The FEIS acknowledges that the "[p]hysical . . . impacts on . . . tribal sacred sites . . . would be immediate, permanent, and large in scale." 2 *FEIS* § 3.12.4.10. The FEIS continues:

> Traditional cultural properties cannot be reconstructed once disturbed, nor can they be fully mitigated. Sacred springs would be eradicated by subsidence or construction of the tailings storage facility, and affected by groundwater drawdown. Changes that permanently affect the ability of tribal members to access TCPs and special interest areas for cultural and religious purposes also consist of an irreversible loss of resources. For uses such as gathering traditional materials from areas that would be within the subsidence area or the tailings storage facility, the project would constitute an irreversible loss of resources.

3 *FEIS* Vol. 3 § 3.14.4.9.

Such immediate and wholesale destruction of Oak Flat will, as the FEIS fully contemplates, make it impossible for Mr. Riley and other Indigenous peoples to conduct religious activities at Oak Flat as they have been doing for

---

[21] National Register Database and Research Ref. # 16000002, NAT'L PARK SERV., https://www.nps.gov/subjects/nationalregister/database-research.html.

centuries—activities that make up a necessary part of their religious exercise and can take place nowhere else. As a result, Plaintiff easily satisfies RFRA's substantial burden requirements.

Not all tribal members need to share the same belief regarding the importance of sacred sites to be able to bring a RFRA claim. Tribal leaders like Mr. Riley have sincere religious beliefs about religious practices that will no longer be possible at the site if the planned destruction takes place. That is sufficient to at least raise a prima facie RFRA claim. Even if these views were not shared by many tribal members (and they are), the Supreme Court has affirmed that religious freedom protections are "not limited to beliefs which are shared by all of the members of a religious sect" and include protections for even "idiosyncratic" beliefs. *Holt v. Hobbs*, 574 U.S. 352, 353 (2015) (quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 715-16 (1981)).[22]

### III. The Government's Arguments Misunderstand the Law and Would Create a Disfavored Standard for Indigenous Religious Exercise.

The Government's arguments about substantial burden analysis misunderstand both the text and caselaw regarding RFRA. The rule the

---

[22] Eugene Volokh, *The Individualistic American Law of Religious Exemptions*, Wash. Post (Jan. 19, 2015), www.washingtonpost.com/news/volokh-conspiracy/wp/2015/01/19/the-individualistic-american-law-of-religious-exemptions ("Small sects, minority groups within sects, and even idiosyncratic religious believers are as protected as large sects. One doesn't need a note from one's priest to prevail in a religious exemption case.").

Government proposes would result in a double standard in the law that provides Indigenous peoples with less protection for their religious exercise than for other groups in comparable situations.

The Government argues, in effect, that the burden on Plaintiff's religious exercise is *too* great to qualify as a "substantial burden." *See* ECF 18 at 16. The Government says that a "substantial burden" can *only* arise when religious individuals are "forced to choose between following the tenets of their religion and receiving a government benefit," or to choose between their religious exercise and receiving a "criminal sanction." *Id*. at 19. Under this approach, if the Government were threatening to issue a small fine to individuals like Mr. Riley for performing ceremonies at Oak Flat, that would constitute a substantial burden. But because the Government wants instead to allow a mining company to leave a crater where Oak Flat once was, Mr. Riley has suffered no substantial burden to his religious exercise.

This type of rule, if the law, would lead to absurd results. Rather than encourage the Government to act less coercively to avoid liability under religious freedom law with respect to Native American religious liberty rights, such a limited understanding of coercion would encourage the Government to act *more* coercively to avoid liability. For example, courts universally acknowledge that there was a substantial burden in *Yoder*, where Amish families were forced to choose between keeping their children out of school or facing a five-dollar

criminal fine. *Wisconsin v. Yoder*, 406 U.S. 205, 207-08, 218 (1972). But under the Government's reasoning, there would be a substantial burden *only* if the Government threatened a fine or penalty, and there would be no substantial burden if the government forcibly rounded up the children and sent them to a public boarding school without giving the parents a choice. Tragically, that is precisely what the Government did to Native American families from the 1880s to the 1930s.[23] Thus, while threats of penalties or loss of benefits are the most common sticks the Government wields as means of influencing private behavior, they are not the only tools. Naked force is an even stronger instrument of government power.

Aside from being logically backwards, the Government's argument misunderstands both *Navajo Nation* and *Lyng v. Northwest Indian Cemetery Protective Association*. While *Navajo Nation* discussed the denial of benefits and threats of penalties categories of government action, the court immediately after that held that "[a]ny burden imposed on the exercise of religion *short of* that

---

[23] *See* Charla Bear, American Indian Boarding Schools Haunt Many, NPR (May 12, 2008, 12:01 AM), https://perma.cc/7WF9-44FD ("Children were sometimes taken forcibly, by armed police."); Margaret D. Jacobs, *A Battle for the Children: American Indian Child Removal in Arizona in the Era of Assimilation*, 45 J. Ariz. Hist. 31, 31 (2004) (describing how the government would surround Native American camps with troops and take the children away to boarding school with military escort). In an 1887 case, the Alaskan federal district court denied the habeas petition of an Indigenous Alaskan woman who sought to regain custody of her eight-year-old son who had been forced to attend a government-funded Presbyterian school. *In re Can-ah-couqua*, 29 F. 687, 687, 690 (D. Alaska 1887). The court required the child to stay at the school and gave the mother only limited visitation rights. *Id.* at 690.

described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA." 535 F.3d at 1069-70. In other words, *Navajo Nation* held that *Sherbert* and *Yoder* constitute a floor for substantial burden claims, not a ceiling for the type of government coercion that could lead to a finding of substantial burden. Thus, interference with religious exercise that is even greater than the burdens in *Sherbert* and *Yoder* should easily qualify as "substantial" under RFRA.

One court to address government action rendering use of a sacred site physically impossible followed this line of reasoning. In *Comanche Nation v. United States*, the Army attempted to build a warehouse on federal land near Medicine Bluffs, a Native American sacred site. No. CIV-08-849, 2008 WL 4426621 (W.D. Okla. Sept. 23, 2008). But Native Americans sued under RFRA, arguing that the warehouse would occupy "the central sight-line to the Bluffs"— the place where they stood to center themselves for meditation—making their "traditional religious practices" physically impossible. *Id.* at 17. The court explained that a substantial burden resulted where the government action "inhibit[ed]" or "den[ied]" reasonable opportunities to engage in religious activities. *Id.* Under these facts, the court held that the Government's physical interference with religious exercise "amply demonstrate[d]" a "substantial burden on the traditional religious practices of Plaintiffs." *Id.* at 3, 17.

*Navajo Nation* and *Lyng* are also distinguishable from the Oak Flat case because neither case involved the destruction of a sacred site; rather, both

involved claims that the Government had merely "'diminish[ed] the sacredness'" of a site. *Navajo Nation*, 535 F.3d at 1071 (quoting *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 448 (1998)).

In *Lyng*, the plaintiffs alleged that a road would impinge on the "purity" of religious practices in an area encompassing "more than 17,000 acres." 485 U.S. at 453. The Government, however, chose a route that was "the farthest removed from contemporary spiritual sites" so that "[n]o sites where specific rituals take place [would] be disturbed." *Id.* at 453-54. Thus, the plaintiffs in *Lyng* did not allege that any sacred site was destroyed; they alleged that the project made their religious practices less spiritually satisfying. *Id.* at 448-53. Indeed, the Court in *Lyng* said that if the plaintiffs had been "prohibit[ed] . . . from visiting" the area, that "would raise a different set of constitutional questions." *Id.* at 453.[24]

Here, by contrast, Mr. Riley and other Plaintiff witnesses are not saying that the Government has interfered with the purity of their religious practices. They are saying that the Government's actions will prevent them from engaging in those practices at all—by obliterating the area used for those practices and leaving a hole in the ground where Oak Flat once was. Further, in *Lyng*, the

---

[24] It is also worth noting that *Lyng* pre-dates RFRA, so did not consider the application of that law's substantial burden test. And the Supreme Court has specifically rejected the idea that "RFRA merely restored the Supreme Court's" religious freedom standard prior to RFRA, describing such an argument as "absurd." *Hobby Lobby*, 134 S. Ct. at 2773.

Government "could [not] have been more solicitous" toward Native American religious practices while building the road. *Id.* at 453-54. Here, the Government has engaged in underhanded legislative tactics and cut corners on procedural requirements—all to ramrod a deal through that would disregard any protection for this sacred site.

*Navajo Nation* is equally inapposite. There, plaintiffs challenged the use of recycled wastewater to make artificial snow on small fraction of the acreage in a sacred mountain range. 535 F.3d at 1062-63. The Ninth Circuit held that there was no substantial burden, because the snow would have no physical impact on the area: "no plants, springs, natural resources, shrines with religious significance, or religious ceremonies . . . would be physically affected[; n]o plants would be destroyed or stunted; no springs polluted; no places of worship made inaccessible, or liturgy modified." *Id.* at 1063. Instead, "the sole effect of the artificial snow [was] on the Plaintiffs' subjective experience." *Id.*

But this case is not about a diminishment of Plaintiff's "subjective experience" in using the site; it is about their inability to use the site at all. Here, unlike *Navajo Nation*, "plants [will be] destroyed"; areas of "religious significance [will be] physically affected"; and a "place[] of worship [will be] made inaccessible" by being turned into a crater. Thus, the holding in *Navajo Nation*, focused on an injury to "religious sensibilities" divorced from any physical impact to the site, is inapplicable here. *Id.* at 1064.

The Government also argues that "Supreme Court precedent provides that actions government takes on its own land categorically do not constitute a 'substantial burden' on religious exercise." *Id.* at 23. Not so. In *Lyng* and *Navajo Nation*, the courts could have written much shorter opinions if this were the rule, merely stating: "government land, government rules." Of course, as discussed above, neither the Supreme Court nor the Ninth Circuit wrote such an opinion, instead taking pains to highlight the limited nature of the government interference with religious sensibilities. And for good reason. The text of RFRA applies to "all . . . implementation of [federal law]"—foreclosing any blanket carve-out for federal land management decisions. 42 U.S.C. § 2000bb-3(a). Not surprisingly, then, several courts have held that RFRA applies to "a federal governmental decision about what to do with federal land." *Village of Bensenville v. FAA*, 457 F.3d 52, 67 (D.C. Cir. 2006).

In fact, it is precisely because the Government claims control over this land that a baseline of interference with religious exercise exists, much the same way such a baseline of interference exists in the prison context, the military, or even with regards to government zoning.[25] In those other legal arenas, either through statutory or constitutional requirements, Government has recognized that absent affirmative accommodation of religious exercise, the religious practices will be impossible. Ignoring the baseline of government interference here will

---

[25] *See* Barclay & Steele, 1333-38.

result in a disparity in the law that provides lesser protection for Indigenous religious exercise regarding sacred sites.[26]

Ultimately, the Government cannot escape a simple fact: It has not merely made Plaintiffs' religious exercise costlier or more difficult; it has made it impossible. Such an acknowledgement on the Government's part satisfies RFRA's substantial burden requirement.

## CONCLUSION

If this Court addresses Plaintiff's RFRA claim, the Court should rule that the Government has substantially burdened the religious exercise of Plaintiff members. The Government acknowledges that the anticipated mining project will result in irreversible destruction that will necessarily end the religious gatherings that have been taking place on this site for centuries. Given the admitted physical impossibility of further religious exercise at this site, the substantial burden question is an easy issue in favor of the Plaintiffs.[27]

---

[26] *Id.*

[27] *Amici* thank Daniel Loesing, Daniel Judge, Alexandra Howell, and Hadyn Petterson for their work in preparing this brief as student participants in the Notre Dame Religious Liberty Initiative.

Dated: February 10, 2021          Respectfully submitted,

                                  s/ Stephanie H. Barclay
                                  Stephanie H. Barclay

Michalyn Steele                   Stephanie H. Barclay (Pro Hac Vice)
(Pro Hac Vice Pending)            Associate Professor of Law
Professor of Law                  Director, Religious Liberty Initiative
Brigham Young University          Notre Dame Law School
J. Reuben Clark Building          3120 Eck Hall of Law
Provo, Utah 84602                 Notre Dame, IN 46556
steelem@law.byu.edu               stephanie.barclay@nd.edu
Telephone: (801) 422-3239         Telephone: (574) 631-6898

                                  *Counsel for Amici*

## CERTIFICATE OF COMPLIANCE

I hereby certify that:

1. This brief complies with the type-volume limitations of Fed. R. App. P. 29(d) and 32(a)(7)(B) because it contains 5,803 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f)

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 13-Point Century Schoolbook.

February 10, 2021                   /s/ Stephanie H. Barclay
                                    Stephanie H. Barclay

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona by using the appellate CM/ECF system on February 10, 2021.

I certify that all participants in the case have been served a copy of the foregoing by the appellate CM/ECF system or by other electronic means.

February 10, 2021                    /s/ Stephanie H. Barclay
                                     Stephanie H. Barclay