**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Apache Stronghold, | No. CV-21-00050-PHX-SPL |
| Plaintiff, | |
| vs. | **ORDER** |
| United States of America, et al., | |
| Defendants. | |

## I.    BACKGROUND

In 2014, Congress passed the National Defense Authorization Act for Fiscal Year 2015 (hereinafter "NDAA"). PL 113-291, available at https://www.congress.gov/113/ plaws/publ291/PLAW-113publ291.pdf (last visited February 12, 2021). Section 3003 of the NDAA, known as the Southeast Arizona Land Exchange and Conservation Act, authorizes the exchange of land between the United States Government and two foreign mining companies (known collectively as "Resolution Copper"). 16 U.S.C.A. § 539p. The 2,422-acre parcel of Arizona land which the Government will convey to Resolution Copper, located within the Tonto National Forest, includes a sacred Apache ceremonial ground called Chi'chil Bildagoteel, known in English as "Oak Flat." (Doc. 1 at ¶ 3). Congress's stated purpose for authorizing the exchange is to "carry out mineral exploration activities under the Oak Flat Withdrawal Area." 16 U.S.C.A. § 539p(6)(i).

On January 12, 2021, Plaintiff Apache Stronghold, a nonprofit organization seeking

to prevent the colonization of Apache land, filed a Complaint in this Court seeking to prevent the land exchange. (Doc. 1 at ¶ 11). Plaintiff argues the land is held in trust by the United States for the Western Apaches by way of an 1852 Treaty. (Doc. 1 at ¶ 7). Plaintiff further alleges the mine will desecrate Oak Flat in violation of the Apaches' religious liberties and will constitute a breach of the trust. (Doc. 1 at ¶ 10).

On January 14, 2021, Plaintiff filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") seeking to prevent the United States Department of Agriculture from publishing a Final Environmental Impact Statement ("FEIS"), a document that "describes the potential environmental effects" of the mine and "includes detailed mitigation measures to minimize impacts." (Doc. 7); USDA Forest Service, *Resolution Copper Update*, available at https://www.fs.usda.gov/detail/r3/home/?cid=FSEPRD858166 (last accessed February 12, 2021). The FEIS was set for publication on the following day, January 15. (Doc. 7 at 3). Plaintiff alleges Defendants "nefariously" moved up the timeline of the FEIS publication, which was previously set for April of 2021, so the land transfer could finalize before President Biden's inauguration and without adequate time for Plaintiff to contest the sale. (Doc. 1 at ¶ 33, 36-39).

On January 14, 2021, this Court denied the Motion to the extent it sought an emergency TRO because Plaintiff could not show immediate and irreparable injury. (Doc. 13). Specifically, because Plaintiff could not show the land conveyance would occur immediately upon the publication of the FEIS, and in fact Defendants would have 60 days from the publication to complete the exchange, a TRO without notice and opportunity for response was unwarranted. (Doc. 13 at 4). The FEIS was published on January 15, 2021 as scheduled, starting the 60-day clock. *See* USDA, FINAL Environmental Impact Statement, Resolution Copper Project and Land Exchange, available at https://www.resolution mineeis.us/sites/default/files/feis/resolution-final-eis-vol-1.pdf (last visited February 12, 2021). The parties then fully briefed the Motion. (Docs. 7, 18, & 30). In their Response, the Government indicate that the land sale would not take place until 55 days after the publication of the FEIS (*i.e.*, no earlier than March 11, 2021). (Doc. 18-1 at 3-4). The Court

1  held a hearing on the PI on February 3, 2021. (Doc. 37).

2  **II.   LEGAL STANDARD**

3  A preliminary injunction is an "extraordinary remedy that may only be awarded

4  upon a clear showing that the plaintiff is entitled to such relief." *Titaness Light Shop, LLC*

5  *v. Sunlight Supply, Inc.*, 585 F. App'x 390, 391 (9th Cir. 2014) (quoting *Winter v. Nat. Res.*

6  *Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). An injunction may be granted only where the

7  movant shows that "he is likely to succeed on the merits, that he is likely to suffer

8  irreparable harm in the absence of preliminary relief, that the balance of equities tips in his

9  favor, and that an injunction is in the public interest." *Herb Reed Enters., LLC v. Fla.*

10  *Entm't Mgmt., Inc*., 736 F.3d 1239, 1247 (9th Cir. 2013) (quoting *Winter*, 555 U.S. at 20).

11  However, the four factors may be evaluated on a sliding scale under this Circuit's "serious

12  questions" test: "[a] preliminary injunction is appropriate when a plaintiff demonstrates

13  that serious questions going to the merits were raised and the balance of hardships tips

14  sharply in the plaintiff's favor." *All. for the Wild Rockies v. Cottrell*, 632 F. 3d 1127, 1134-

15  35 (9th Cir. 2011) (citing *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (en

16  banc)) (internal quotations omitted).

17  "Likelihood of success on the merits is the most important *Winter* factor; if a movant

18  fails to meet this threshold inquiry, the court need not consider the other factors in the

19  absence of serious questions going to the merits." *Disney Enters., Inc. v. VidAngel, Inc.*,

20  869 F.3d 848, 856 (9th Cir. 2017) (internal citations and quotations omitted); *see also, e.g.*,

21  *Krieger v. Nationwide Mut. Ins. Co*., No. CV-11-1059-PHX-DGC, 2011 WL 3760876, at

22  *1 (D. Ariz. Aug. 25, 2011) ("Because Plaintiff has failed to show a likelihood of success

23  on the merits or the existence of serious questions, the Court will not issue a preliminary

24  injunction. The Court need not address the other requirements for preliminary injunctive

25  relief.").

26  **III.   DISCUSSION**

27  For the following reasons, the Court finds that Plaintiff has not demonstrated a

28  likelihood of success on, or serious questions going to, the merits of its claims.

**A.  Breach of Trust/Fiduciary Duties**

      *i.  Standing*

Plaintiff alleges the land at issue is managed by the Government in trust for the Western Apaches "as a result of official U.S. Government support of actions unilaterally removing the Western Apaches from that land and forcing them to struggle to continue to maintain their relationships to their land." (Doc. 1 at ¶ 51) (Count 3). Thus, Plaintiff argues the conveyance to Resolution Copper is in breach of the Government's trustee and fiduciary duties.

As an initial matter, Plaintiff Apache Stronghold lacks standing to bring the breach of trust claim. The "irreducible constitutional minimum of standing consists of three elements . . . [t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, ___ U.S. ___, 136 S.Ct. 1540, 1547 (2016) (internal punctuation omitted) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180–81 (2000)). Closely related to the constitutional standing requirement that a plaintiff must suffer a personal injury is the prudential requirement that a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975). This limitation serves an important function: It prevents "the adjudication of rights which those not before the Court may not wish to assert" and seeks to ensure "that the most effective advocate of the rights at issue is present to champion them." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc*., 438 U.S. 59, 80 (1978).

But "since the prohibition against a party asserting the legal rights of another is prudential—not constitutional—the Supreme Court may 'recognize[ ] exceptions to this general rule.'" *Al–Aulaqi v. Obama*, 727 F.Supp.2d 1, 15 (D.D.C. 2010) (alteration in original) (quoting *Coal. of Clergy, Laws., & Professors v. Bush*, 310 F.3d 1153, 1160 (9th Cir. 2002)). For example, an organization may have standing to sue on behalf of its members—but only if "its members would otherwise have standing to sue in their own

right." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *see also Ecological Rights Found. v. Pacific Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000). The issue here, then, is whether Apache Stronghold's members have standing.

Apache Stronghold argues "[t]here were no tribes in 1852 in any formal sense" and that, instead, there were "leaders representing . . . dozens of groups of Apaches." (Doc. 47 at 25). Accordingly, Plaintiff argues "the Treaty of 1852 was between the United States and the Western Apache peoples, not with any particular Tribe." (Doc. 30 at 3). By extension, then, Apache Stronghold argues its individual members have standing to assert the Western Apaches' treaty rights because they are direct descendants of Mangas Coloradus, "one of the Apache signatories to the 1852 Treaty," since they "are among the intended beneficiaries of [their] direct ancestor's agreement with the United States." (Doc. 30 at 3).[1] Plaintiff's arguments are unavailing.

"[T]he existence of a trust relationship between the United States and an Indian or Indian tribe includes as a fundamental incident the right of an injured beneficiary to sue the trustee for damages resulting from a breach of the trust." *United States v. Mitchell*, 463 U.S. 206, 226 (1983). However, a treaty, by its very definition, "is 'essentially a contract between two sovereign nations,'" not between individuals. *Herrera v. Wyoming*, 587

---

[1] Plaintiff also argues that the recent Supreme Court case *McGirt v. Oklahoma* "made it abundantly clear that even a single individual Native American and enrolled member of a federally recognized Indian tribe can assert his treaty rights and the aboriginal land title rights of his people." (Doc. 30 at 4) (citing *McGirt v. Oklahoma*, 591 U.S.___, 140 S.Ct. 2452 (2020)); *see also* (Doc. 47 at 77) (Plaintiff's counsel stating he "didn't believe it was necessary" to join the Western Apache tribes as plaintiffs "in light of the Supreme Court's recent decision in *McGirt v. Oklahoma*, where an individual asserted and vindicated his entire tribe's treaty rights to a vast part of the state of Oklahoma"). But in *McGirt*, the plaintiff did not assert or seek to enforce tribal treaty rights. Rather, he suffered individualized injury belonging to him, not the tribe—he had been tried and convicted of a crime by the state of Oklahoma despite committing the crime on federal Indian land. The Court had to adjudicate the tribal land issue before it could adjudicate McGirt's individual rights. Here, at least as it relates to the breach of trust claim, the individual Apache Stronghold members assert no such personalized right. Accordingly, *McGirt* is not instructive here.

5

U.S. ___, 139 S. Ct. 1686, 1699 (2019) (citing *Washington v. Wash. State Com. Passenger Fishing Vessel Assn.*, 443 U.S. 658, 675 (1979)). Accordingly, in most situations, "[r]ights, enumerated under treaties, are reserved to communities or 'tribes' rather than to individuals." *United States v. State of Or.*, 787 F. Supp. 1557, 1566 (D. Or. 1992), *aff'd*, 29 F.3d 481 (9th Cir. 1994), *amended*, 43 F.3d 1284 (9th Cir. 1994).[2]

Where a treaty grants rights to an entire tribe rather than to individual tribal members, "[o]nly the tribe that signed the treaty, or the signatory tribe, can exercise treaty rights." *State v. Posenjak*, 127 Wash. App. 41, 49, 111 P.3d 1206, 1211 (2005) (citing *United States v. Washington*, 641 F.2d 1368, 1372 (9th Cir. 1981) ("The appellants seek to exercise treaty rights as tribes. They may do so only if they are the tribes that signed the treaties.")). And "[i]ndividual Indians do not have any treaty rights, *even if they are descendents* [sic] *of the signers of the treaty*, because a treaty is a contract between sovereigns, not individuals." *Posenjak*, 127 Wash. App. at 49 (emphasis added) (rejecting plaintiff's argument that "he has treaty rights because his great-great-great-grandfather signed the Point Elliott Treaty" since "[t]reaty rights are rights of signatory tribes, not individual Indians.") (citing *Washington*, 443 U.S. at 675).[3]

---

[2] Plaintiff urges the Court to consider cases like *United States v. Winans* in which courts have found individual Indian fishing and/or hunting rights reserved in treaties. (Doc. 51 at 3-4) (citing 198 U.S. 371). But sovereign nations cannot fish or hunt. They can, however, hold title to land. *Compare, e.g.*, *Bess v. Spitzer*, 459 F.Supp.2d 191, 196 (E.D. N.Y. 2006) (finding that "individual Indians lack standing to sue under the Treaty of Fort Albany of 1664 because that Treaty secures rights for 'tribes and bands of Indians' rather than individuals") *with, e.g.*, *United States v. State of Wash.*, 384 F. Supp. 312, 399 (W.D. Wash. 1974), *aff'd and remanded*, 520 F.2d 676 (9th Cir. 1975) (individual Indians had standing to enforce treaty rights because the treaties at issue had individually enforceable provisions guaranteeing the right of the individual Indians to fish on the land). The line of cases in which individual Indians sought to enforce their individual treaty rights to fish or hunt on aboriginal land is inapplicable here.

[3] Although decisions from the Washington Court of Appeals are not binding on this Court, the Ninth Circuit affirmed the *Posenjak* decision, holding in relevant part that "*Posenjak* also claims treaty rights as an individual, but the Point Elliott Treaty reserves rights to tribes as communities, not to American Indians as individuals." *Posenjak v. Dep't of Fish & Wildlife of State of Wash.*, 74 F. App'x 744, 746 n.2 (9th Cir. 2003).

Here, it is immaterial that Apache Stronghold's members are direct descendants of the signatories to the 1852 Treaty because the Treaty only grants tribal rights, not individual rights. Although Plaintiff argues the Apache people were not a "tribe" when the Treaty was signed, it is clear from the plain language of the Treaty that the signors bound the Western Apache people as a whole. The Treaty consistently refers to the Apaches as a "nation or tribe" in the Treaty. In the preamble, the Treaty provides that the individual Apache signatories were "acting on the part of the Apache Nation of Indians." Treaty with the Apache preamble, July 1, 1852, 10 Stat. 979. Further, Article I of the Treaty states "[s]aid *nation or tribe* of Indians *through their authorized Chiefs*" submit to U.S. jurisdiction. *Id.* at art. 1 (emphasis added). The Treaty continuously refers to the "*nation or tribe* of Indians" as the party bound to the agreement. Even reading the language of the 1852 Treaty with a liberal construction in favor of Plaintiff's members' interests as Indians, the Court cannot infer an enforceable trust duty as to any individual Indians. *See Herrera*, 139 S. Ct. at 1699 (describing canon of construction requiring courts to interpret treaties in favor of the Indians). Stated differently, Plaintiff has not shown the Treaty—or any other source of law—creates an *individual* trust duty the United States breached by authorizing the land exchange. The individual Western Apache members therefore lack standing to assert a breach of the trust.

## ii.   Merits

Even if Apache Stronghold had standing to assert the breach of trust claim, it is unlikely to succeed on the merits. Plaintiff does not point to any specific trust language regarding the land at issue, in the 1852 Treaty or elsewhere. Plaintiff has alluded to a trust duty arising from the relationship between the Government and the Indians generally. *See* (Doc. 36 at 5, n.3) (citing the general "federal-Tribe trust relationship" and "the United States' trust responsibility to all federally recognized Indian tribes and individual Indian beneficiaries"); *see also* (Doc. 47 at 86) ("The notion of a trust, to me, involves an obligation on the part of the United States to . . . act for the happiness and . . . prosperity, of the Apaches."). However, at the PI hearing, Plaintiff's expert witness Dr. John R. Welch

testified that he is "not aware of any sort of codified or written-down trust associated with the totality of the Western Apaches or the Eastern Apaches territory referenced in [the] 1852 Treaty." (Doc. 47 at 86).

In 1983, the United States Supreme Court held that "where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) *even though* nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *United States v. Mitchell*, 463 U.S. 206 (1983) (emphasis added) (citing *Navajo Tribe of Indians v. United States*, 624 F.2d 981, 987 (Ct. Cl. 1980)). In *United States v. Jicarilla*, however, the Court clarified the "general trust" relationship between the Government and the Indians. 564 U.S. 162 (2011). The Court acknowledged that a general trustee/beneficiary analogy applied to the Government's relationship with the Indians "in limited contexts." *Id.* at 173. However, the Court explained that, although "relevant statutes denominate the relationship between the Government and the Indians as a 'trust,' that trust is defined and governed by statutes rather than the common law." *Id.* Accordingly, "the [trust] analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).

The requirement that Congress create a specific trust duty by statute derives from Congress's plenary authority over Indian affairs. "[T]he organization and management of the trust is a sovereign function subject to the plenary authority of Congress." *Id.* With this plenary power in mind, the Government "has often structured the trust relationship to pursue its own policy goals." *Jicarilla*, 546 U.S. at 176. Although the Government's trust relationship with the Indians "relat[es] to the welfare of the Indians," it remains "distinctly an interest of the United States" subject to congressional control. *Heckman v. United States*, 224 U.S. 413, 437 (1912). For example, in *Heckman*, the Government sued to prevent certain conveyance of lands by members of an Indian tribe because the conveyances violated restrictions on alienation imposed by Congress. *Id.* at 445–46. The Government

8

sued as the representative of the very Indian grantors whose conveyances it sought to cancel because, while it was formally acting as trustee, the Government was in fact asserting its own sovereign interest in the disposition of the Indian lands. *Id.* at 445. "Such a result was possible because the Government assumed a fiduciary role over the Indians not as a common-law trustee but as the governing authority enforcing statutory law." *Jicarilla*, 546 U.S. at 176.

It is undeniable that the Government "has charged itself with moral obligations of the highest responsibility and trust" to Indians, *Seminole Nation v. United States*, 316 U.S. 286, 296–97 (1942), obligations "to the fulfillment of which the national honor has been committed," *Heckman*, supra, at 437. Nonetheless, this Court must follow Supreme Court precedent. And the Supreme Court tells us that when "the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, . . . neither the Government's 'control' over [Indian land] nor common-law trust principles matter." *United States v. Navajo Nation*, 556 U.S. 287, 302 (2009). "The Government assumes Indian trust responsibilities *only* to the extent it expressly accepts those responsibilities by statute." *Jicarilla*, 546 at 177 (emphasis added).

Here, Mexico ceded the land at issue in this case to the United States via the Treaty of Guadalupe Hidalgo in 1848, four years before the 1852 Treaty was executed. *See* Map of the United States Including Western Territories (scanned map), *in* NATIONAL ARCHIVES CATALOG (1848), available at https://catalog.archives.gov/id/2127339 (last accessed February 12, 2021). At that point, the United States took legal title to the land. This Court has carefully examined the 1852 Treaty and supporting documentation in this case and finds no evidence that the United States ever forfeited that title, or that Congress intended the Government to hold the land in trust for the Western Apaches.

The 1852 Treaty certainly did not create a trust relationship. The parties merely agreed that they would, at a later date, designate territorial boundaries. *See* Treaty with the Apache art. 8, July 1, 1852, 10 Stat. 979 (stating that "the government of the United States shall at its earliest convenience designate, settle, and adjust their territorial boundaries").

When courts have considered such language in the past, they have consistently held it did not give rise to a trust relationship. For example, in *Robinson v. Salazar*, 838 F. Supp. 2d 1006, 1022 (E.D. Cal. 2012), the treaty at issue could "not be said to recognize Indian title" because, by its terms, it did not "designate, settle, adjust, define, or assign limits or boundaries to the Indians" and instead left "such matters to the future." *Id.* The language in the *Robinson* treaty is identical to the language in the 1852 Treaty at issue here. *Id.* (treaty stating that "the aforesaid Government shall, at its earliest convenience, designate, settle, and adjust their territorial boundaries"); *see also Uintah*, *Uintah Ute Indians v. United States*, 28 Fed. Cl. 768, 789 (1993) (finding no trust created based on identical language). And here, Plaintiff concedes that, while there were various efforts to designate those boundaries, those efforts ultimately failed. (Doc. 47 at 87).[4] The 1852 Treaty simply provides no indication that the United States is holding the land in trust for the Apaches.[5]

---

[4] Although Plaintiff provides the Court with maps indicating territorial boundaries, the maps were created decades after the signing of the Treaty by the Smithsonian Institute based on anthropologists' "best interpretation of what the United States and the parties to the 1852 treaties *would have* agreed to as [sic] the time as being Western Apache's . . . treaty territory." (Doc. 47 at 87-88) (emphasis added). They do not change the conclusion that no government document created a trust.

[5] Plaintiff also references the Western Apaches' aboriginal title to the land. *See, e.g.*, (Doc. 7 at 7) ("[T]he Federal Government . . . attempted to 'quiet' Apaches' reserved treaty rights *or aboriginal land title*"). But Apache Stronghold would run into the same standing issue if it sought to assert aboriginal title to the land. *See United States v. Dann*, 873 F.2d 1189, 1195 (9th Cir. 1989) (finding that "individual Indians do not even have standing to contest a transfer of tribal lands" because "[t]he common view of aboriginal title is that it is held by tribes"). Additionally, any aboriginal title the tribes may have had was extinguished in 1873. *See* The San Carlos Apache Tribes of Arizona, *et al*. v. United States, 21 Ind. Cl. Comm 189, 219 (June 27, 1969) (findings of fact), available at https://portal.azoah.com/oedf/documents/17-001-WQAB/SCAT-3-IndianClaimsComm'n .1969.Bates.pdf (last accessed February 12, 2021). ("May 1, 1873 marks the date on which the United States took from the Western Apache Indians their Indian title to all of their aboriginal lands."); *see also United States v. Santa Fe Pac. R. Co*., 314 U.S. 339, 347 (1941) ("The exclusive right of the United States to extinguish Indian title has never been doubted. And whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts.") (internal quotations omitted).

Finally, even assuming the 1852 Treaty did create a trust relationship, Congress made clear its intent to extinguish that trust relationship by passing Section 3003 of the NDAA, and this Court cannot disturb that decision. "It is well settled that an act of [C]ongress may supersede a prior treaty, and that any questions that may arise are beyond the sphere of judicial cognizance and must be met by the political department of the government." *Thomas v. Gay*, 169 U.S. 264, 271 (1898). "Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government." *Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903); *see also Cherokee Nation v. Hitchcock*, 187 U.S. 294, 308 (1902) ("The power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and is not one for the courts"); *Winton v. Amos*, 255 U.S. 373, 391 (1921) ("Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property.")

In 1971, President Nixon authorized Oak Flat to be mined if it were first conveyed to a private entity, and in 2014, Congress authorized that conveyance. (Doc. 7 at ¶ 21). This Court's hands are tied both by Congress and by the Constitution. *Skoko v. Andrus*, 638 F.2d 1154, 1158 (9th Cir. 1979) ("The courts cannot interfere with the administration of public property as arranged by the Congress and the Executive, so long as constitutional boundaries are not transgressed by either branch."). The breach of trust claim must fail.

**B. RFRA and First Amendment Free Exercise Clause (Substantial Burden)**

Although the court cannot find any codified trust, the evidence before the Court shows that the Apache peoples have been using Oak Flat as a sacred religious ceremonial ground for centuries. *See* (Doc. 47 at 41) ("[T]he stories from my great-grandmother and her people, [Oak Flat]'s where she came from. And so those stories that my grandfather who taught my mother, who taught me, I am fourth generation of, I guess prisoners of war."). The spiritual importance of Oak Flat to the Western Apaches cannot be overstated

11

and, in many ways, is difficult to put into words. The importance was immediately apparent at the PI hearing in the sometimes-tearful testimony of Apache Stronghold members Wendsler Nosie and Naelyn Pike. Nosie, co-founder and spokesperson of Apache Stronghold and a member of the San Carlos Apache Tribe, testified that the Apache people grew up with a "fear of military presence" from the U.S., which created a "suppressed way of life." (Doc. 47 at 58). The Apaches, armed with a promise from the U.S. that they "would be able to return to [their] holy and sacred places if [they] conform to being assimilated," were deeply troubled by the forced assimilation. (Doc. 47 at 58). But the Apaches did everything they could to remain connected to their spirituality, remaining "tied to the earth," and "intertwined with the earth, with the mother." (Doc. 47 at 59).

Naelyn Pike, Nosie's granddaughter, testified that, despite the turmoil and threatened ouster, the Apaches have maintained their spiritual connection to the land. Today, the Apache people believe "Usen, the Creator, has given life to the plants, to the animals, to the land, to the air, to the water." (Doc. 47 at 42). Because of this, the Apaches view Oak Flat as a "direct corridor" to the Creator's spirit. (Doc. 47 at 42). The land is also used as a sacred ceremonial ground. Many of the young Apache women have a coming of age ceremony, known as a "Sunrise Ceremony," in which each young woman will "connect her soul and her spirit to the mountain, to Oak Flat." (Doc. 47 at 42, 48). Apache individuals pray at the land and speak to their Creator through their prayers. The Apache people also utilize the land's natural resources, picking acorns, berries, cactus fruit, and yucca to use for consumption. (Doc. 47 at 42). Because the land embodies the spirit of the Creator, "without any of that, specifically those plants, because they have that same spirit, that same spirit at Oak Flat, that spirit is no longer there. And so without that spirit of Chi'Chil Bildagoteel, it is like a dead carcass." (Doc. 47 at 42). If the mining activity continues, Naelyn Pike testified, "then we are dead inside. We can't call ourselves Apaches." (Doc. 47 at 45). Quite literally, in the eyes of many Western Apache people, Resolution Copper's planned mining activity on the land will close off a portal to the Creator forever and will completely devastate the Western Apaches' spiritual lifeblood.

In light of the Western Apaches' deep connection to Oak Flat, Apache Stronghold alleges in this lawsuit that conveying the land to Resolution Copper "puts government-imposed coercive pressure on Plaintiffs to change or violate their religious beliefs" in violation of the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.* (Doc. 1 at ¶¶ 65, 73). Defendants "do not question the sincerity of Plaintiff's religious and historical connection to the lands at issue" and instead argue "Plaintiff has not alleged a government action that 'substantially burdens' their religious exercise." (Doc. 18 at 15, 27).[6]

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]." U.S. Const., amend. I. In *Employment Division v. Smith*, the Supreme Court held that the Free Exercise Clause does not bar the Government from burdening the free exercise of religion with a "valid and neutral law of general applicability." 494 U.S. 872, 879 (1990). However, Congress thereafter enacted the Religious Freedom Restoration Act ("RFRA") because the *Smith* decision "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral towards religion." 42 U.S.C. § 2000bb(a)(4) (citing *Smith*, 494 U.S. at 872). Thus, the RFRA "created a cause of action for persons whose exercise of religion is substantially burdened by a government action, regardless of whether the burden results from a neutral law of general applicability." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008) (citing 42 U.S.C. § 2000bb-1). In other words, RFRA is limited to situations in which Congress has passed a religiously

---

[6] Defendants also argue that construction on public land cannot, as a matter of law, constitute a "substantial burden" on religion. (Doc. 18 at 30- 35). While this Court need not reach this argument, the Court notes that the Ninth Circuit has indicated it would reject this argument. In *Navajo Nation*, the Ninth Circuit assumed, without deciding, "that RFRA applies to the government's use and management of its land" and the dissenting opinion explained that "[i]t is hardly an open question whether RFRA applies to federal land. . . . There is nothing in the text of RFRA that says, or even suggests, that such a carve-out from RFRA exists. No case has ever so held, or even suggested that RFRA is inapplicable to federal land." *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1095 (9th Cir. 2008) (Fletcher, J., dissenting).

neutral law of general applicability, but nonetheless must provide exemptions under that law for certain religious practices if not doing so would substantially burden them.

The law at issue here here—Section 3003 of the NDAA—is a neutral law of general applicability. It merely authorizes the exchange of land with a mining company, and, although it will affect the Apaches' religious practices deeply, that is not its purpose.[7] In the Ninth Circuit, where courts consider a neutral law of general applicability, Free Exercise violations are found only in very limited situations. "Under RFRA, a 'substantial burden' is imposed *only when* individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1058 (emphasis added) (citing *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). In *Yoder*, "the application of the compulsory school-attendance law" to the Amish plaintiffs violated the RFRA because it "affirmatively compel[led them], under the threat of criminal sanction, to perform acts undeniable at odds with fundamental tenets of their religious beliefs." *Id.* (citing *Yoder*, 406 U.S. at 218). In *Sherbert*, the plaintiff refused to work on Saturdays, her faith's day of rest, but was denied government unemployment benefits for failing to accept work without good cause. *Id.* (citing *Sherbert*, 374 U.S. at 399). The state's conditioning of unemployment benefits on the plaintiff's ability to work on Saturdays unconstitutionally forced her "to choose between following the precepts of her religion and forfeiting benefits." *Sherbert*, 374 U.S. at 404. In *Navajo Nation*, the Ninth Circuit held that "[a]ny burden imposed on the exercise of religion short of that described by *Sherbert* and *Yoder* is not a 'substantial burden' within the meaning of RFRA, and does not require the application of the compelling interest test set forth in those two cases." *Navajo Nation*, 535 F.3d at 1070.[8]

---

[7] Apache Stronghold argues the law is in fact intentionally discriminatory. *See* (Doc. 1 at 28). The Court considers that argument more thoroughly *infra* Section (III)(C).

[8] The Court is in receipt of the Amicus Brief filed in this case (Doc. 56), and has considered the arguments and cases cited therein. The Brief urges the Court to find that the limited *Yoder/Sherbert* scenarios merely "constitute a floor for substantial burden claims,

1     The facts of this case are similar to those of *Navajo Nation*. There, the Government

2  released plans to use artificial snow containing treated sewage water to expand the Arizona

3  Snowbowl Ski Resort, located within sacred government-owned Navajo land in northern

4  Arizona. *Id.* at 1063. The plaintiffs, the Navajo Tribe and its members, argued the use of

5  the sewage water would "spiritually contaminate the entire mountain and devalue their

6  religious exercises" in violation of the Free Exercise Clause. *Id.* The Ninth Circuit held that

7  the plaintiffs could not maintain an RFRA action because they could not show "substantial

8  burden." *Id.* The Ninth Circuit acknowledged the land's "long-standing religious and

9  cultural significance to Indian tribes." *Id.* at 1064. The Navajo people believed the

10  mountains were "a living entity," conducted religious ceremonies on them, and collected

11  plants, water, and other materials from them. *Id.* Nonetheless, bound by precedent, the

12  Ninth Circuit held "there is no showing the government has coerced the Plaintiffs to act

13  contrary to their religious beliefs under the threat of sanctions, or conditioned a

14  governmental benefit upon conduct that would violate the Plaintiffs' religious beliefs, there

15  is no 'substantial burden' on the exercise of their religion." *Id.* at 1063; *see also, e.g.*,

16  *Snoqualmie Indian Tribe v. F.E.R.C.*, 545 F.3d 1207, 1213–15 (9th Cir. 2008) (rejecting

17  tribe's RFRA claim because "[t]he Tribe's arguments that the dam interferes with the

18

---

19  not a ceiling for the type of government coercion that could lead to a finding of substantial

20  burden." (Doc. 56 at 24). However, all of the cases cited in the brief interpret what is

     required for "substantial burden" under the Religious Land Use and Institutionalized

21  Persons Act ("RLUIPA"), which applies to prisoners' rights and state land use laws, not

22  the RFRA. And while it is true that each statute uses "the same standard," *see Holt v.*

     *Hobbs*, 135 S. Ct. 853, 860 (2015), this merely means that both statutes require the

23  government to pass a strict scrutiny analysis where the law in question imposes a

24  "substantial burden" on religious rights. What constitutes a "substantial burden," however,

     has evolved differently under each statute. *See Navajo Nation*, 535 F.3d at 1078 (expressly

25  rejecting plaintiffs' reliance on RLUIPA cases because "instead the 'substantial burden'

26  question must be answered by reference to the Supreme Court's Pre-*Smith* jurisprudence,

     including *Sherbert* and *Yoder*, that RFRA expressly adopted. Under that precedent, the

27  Plaintiffs have failed to show a 'substantial burden' on the exercise of their religion").

28  Under current Ninth Circuit RFRA precedent, Section 3003 does not impose a substantial

     burden.

1    ability of tribal members to practice religion are irrelevant to whether the hydroelectric

2    project either forces them to choose between practicing their religion and receiving a

3    government benefit or coerces them into a Catch-22 situation: exercise of their religion

4    under fear of civil or criminal sanction.").

5           To be sure, the *Navajo Nation* court found no substantial burden in part because

6    there were "no plants, springs, natural resources, shrines with religious significance, or

7    religious ceremonies that would be physically affected by the use of such artificial snow.

8    No plants would be destroyed or stunted; no springs polluted; no places of worship made

9    inaccessible, or liturgy modified." *Navajo Nation*, 535 F.3d at 1063. Instead, "[t]he only

10   effect of the proposed upgrades is on the Plaintiffs' subjective, emotional religious

11   experience." *Id.* at 1070. And this Court recognizes that the burden imposed by the mining

12   activity in this case is much more substantive and tangible than that imposed in *Navajo

13   Nation*—the land in this case will be all but destroyed to install a large underground mine,

14   and Oak Flat will no longer be accessible as a place of worship. *See, e.g.*, FEIS at 84

15   (finding that the "[c]onstruction and operation of the mine would profoundly and

16   permanently alter . . . Chí'chil Biłdagoteel (Oak Flat) . . . through anticipated largescale

17   geological subsidence"); FEIS at 25 ("the proposed mine would disturb large areas of

18   ground and potentially destroy native vegetation").

19          However, the Ninth Circuit also explained that the Supreme Court *Lyng* decision

20   would have compelled it to reach the same result even if the use of artificial snow would

21   "virtually destroy the . . . Indians' ability to practice their religion." *Navajo Nation*, 535

22   F.3d at 1072. In *Lyng*, the plaintiffs, Indian tribes, challenged the U.S. Forest Service's

23   approval of plans to construct a road on a ceremonial tribal ground. *Lyng v. Northwest

24   Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988). The tribes alleged the construction

25   would interfere with their free exercise of religion by disturbing a sacred area. *Id*. at 442–

26   43. The area was an "integral and indispensable part" of the tribes' religious practices, and

27   a Forest Service study concluded the construction "would cause serious and irreparable

28   damage to the sacred areas." *Id*. at 442 (citations and internal quotation marks omitted).

Nonetheless, the Supreme Court rejected the Indian tribes' Free Exercise Clause challenge. The Court held that, although the government's plan would "diminish the sacredness" of the Indian land and would "interfere significantly" with their ability to practice their religion, it did not impose a "heavy enough" burden to violate their Free Exercise Clause rights. *Id.* at 447-49. Because the plaintiffs were not "coerced by the Government's action into violating their religious beliefs" nor did the "governmental action penalize religious activity by denying [the plaintiffs] an equal share of the rights, benefits, and privileges enjoyed by other citizens," they could not make out an RFRA claim. *See id.* at 449. Even where land is physically destroyed, the government action must still fall within those two narrow situations to make out a Free Exercise violation under RFRA.[9]

Apache Stronghold runs into the same problem as plaintiffs in both *Navajo Nation* and *Lyng*, each of which is still good law and binding upon this Court: Plaintiff has not been deprived a government benefit, nor has it been coerced into violating their religious beliefs. The Court does not dispute, nor can it, that the Government's mining plans on Oak Creek will have a devastating effect on the Apache people's religious practices. To that same end, the Western Apache peoples no doubt derive great "benefits" from the use of Oak Flat, at least in the common sense of the word. However, Oak Flat does not provide the type of "benefit" required under RFRA jurisprudence: It isn't something the Government gave to the Western Apaches, like unemployment benefits, and then took away because of their religion. Similarly, building a mine on the land isn't a civil or criminal "sanction" under the RFRA. *See* SANCTION, Black's Law Dictionary (11th ed.

_____

[9] Plaintiff urges this Court to apply what it considers a "much more lenient test to prove substantial burden than the *Navajo Nation* test" as set forth in *Little Sisters of the Poor Saints Peter and Paul Home*, 140 S.Ct. 2367 (2020). (Doc. 30 at 12-14). Plaintiff urges the Court to instead consider whether "the government puts substantial pressure on [the Apaches] to substantially modify [their] behavior and to violate [their] beliefs." (Doc. 30 at 13). But the *Little Sisters* case did not abrogate the test set forth in *Lyng* and *Navajo Nation*—it did not reconsider the "substantial burden" standard at all. And in fact, the Ninth Circuit has applied the *Yoder/Sherbert* framework set forth in *Lyng* and *Navajo Nation* recently as July 20, 2020. *See, e.g.*, *Fazaga v. Fed. Bureau of Investigation*, 965 F.3d 1015, 1061 (9th Cir. 2020).

2019) (defining a "sanction" as a "provision that gives force to a legal imperative by either rewarding obedience or punishing disobedience"). "Just as the Ninth Circuit and other courts must follow *Lyng* until the Supreme Court instructs otherwise, this Court must do the same." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 239 F. Supp. 3d 77, 94 (D.D.C. 2017). Accordingly, Plaintiff's RFRA and Free Exercise claims must fail.[10]

### C. First Amendment Free Exercise Clause (Intentional Discrimination)

At the PI hearing, Plaintiff indicated that "for the purposes of the preliminary injunction, the only two issues before the Court . . . are the Treaty rights and the serious question of who owns that land, and the Religious Freedom Restoration Act rights that have been violated." (Doc. 47 at 80). However, the Court notes that Plaintiff has not demonstrated a likelihood of success on, or serious questions going to, the merits of its other claims.

Plaintiff alleges Section 3003 intentionally discriminates against the Western Apaches because the Government "designed" the land conveyance "in a way that made it impossible for Plaintiffs to comply with [] their religious beliefs" and further promulgated the sale "in order to suppress the religious exercise of Plaintiff Apache Stronghold and its Western Apache members." (Doc. 1 at ¶ 84).

---

[10] Plaintiff cites *Burwell v. Hobby Lobby* for the proposition that the RFRA cannot be read "as restricting the concept of the 'exercise of religion' to those practices specifically addressed in our Pre-*Smith* decisions." 573 U.S. 682, 714 (2014); *see also* (Doc. 47 at 12) (Plaintiff arguing that the *Hobby Lobby* decision "admonished the lower courts not to narrowly follow the 'specific' holdings of its pre-Smith 'ossified' cases to limit religious believers' RFRA claims"). But in *Hobby Lobby*, the Court considered the discrete issue of whether corporate entities could be considered "persons" under the RFRA, not the type of government activity that would cause a "substantial burden." *See Hobby Lobby*, 573 U.S. at 715-716 ("[T]he results would be absurd if RFRA merely restored this Court's pre-*Smith* decisions in ossified form and did not allow a plaintiff to raise a RFRA claim unless that plaintiff fell within a category of plaintiffs one of whom had brought a free-exercise claim that this Court entertained in the years before Smith."). The *Hobby Lobby* decision did not amend the previous "substantial burden" standard set forth in *Lyng*, and it does not change that analysis here.

As explained above, the Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion]," U.S. Const., amend. I. The right to freely exercise one's religion, however, "does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Emp. Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252 (1982) (Stevens, J., concurring in judgment)). Under the governing standard, "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).

In assessing neutrality and general applicability, courts evaluate both "the text of the challenged law as well as the effect . . . in its real operation." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) (ellipsis in original) (internal quotation marks omitted). "A law lacks facial neutrality if it refers to a religious practice without a secular meaning discernable from the language or context." *Lukumi*, 508 U.S. at 533. Even if a law is facially neutral, it may nonetheless fail the neutrality test if "[t]he record . . . compels the conclusion that suppression of [a religion or religious practice] *was the object* of the ordinances." *Id*. at 534, 542 (emphasis added); *see also Selecky*, 586 F.3d at 1130 ("[I]f the *object* of a law is to infringe upon or restrict practices because of their religious motivation, the law is not neutral.") (emphasis added) (quoting *Lukumi*, 508 U.S. at 533).

The Southeast Arizona Land Exchange and Conservation Act is facially neutral, and Plaintiff has provided no evidence of any discriminatory intent behind its passage. At the PI hearing, when asked what evidence of discriminatory intent Apache Stronghold has, Plaintiff's counsel could not directly answer the question. (Doc. 47 at 91-92). Instead, Plaintiff argued Apache Stronghold's members "presented repeatedly before the introduction of the National Defense Authorization Act Section 3003 rider, about the central religious importance of this place, Oak Flat" but that "there's no deliberate regard

for it" in the Act, "much less an utterance that there's a compelling government interest" to convey the land to Resolution Copper. (Doc. 47 at 92). But a lack of deliberate regard for the Apaches religious ties to the land, as disappointing and inappropriate as it may be, in no way shows that the law was passed with the objective to discriminate against them. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979) ("[E]ven if a neutral law has a disproportionately adverse effect . . ., it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.").

Because Section 3003 is neutral, Plaintiff is unlikely to succeed on its Intentional Discrimination claim. A neutral law need only be "rationally related to a legitimate government purpose." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1075-76 (9th Cir. 2015). The Court finds, at this juncture, that the governmental interest in supporting economic development of mineral resources is likely more than sufficient to withstand rational basis review. *See, e.g.*, *Merrifield v. Lockyer*, 547 F.3d 978, 991 (9th Cir. 2008) (noting the "relatively easy standard of rational basis review"). Accordingly, Plaintiff is unlikely to succeed on the Free Exercise Clause Intentional Discrimination claim.

**D. Due Process and Petition Clause Claims**

     *i.  Standing*

Plaintiff's Due Process and Petition Clause claims are based only on the publication of the FEIS. (Doc. 47 at 80). As an initial matter, Plaintiff likely lacks standing to contest the publication of the FEIS because Plaintiff cannot show that a favorable decision from this Court would redress its alleged injury. As the Court stated in its Order denying the TRO, Plaintiff's alleged injury stems from the land exchange, not the FEIS publication. (Doc. 13 at 3). But the land exchange, and subsequent mining activity, can still occur even if the FEIS was not published or is somehow otherwise rescinded. *See* 16 U.S.C. § 539p(B) (stating that the FEIS "shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations" but not requiring that it be published before the exchange can occur). Although the NDAA indicates that the land exchange would occur within 60 days of the FEIS publication, Plaintiff has not shown the

publication was a *requirement* to proceed with the land exchange. From the plain text of the FEIS, it doesn't appear so. Accordingly, Apache Stronghold hasn't demonstrated its standing to bring the Due Process and Petition Clause claims.

ii.   *Merits*

Even if Apache Stronghold had standing to assert the Due Process and Petition Clause claims, it is unlikely to succeed on the merits of those claims. Per Plaintiff's own timeline, on January 4, 2021, Reuters reported that the Forest Service was set to publish the FEIS on January 15, 2021. (Doc. 1 at 12). Plaintiff alleges this eleven-day window did not provide sufficient time for Plaintiff to challenge the FEIS publication and protect their "treaty rights, property rights, religious freedom rights, and other legal rights." (Doc. 1 at ¶ 44). But Plaintiff had much longer than eleven days to contest the FEIS and land exchange.

"The Due Process Clause of the Fifth Amendment prohibits the United States . . . from depriving any person of property without 'due process of law.'" *Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also* U.S. Const. amend. XV. "[D]ue process requires the government to provide 'notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Similarly, the First Amendment Petition Clause protects "the right of the people . . . to petition the Government for a redress of grievances." U.S. Const. amend. I. However, the Petition Clause "does not impose any affirmative obligation on the government to listen, to respond to or . . . to recognize" those grievances. *Smith v. Ark. State Highway Emps., Local 1315*, 441 U.S. 463, 465 (1979). Plaintiff is unlikely to succeed on the Due Process and Petition Clause claims because it received sufficient notice of, and opportunity to contest, the FEIS and the land exchange itself.

"Publication in the Federal Register is legally sufficient notice [under the Fifth Amendment] to all interested or affected persons regardless of actual knowledge or

21

hardship resulting from ignorance." *State of California ex rel. Lockyer v. F.E.R.C.*, 329 F.3d 700, 707 (9th Cir. 2003) (citing *Camp v. U.S. Bureau of Land Mgmt.*, 183 F.3d 1141, 1145 (9th Cir.1999)); *see also* 44 U.S.C. § 1507 (providing that Federal Register publication generally "is sufficient to give notice of the contents of the document to a person subject to or affected by it"). Here, Defendants—specifically the Forest Service— published the "Notice of intent to prepare an Environmental Impact Statement for approval of a plan of operations for the Resolution Copper Project and associated land exchange; request for comments; and notice of public scoping" on the Federal Register on March 18, 2016. *See* Federal Register, Tonto National Forest; Pinal County, AZ; Resolution Copper Project and Land Exchange Environmental Impact Statement, available at https://www.federalregister.gov/documents/2016/03/18/2016-05781/tonto-national-forest -pinal-county-az-resolution-copper-project-and-land-exchange-environmental (last visited January 26, 2021). The Forest Service received comments for two months following publication. Commentors were invited to send written comments by P.O. box or email, submit comments on USDA's Resolution Copper website, submitting verbal messages to a phone number, or submitting written or oral comments during open house held by the Forest Service on four separate dates.

Although January 4th may have been the first notice of the January 15th date of publication, it is not the first notice Plaintiff had of the land exchange. To the contrary, Apache Stronghold alleges its members "have repeatedly pleaded with Defendants directly in person and in correspondence, publicly and privately—including numerous appearances and presentation of testimony before Congress over the past several years—and participating in various federal agency and Forest Service administrative processes, asserting their Apache land rights and requesting Defendants to comply with their obligations and to recognize and honor their Apache land rights." (Doc. 1 at ¶ 11). And at the PI hearing, Wendsler Nosie presented a book, over an inch thick, detailing Apache Stronghold's "Comments on the Resolution Copper Project and Land Exchange Draft Environmental Impact Statement submitted by the Apache Stronghold." (Doc. 47 at 63).

Nosie further testified that he presented testimony to Congress before the passage of the NDAA "many "[m]any times." (Doc. 47 at 65). In fact, Nosie "visited all of the Congressional agencies, leaders, you know, to express the concerns and positions of the tribe," testimony which was "specifically in regard to the religious importance of Oak Flat and what was being proposed in terms of a copper mine." (Doc. 47 at 65). Although Congress disagreed with, or perhaps even disregarded, Apache Stronghold's pleas, Apache Stronghold was not denied a voice—at least not under the law. Plaintiff is therefore unlikely to succeed on its Due Process or Petition Clause claims.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff has not identified a likelihood of success on, or serious questions going to, the merits of its claims. Accordingly, the Court need not address the remaining *Winter* factors. The Court cannot grant the preliminary injunction requested.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 7) is **denied**.

Dated this 12th day of February, 2021.

Honorable Steven P. Logan
United States District Judge