1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                        FOR THE DISTRICT OF ARIZONA

8    Apache Stronghold,                    )    No.  CV-21-00050-PHX-SPL
                                           )
9                                          )
                        Plaintiff,         )
10   vs.                                   )    **ORDER**
                                           )
11                                         )
     United States of America, et al.,     )
12                                         )
                                           )
13                      Defendants.        )
                                           )
14   _____  )

15

16          Before the Court is Plaintiff's Motion for Injunction Pending Appeal (Doc. 150),

17   Defendant-Intervenor Resolution Copper Mining LLC's Response in Opposition (Doc.

18   156), the Federal Defendants' Response in Opposition (Doc. 157), and Plaintiff's Reply

19   (Doc. 162). In its Motion, Plaintiff "requests that the Court lift the stay of this case (ECF

20   81) to enter a narrow, temporary injunction prohibiting Federal Defendants from

21   transferring Oak Flat to Defendant-Intervenor Resolution Copper during the pendency of

22   Apache Stronghold's Supreme Court appeal." (Doc. 150 at 1–2). On May 7, 2025, the

23   Court conducted a hearing on the Motion where it heard witness testimony and oral

24   argument. (ME 167). The Court now rules as follows.

25        **I.    PROCEDURAL HISTORY**

26          While this action was initiated in federal court in 2021, the underlying dispute is

27   now well over a decade in the making. On January 12, 2021, Plaintiff Apache Stronghold

28   filed its Complaint seeking to prevent a congressionally authorized land exchange between

the federal government and Resolution Copper Mining LLC ("Resolution Copper"). (Doc. 1). The exchange at issue is set to occur pursuant to a statute passed by Congress in 2014, the National Defense Authorization Act for Fiscal Year 2015 (the "NDAA"). (Doc. 1 at ¶ 30); Pub. L. No. 113-291, 128 Stat. 3292. Section 3003 of the NDAA, known as the Southeast Arizona Land Exchange and Conservation Act (the "Land Exchange Act"), dictates that a 2,422-acre parcel of federally owned land will be conveyed to Resolution Copper in exchange for 5,344 acres of land currently owned by the company. *See* 16 U.S.C. § 539p(b)(2), (d)(1). The 2,422-acre parcel set to be transferred is located within the Tonto National Forest and includes a sacred Apache ceremonial ground called *Chi'chil Bildagoteel*, known in English as "Oak Flat." (Doc. 1 at ¶¶ 2, 30). Plaintiff alleges that the land transfer would violate it and its members First and Fifth Amendment rights, would violate the Religious Freedom Restoration Act ("RFRA"), and would breach the federal government's trust and fiduciary duties to the Western Apache people. (Doc. 1).[1]

The Land Exchange Act mandates that "[n]ot later than" sixty days after the Secretary of the United States Department of Agriculture publishes a Final Environmental Impact Statement ("FEIS"), the Secretary "shall" convey Oak Flat to Resolution Copper. 16 U.S.C. § 539p(c)(10). On January 4, 2021, the Forest Service announced that the FEIS

---

[1] Two related cases were filed in January 2021 challenging the land transfer. *See San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 21-cv-00068-DWL (D. Ariz.); *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 21-cv-00122-DWL (D. Ariz.). The San Carlos Apache Tribe sued the Forest Service to stop the land transfer, asserting similar claims as *Apache Stronghold* (claiming violations of RFRA, the Free Exercise Clause, and the 1852 Treaty of Santa Fe), as well as claims that the 2021 FEIS was deficient under the Administrative Procedure Act ("APA") and other statutes. (*See* Doc. 133-1 at 293 n.5); *Apache Stronghold v. United States*, 101 F.4th 1036, 1132 n.5 (9th Cir. 2024). Similarly, a coalition of environmental and tribal groups sued to enjoin the transfer and vacate the FEIS under the APA and other statutes. (*Id.*). On April 16, 2021, this Court denied a Motion to Consolidate the three cases, noting that the additional legal theories asserted in those cases varied from the religious liberty claims primarily at issue in *Apache Stronghold*. (Doc. 79 at 2–3).

Now that the Forest Service has issued its 60-day notice of the republication of the FEIS, parties in the two related cases have requested, and been issued, expedited briefing deadlines to file their own motions for preliminary injunction challenging the transfer. *See* ME 78, *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 21-cv-00068-DWL (D. Ariz. May 5, 2025); ME 64, *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 21-cv-00122-DWL (D. Ariz. May 5, 2025).

would be published on January 15, 2021. (Doc. 133-1 at 23). Accordingly, on January 12, 2021, Plaintiff filed its Complaint in this Court (Doc. 1), and on January 14, 2021, it filed a Motion for Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") seeking to halt the transfer (Doc. 7). While this Court quickly denied the TRO on the basis that, in light of the 60-day notice period, Plaintiff had not shown that any *immediate* irreparable injury would occur, it ordered expedited briefing and set a hearing on Plaintiff's PI Motion. (Doc. 13).

On February 12, 2021, following full briefing and a hearing, this Court denied Plaintiff's Motion for PI, finding that Plaintiff had not demonstrated a likelihood of success on the merits as to any of its three claims. (Doc. 57); *Apache Stronghold v. United States*, 519 F. Supp. 3d 591, 604 (D. Ariz. 2021). Plaintiff promptly filed an interlocutory appeal. (Doc. 59). Plaintiff also filed an Emergency Motion to Stay (Doc. 61), requesting that this Court enter an injunction pending appeal prohibiting Defendants from carrying out the land exchange until the interlocutory appeal was fully resolved. (Doc. 61 at 2). This Court denied that request on February 22, 2021. (Doc. 64).

On March 1, 2021, the U.S. Forest Service rescinded the FEIS to engage in further consultation and analysis. (Doc. 80 at 2–3 & n.1). The land exchange would not occur until a new FEIS was published. (*Id.* at 2). On March 5, 2021, a three-judge Ninth Circuit panel considered and denied Plaintiff's emergency motion for an injunction pending appeal, noting that publication of a new FEIS would take "months," and that Plaintiff's motion was therefore premature. *Apache Stronghold v. United States*, No. 21-15295, 2021 WL 12295173, at *1 (9th Cir. Mar. 5, 2021). Although the panel "express[ed] no view on the merits," Judge Bumatay, in dissent, argued that Plaintiff had established a strong likelihood of success on the merits and was therefore entitled to a preliminary injunction. *Id.* at *3 (Bumatay, J., dissenting). He argued that Plaintiff was entitled to the injunction pending appeal because the Government's decision to rescind the FEIS did "not defeat Apache Stronghold's showing of irreparable harm," and did not "guarantee that Oak Flat [wouldn't] be transferred during this appeal." *Id.* at *6 (Bumatay, J., dissenting). On May

12, 2021, this Court stayed this action pending disposition of the appeal on the merits. (Doc. 81). The Court also ordered the Forest Service to provide 60 days' notice to Plaintiff's counsel, the public, and the Court before the republication of a FEIS for the land exchange at issue. (Doc. 81).

In 2022, a divided three-judge Ninth Circuit panel affirmed this Court's order on the merits. *Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022). In dissent, however, Judge Berzon argued that the majority had applied "an overly restrictive test for identifying a 'substantial burden' on religious exercise" under RFRA. *Id.* at 773–74 (9th Cir.). The Ninth Circuit granted rehearing *en banc*. *Apache Stronghold v. United States*, 56 F.4th 636 (9th Cir. 2022).

After rehearing the case *en banc*, the Ninth Circuit ultimately issued a 6-5 decision affirming this Court's denial of a preliminary injunction against the land exchange. (Doc. 133); *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024). The *en banc* order consisted of seven separate written opinions totaling 246 pages. (Doc. 133-1). On September 11, 2024, Apache Stronghold filed a petition for writ of certiorari with the Supreme Court. (Doc. 138 at 2). The Court originally scheduled the matter for its conference on November 22, 2024, but it has subsequently "relisted" the matter for consideration thirteen times. (Doc. 140 at 2; Doc. 150 at 2; Doc. 158 at 2).

On April 17, 2025, the Forest Service filed its 60-day notice of publication of the new FEIS pursuant to this Court's prior order. (Docs. 81, 148). This will trigger the land transfer as soon as June 16, 2025. (Doc. 150 at 5). On April 25, 2025, Apache Stronghold filed the instant Motion (Doc. 150) requesting that the Court lift the stay on this case and enter a temporary injunction prohibiting Federal Defendants from transferring Oak Flat to Resolution Copper during the pendency of Apache Stronghold's Supreme Court appeal. This Court lifted the stay for the purpose of considering and ruling on the Motion, set an expedited briefing schedule, and scheduled a hearing on the Motion, which occurred on May 7, 2025. (Doc. 153; ME 167). The Motion has been fully briefed and is now ripe for review.

## II.    LEGAL STANDARDS

### A.    Injunction Standard

A party seeking injunctive relief must show that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The Ninth Circuit weighs these factors on a sliding scale, such that where there are only 'serious questions going to the merits'— that is, less than a 'likelihood of success' on the merits—a preliminary injunction may still issue so long as 'the balance of hardships tips sharply in the plaintiff's favor' and the other two factors are satisfied." *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018) (citing *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013)).

### B.    Injunctions Pending Appeal

Under Federal Rule of Civil Procedure 62, "While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). Federal Rule of Appellate Procedure 8 indicates that a party must move *first* in the district court for an order granting an injunction while an appeal is pending. Fed. R. App. P. 8(a)(1)(C).

"[C]ourts evaluate injunctions pending appeal using a standard that is "similar" to the one for preliminary injunctions, not one that is identical." *NetChoice v. Bonta*, 761 F. Supp. 3d 1232, 1235 (N.D. Cal. 2025). If the Court were to do otherwise, it would be placed in the peculiar position of having "to decide that it was wrong before," in which case an injunction pending appeal "would be no different than reconsideration." *Id.* "Thus, it does not follow that parties need to meet the high bar for reconsideration to secure an injunction pending appeal." *Id.* A district court may enter an injunction pending appeal "even when it 'believe[s] its analysis in denying preliminary injunctive relief is correct.'" *Id.* (quoting *Am. Beverage Ass'n v. City & Cnty. of S.F.*, No. 15-cv-03415, 2016 WL 9184999, at *2

(N.D. Cal. June 7, 2016). Because granting such an injunction remains "an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (citation omitted), it is "[o]nly when the legal question raised is particularly important and 'serious questions going to the merits' have been raised should a district court consider such a course of action." *NetChoice*, 761 F. Supp. 3d at 1236 (citing *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011)).

### III.    DISCUSSION

A majority of the Ninth Circuit *en banc* held that Apache Stronghold's claims under the Free Exercise Clause and RFRA failed based on the Supreme Court's decision in *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439 (1988), and that its claim under the 1852 Treaty of Santa Fe failed because the Government's statutory obligation to transfer Oak Flat pursuant to the Land Exchange Act would abrogate any treaty obligation. (Doc. 133-1 at 14–58); *Apache Stronghold*, 101 F.4th at 1044–65. A different majority of the Court also overruled the Ninth Circuit's prior decision in *Navajo Nation v. U.S. Forest Service*, 535 F.3d 1058 (9th Cir. 2008), to the extent that *Navajo Nation* narrowly defined a "substantial burden" under RFRA as being "imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1070; (Doc. 133-1 at 14); *Apache Stronghold*, 101 F.4th at 1043 (citing *Sherbert v. Verner*, 374 U.S. 398 (1963); *Wisconsin v. Yoder*, 406 U.S. 205 (1972)). The Court held that *preventing* access to religious exercise is also an example of a "substantial burden." (Doc. 133-1 at 14); *Apache Stronghold*, 101 F.4th at 1043. Nonetheless, because a separate majority found that Plaintiff lacked a cognizable First Amendment or RFRA claim under *Lyng*, it did not reach the precise question of whether the "substantial burden" standard has been met in this case. (*See* Doc. 133-1 at 138); *Apache Stronghold*, 101 F.4th at 1105 (Nelson, J., concurring).

At the time the preliminary injunction was denied in 2021, it was not this Court's prerogative to decide whether *Lyng* or *Navajo Nation* had been wrongly decided (nor may

it do so now); it was this Court's duty to apply the law as settled by existing Ninth Circuit and Supreme Court precedent. *See, e.g.*, *Hart v. Massanari*, 266 F.3d 1155, 1170 (9th Cir. 2001) ("If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect. Binding authority must be followed unless and until overruled by a body competent to do so."). Now, a different question is before this Court—one that implicitly asks it to examine not just the applicability of existing precedent to the case at hand, as it did in 2021, but also to examine the likelihood that that precedent could be overturned. Defendants seek to limit this Court's attention to the "likelihood of success on the merits" factor as already decided by this Court, a three-judge panel of the Ninth Circuit, and a majority of the Ninth Circuit *en banc*. But as other courts deciding whether to grant an injunction pending appeal have noted, it would be a futile exercise for this Court *only* to relitigate and reconsider what it has already decided: it determined that Plaintiff did not have a likelihood of success on the merits of their Free Exercise, RFRA, and treaty claims under Ninth Circuit law as it stood then, and nothing has changed that would entitle it to a different decision now. *See NetChoice*, 761 F. Supp. 3d at 1235. However, enough *has* changed to suggest that the Supreme Court, should it grant certiorari—and there is good reason to anticipate that it will grant certiorari, given the fact that the case has been relisted thirteen times for consideration (Doc. 162 at 3)—could change the existing precedent in a way that would necessarily change the outcome of this case. *See Am. Beverage Ass'n*, 2016 WL 9184999, at *1 ("When there is reason to believe that an appeal will be taken, there is no reason why the district court should not make an order preserving the status quo during the expected appeal.") (quoting Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.)).

There are numerous reasons to think this. First, every stage of the *Apache Stronghold* proceedings has been sharply divided. (Doc. 150 at 11). The Ninth Circuit *en banc* "splintered into two different 6-5 majorities, issuing seven opinions spanning 246 pages." *Id.* at 8; (Doc. 133-1). Accounting for the fact that Judge Bumatay dissented at the

emergency stage, *Apache Stronghold*, 2021 WL 12295173, "six of the twelve Ninth Circuit judges to address the merits have agreed with Apache Stronghold." (Doc. 150 at 11). Notably, Judge Nelson, the swing vote *en banc*, suggested that "perhaps it is time for the Supreme Court to revisit *Lyng*," which was the case he ultimately found dispositive on the issue. (Doc. 133-1 at 147); *Apache Stronghold*, 101 F.4th at 1109.

Much of this splintering can be attributed to the fact that "substantial burden" was never statutorily defined under RFRA, nor has the Supreme Court since clarified what, precisely, constitutes a "substantial burden." (*See* Doc. 133-1 at 77–78); *Apache Stronghold*, 101 F.4th at 1074 (Bea, J., dissenting in part and concurring in part). As Judge Nelson pointed out in his concurrence, the "ordinary meaning of 'substantial burden' suggests that in selling the land, the government is preventing the Apache's [sic] participation by restricting their access to the land," and "[p]reventing access to religious exercise generally constitutes a substantial burden on religion." (Doc. 133-1 at 111–12); *Apache Stronghold*, 101 F.4th at 1092 (Nelson, J., concurring). Taken at face value, it is a logically puzzling result that under the coercion-based definition of "substantial burden" affirmed by the *en banc* majority, the Apaches are not "burdened" within the current meaning of the law—after all, they are not being forced to *choose* between their religion and a benefit conferred upon other citizens, or between their religion and civil or criminal penalties. They *cannot choose* to practice their religion at all once their sacred religious site is completely "obliterated." (Doc. 133-1 at 207); *Apache Stronghold*, 101 F.4th at 1139 (Murguia, C.J., dissenting). An additional and related unsettled question for the Supreme Court is whether the definition of "substantial burden" under RFRA should be interpreted uniformly with its "sister statute," the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*, both of which were enacted "to provide very broad protection for religious liberty." *Holt v. Hobbs*, 574 U.S. 352, 356 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014)); *see also* (Doc. 133-1 at 206–10); *Apache Stronghold*, 101 F.4th at 1138–40) (Murguia, C.J., dissenting) (noting that "at least seven other circuits agree" that the "substantial burden"

standards are the same under RFRA and RLUIPA).

And despite relying heavily on *Lyng* in coming to its determination that Plaintiff failed to assert cognizable Free Exercise or RFRA claims, and that it therefore failed to demonstrate a likelihood of success on the merits, the Ninth Circuit's *en banc* order hardly closes the case on how *Lyng* ought to be interpreted nearly 40 years on, nor has the Supreme Court definitively clarified how its own decision in *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), reconciled *Lyng* with its "neutral law of general applicability" standard. (*See* Doc. 133-1 at 229); *Apache Stronghold*, 101 F.4th at 1150 ("*Smith* . . . treats *Lyng* as declining to apply the compelling interest test to a neutral law of general applicability, and RFRA displaced that standard for governmental decisions governed by RFRA.") (Murguia, C.J., dissenting). If the Supreme Court settles once and for all that *Lyng* was a case decided on the basis that the law in question was neutral and generally applicable, and *not* on the basis that the plaintiffs lacked a cognizable claim under the Free Exercise Clause, then the "neutral law of general applicability" standard was subsumed by RFRA, and *Lyng* would not carry the day on Plaintiff's RFRA claim here. (*See* Doc. 133-1 at 231); *Apache Stronghold*, 101 F.4th at 1151 ("RFRA's rejection of *Smith*'s rule—that the compelling interest test is inapplicable to neutral and generally applicable laws—means that *Lyng* likewise does not control in RFRA cases.") (Murguia, C.J., dissenting); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460 (2017) (noting that "when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion" and citing *Lyng* immediately thereafter); *Fulton v. City of Philadelphia, Pennsylvania*, 593 U.S. 522, 536 (2021) ("*Smith* itself drew support for the neutral and generally applicable standard from cases involving internal government affairs." (citing *Lyng*)).

Of course, this Court does not have a crystal ball to determine what the Supreme Court will, let alone should, decide. The Court today has a much narrower task: determining whether to enter a narrow, temporary injunction preventing the transfer of Oak

Flat during the pendency of Plaintiff's Supreme Court appeal, which requires analysis of the *Winter* factors. The Court will begin by examining the balance of equities, because *if* Plaintiff can establish that the balance of equities "tips sharply" in its favor, it need only show that there are "serious questions going to the merits" of its case—a lower standard than a "likelihood of success on the merits." *Short*, 893 F.3d at 675. Serious questions on the merits "need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (citations and quotation marks omitted). "Serious questions" that would support issuance of an injunction may also include serious legal questions as to proper interpretation of a statute (here, RFRA). (Doc. 162 at 4); *see hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022).

The "balance of equities" and "public interest" factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 434–35 (2009) (evaluating "harm to the opposing party and the public interest" in the context of considering a stay pending appeal, and noting that there is "substantial overlap" between these factors and the *Winter* factors); *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) ("The third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry when the government opposes a preliminary injunction."). "The 'balance of equities' concerns the burdens or hardships to [Plaintiff] compared with the burden on Defendants if an injunction is ordered. The 'public interest' mostly concerns the injunction's 'impact on nonparties rather than parties.'" *Id.* (citations omitted). Weighing the relative burdens and hardships on the parties in this matter is also related to the inquiry regarding the second *Winter* factor, the likelihood of irreparable harm, as many of the arguments necessarily overlap.

At the outset, Plaintiff argues that the balance of equities easily tips in its favor because this case raises serious First Amendment issues with respect to the Apaches' religious liberties. (Doc. 150 at 15); *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024).

Defendants counter that this is not a case where the Government is directly seeking to restrict First Amendment conduct, but rather one where a statutory land exchange will have downstream effects on religious exercise, which, on their view, is a much lower harm to Plaintiff. (Doc. 156 at 18–19). They further assert that Plaintiff's claim that the land exchange will end sacred Apache rituals "is a serious overstatement" because "sunrise ceremonies routinely occur elsewhere." (*Id.* at 18). This Court is disinclined to minimize the importance of Oak Flat to the Apaches' belief system, but it acknowledges that this case might be distinguished on its facts from some of the free speech cases Plaintiff cites.

Furthermore, Defendants argue that the equities tip in *their* favor because the land transfer will occur pursuant to an act of Congress, and it is therefore clearly in the public interest for the land exchange to be completed. (Doc. 156 at 19); *see United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497 (2001) ("[A] court sitting in equity cannot 'ignore the judgment of Congress, deliberately expressed in legislation.'") (quoting *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 551 (1937)). Plaintiff's response is that while Congress indeed passed the Land Exchange Act, it also passed RFRA, which was—on their view—intended to supersede later federal laws that inhibit the free exercise of religion. (Doc. 162 at 9); *see also Burwell*, 573 U.S. at 683 ("RFRA's text shows that Congress designed the statute to provide very broad protection for religious liberty").

Both sides' positions hold water, but the Court is more persuaded by Plaintiff's emphasis on the fundamental freedoms at stake in this case. After all, "[r]eligious liberty and the concept of free exercise are grounded in the bedrock of our founding and the structure of our system of government." (Doc. 133-1 at 116); *Apache Stronghold*, 101 F.4th at 1094 (Nelson, J., concurring). However, the Court's determination regarding the balance of equities need not rest on such considerations alone. Plaintiff also enumerates various harms it will suffer if the land transfer occurs during the pendency of this appeal, which affect both the balance of equities and the likelihood that it will suffer irreparable harm without an injunction.

It is undisputed that if the transfer goes forward and Resolution Copper's mining

plans are effectuated, Plaintiff will suffer irreparable harm in the long term. As this Court observed in its initial Order denying Plaintiff's 2021 Motion for Preliminary Injunction, "[q]uite literally, in the eyes of many Western Apache people, Resolution Copper's planned mining activity on the land will close off a portal to the Creator forever and will completely devastate the Western Apaches' spiritual lifeblood." (Doc. 57 at 12); *Apache Stronghold*, 519 F. Supp. 3d at 604. For purposes of this injunction, however, the relevant question is what harms will result before the Supreme Court resolves this appeal. Plaintiff emphasizes three primary short-term harms it will suffer: (1) the Apaches' immediate loss of legal rights with respect to Oak Flat, (2) the preliminary construction projects that Resolution Copper will initiate in preparation for the mine, and (3) this Court's potential loss of power to later rescind the transfer. (*See* Doc. 150).

As to the first point, Plaintiff argues that, once the transfer is complete, Oak Flat will become private property no longer subject to federal law or Forest Service management, which "gives Resolution power to exclude Apache Stronghold's members from Oak Flat and to restrict the timing and location of religious ceremonies that regularly take place at Oak Flat . . . ." (*Id.* at 15). The fact that Oak Flat will become private property will make such restrictions "harder or impossible to challenge." (*Id.*); *see also Apache Stronghold*, 2021 WL 12295173, at *6 (Bumatay, J., dissenting) ("[O]nce the land leaves the Government's hands, the Western Apaches likely cannot bring a RFRA or Free Exercise claim against Resolution Copper should the venture burden or extinguish their ability to worship or access Oak Flat."). Defendants counter that under the Land Exchange Act, Resolution Copper "must preserve public access to Oak Flat Campground for as long as safely possible." (Doc. 156 at 18 (citing 16 U.S.C. § 539p(i)(3) ("As a condition of conveyance of the Federal land, Resolution Copper shall agree to provide access to the surface of the Oak Flat Campground to members of the public, including Indian tribes, to the maximum extent practicable, consistent with health and safety requirements, until such time as the operation of the mine precludes continued public access for safety reasons, as determined by Resolution Copper."))); (Doc. 157 at 16). They further claim that Resolution

Copper is "committed to maintaining public access according to the status quo . . . for about a decade." (Doc. 156 at 18). These assurances are insufficient. Nothing about Resolution Copper's broad "commitment" to public access is legally binding; furthermore, even their statutorily mandated duty to maintain access to the Oak Flat Campground is (1) contingent on their *discretionary* determination that access is "practicable" and "consistent with health and safety requirements," 16 U.S.C. § 539p(i)(3), and (2) fails to account for the fact that the Oak Flat Campground represents only a tiny portion of Oak Flat itself. (*See* Doc. 162 at 6–7).

Second, Plaintiff argues that after the land transfer, Resolution Copper will begin "preparatory activities" such as construction of new roads and buildings that are likely to degrade the Oak Flat environment. (Doc. 150 at 14). In his dissent at the emergency stage, Judge Bumatay argued that "[a]ny of these construction activities may cause irreparable damage to the Oak Flat, even if the site won't be entirely cratered immediately after conveyance." *Apache Stronghold*, 2021 WL 12295173, at *5 (Bumatay, J., dissenting). To that end, many of Defendants' arguments that actual "subsidence" of the land won't begin to occur for at least six years after transfer are irrelevant. (Doc. 156 at 17). Furthermore, and related to Plaintiff's third argument, Resolution Copper will actually have some incentive to begin physically transformative activities as soon as possible to bolster future equitable arguments against recission. (Doc. 162 at 8).

After the transfer is completed, Plaintiff argues that the Court may lose the equitable authority to rescind the transfer later once Resolution Copper takes certain irreversible actions. (Doc. 150 at 15); *see Kettle Range Conservation Grp. v. U.S. Bureau of Land Mgmt.*, 150 F.3d 1083, 1087 (9th Cir. 1998) (noting, in a case where a land transfer from the government to private parties had already occurred, that "at this point it might be impractical to attempt to unscramble the eggs. Any such effort might produce results that are in fact not equitable. The public land to which title has already been transferred may well have undergone significant modification."). Furthermore, Plaintiff posits that if the Supreme Court were to reverse and remand this case after the land exchange occurs,

Defendants could then argue that the initial preliminary injunction request—which sought to *prevent* that transfer from occurring—is rendered moot, and Plaintiff would have to move for a new PI seeking a mandatory, rather than prohibitory, injunction. *See Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) ("'A mandatory injunction orders a responsible party to take action,' while '[a] prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits.'") (citation omitted). Mandatory injunctions are "particularly disfavored," meaning that Plaintiff would have a higher hurdle to clear should it have to move anew for an injunction following the transfer. *Id.* (citation omitted).

On the other side, Resolution Copper states that it "has already spent over $2.7 billion on the Project, plus nearly $11 million per month to maintain the mine in its present, non-operational state." (Doc. 161-1 at 19). The Court finds these claims unpersuasive. Based on the testimony of Victoria Peacey, Resolution Copper's President and General Manager, the $11 million figure represents Resolution Copper's approximate "holding costs" to maintain "an existing underground mine infrastructure," as well as "wages and benefits for the roughly 400 people" who work there currently. (Draft Hr'g Tr. at 31:4–9). This existing infrastructure is from the historic Magma Copper Mine, which Resolution purchased in 2004 and began reclaiming in 2005. (Peacey Decl., Doc. 156 at 27). This purchase occurred, and the related reclamation projects began, in 2004—a full decade before Congress passed the Land Exchange Act. Not only does Resolution Copper currently lack any legal title to Oak Flat until the land transfer occurs, but it made the decision to purchase the existing Magma Copper Mine infrastructure long before it had any real expectancy interest in the nearby Oak Flat land it now hopes to mine. The money Resolution Copper has chosen to spend on its existing infrastructure, and any choice it has made to expend its money in anticipation of a transfer it hopes will still occur, is just that— Resolution Copper's voluntary choice. These continued "holding costs" for the ongoing infrastructure and reclamation efforts hardly persuade the Court that the balance of equities tips in its favor.

14

It is true that the land transfer would eventually produce domestic copper, add conservation lands to the public trust, and create jobs and revenue for the state of Arizona, all of which benefit the public interest. (Doc. 156 at 19–21). But while an injunction will likely prevent Resolution Copper from beginning its work for a limited time,[2] as Plaintiff points out, it will ultimately "not stop Resolution from mining a single ounce of copper should the transfer ultimately be upheld." (Doc. 162 at 10). The public interests Defendants tout will therefore not be lost because of an injunction, but merely delayed; on the other hand, if the transfer occurs, it "could result in the permanent loss of Apaches' legal rights to access their ancestral sacred site." (*Id.*). In fact, this argument is crucial to the Court's decision here today, as Plaintiff urges this Court to consider the potential "error costs on each side" depending on how this injunction and appeal play out. (*See* Draft Hr'g Tr. at 16:16–17:19). In the most harmful scenario to Plaintiff, if this Court denies the injunction, the Supreme Court grants cert and reverses, and Plaintiff ultimately wins on the merits, Plaintiff will have already suffered some or all of its enumerated immediate harms, even despite winning the day in this litigation. Yet in the riskiest scenario for Defendants, where the injunction is granted, the Supreme Court grants cert, and it ultimately affirms Defendants on the merits, the only harm will have been a delay of the land transfer for a number of months or (at most) a couple years.[3] The obvious conclusion, then, is that the balance of equities indeed "tips sharply" in Plaintiff's favor, in which case it need only demonstrate "serious questions" on the merits to warrant an injunction pending appeal.

In the context of granting an injunction pending appeal, the "serious questions" standard, which is still a high standard, is more likely to be satisfied where the issues raised "are novel, difficult, and important." *NetChoice*, 761 F. Supp. 3d at 1236. After all, it makes

---

[2] Even that is not guaranteed—should the Supreme Court deny cert before June 16, for example, the land transfer can occur precisely on schedule, and there would be no harm to Defendants at all.

[3] This Court also notes Federal Defendants' own telling contention that if the Supreme Court grants review, the Government "may reevaluate how to proceed" with regard to republication of the FEIS. (Doc. 148 at 2).

sense that such "weighty issues" might warrant appellate review before a law goes into effect. *See id.*; *see also* Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.) ("[A] stay will be granted if the balance of equities favors [the] action. Many courts also take into account that the case raises substantial difficult or novel legal issues meriting a stay."). Defendants' primary argument against a finding that Plaintiff has shown serious questions on the merits is that the Ninth Circuit has already (twice) determined that it has no likelihood of success on the merits of its Free Exercise, RFRA, and treaty claims, and that these findings are now the binding "law of the case." (*See* Doc. 157 at 11). However, Plaintiff counters that as a general rule, decisions at the preliminary injunction phase do not constitute the law of the case. (Doc. 162 at 3) (citing *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007)). It argues that "[t]here is no inconsistency in concluding that Plaintiff has not shown a sufficient likelihood of success on the merits to justify a years-long injunction, but has shown sufficiently serious questions on the merits to allow the Supreme Court to complete its review." (*Id.* at 4). This Court agrees with Plaintiff. If "the law of the case" foreclosed any other conclusion, there would be no point in statutorily allowing injunctions pending appeal. (*See id.*); *Rodriguez v. Robbins*, 804 F.3d 1060, 1080 (9th Cir. 2015) ("The general rule is that our decisions at the preliminary injunction phase do not constitute the law of the case. Because preliminary injunction decisions are often made hastily and on less than a full record, they may provide little guidance as to the appropriate disposition on the merits.") (citations and quotation marks omitted).

At the May 7 hearing, Federal Defendants ostensibly suggested that this Court ought to punt the question of whether to grant this emergency injunction to the Ninth Circuit. (*See* Draft Hr'g Tr. at 20:15–22). This suggestion wholly discounts the fact that the Federal Rules of Civil Procedure specifically grant District Court judges the discretion to grant injunctions pending appeals. *See* Fed. R. Civ. P. 62(d); Wright & Miller, 11 Fed. Prac. & Proc. Civ. § 2904 (3d ed.) (explaining that this rule "codifies the inherent power of courts to make whatever order is deemed necessary to preserve the status quo and to ensure the

effectiveness of the eventual judgment."). If this Court were to simply defer consideration of every difficult question to a higher court, it may as well not function as a court at all.

Accordingly, for the reasons mentioned at the outset of this Discussion section, this Court finds that Plaintiff has shown serious questions going to the merits of its case. Having carefully considered the parties' briefing, oral arguments, witness testimony, and proffered exhibits, and after weighing the four *Winter* factors, this Court concludes that Plaintiff is entitled to a narrow injunction during the pendency of its appeal.

## IV.    CONCLUSION

There is no close question in this matter. It is abundantly clear that the balance of equities "tips sharply" in Plaintiff's favor, and that even in the short term, they have established a likelihood of irreparable harm should the transfer proceed. Furthermore, they have presented serious questions on the merits that warrant the Supreme Court's careful scrutiny, should it agree to grant cert.

It remains the case that preliminary injunctions are an extraordinary remedy, and in the case of injunctions pending appeal, they ought to be reserved for those cases presenting novel, difficult, and important legal questions that warrant further consideration before the status quo is disrupted. *See NetChoice*, 761 F. Supp. 3d at 1236. But if this is not such a case, then what is?

As a final matter, Plaintiff has requested that the injunction remain in effect for 21 days after denial of the petition for certiorari, or 21 days after the issuance of the Supreme Court's judgment. However, they have provided no reason for further delay once the appeal is resolved.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Injunction Pending Appeal (Doc. 150) is **granted as modified**. Federal Defendants are enjoined from publishing the Final Environmental Impact Statement and conveying the Federal land described in section 3003 of the National Defense Authorization Act for Fiscal Year 2015, Pub. L. No. 113-291. This injunction shall remain in effect until the day after denial of the petition for certiorari in

*Apache Stronghold v. United States*, No. 24-291 (U.S.) (should the petition be denied), or the day after the issuance of the Supreme Court's judgment in *Apache Stronghold v. United States*, No. 24-291 (U.S.) (should the petition be granted).

Dated this 9th day of May, 2025.

Honorable Steven P. Logan
United States District Judge