# Exhibit B

| Original Complaint | First Amended Complaint |
|---|---|
| ~~The Great Spirit made all things... So live your life that the fear of death can never enter your heart. Trouble no one about their religion; respect others in their view, and demand that they respect yours. Love your life, perfect your life, beautify all things in your life. Seek to make your life long and its purpose in the service of your people.~~ | **COMES NOW** Plaintiff and pleads as follows: |

Original Complaint

~~The Great Spirit made all things... So live your life that the fear of death can never enter your heart. Trouble no one about their religion; respect others in their view, and demand that they respect yours. Love your life, perfect your life, beautify all things in your life. Seek to make your life long and its purpose in the service of your people.~~

~~Tecumseh, Shawnee Chief (1768-1813), from his speech to the Osages in 1811, and other speeches to other Native nations.~~



~~A version of Benson John Lossing's engraving (in wood) of Shawnee Chief Tecumseh, with water colors on a platinum print after a pencil sketch by French trader Pierre Le Dru at Vincennes, taken from life, c.1808.~~

~~Plaintiff Apache Stronghold and its members, by and through their attorneys, allege and state as follows:~~
### ~~THE NATURE OF THIS ACTION~~
~~1. This is a gravely serious and urgent matter of the religious freedom rights, the treaty rights, and land~~

First Amended Complaint

**COMES NOW** Plaintiff and pleads as follows:

### INTRODUCTION

1. Since time immemorial, Western Apaches have centered their worship on a sacred site in Arizona called *Chí'chil Biłdagoteel*, or Oak Flat. Oak Flat is the Apaches' direct corridor to the Creator and the locus of sacred ceremonies that cannot take place elsewhere.

2. The government has long recognized the significance of Oak Flat and protected Apache ceremonies there—reserving Oak Flat from mining, and placing it in the National Register of Historic Places. Yet the government is now attempting to transfer Oak Flat to a foreign-owned copper-mining company for the sole purpose of creating a mine that will destroy the site, swallowing it in a massive crater and ending Apache religious rituals forever.

3. The government admits the mine will destroy Oak Flat and that the Apaches will never again be able to access the site or perform sacred rituals there. The government also admits that it has ample alternative sources of copper, and that the copper beneath Oak Flat could be mined without disturbing Oak Flat's surface. Yet the government declined to utilize these alternatives, or even consider them, because the mining company said they would reduce its profits. Thus, the government has authorized the complete physical destruction of an irreplaceable sacred site solely to increase the profits of a foreign-owned mining company.

4. This wanton, intentional, and needless destruction of Oak Flat violates multiple federal statutes, the U.S. Constitution, the 1852 Treaty of Santa Fe between the U.S. and Apaches, and the nation's fiduciary duties to Western Apaches. Accordingly, this lawsuit seeks a declaration that the government's actions are unlawful and an injunction preventing the destruction of Oak Flat and protecting the Apaches' right to continue accessing and worshipping at Oak Flat.

1

rights of the Western Apache Peoples which the Defendants are now poised this week to obliterate forever. This case is at a crisis point precipitated by the recklessly deliberate and illegal aggressions and harmful, damaging actions of the Defendants.

2.     The deliberate and direct effect of the Defendants' publicly stated plans and planned actions is to illegally annihilate the religious freedom rights of the Western Apache Peoples at a sacred and actively utilized religious place and traditional Western Apache cultural property known to the Apache since time immemorial as Chi'chil Bildagoteel. A literal English translation of Chi'chil Bildagoteel is "Emory Oak extends on a Level," or more simply as it is commonly known: "Oak Flat."



IMAGE 1: Grove of Emory Oaks at Chi'Chil Bildagoteel National Historic District & Western Apache Traditional Cultural Property. Photograph by Russ McSpadden / Center for Biological Diversity, from "The Mine at Oak Flat: A Timeline of Government Bad Faith" by Asa Burroughs, *Moyers On Democracy* (December 29, 2020). Available online at https://billmoyers.com/story/the-mine-at-oak-flat-a-timeline-of-a-government-bad-faith/ .

3.     The publicly stated primary purpose of the Defendants is to present a concrete plan and act to enable the conveyance in the immediate future of federally-managed land which includes Oak Flat, and other lands, to two foreign mining companies, Rio

Tinto and BHP, to install a massive industrial complex to extract copper ore, while dumping the toxic waste nearby in the process, in spite of knowing that Oak Flat is a traditional cultural and religious property of the Plaintiff Apache Stronghold and all Western Apache Peoples.

4.    The traditional Western Apaches have never lost their vital relationship to Oak Flat, though the U.S. Government, at times in Apache history, has actually imprisoned Apaches on their own Reservations and often, and for prolonged periods of time, have not allowed Apaches to come to Oak Flat for any of their traditional reasons and needs which include for their physical and spiritual health and well-being, and especially in conformance with their traditional Apache religious beliefs and ceremonies that are centered and seated at Oak Flat.

5.    This action is brought to protect the constitutional rights of Apache Stronghold and its members, guaranteed by the First Amendment Right to the Free Exercise of Religion, the First Amendment Right to Petition and Remedy, the Fifth Amendment Right to Due Process (Adequate and Effective Notice), the statutory rights guaranteed by the Religious Freedom Restoration Act, and for breach of treaty rights, trust responsibilities, and fiduciary duty owed to Plaintiff Apache Stronghold and its members by the Defendants.

## ~~IDENTIFICATION OF THE~~ PARTIES

~~24.~~    Plaintiff Apache Stronghold, is a 501(c)(3) ~~Arizona~~ nonprofit ~~community~~ organization ~~of individuals who come together in unity to battle continued colonization, defend Holy sites and freedom of religion, and are dedicated to building a better community through neighborhood programs and civic engagement. Apache Stronghold is based in the Western Apache lands of the San Carlos Apache Tribe at San Carlos, within the State of Arizona, connecting Apaches and other Native and non-Native allies from all over the world.~~

~~25.~~    Defendant United States of America ("United States" or "U.S.") is sued for the wrongful acts of its representatives, employees and agencies. The United

## PARTIES

5.    Plaintiff Apache Stronghold is an Arizona 501(c)(3) nonprofit organization that unites Western Apaches with other Native and non-Native allies to preserve indigenous sacred sites. Apache Stronghold was co-founded by Dr. Wendsler Nosie, former Chairman of the San Carlos Apache Tribe and direct descendant of Apache prisoners of war imprisoned at San Carlos. Among Apache Stronghold's members are Apaches who exercise their religion at Oak Flat.

6.    Defendant United States of America ("United States" or "U.S.") is being sued for the wrongful acts of its representatives, employees, and agencies. The United States is further implicated by

3

States is further implicated by and through the actions, policies, patterns, practices, and customs of the other ~~named~~ Defendants and its policy-makers, agents, and officers.

~~26.~~ Defendant ~~Perdue~~ is the Secretary of Agriculture and chief officer for the ~~U.S. Department of Agriculture ("~~USDA~~"), and as such is charged with the primary duties and responsibilities of the United States and the USDA, including the USDA's Forest Service, and those as trustee and fiduciary regarding management of lands and other assets under USDA Forest Service control or responsibility to which members of federally-recognized Indian tribes and treaty tribes have rights, including members of the Plaintiff organization, Apache Stronghold. Perdue~~ is sued in ~~his~~ supervisory and individual capacity.

~~27.~~ Defendant ~~Christensen~~ is the Chief of the ~~USDA~~ Forest Service ~~and~~ is charged with the primary duties and responsibilities of the United States and the ~~USDA~~ Forest Service, and those as trustee and fiduciary regarding management of lands and other assets under ~~USDA~~ Forest Service control or responsibility ~~to which members of federally-recognized Indian tribes and treaty tribes have rights, including members of the Plaintiff organization, Apache Stronghold~~. ~~Christensen~~ is sued in ~~her~~ supervisory and individual capacity.

~~28.~~ Defendant ~~Neil Bosworth at all times material herein was~~ the Supervisor of the USDA Tonto National Forest~~, and as such~~ is charged with the primary duties and responsibilities of the United States and the ~~USDA Forest Service~~, and those as trustee and fiduciary regarding management of lands and other assets under USDA Forest Service control or responsibility ~~to which members of federally-recognized Indian tribes and treaty tribes have rights, including members of the Plaintiff organization, Apache Stronghold. Bosworth is currently serving in an unknown capacity with the USDA Forest Service within or under supervision and control of the Regional Forester in the Southwest Region Office. Bosworth~~ is sued in his ~~supervisory and individual~~ capacity.

and through the actions, policies, patterns, practices, and customs of the other Defendants and its policy-makers, agents, and officers.

7.    Defendant United States Department of Agriculture ("USDA") is the federal department responsible for the management of the United States Forest Service ("Forest Service") and national forests, including the Tonto National Forest, which has included Oak Flat.

8.    Defendant United States Forest Service ("Forest Service") is a federal agency of the USDA. By statutory authority and the agency's own regulations and policies, the Forest Service is responsible for implementing the National Historic Preservation Act, the National Environmental Policy Act, and other land management laws, regulations, and executive orders pertaining to actions and decisions about lands administered by Defendants. The Forest Service has an obligation to consult and coordinate with Native American tribes and other governmental units when making findings and determinations under Section 106 of the NHPA regarding the effects of Forest Service-approved projects on cultural resources. Importantly, the Forest Service has a fiduciary duty under the federal trust responsibility to consult and coordinate with tribes and protect tribal properties, including traditional cultural properties and sacred sites, when approving and assessing the effects of projects. Thus, the Forest Service is, by law, responsible for the management and actions undertaken with respect to the public lands at issue here.

9.    Defendant Brooke Rollins is the Secretary of Agriculture and the chief officer for the USDA. Rollins is responsible for the supervision of the Forest Service and the implementation and enforcement of applicable law in this proceeding. Rollins is sued in her official capacity.

10.    Defendant Tom Schultz is the Chief of the Forest Service. Schultz is charged with the primary duties and responsibilities of the United States and the Forest Service, and those as trustee and fiduciary regarding management of lands and other assets

4

29.    Defendant Tom Torres, is the Acting Supervisor, USDA Tonto National Forest, and as such is charged with the primary duties and responsibilities of the United States and the USDA Forest Service, and those as trustee and fiduciary regarding management of lands and other assets under USDA Forest Service control or responsibility to which members of federally-recognized Indian tribes and treaty tribes have rights, including members of the Plaintiff organization, Apache Stronghold. Torres is sued in his supervisory and individual capacity, as well as in his former capacity in his position previous to his appointment as Acting Supervisor of the Tonto National Forest.

under Forest Service control or responsibility. Schultz is sued in his official capacity.

11.    Defendant Robert Trujillo is the Supervisor of the USDA Tonto National Forest. Trujillo is charged with the primary duties and responsibilities of the United States and the BLM, and those as trustee and fiduciary regarding management of lands and other assets under BLM control or responsibility. Trujillo is sued in his official capacity.

12.    Defendant Raymond Suazo is the Arizona State Director of the Bureau of Land Management ("BLM"). Suazo is charged with the primary duties and responsibilities of the United States and the Forest Service, and those as trustee and fiduciary regarding management of lands and other assets under Forest Service control or responsibility. Suazo is sued in his official capacity.

13.    Defendant-Intervenor Resolution Copper Mining LLC ("Resolution Copper" or "Resolution") is a joint venture formed by two multinational mining companies, Rio Tinto and BHP. On June 30, 2023, this Court granted Resolution's Motion to Intervene as Defendant/Appellee. Dkt. 117. With the federal government's authorization and assistance, Resolution plans to construct the copper mine that will destroy Oak Flat.

## JURISDICTION AND VENUE

22.    This Court has jurisdiction over federal claims pursuant to the constitutional provisions enumerated and pursuant to 28 U.S.C. § 1331 (Federal Question), and 28 U.S.C. § 1361, because this is "an action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff. This Court also has jurisdiction over the claims pursuant to 28 U.S.C. § 1343 (3) and (4), as they are brought to redress deprivations of rights, privileges and immunities secured by the United States Constitution and by law. Jurisdiction is also proper pursuant to the Declaratory Judgment Act 28 U.S.C. §§ 2201(a) and 2202, and in equity.

14.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1361, and 1367 because Plaintiff challenge federal officers' violations of the Constitution and laws of the United States.

15.    Jurisdiction is also proper pursuant to the Declaratory Judgment Act 28 U.S.C. §§ 2201(a) and 2202, and in equity.

16.    The challenged agency actions are subject to judicial review and authority pursuant to 5 U.S.C. §§ 702, 704, and 706.

17.    Venue lies in this District under 28 U.S.C. § 1391(e) because it is a judicial district in which "a defendant in the action resides" and where "a

5

23.    ~~Venue is proper in the U.S. District Court of the District of Arizona, Phoenix Division, under 28 U.S.C. § 1391(b)(1) & (2), and 28 U.S.C. § 1391(e)(2), and 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and a substantial part of the property that is the subject of the action is situated in Pinal County and Gila County, the principal place of business of the Plaintiff Apache Stronghold is located within Gila County, and Defendants include officers and employees of the United States and the Department of Agriculture acting in their official capacities or under color of legal authority.~~

substantial part of the events or omissions giving rise to the claim occurred."



~~MAP 2: USDA Tonto National Forest Map of the "Oak Flat Parcel" (March 2011; revised March 30, 2015).~~

6



MAP 3: Chi'chil Biłdagoteel Traditional Cultural Property (TCP) Boundary Map from Chi'chil Biłdagoteel National Historic District Nomination, United States Department of the Interior National Park Service National Register of Historic Places Registration Form, at p.38 (September 22, 2014).

## FACTUAL ALLEGATIONS

6. Evidence exists that the "Oak Flat Parcel" within the proposed "Southeast Arizona Land Exchange and Resolution Copper Mine Project" which quite possibly as soon as January 15, 2021 is to be conveyed away by the Defendants to the foreign mining conglomerates Rio Tinto and BHP via their joint subsidiary Resolution Copper Mine, is not owned by the Defendants.

## FACTUAL ALLEGATIONS

### Oak Flat

18.    For centuries before and after Europeans first appeared on this continent, Western Apaches and other tribes have worshipped at a sacred site called *Chí'chil Biłdagoteel* ("a broad flat of Emory oak trees"), or Oak Flat: a Western Apache sacred site used by Apaches and other indigenous groups.

7

7.    The Western Apaches through their 1852 Treaty with the United States of America continue to have ownership interests in the lands proposed to be conveyed away in a land swap by the Defendants with the foreign mining conglomerates, Rio Tinto and BHP, via their joint subsidiary Resolution Copper Mine. Those lands particularly include, but are not limited to, the "Oak Flat Parcel." And the "Oak Flat Parcel" of the proposed Resolution Copper Mine Project is located right smack dab in the middle of the Western Apaches' 1852 Treaty lands.

8.    The U.S. government as a trustee of the Apache Nations, and the Western Apache Peoples in particular, intends to dispose of and allow the total destruction of the Western Apaches' Chi'chil Bildagoteel National Historic District and Traditional Cultural Property, the seat of Western Apache religious beliefs and the exercises of their religious freedom as guaranteed first by the Apache Nations' treaty rights under the 1852 Treaty of Santa Fe, and by the First Amendment to the United States Constitution, the Religious Freedom Restoration Act (42 U.S.C. § 2000bb, *et seq.*), and the United Nations Declaration on the Rights of Indigenous Peoples, to which the United States of America is a party.



IMAGE 2: Wendsler Nosie, Sr., co-founder of Apache Stronghold, standing alongside an Apache ceremonial sweat lodge frame at Chi'Chil Bildagoteel ("Oak Flat") on Friday, December 20, 2019 (Photo by Eli Imadali, Arizona Republic).

9.    The deliberate and direct effect of the Defendants' publicly stated concrete plans and

19.    Oak Flat is located within a 6.7-square-mile area about three miles east of present-day Superior, Arizona, between the high escarpment called "Apache Leap" on the west and Ga'an Canyon (called "Devil's Canyon" by non-Indians) on the east.

20.    The terrain is characterized by old-growth oak groves, grassy basins, boulder fields, jagged cliffs, and perennial waters used by birds, mountain lions, foxes, bears, deer, and other animals and plants that are important to Apaches and other indigenous peoples of the region.

21.    The site also includes sacred springs, burial sites, and an unmatched concentration of archaeological sites testifying to its persistent use for at least 1,500 years.

22.    Sometimes described as the birthplace of Western Apache religion, Oak Flat figures prominently in Western Apache cosmology as a unique dwelling place of spiritual beings, called Ga'an, who are holy spirits and messengers between the Creator and human beings.

23.    As the dwelling place of the Ga'an, Oak Flat is a direct corridor to the Creator and is uniquely endowed with holiness and medicine. As such, Oak Flat is the site of religious ceremonies that are tied to that place and cannot be replicated elsewhere.

24.    As one scholar has observed: "For centuries, Western Apaches have maintained close ties to [Oak Flat] as a place to collect traditional foods and medicines, a place of ancestral origins, a place where holy beings reside, and the only place where certain prayers, offerings, and ceremonies can be conducted." Tisa Wenger, *Fighting for Oak Flat: Western Apaches and American Religious Freedom*, 39 J.L. & Religion 247, 248 (2024) ("Wenger").

25.    Ceremonies that occur at Oak Flat include sweat lodge ceremonies for boys entering manhood, Holy Ground Ceremonies for blessing and healing, the Sunrise Ceremony marking an Apache girl's entry into womanhood, and the gathering of sacred

planned actions is to illegally annihilate the religious freedom rights of the Western Apache Peoples at a sacred and actively utilized religious place and traditional Western Apache cultural property known to the Apache since time immemorial as Chi'chil Biłdagoteel. A literal English translation is "Emory Oak extends on a Level," or more simply as it is commonly known: "Oak Flat."

10. The publicly stated primary purpose of the Defendants is to enable the conveyance of federally-managed land which includes Oak Flat, and other lands, to two foreign mining companies, Rio Tinto and BHP, to install a massive industrial complex to extract copper ore there, while dumping the toxic waste nearby in the process, knowing that Oak Flat is a traditional cultural and religious property of the Plaintiff Apache Stronghold and all Western Apache Peoples.

11. The Plaintiff Apache Stronghold organization and its members have no adequate administrative remedies available. Plaintiff and many of its members have repeatedly pleaded with Defendants directly in person and in correspondence, publicly and privately including numerous appearances and presentation of testimony before Congress over the past several years and participating in various federal agency and Forest Service administrative processes, asserting their Apache land rights and requesting Defendants to comply with their obligations and to recognize and honor their Apache land rights and religious freedom rights, and to either cease or redress the breaches of trust complained of herein, to no avail.

12. Plaintiffs have exhausted all reasonable avenues of redress and remedy other than this action. Only this Court can provide to Plaintiffs the relief and remedies to which they are entitled.

13. Plaintiff and its members' beliefs forbid them from participating in any plans and actions that will cause adverse effects, damage or harms to Oak Flat and all it contains, both physical and spiritual, or providing access to those who would cause such damage or harms. This includes participation in any medicine plants, animals, and materials essential to those ceremonies.

26. The Holy Ground Ceremony is a blessing and a healing ceremony that a medicine man conducts for people who are sick or seeking guidance. It takes place at Oak Flat as a holy place for healing; it draws on holy medicinal plants available only at Oak Flat. It has been performed in its current form at Oak Flat for at least 100 years, and it reflects and builds on much older practices.

27. The Holy Ground Ceremony traces back at least to the 1920s and the Apache prophet Silas John, who relied on much older traditions. Silas John's Holy Ground movement "very clearly included ceremonies at Chi'chil Biłdagoteel [Oak Flat]." Wenger at 257-58. By "selecting sites that Apaches already considered sacred, the Holy Ground movement secured credibility in Indigenous terms and deepened the sanctity of the places where its ceremonies were held." *Id.* at 259-60.

28. The federal government actively suppressed the Holy Ground movement by forbidding Silas John's dances and jailing him. *Id.* at 259. Nevertheless, some families still held Holy Ground ceremonies at Oak Flat. *Id.* And they continue to do so today.

29. The Sunrise Ceremony, which marks an Apache girl's entry into womanhood, requires months of planning, takes several days to celebrate, and is often attended by hundreds of tribal members. To prepare, the girl gathers plants from Oak Flat and speaks to the spirit of Oak Flat, expressing gratitude for its resources. Her godmother dresses her in the essential tools of womanhood, and tribal members surround her with singing, dancing, and prayer. In the night, the Ga'an enter Apache men called crown dancers. The Ga'an bless the girl, who joins their dance.

30. On the final day, one of the Ga'an dancers paints the girl with white clay taken from the ground at Oak Flat, molding her into the woman she is to become. When her godmother wipes the clay from

9

plans and actions and agreements to accept monetary compensation or other compensation, including proffers of things and promises presented to the Plaintiff and its members as "mitigation" for the adverse effects, damage, or harms suffered heretofore whether temporary or permanent. It also includes being involved in anything that is contrary to their religious beliefs and teachings.

14. Such attempted "mitigation" proffers, solicitations, and coercions alone cloaked in the guise of "meetings," "listening sessions," and "consultations" cause serious distress and harm to Plaintiff and its members because their religious beliefs forbid such engagements and actions. It is no different to them than Christians bargaining with the Devil for their souls. And yet, the Defendants have constantly urged the Plaintiff and its members to do just that.

15. The United States does not have the power and authority to transfer the land at issue in this case.

16. Oak Flat is within the vast area of land and property and the rights thereto reserved by the Apache Nations to themselves in their 1852 Treaty with the United States of America,[1] commonly known as the "1852 Treaty of Santa Fe," which was ratified by the U.S. Senate and proclaimed by President Pierce on March 25, 1853. The 1852 Treaty was never amended, rescinded, nor terminated.

17. The Western Apaches through their 1852 Treaty continue to have ownership interests in the lands proposed to be exchanged by the Defendants. Oak Flat is a place that has special significance a place where Apaches traditionally pray, collect water and medicinal plants for ceremonies, gather acorns and other foods, and honor those that are buried here. Many traditional Western Apache religious beliefs are seated only at Oak Flat, which is one reason why they exercise their religion there.

18. American history and the land in Arizona is stained with the blood of Apache women, men, elders and children, hunted down on the Apaches own Treaty lands and individually killed and mass-murdered in family groups by European and Euroamerican

her eyes, she is a new woman forever imprinted with the spirit of Oak Flat.

31. Oak Flat is also the site of several natural springs, which are rare in this arid region, and which are sources of spiritual power for Apaches.

32. One example is *Tú Nahikaadi*, Dripping Spring, a cave with a dripping spring, which has a unique role in Apache oral tradition.

33. According to Apache tradition, a great flood scoured the world, and the matriarch of the Apache people, Changing Woman, survived the flood and took refuge in a cave with a dripping spring. Wenger at 250-51. She emerged alone into this world, and her children, conceived with the Sun, received guidance from the Ga'an on how to live in this land. *Id.*

34. Western Apaches continue to visit Dripping Spring for religious rituals, and the Apache girl in a Sunrise Dance embodies Changing Woman as she dances her way to womanhood.

35. Oak Flat is also the site of a large rock overhang with ancient pictographs and petroglyphs known as *Tséyaa Gogeschin*, translated as "Written or Painted under the Rocks," which holds special meaning for Apache medicine people and provides a tangible, irreplaceable connection to Apache ancestors. The Chairman of the San Carlos Apache Tribe has described the pictographs and petroglyphs as "the footprints and the very spirit of our ancestors," akin to "the Western Wall in Jerusalem, St. Peter's Basilica in Vatican City, or Ang[k]or Wat in Cambodia. This is why I call Oak Flat the Sistine Chapel of Apache religion." 6-EIS-U-9.

### Apache Stronghold's Religious Practices

36. Apache Stronghold is a nonprofit organization comprised of Apaches and other Native and non-Native allies who seek to preserve their irreplaceable sacred site, Oak Flat.

37. Apache Stronghold's co-founder, Dr. Wendsler Nosie, Sr., is one among many Apache Stronghold members who have practiced, currently practice, and will continue to practice their religion at Oak Flat.

10

colonists, "settlers," "prospectors," miners, and agents of the United States of America. Much of it caused by those invaders of Apache land seeking to separate the Apaches from their Treaty lands which miners and prospectors unscrupulously coveted.

19.    Those murderous campaigns and genocidal pogroms were rationalized by dehumanizing the Apache Peoples. See, *e.g.*, Welch, John R., "Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona, 1859-1874." (Sage Open Journal, October-December:1-19 (2017)).[2]

20.    The United States of America does not have the power and authority to transfer the Oak Flat land at issue in this case, and in fact has a trust responsibility and fiduciary duty to Plaintiff Apache Stronghold, and



all Western Apaches, to conserve and preserve that precious and irreplaceable asset and sacred religious property for the benefit of Apache Stronghold and all Western Apaches, and to protect Oak Flat from any harm, diminishment, waste, or loss.

21.    Here is a partial summary line of significant and relevant events so far to date (1955-2020)[3]:

**September 27, 1955**    President Dwight D. Eisenhower signs Public Land Order 1229 declaring Oak Flat off limits for mining due to cultural and natural value. [Subcommittee on Public Lands and Forests]

**September 25, 1971**    The Department of the Interior, under President Richard M. Nixon, renews the mining ban at Oak Flat but opens a loophole in

38.    According to Dr. Nosie, his family, and many others, the Apaches have never lost their relationship to Oak Flat. Despite the violent history of invasion; forced march and imprisonment of Native people on reservations; and the efforts by the United States to discourage, impede, or fully disallow Apaches from practicing their religion at their sacred site, Dr. Nosie honors and maintains his ancestors' unbroken tie to Oak Flat.

39.    For Dr. Nosie, Oak Flat's religious value to the Apaches' prayers, ceremonies, and family histories cannot be overstated. Native religion was the first religion practiced in the San Carlos region, and Dr. Nosie and his family continue to practice it today.

40.    Dr. Nosie's connection to Oak Flat is central to who he is as an Apache man. He has a deep spiritual and religious connection to the land, water, plants, and animals at Oak Flat. He recognizes Oak Flat as a special, holy, and sacred place that must be honored and protected. He sincerely believes in the spiritual forces of God the Creator, whom he believes gave Oak Flat to the Apaches so they could protect and honor the land through their humble exercise of their traditional Apache religious ways.

41.    Dr. Nosie's granddaughter, Naelyn Pike, is another Apache Stronghold member who has practiced, currently practices, and will continue to practice her religion at Oak Flat.

42.    Naelyn believes Oak Flat in particular must be protected because it is a God-given gift the Creator has given to the Apaches for sacred ceremonies and other religious and cultural purposes.

43.    Naelyn has participated in many sacred ceremonies at Oak Flat, including the Sunrise Ceremony of her sister, Nizhoni Pike.

44.    Because Naelyn believes the essence of an Apache woman is the Apache's traditional land and religious connection to *Nahgosan*, Mother Earth, she continues to stand for Oak Flat so future Apache women and girls can celebrate their Sunrise Ceremonies at this irreplaceable sacred site.

11

the law: the land cannot be mined under federal ownership, but it can be traded to private holders who won't be subject to land use restrictions. [Colorado Natural Resources, Energy & Environmental Law Review]

November 2013 – Resolution Copper introduces the General Plan of Operations (GPO) for a proposed mine at Oak Flat. [Resolution Mine EIS]

December 19, 2014 – Congress passes the National Defense Authorization Act – a military spending bill – that includes Section 3003, added by Arizona Senators John McCain and Jeff Flake. The "Midnight Rider," introduced the night before a vote, states that Oak Flat would be swapped with private land owned by Rio Tinto and BHP Billiton Mining companies. Senator McCain received campaign contributions from Rio Tinto affiliates; Senator Flake was a lobbyist for Rio Tinto in Namibia. [NYT]

July 22, 2015 – Apache protestors finish a cross-country trip to Washington, D.C with a gathering on the lawn of the Capitol building. Naelyn Pike, a 16-year-old Apache activist and co-leader of the Apache Stronghold coalition, tells the Huffington Post: "[The Resolution Copper Mining Proposal is] like taking away a church. But the thing about Oak Flat is it's worse, because you can rebuild a church. Oak Flat will be completely destroyed and it could never come back." [Huffington Post]

November 5, 2015 – Senators Bernie Sanders (D-VT) and Tammy Baldwin (D-WI) introduce the first version of the Save Oak Flat Act, S. 2242 to repeal Senator McCain's midnight rider in the National Defense Authorization Act:

"Section 3003 was strongly opposed by Indian tribes nationwide because it sets dangerous legislative precedent for the lack of protection of tribal sacred areas located on Federal lands

45.    Many of Apache Stronghold's members share Dr. Nosie's and Naelyn's religious beliefs and also engage in religious ceremonies uniquely tied to Oak Flat.

46.    Many of Apache Stronghold's members are also parents who wish to raise their children in Apache religious ways, including by holding and participating in religious ceremonies with their children at Oak Flat. If Oak Flat is destroyed, they will be unable to raise their children in the traditional Apache ways and provide them with initiation into Apache manhood and womanhood at Oak Flat.

***The United States and Oak Flat***

47.    Oak Flat was Apache land before the United States, Mexico, and "New Spain" ever existed.

48.    Beginning in the 1500s, other nations made claims on the area, including Spain and, later, Mexico.

49.    The United States first gained an interest in the area in 1848, after the Mexican-American War, when Mexico ceded its claim to the area in the Treaty of Guadalupe Hidalgo.

50.    In 1852, in fulfillment of specific obligations the United States made to Mexico in the Treaty of Guadalupe Hildalgo to secure peace between their two nations and the Apaches, the United States entered the Treaty with the Apache ("Treaty of Santa Fe") with several Apache leaders. In it, the United States promised to settle the Apaches' territorial boundaries and to pass and execute laws "and act as to secure the permanent prosperity and happiness of said Indians." Treaty with the Apache, Apache Nation-U.S., July 1, 1852, 10 Stat. 979, arts. 9, 11.

51.    The government's official ethnographic map of the area, published by the U.S. Department of the Interior's Bureau of American Ethnology in 1899, shows Oak Flat to be within the Apache homeland. *See* John Wesley Powell, 2 *Eighteenth Annual Rep. of the Bureau of Am. Ethnology*, H.R. Dkt. 736, at 923 (1899) (noting 689, in green below, as "original domain" of "Western [Apache] bands"; "[n]o treaty of purchase was made with them").

12

by mandating the conveyance of Federal lands with significant religious, cultural, historic, and anthropological significance for Indian tribes to a private company that will destroy the land."

The Save Oak Flat Act will die in congress that year. [GovTrack]

March 18, 2016    The Environmental Impact Statement (EIS) for Resolution Copper begins. The Federal Register notes that, "The EIS will analyze the no action alternative, which would neither approve the proposed GPO [General Plan of Operations] nor complete the land exchange. However, the responsible official does not have discretion to select the no action alternative…" [The Federal Register] This means that the EIS alone, which will take four years and include hundreds of hours of public comment, cannot stop the Rio Tinto mine.

January 17, 2019    Senator Sanders introduces a third version of the Save Oak Flat Act. [Govtrack]

August 9, 2019    Tonto National Forest releases a 1,400-page Draft EIS kickstarting 90 days of public comment. Wendsler Nosie, Sr., Apache resistance leader and grandfather of youth activist Naelyn Pike, offers testimony at a public hearing: "It's like destroying Mount Sinai…How is that going to be replaced?" [Resolution Mine EIS – Public Meeting Transcript]

March 13, 2020    Scientists and Apache activists testify before a congressional subcommittee calling for a halt to the Resolution Copper project. Naelyn Pike, now 21 years old, asked: "How can we practice our ceremonies at Oak Flat when it is destroyed? How will the future Apache girls and boys know what it is to be Apache, to know our home when it is gone?" [AZ Central]

52.    However, the government failed to carry out its treaty obligation to settle territorial boundaries formally.



53.    Shortly after the Treaty of Santa Fe, settlers and miners entered the area over Apache opposition, and U.S. soldiers and civilians repeatedly massacred Apaches. John R. Welch, *Earth, Wind, and Fire: Pinal Apaches, Miners, and Genocide in Central Arizona*, 1859-1874, SAGE Open, Dec. 2017, at 7, https://perma.cc/V457-4HDT.

54.    In 1862, U.S. Army General James Carleton ordered Apache men to be killed wherever found. *Id.* at 7.

55.    When miners discovered gold and silver nearby, General Carleton ordered the Apaches' "removal to a Reservation" or "utter extermination" to protect "all those who go to the country in search of precious metals." *Id.* at 8.

56.    By 1874, the government had forced 4,000 Apaches onto the San Carlos Reservation—nicknamed "Hell's 40 Acres" because it was a barren wasteland.

57.    In 1883, the U.S. Commissioner of Indian Affairs issued the Code of Indian Offenses, prohibiting traditional Native American religious practices on pain of imprisonment. Hiram Price,

13

~~May 24, 2020   A Rio Tinto mine in Australia destroys an Aboriginal site with evidence of continued human inhabitance dating back 46,000 years. [The Guardian]~~

~~June 11, 2020   A Rio Tinto senior executive tells employees that the company's public apologies about the Aboriginal site do not reflect any concession of wrongdoing. [The Guardian]~~

~~September 11, 2020   The Rio Tinto CEO and two top executives resign over controversies relating to the destruction of the Aboriginal site. [The Guardian]~~

~~December 1, 2020   The website for the US Department of Agriculture is updated with a new release date for the Resolution Copper Environmental Impact Timeline — January 2021. [ResolutionMine.US]~~

~~January 4, 2021   Reuters breaks the news and reports that the U.S. Forest Service will publish the FEIS on January 15, 2021, quoting Tonto National Forest Acting~~

~~Supervisor Tom Torres: "The U.S. Forest Service will publish a final environmental impact statement for the mine on Jan. 15, a necessary step to complete the land exchange, said Tom Torres, acting supervisor of the Tonto National Forest, where the mine would be built."[4]~~

~~**ADDITIONAL FACTUAL ALLEGATIONS**~~
~~30.    **The National Defense Authorization Act for Fiscal Year 2015 ("NDAA of 2015")**~~

*Rules Governing the Court of Indian Offenses*, University of North Dakota, Mar. 1883, at 4-5, https://perma.cc/2YQT-7ENT.

58.    The government also forcibly removed hundreds of Apache children from their families, sending them to boarding schools aimed at rooting out their "savagism" and converting them to Christianity. David Wallace Adams, *Education for Extinction: American Indians and the Boarding School Experience, 1875-1928* 6 (Univ. Press of Kan. 1st ed. 1995).

59.    After decades of conflict over their ancestral lands, the Chiricahua Apaches who remained at liberty, led by Geronimo, surrendered in 1886 and agreed to be detained for two years in exchange for the return of their land. Gilbert King, Geronimo's Appeal to Theodore Roosevelt, Smithsonian Mag., Nov. 9, 2012, https://perma.cc/VT82-ZS95; Michael Lieder & Jake Page, Wild Justice: The People of Geronimo vs. The United States (Random House, 1997).

60.    But the government broke this promise, too. It held them prisoner for 23 years and eventually relocated and confined most of them to the San Carlos Reservation (except for Geronimo and a few others who were never allowed to return to their home-lands).

61.    The government states that Oak Flat is "part of the traditional territories of the Western Apache," who "lived on and used the resources of these lands"; that the government obtained Oak Flat "by force 150 years ago"; and that because of the government's actions, Western Apaches "today live on lands that do not encompass places sacred to their cultures." 3-EIS-873–75.

62.    Starting in the 1900s, the government took steps to protect Oak Flat.

63.    In 1905, the government created the Tonto National Forest, which included Oak Flat.

64.    In 1955, President Eisenhower reserved part of Oak Flat to protect it from mining. 20 Fed. Reg. 7319, 7336-37 (Oct. 1, 1955).

The defendant United States of America, by and through its Department of Agriculture agency, the Forest Service, and their personnel, has suddenly publicly stated for the first time its intent to publish a Final Environmental Impact Statement ("FEIS") on this coming Friday, January 15, 2021.[5] That mere act of publication will immediately enable the Forest Service to attempt to convey a 2,422-acre parcel of "Forest Service land" to an entity owned entirely by foreign mining corporations, pursuant to a mandate in Section 3003 of the "Cromnibus"[6] National Defense Authorization Act of 2015 ("the NDAA"),[7] slipped in at the 11th hour with a total federal government operational shutdown looming.



G'an (Mountain Spirits) Canyon at Chi'chil Biłdagoteel National Historic District and Western Apache Traditional Cultural Property and Sacred Place (Photo by Robert A. Witzeman, M.D., Maricopa Audubon Society)

**The Land Exchange Mandate**

31. While Section 3003 of the NDAA mandates that the Southeast Arizona Land Exchange shall be done no later than sixty (60) days after the publication of the FEIS, there is no such mandate in the NDAA establishing any particular date or time frame for the publication of the FEIS.

32. The FEIS is the precursor act for the land exchange mandate.

33. Until as recently as this past summer, the FEIS was not even scheduled in the Tonto National Forest's Schedule of Proposed Actions ("SOPA") to be published until at least April 2021.

65. In 1971, President Nixon renewed the protection. 36 Fed. Reg. 18,997, 19,029 (Sep. 25, 1971).

66. As recently as 2016, the National Park Service placed Oak Flat in the National Register of Historic Places, recognizing "that *Chí'chil Biłdagoteel* is an important feature of the Western Apache landscape as a sacred site, as a source of supernatural power, and as a staple in their traditional lifeway." Nat'l Park Serv., *Chí'chil Biłdagoteel Historic District, Traditional Cultural Property, National Register of Historic Places Registration Form (NPS Form 10-900)* 8 (Jan. 2016).

***Resolution Copper lobbies Congress to mine Oak Flat***

67. In 1995, a large copper deposit was discovered 4,500 to 7,000 feet beneath Oak Flat.

68. In 2004, two large multinational mining companies, Rio Tinto and BHP, formed a joint venture called Resolution Copper and began lobbying Congress to transfer Oak Flat so Resolution could mine the deposit.

69. Rio Tinto's largest shareholder is Aluminum Corporation of China, a "state-owned enterprise" of the Chinese government.[1]

70. Rio Tinto has been widely condemned internationally for destroying indigenous sacred sites—including 46,000-year-old caves constituting one of Australia's most significant cultural sites.[2] Australia's Parliament found that "Rio knew the value of what they were destroying but blew it up anyway … despite having options which would have preserved [the site]."[3]

71. Between 2005 and 2013, Congress considered at least twelve standalone bills to transfer Oak Flat to Resolution. Those proposals were met with the opposition of individual Apaches and their tribal governments, led by the San Carlos Apache Tribe, and joined by many other tribes, as well as local, state, regional, and national environmental and conservation organizations. Each proposed bill failed in committee.

34. Plaintiff Apache Stronghold and many of its members, including but not limited to Wendsler Nosie, Sr., and Naelyn Pike, have been actively engaged throughout the Forest Service's conduct of the public administrative processes concerning Rio Tinto and BHP's intent to establish a copper mine on local lands near the San Carlos Apache Reservation, including those managed by the U.S. Forest Service.

35. The names and addresses, and even email addresses, of Apache Stronghold and many of its members, including but not limited to Wendsler Nosie, Sr., and Naelyn Pike, have been known to the Forest Service for a considerable amount of time, and the Forest Service has been well aware of their religious rights and legal interests in Oak Flat and the proposed land exchange and copper mine.

36. Without any prior notice to Apache Stronghold and its members particularly including but not limited to Wendsler Nosie, Sr., and Naelyn Pike and in deliberate and reckless disregard of the rights and legal interests of Apache Stronghold and its Western Apache members, the Forest Service by and through Tonto National Forest Acting Supervisor Tom Torres leaked to a Reuters news reporter on or before January 4, 2021, that the Forest Service will be publishing the FEIS on January 15, 2021.

**The Mandate's Effect on Plaintiff and the Need for Immediate Relief**

37. That news, and the now suddenly looming ten (10) day deadline, was a surprise announcement without any adequate or effective notice of that January 15, 2021 date to Plaintiff Apache Stronghold and its members who have been actively engaged in the environmental and cultural resources review processes from the beginning days. Plaintiff Apache Stronghold and its members were shocked and distressed to learn that, first through a rumor that day, and then through reading the news report.

38. Plaintiff notes the obvious fact that the surprise announcement of the publication date was made and the agency action of publication of the FEIS would be consummated by the Forest Service before the new

72. Lacking congressional support for a standalone bill, Resolution and its allies tried a different tack: attaching the bill as a rider to other legislation.

73. Each year, Congress passes the National Defense Authorization Act (NDAA), which is necessary legislation to fund the military. In 2014, amidst a series of government-shutdown political battles within Congress, the NDAA was 698 pages long and authorized hundreds of billions of dollars in defense spending, shot through with a wide range of proposed riders. See Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, 128 Stat. 3292 (2014) ("§ 3003, 128 Stat."). At the last minute, Arizona Senators McCain and Flake attached to that bill a land-transfer provision as a rider—called the "Southeast Arizona Land Exchange and Conservation Act"—without a separate vote or debate. The land-transfer provision then passed as Section 3003 of the NDAA. § 3003, 128 Stat. 3732-3741.

74. Section 3003 authorizes the Secretary of Agriculture "to convey" the United States's interests in approximately 2,422 acres of Forest Service managed lands, including Oak Flat, to Resolution, in exchange for other parcels of land owned by Resolution scattered elsewhere in Arizona. § 3003(b)(2), (b)(4), (c)(1), (d)(1), 128 Stat. 3732-3737.

75. Section 3003 also revokes the orders by Presidents Eisenhower and Nixon protecting Oak Flat. § 3003(i)(1)(A), 128 Stat. 3740.

76. Section 3003 instructs that, before conveying any federal land, the Secretary must "prepare a single environmental impact statement under the National Environmental Policy Act [(NEPA)] which shall be used as the basis for all decisions under Federal law related to the proposed mine and the Resolution mine plan of operations and any related major Federal actions significantly affecting the quality of the human environment, including the granting of any permits, rights-of-way, or approvals

16

Biden Presidential Administration is inaugurated at 11:00 AM Eastern Standard Time on January 20, 2021. 39. That choice of date, even of all the possible dates just in the month of January 2021, is not a coincidence or a mere act of ministerial housekeeping by an outgoing administration. It is a nefarious act and breach of fiduciary duty and trust by a federal trustee of the Plaintiff and its Western Apache members, and violates their treaty rights, unduly burdens their constitutional rights, and their other rights to this land that is at the center of this case.

40. The Resolution Copper Mine is planned and expected to cause a 1,000+ foot deep, 2-miles wide subsidence crater that would be centered at Oak Flat:



Map shows area of massive mining subsidence that would occur to Oak Flat if that land is exchanged by the U.S. Forest Service for other land elsewhere in Arizona owned by Rio Tinto-BHP's joint venture entity, Resolution Copper Mine, and Oak Flat gets undermined.(© Reuters/Nancy Wiechec). https://www.msn.com/en-gb/news/world/trump-to-approve-land-swap-for-rio-tintos-resolution-copper-project/ar-BB1ct2gu

41. Acting Tonto National Forest Supervisor Torres is the person who on January 5, 2021, publicly admitted to a Reuters news reporter that the publication date of the Forest Service's Oak Flat Southeast Arizona Land Exchange and Resolution Copper Mine Project Final Environmental Impact Statement would be Friday, January 15, 2021. That

for the construction of associated power, water, transportation, processing, tailings, waste disposal, or other ancillary facilities." § 3003(c)(9)(B), 128 Stat. 3735-3736.

77. Section 3003 also requires the Secretary to "engage in government-to-government consultation with affected Indian tribes concerning issues of concern to the affected Indian tribes related to the land exchange." § 3003(c)(3)(A), 128 Stat. 3733. Following consultation with the Indian tribes, the Secretary must consult with Resolution "and seek to find mutually acceptable measures to—(i) address the concerns of the affected Indian tribes; and (ii) minimize the adverse effects on the affected Indian tribes resulting from mining and related activities on the Federal land conveyed to Resolution Copper under this section." § 3003(c)(3)(B), 128 Stat. 3733.

78. Section 3003 also provides that the land transfer cannot occur until "the final appraised values of the Federal land and non-Federal land are determined and approved by the Secretary." 16 U.S.C. § 539p(c)(4)(B)(ii). The appraisals must be conducted "in accordance with nationally recognized appraisal standards, including (I) the Uniform Appraisal Standards for Federal Land Acquisitions ["UASFLA"]; and (II) the Uniform Standards of Professional Appraisal Practice," 16 U.S.C. § 539p(c)(4)(B), and must provide "the market value of Federal and non-Federal properties involved in an exchange." 36 C.F.R. § 254.9(a)(1). The UASFLA likewise requires that "[t]he federal land [be] appraised as if in private ownership, to its highest and best use," and that "the appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market." The land-transfer statute further requires that "[t]he value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." 16 U.S.C. § 539p(c)(5)(A). If the appraised value of the federal lands exceeds the value of the non-federal

17

news report was published online on or about January 4, 2021.8

lands, Resolution Copper was required to convey additional non-federal land to the United States, make a cash payment, or both. 16 U.S.C. § 539p(c)(5)(B)(i).

79.    Once the Secretary publishes the EIS, Section 3003 provides that "the Secretary shall convey all right, title, and interest of the United States" in Oak Flat "to Resolution Copper" within "60 days." § 3003(c)(10), 128 Stat. 3736.

***The mine will destroy Oak Flat***

80.    The government initially published an EIS on January 15, 2021, but withdrew it a few weeks later, stating that it needed additional "time" to "fully understand concerns raised by Tribes." USDA, Resolution Copper Project & Land Exchange Environmental Impact Statement: Project Update (Feb. 21, 2023), https://perma.cc/K2HD-XWEG.

81.    Before publishing the 2021 EIS, the Secretary failed to properly coordinate with the Advisory Council on Historic Preservation ("ACHP") in the production of a plan to avoid, minimize, and mitigate harm to Oak Flat's historical features.

82.    Due to this failure, in March 2021, the ACHP submitted comments including recommendations to which the Secretary was required to respond.

83.    The Secretary declined to adopt the ACHP's recommendations in a letter issued in April 2025.

84.    The government republished an EIS on June 20, 2025.

85.    The EIS confirms that the mine will destroy Oak Flat.

86.    The copper is located between 4,500 and 7,000 feet below Oak Flat's surface. To mine it, Resolution stated it will use a technique called panel caving, which involves tunneling beneath the ore, fracturing it with explosives, and removing it from below.

87.    This method is purportedly cheaper than other feasible mining techniques, but far more destructive of Oak Flat's surface.

88.    Once the ore is removed, approximately 1.37 billion tons of toxic mining and processing waste

18

("tailings") will need to be stored forever. These tailings will permanently bury or otherwise destroy many prehistoric and historic cultural artifacts, including human burials. Oak Flat itself will collapse ("subside") into a crater almost 2 miles across and 800 to 1,110 feet deep.

89. The EIS admits that the impacts of the mine will be "immediate, permanent, and large in scale"; that all "public access" to the site will be "eliminate"; and that nothing can "replace or replicate the Tribal resources and [traditional cultural properties] that would be destroyed." 1-EIS-153; 3-EIS-892.

90. Among other things, the mine will destroy the places used for Sunrise, Holy Ground, and other sacred ceremonies; old-growth oak groves and sacred medicinal plants; sacred springs, including Dripping Spring; burial grounds; and ancient religious and cultural artifacts, including the petroglyphs and pictographs of *Tséyaa Gogeschin*.

91. The destruction of Oak Flat will terminate forever the Apaches' access to the site; destroy the foods, medicines, springs, artifacts and locations that are essential to their religious practices; and make it physically impossible for the Apaches ever to engage in their core religious practices again.

***The mine will not further any compelling governmental interest***

92. The Resolution mine does not further any compelling governmental interest. Nor is it the least-restrictive means of furthering any such interest.

93. The United States already produces at least half of the copper it needs domestically. The rest is imported from a diverse set of reliable, longstanding allies—mainly Chile, Canada, Mexico, and Peru.

94. The United States also has ample copper reserves apart from the Resolution deposit. In fact, the Resolution deposit is not even the largest porphyry copper deposit in Arizona: that is the Morenci deposit, in Morenci, Arizona. Larger copper and copper-nickel deposits are also located in Alaska and Minnesota.

19

95.     Copper is also readily recyclable, and recycled copper contributes over one third of the United States' copper supply; but "the U.S. predominantly exports its copper scrap" rather than recycling it at home. Bruno Venditti, *The State of Copper Recycling in the U.S.*, Elements by Visual Capitalist (Dec. 12, 2023), https://elements.visualcapitalist.com/the-state-of-copper-recycling-in-the-u-s/.

96.     The primary limit on United States copper supply is not ore, but a shortfall of domestic copper refining capacity. Because domestic production of raw copper already vastly outstrips American copper refining capacity, the U.S. already "sends nearly half its copper abroad," "only to import" it again later as "refined copper." Bruno Venditti, *Visualizing the U.S. Copper Gap*, Elements by Visual Capitalist (July 11, 2025), https://elements.visualcapitalist.com/visualizing-the-u-s-copper-gap/. Resolution's mine will do nothing to address the lack of domestic copper refining capacity; it will exacerbate it.

97.     The copper produced from Resolution's mine will likely be sent to China to be refined there, and—if it returns at all—reimported at a premium, benefitting the Nation's leading mineral competitor.

98.     Resolution is wholly owned by foreign corporations, Rio Tinto and BHP; and is controlled by Rio Tinto. Rio Tinto's largest shareholder is Aluminum Corporation of China, a "state-owned enterprise" controlled by the Chinese government.

99.     China is the world's dominant copper-refining power, controlling over 50% of global smelting.

100.    China is also Rio Tinto's largest customer, accounting for "a commanding 57 percent of [its] total revenue." Zheng Xin, *Rio Tinto banks on nation's energy shift*, Chinadaily.com.cn (Mar. 26, 2025), https://perma.cc/C9HX-UC24.

101.    Rio Tinto recently told federal regulators it is "nearly impossible for U.S. smelters to … operate profitably," and that Chinese "dominance over copper smelting makes China the most profitable

20

destination for almost any mine in the world to sell its copper."

102. Even focusing on the copper at Oak Flat, the government and Resolution have chosen a gratuitously destructive mining method. The government admits that other underground mining techniques are technically and physically feasible; would allow billions of tons of copper to be profitably mined; and, would preserve Oak Flat's surface. But the government rejected any detailed consideration of these alternatives on the ground that they "would result in higher per-ton mining costs" and thus "reduce the amount of ore that could be profitably mined." 1-EIS-50–51; 4-EIS-F-3–4.

***Apache Stronghold and other groups challenge the 2021 EIS***

103. Before the government initially published an EIS on January 15, 2021 (before withdrawing it a few weeks later), Apache Stronghold filed this suit challenging the legality of the proposed conveyance of Oak Flat to Resolution. *Apache Stronghold v. United States*, No. 2:21-cv-50 (D. Ariz. Jan. 12, 2021).

104. Shortly thereafter, two other groups—the San Carlos Apache Tribe ("SCAT" or "the Tribe") and the Arizona Mining Reform Coalition, at al. ("AMRC")—filed additional lawsuits. *San Carlos Apache Tribe v. U.S. Forest Serv.*, No. 2:21-cv-68 (D. Ariz. Jan. 14, 2021) ("*SCAT*"); *Ariz. Mining Reform Coal. v. U.S. Forest Serv.*, No. 2:21-cv-122 (D. Ariz. Jan. 22, 2021) ("*AMRC*"). Those two lawsuits initially focused on the adequacy of the 2021 EIS and were stayed when the EIS was withdrawn on March 1, 2021. Order, *SCAT*, No. 2:21-cv-68 (D. Ariz. Mar. 23, 2021), Dkt. 47; Order, *AMRC*, No. 2:21-cv-122 (D. Ariz. Mar. 16, 2021), Dkt. 35.

105. Apache Stronghold's lawsuit challenged the legality of the land transfer under, *inter alia*, the Religious Freedom Restoration Act and the First Amendment, as well as the rights of the Stronghold's Apache members under the Treaty of Santa Fe and the federal government's trust

21

responsibility and duties as a fiduciary of the Apaches.

106. Apache Stronghold sought an emergency injunction. The district court declined to enjoin the government. *Apache Stronghold*, No. 2:21-cv-50, 2021 WL 689906 (D. Ariz. Feb. 22, 2021). Apache Stronghold sought an emergency injunction from the Ninth Circuit. Six hours before its response was due, the government rescinded the EIS, paused the transfer, and argued the harm was no longer imminent. Over a dissent from Judge Bumatay, a motions panel denied emergency relief on March 5, 2021, agreeing that immediate relief was no longer necessary. *Apache Stronghold v. United States*, 2021 WL 12295173 (9th Cir. Mar. 5, 2021); *id.* at *1 (Bumatay, J., dissenting). On plenary review, a divided panel rejected Apache Stronghold's claims on June 24, 2022. *Apache Stronghold v. United States*, 38 F.4th 742 (9th Cir. 2022); *id.* at 773 (Berzon, J., dissenting). After granting rehearing, the en banc Ninth Circuit affirmed, on March 1, 2024, by a sharply divided, 6-5 vote. *Apache Stronghold v. United States*, 101 F.4th 1036 (9th Cir. 2024) (en banc). Apache Stronghold filed a petition for certiorari, which the U.S. Supreme Court denied on May 27, 2025, over a dissenting opinion from Justices Gorsuch and Thomas. *Apache Stronghold v. United States*, 145 S. Ct. 1480 (2025) (Gorsuch & Thomas, JJ., dissenting).

### *The United States issues another EIS*

107. On April 17, 2025, while Apache Stronghold's petition for certiorari was still pending at the Supreme Court, the government provided notice that it intended to publish a new EIS and draft record of decision as early as June 16, 2026. Dkt. 148.

108. Apache Stronghold moved to lift the stay in this Court and sought a temporary injunction prohibiting the government from transferring Oak Flat to Resolution Copper during the pendency of Apache Stronghold's Supreme Court appeal. Dkt. 150.

22

109. On May 9, 2025, this Court enjoined the government from issuing the EIS and transferring the land until after the Supreme Court resolved Apache Stronghold's appeal. Dkt. 170.

110. A few weeks after the Supreme Court declined to review the denial of a preliminary injunction to Apache Stronghold, the Forest Service published the new final EIS on June 20, 2025.

111. Barring judicial intervention, the new EIS triggered a 60-day deadline for the government to convey Oak Flat to Resolution. § 3003(c)(10), 128 Stat. 3736.

***While judicial review is ongoing, the United States conveys deeds to Resolution***

112. The newly issued EIS revived the two lawsuits stayed since 2021. Both the Tribe and AMRC filed amended complaints and sought preliminary injunctions. First Am. Compl., *SCAT*, No. 2:21-cv-68 (D. Ariz. July 14, 2025), Dkt. 104; Mot. for Prelim. Inj., *SCAT*, No. 2:21-cv-68 (D. Ariz. July 14, 2025), Dkt. 105; Second Am. Compl., *AMRC*, No. 2:21-cv-122 (D. Ariz. July 14, 2025), Dkt. 87; Mot. Prelim. Inj., *AMRC*, No. 2:21-cv-122 (D. Ariz. July 14, 2025), Dkt. 88.

113. A third lawsuit challenging the new EIS was also filed in the District of D.C., *Lopez v. United States*, No. 2:25-cv-2408 (D.D.C. July 24, 2025). That suit was transferred to the District of Arizona and assigned to Judge Lanza, who was also presiding over the SCAT and AMRC cases. Order, *Lopez*, No. 2:25-cv-2408 (D.D.C. Aug. 1, 2025), Dkt. 27.

114. On August 15, 2025, Judge Lanza denied a preliminary injunction in the SCAT and AMRC cases, despite acknowledging that "it is difficult to overstate just how profoundly the land exchange will undermine the ability of members of the San Carlos Apache Tribe ('the Tribe') to practice their religion." Order at 2, *SCAT*, No. 2:21-cv-68 (D. Ariz. Aug. 15, 2025), Dkt. 124. Two days later, Judge Lanza denied a preliminary injunction in the *Lopez* case, incorporating by reference the analysis

23

in the *SCAT* and *AMRC* orders. Order at 4-6, *Lopez*, No. 2:25-cv-2758 (D. Ariz. Aug. 17, 2025), Dkt. 45.

115. The *SCAT*, *AMRC*, and *Lopez* plaintiffs promptly sought emergency relief from the Ninth Circuit. *AMRC*, No. 25-5185 (9th Cir. Aug. 15, 2025); *SCAT*, No. 25-5189 (9th Cir. Aug. 15, 2025); *Lopez*, No. 25-5197 (9th Cir. Aug. 17, 2025).

116. On August 18, 2025, the Ninth Circuit granted "a temporary administrative injunction to preserve the status quo while the motions are pending." Order, *SCAT*, No. 25-5189 (Aug. 18, 2025), Dkt. 17. In the same order, the Ninth Circuit consolidated the *SCAT* and *AMRC* appeals.

117. On September 11, 2025, the Ninth Circuit consolidated the Lopez appeal with the *SCAT* and *AMRC* appeals. Order, *SCAT*, No. 25-5189 (9th Cir. Sept. 11, 2025), Dkt. 46. The Ninth Circuit heard oral argument on January 7, 2026.

118. On March 13, 2026, the Ninth Circuit affirmed the district court's denial of a preliminary injunction. *AMRC v. U.S. Forest Serv.*, 170 F.4th 879, 903 (9th Cir. 2026), *amended and superseded by*, No. 25-5185, 2026 WL 958126 (9th Cir. Apr. 8, 2026). In the same order, the Ninth Circuit dissolved the administrative stay. *Id.*

119. The Ninth Circuit issued its ruling on Friday, March 13, at 7:34 p.m. ET. At 8:58 p.m. ET that evening, the *Lopez* plaintiffs informed the government and Resolution that they intended to file an emergency application for a stay from the U.S. Supreme Court and asked the government to inform them by 10:00 a.m. ET on Saturday if the government would agree to a brief stay of the land exchange to allow the Supreme Court to review the emergency application.

120. Despite being on notice that an emergency appeal to the Supreme Court was forthcoming, the government nevertheless transferred the land to Resolution Copper sometime on Friday night or Saturday morning and did not inform the *Lopez* plaintiffs of the transfer until 1:00 p.m. ET on Saturday, March 14. The *Lopez* plaintiffs filed an

24

emergency application with the Supreme Court later that day.

121. In its March 15, 2026, response to the *Lopez* plaintiffs' emergency petition, Resolution Copper informed the Supreme Court that it was starting to drill immediately—even before the Supreme Court ruled on the Lopez plaintiffs' emergency application. Opp'n to Req. for Immediate Administrative Stay at 6, *Lopez*, No. 25A1008 (U.S. Mar. 15, 2016).

122. Justice Kagan denied the emergency application on March 19.

(footnotes)

1 *About Chinalco*, Overview, Aluminum Corp. of China, https://perma.cc/2E4J-6HMF; see Neil Hume, *Rio faces rebellion from biggest shareholder*, Financial Times (Apr. 10, 2019), https://archive.ph/MOCv6.

2 Parliament of the Commonwealth of Australia, Joint Standing Committee on North-ern Australia, *Never Again*, at vi (Dec. 2020), https://perma.cc/JHF6-NZBA.

3 *Id.*

4 *Rio Tinto Comment on Bureau of Industry and Security Request for Public Comments on Section 232 National Security Investigation of Imports of Copper (BIS-2025-0010)*, Regulations.gov (Apr. 1, 2025), https://perma.cc/BWG6-4GPB.

1 ~~"1852 Treaty between the U.S. and the Apache Nation of Indians," sometimes referenced as the "Treaty of Santa Fe"~~

~~(*Articles of a treaty made and entered into at Santa Fe, New Mexico, on the first day of July in the year of our Lord one thousand eight hundred and fifty-two, by and between Col. E. V. Sumner, U.S.A., commanding the 9th Department and in charge of the executive office of New Mexico, and John Greiner, Indian agent in and for the Territory of New Mexico, and acting superintendent of Indian affairs of said Territory, representing the United States, and Cuentas, Azules, Blancito, Negrito, Capitan Simon, Capitan Vuelta, and Mangus Colorado, chiefs, acting on the part of the Apache Nation of Indians, situate and living within the limits of the United States.*).~~

~~Transcribed copy of the 1852 Treaty available online at http:avalon.law.yale.edu/19th_century/apa1852.asp.~~

2 ~~Article available in Sage Open Journal online at: http://journals.sagepub.com/do/full/10.1177/2158244017747016~~

3 ~~Adapted from "The Mine at Oak Flat: A Timeline of Government Bad Faith," Asa Burroughs, Moyers On Democracy (December 29, 2020). Available online at https://billmoyers.com/story/the-mine-at-oak-flat-a-timeline-of-a-government-bad-faith/~~

4      "Trump to Approve Land Swap for Rio Tinto's Resolution Copper Project," Ernest Scheyder, Reuters (January 4, 2021). Article accessed on January 10, 2021, for citation at https://www.msn.com/en-gb/news/world/trump-to-approve-land-swap-for-rio-tintos-resolution-copper-project/ar-BB1ct2gu.

5      "The final EIS and draft Record of Decision (ROD) presently are scheduled to be published in the Federal Register on January 15, 2021. Visit Resolution Copper Timeline (link is external) for more information." From United States Department of Agriculture, National Forest Service, Tonto National Forest, Resolution Copper Project and Land Exchange Environmental Impact Statement webpage, https://www.resolutionmineeis.us/documents/nez-2014 accessed January 8, 2021. See also, "Current Status (as of Jan. 4, 2021)" https://www.resolutionmineeis.us ("The final EIS and draft Record of Decision are scheduled to be published in the Federal Register on January 15, 2021.").

6      See, "Get on the Cromnibus: What this odd phrase has to do with the US budget," Tom McCarthy, The Guardian (December 12, 2014) https://www.theguardian.com/us-news/2014/dec/12/cromnibus-odd-phrase-budget-battle-spending-bill . And see, "Senate passes spending bill, ends government shutdown threat," By David Lawder and Amanda Becker, Reuters (December 13, 2014) https://www.reuters.com/article/us-usa-congress-budget/senate-passes-spending-bill-ends-government-shutdown-threat-idUSKBN0JR0I820141214 . See also, "Crowd protests copper mine on sacred lands," Apache Messenger/Indianz.com (December 22, 2014) https://www.indianz.com/News/2014/015978.asp

7      H.R.3979 - Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015, Public Law No: 113-291 https://www.congress.gov/bill/113th-congress/house-bill/3979/text | https://www.congress.gov/113/plaws/publ291/PLAW-113publ291.pdf.

26

8      "Trump To Approve Land Swap For Rio Tinto's Resolution Copper Project," Ernest Scheyder, Reuters (January 4, 2021) ("The U.S. Forest Service will publish a final environmental impact statement for the mine on Jan. 15, a necessary step to complete the land exchange, said Tom Torres, acting supervisor of the Tonto National Forest, where the mine would be built."). Article accessed on January 10, 2021, for citation at https://www.msn.com/en-gb/news/world/trump-to-approve-land-swap-for-rio-tintos-resolution-copper-project/ar-BB1ct2gu.

# CLAIMS

## COUNT 1
### Violation of the Fifth Amendment to the United States Constitution Due Process (Inadequate and Ineffective Notice)

42.    Plaintiffs incorporate by reference all preceding paragraphs, images, maps, and figures.

43.    Defendants knew Plaintiff's U.S. Post Office mailing address and email address and never provided Plaintiff with official notice of their intent and plan to publish the FEIS on January 15, 2021.

44.    Defendants lack of adequate and effective notice unlawfully and illegally prejudiced Plaintiff Apache Stronghold and its members' treaty rights, property rights, religious freedom rights, and other legal rights, in violation of their Fifth Amendment Right to Due Process (Adequate and Effective Notice) in order to be able to effectively petition the government for redress and the right to remedy to vindicate and protect their rights.

45.    Absent injunctive and declaratory relief against the Mandate, Plaintiff and its members have been and will continue to be harmed.

## COUNT 2
### Violation of the Fifth Amendment to the United States Constitution Violation of the First Amendment to the United States Constitution Petition Clause and Right to a Remedy

46.    Plaintiffs incorporate by reference all preceding paragraphs, images, maps, and figures.

27

47. The time period of actual notice elapsing from January 4, 2021 to January 15, 2021, is prejudicial and woefully inadequate to provide Plaintiff Apache Stronghold and its members a fair opportunity to defend their rights and to effectively petition the government for redress and remedy, and caused undue harm, damage, and imposed an undue burden on Plaintiff Apache Stronghold and its Western Apache members' ability to protect their treaty rights, religious freedom rights, and other legal rights.

48. Absent injunctive and declaratory relief against the Mandate, Plaintiff and its members have been and will continue to be harmed.

**COUNT ~~5~~**
**Violation of the Religious Freedom Restoration Act**
~~**Substantial Burden**~~

~~71.~~ Plaintiffs incorporate by reference all preceding paragraphs~~, images, maps, and figures~~.

72. Plaintiff Apache Stronghold and its members' sincerely held religious beliefs originate at, and are seated at, Oak Flat. Plaintiffs' compliance with these beliefs is a religious exercise.

73. The Mandate creates government imposed coercive pressure on Plaintiffs to change or violate their religious beliefs.

74. The Mandate chills, burdens, inhibits, and destroys Plaintiffs' religious exercise.

75. The Mandate furthers no compelling governmental interest.

76. The Mandate is not narrowly tailored to any governmental interest.

77. The Mandate is not the least restrictive means of furthering Defendants' stated interests.

78. The Mandate and the Defendants' threatened execution of the Mandate violate Plaintiffs' rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, *et seq.*

**COUNT I**
**Violation of the Religious Freedom Restoration Act:**
**Destruction of Sacred Site and Prevention of Religious Exercise**
**42 U.S.C. § 2000bb *et seq.***

123. Plaintiff incorporates by reference all preceding paragraphs.

124. Under RFRA, "Government shall not substantially burden a person's exercise of religion" unless it satisfies strict scrutiny. 42 U.S.C. § 2000bb-1(a)-(b). RFRA broadly defines the "exercise of religion" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.* §§ 2000bb-2(4), 2000cc-5(7)(A). RFRA also defines the "exercise of religion" to include "[t]he use ... of real property" for religious exercise. *Id.* §§ 2000bb-2(4), 2000cc-5(7)(B).

125. Members of Apache Stronghold—including but not limited to Dr. Wendsler Nosie, Sr. and Naelyn Pike—exercise their religion by visiting and praying at Oak Flat, and participating in sacred ceremonies that are uniquely tied to Oak Flat and cannot be replicated elsewhere. These members intend to continue in their religious exercise at Oak Flat in ongoing, imminent, active participation in ceremonies and religious observances at Oak Flat.

28

79. Absent injunctive and declaratory relief against the Mandate, Plaintiffs have been and will continue to be harmed.

126. Defendants' actions substantially burden the religious exercise of Apache Stronghold's members in several different ways.

127. The transfer and destruction of Oak Flat substantially burdens the religious exercise of Apache Stronghold's members.

128. Denying access to Oak Flat substantially burdens the religious exercise of Apache Stronghold's members.

129. Physically destroying Oak Flat substantially burdens the religious exercise of Apache Stronghold's members.

130. Interfering with religious ceremonies at Oak Flat substantially burdens the religious exercise of Apache Stronghold's members.

131. Completely preventing the exercise of religion at Oak Flat substantially burdens the religious exercise of Apache Stronghold's members.

132. Defendants' actions are subject to strict scrutiny.

133. Strict scrutiny requires that the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

134. A compelling interest includes "only those interests of the highest order." *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). And the least-restrictive-means standard is "exceptionally demanding." *Burwell v. Hobby Lobby, Inc.*, 573 U.S. 682, 728 (2014). To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector. *Id.*

135. Defendants cannot satisfy strict scrutiny.

136. To the extent this claim may be barred by *Apache Stronghold v. United States*, 101 F.4th 1036 (2024) (en banc), that decision should be overruled.

29

**COUNT II**
**Violation of the Religious Freedom Restoration Act:**
**Coercion, Discrimination, Penalties, and Denial of Equal Treatment**
**42 U.S.C. § 2000bb *et seq.***

137. Plaintiff incorporates by reference all preceding paragraphs.

138. Under *Apache Stronghold*'s interpretation of RFRA, "a disposition of government real property" substantially burdens a person's religious exercise if it has a "tendency to coerce individuals into acting contrary to their religious beliefs," "'discriminate[s]' against religious adherents," "'penalize[s]' them," or "den[ies] them 'an equal share of the rights, benefits, and privileges enjoyed by other citizens.'" *Apache Stronghold*, 101 F.4th at 1044.

139. Defendants' actions and disposition of property have a tendency to coerce Apache Stronghold and its members into acting contrary to their religious beliefs.

140. Defendants' actions and disposition of property discriminate against religious adherents—namely, Apache Stronghold and its members.

141. Defendants' actions and disposition of property penalize Apache Stronghold and its members.

142. Defendants' actions and disposition of property deny Apache Stronghold and its members the rights, benefits, and privileges enjoyed by other citizens.

143. Defendants' actions and disposition of property have the tendency and effect of, among other things:

a. Coercing Apache Stronghold and its members to stop engaging in their religious practices and to act contrary to their religious beliefs;

b. Exposing Apache Stronghold and its members to force, violence, and threats of force and violence that have coerced them to stop and

30

intimidated and deterred them from continuing their religious practices;

c. Subjecting Apache Stronghold and its members to penalties on or for their religious exercise, including but not limited to, excessive fees, financial penalties, trespassing citations, civil liability, and criminal liability;

d. Depriving and Apache Stronghold and its members of the protection they previously had for their religious exercise and the protection some other members of the public still enjoy for activities at Oak Flat;

e. Abrogating rights, benefits, and privileges enjoyed by other citizens in the use of government-controlled (and formerly government-controlled) property, including Oak Flat;

f. Discriminating against Apache worshippers including Apache Stronghold and its members and devaluing their religious beliefs, practices, and sites; and

g. Causing other harms and substantial burdens on Apache Stronghold and its members' religious exercise.

144. Because these actions constitute a substantial burden even under the standard articulated by the en banc Ninth Circuit in *Apache Stronghold*, they can be maintained only if they satisfy strict scrutiny.

145. Strict scrutiny requires that the government "demonstrates that application of the burden to the person–(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

146. A compelling interest includes "only those interests of the highest order." *Yoder*, 406 U.S. at 215. And the least-restrictive-means standard is "exceptionally demanding." *Hobby Lobby*, 573 U.S. at 728. To pass the least-restrictive-means test, the government must show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion" by the religious objector. *Id.*

31

**COUNT 4**
**Violation of the First Amendment to the U~~nited States~~ Constitution**
**Free Exercise Clause ~~— Substantial Burden~~**

58.    Plaintiff~~s~~ incorporate by reference all preceding paragraphs~~, images, maps, and figures~~.

~~59.    Plaintiff Apache Stronghold and its members' sincerely held religious beliefs originate at, and are seated at, Oak Flat. Plaintiffs' compliance with these beliefs is a religious exercise.~~

~~60.    Neither the NDAA of 2015 nor the Mandate is neutral.~~

~~61.    Neither the NDAA of 2015 nor the Mandate is generally applicable.~~

~~62.    The Mandate furthers no compelling governmental interest.~~

~~63.    The Mandate is not narrowly tailored to any governmental interest.~~

~~64.    The Mandate is not the least restrictive means of furthering Defendants' stated interests.~~

~~65.    The Mandate creates government imposed coercive pressure on Plaintiff Apache Stronghold and its members to change or violate or abandon their religious beliefs.~~

~~66.    The Mandate chills, burdens, inhibits, and destroys Plaintiff Apache Stronghold and its members' religious exercise.~~

~~67.    The Mandate imposes a substantial burden on Plaintiff Apache Stronghold and its members' religious exercise.~~

~~68.    The Mandate is not narrowly tailored to any compelling governmental interest.~~

~~69.    The Mandate and Defendants' threatened enforcement of the Mandate violate Plaintiff Apache Stronghold and its members' rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.~~

147.    Defendants cannot satisfy strict scrutiny.

148.    Because Defendants cannot satisfy strict scrutiny, their actions violate RFRA.

**COUNT III**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Neutrality and General Applicability**

244.    Plaintiff incorporate<u>s</u> by reference all preceding paragraphs.

245.    As enrolled members and descendants of the Treaty of Santa Fe tribes, Apache members of Apache Stronghold have aboriginal rights under the law of Indian title to continue to use and occupy Oak Flat for purposes of religious exercise.

246.    The Treaty of Santa Fe tribes and their descendants, Apache members of Apache Stronghold, had actual, exclusive, and continuous use and occupancy of lands that included Oak Flat for a long time prior to the 1850s and thus established Indian title to Oak Flat.

247.    A variety of evidence—archaeological, oral tradition, and other sources—shows the actual, exclusive, and continuous use and occupancy by Apaches of lands that included Oak Flat for a long time prior to the 1850s.

248.    The Apache's Indian title has not been extinguished by treaty, agreement, congressional action, or other authorized actions of the federal government.

249.    The United States has never compensated the Treaty of Santa Fe tribes or any of their descendants as holders of Indian title for Oak Flat.

250.    The Indian title of the Treaty of Santa Fe tribes and their descendants has not been extinguished by voluntary abandonment.

251.    Individual Apache members of Apache Stronghold also hold individual Indian title to the use and occupancy of Oak Flat for purposes of religious exercise.

32

70. Absent injunctive and declaratory relief against the Mandate, Plaintiff and its members have been and will continue to be harmed.

**COUNT 6**
**Violation of the First Amendment to the United States Constitution**
**Free Exercise Clause Intentional Discrimination**

80. Plaintiffs incorporate by reference all preceding paragraphs, images, maps, and figures.

81. Plaintiff Apache Stronghold and its members' sincerely held religious beliefs originate at, and are seated at, Oak Flat. Plaintiffs' compliance with these beliefs is a religious exercise.

82. Plaintiffs sincerely held religious beliefs prohibit them from allowing harm to occur at or on or to Oak Flat.

83. Plaintiffs' compliance with these beliefs is a religious exercise.

84. Despite being informed in detail of these beliefs beforehand, Defendants designed the Mandate in a way that made it impossible for Plaintiffs to comply with both their religious beliefs and to allow the Mandate to be imposed.

85. Defendants promulgated the Mandate in order to suppress the religious exercise of Plaintiff Apache Stronghold and its Western Apache members and other traditional Western Apaches.

86. The Mandate and Defendants' threatened enforcement of the Mandate thus violate the Plaintiffs rights secured to them by the Free Exercise Clause of the First Amendment to the United States Constitution.

252. Individual Apache members of Apache Stronghold can show that their lineal ancestors held, used, and occupied, as individuals, Oak Flat for purposes of religious worship, with the right and power to exclude all others, from time immemorial, until temporarily removed involuntarily.

253. Individual Apache members of Apache Stronghold can therefore show that they have Indian title to Oak Flat.

254. The title of individual Apache members of Oak Flat has not been extinguished by the government or by voluntary abandonment.

255. A notice of Lis Pendens is recorded in the property records of the Pinal County Recorder's Office as of January 13, 2021. *See* Dkt. 58.

256. Resolution Copper's possession of Oak Flat is thus null, or subject to the Indian title of the Treaty of Santa Fe tribes and of individual Apache members of Apache Stronghold, who are descendants of the Treaty of Santa Fe tribes.

257. Any permits for mining Oak Flat granted by the federal government are subject to and in violation of the Indian title of the Treaty of Santa Fe tribes and of individual Apache members of Apache Stronghold.

258. Activities supporting the physical destruction of Oak Flat are in violation of the Indian title of the Treaty of Santa Fe tribes and of individual Apache members of Apache Stronghold.

**COUNT IV**
**Violation of the First Amendment to the U.S. Constitution**
**Free Exercise Clause**
**Interference with the Right to Direct the Religious Upbringing of Children**

159. Plaintiff incorporates by reference all preceding paragraphs.

160. Defendants' actions are subject to strict scrutiny under the Free Exercise Clause when they "substantially interfer[e] with the religious development" of children. *Mahmoud v. Taylor*, 606

33

U.S. 522, 556 (2025) (quoting *Yoder*, 406 U.S. at 218).

161. When the government's actions impose an "objective danger," or a "very real threat of undermining" parents' religious exercise, they impose a burden on religious exercise. *Id.* at 543, 553.

162. Members of Apache Stronghold who are parents exercise their religion by raising their children in accordance with their Apache religious beliefs, which includes worship, prayer, gathering medicine, and holding religious ceremonies at Oak Flat.

163. By transferring and destroying Oak Flat, Defendants are cutting off Apache parents from ever engaging in core religious practices that are essential to their children's religious development. This not only poses an "objective danger" or "very real threat of undermining" Plaintiff's religious exercise, but also renders it altogether physically impossible. *Id.*

164. Defendants' actions cannot satisfy strict scrutiny.

## COUNT 3
### ~~Breaches~~ of Trust and Fiduciary Duties
### ~~Demand for Protection of Assets, a Full Accounting, and Damages~~

49. ~~Plaintiff~~s incorporate by reference all preceding paragraphs~~, images, maps, and figures~~.

50. ~~See "MAP 1: Royce's Arizona map No. 1, depicting Arizona portions of Western and Chiricahua Apache homelands," above at p.9, incorporated herein by this reference.~~

51. ~~The land and property rights containing and pertaining to Chi'chil Biłdagoteel (Oak Flat) were reserved by the Apaches in the 1852 Treaty of Santa Fe and it has been managed in trust for them by the U.S. Government as a result of official U.S. Government support of actions unilaterally removing the Western Apaches from that land and forcing them to struggle to continue to maintain their relationships to their land, especially their traditional cultural and religious relationships.~~

## COUNT V
### Violation of Treaty with the Apaches (July 1, 1852)
### Treaty of Santa Fe

165. Plaintiff incorporates by reference all preceding paragraphs.

166. The Treaty of Santa Fe, like all Indian treaties, impliedly reserves to the Apaches everything they did not explicitly grant thereby to the United States. *See United States v. Winans*, 198 U.S. 371, 381 (1905); *accord Nw. Band of Shoshone Nation v. Wooten*, 83 F.4th 1205, 1212 (9th Cir. 2023).

167. This Treaty, like all Indian treaties, is to be construed as its Indian signatories would have understood it. *See United States v. Washington*, 853 F.3d 946, 963 (9th Cir. 2017); *accord Herrera v. Wyoming*, 587 U.S. 329, 344-45 (2019).

168. Through the Treaty, the United States promised the Apaches that it would "designate, settle, and adjust [the Apaches'] territorial

34

52. This has caused Plaintiff and its Western Apache members undue hardships and harms throughout all relevant times from their birth.

53. The 1852 Treaty land and traditional cultural and religious property was to have been managed in trust for the Western Apaches by U.S. Government & its agencies once the Defendant United States of America forced the Western Apaches off of their Treaty land.

54. The U.S. Government and its agents at the USDA as Trustee intend to illegally and unconstitutionally dispose of Western Apache land and religious property.

55. U.S. Government and its agents at USDA as Trustee intends to illegally and unconstitutionally allow total destruction of Plaintiff Apache Stronghold and its Western Apache members' land and religious property, and total destruction of the traditional Western Apaches' religious beliefs and their free exercise of religion at Oak Flat.

56. The United States and its agents breached their fiduciary duties as a trustee for the Plaintiff Apache Stronghold and its Western Apache members, causing harm and damage to the Western Apaches as beneficiaries of the trust and fiduciary duties.

57. Absent injunctive and declaratory relief against the Mandate, Plaintiff and its members have been and will continue to be harmed.

boundaries" and "pass and execute laws" protecting "the prosperity and happiness of" the Apaches on their ancestral home-land. Treaty with the Apache, Apache Nation-U.S., July 1, 1852, 10 Stat. 979 ("Treaty of Santa Fe"), arts. 9, 11.

169. The Treaty further provides that it should be given a "liberal construction … as to secure the permanent prosperity and happiness of [the Apaches]." Treaty of Santa Fe, art. 11.

170. There is no indication that the Apaches understood the Treaty of Santa Fe to terminate their usufructuary, religious-use, and other rights to use their territory for its accustomed purposes, including to worship at Oak Flat.

171. This language obligates the United States to preserve traditional Apache religious and other practices on their ancestral homeland. *See Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 (1968); *Herrera*, 587 U.S. at 349-350.

172. Although the United States Congress failed to enact formal boundary lines, the earliest map prepared by the U.S. Department of the Interior Bureau of American Ethnology in 1899 confirms that Oak Flat is within the Apaches' historical territories.

173. The EIS concedes that the "Oak Flat Federal Parcel" is within "the traditional territories of the Western Apache," 2-EIS-776 (2021), who were "forced onto reservations" but "continued to use the vicinity of the project area into the twentieth century," 2-EIS-776 (2021).

174. Congress has not expressly abrogated the Treaty of Santa Fe. *See Shoshone-Bannock Tribes v. DOI*, 153 F.4th 748, 765 (9th Cir. 2025).

175. No other federal action purporting to touch the land at Oak Flat has extinguished the Apaches' rights and interests in Oak Flat, including their usufructuary, religious-use, and other rights to worship there as they have for centuries.

176. The United States has never gained all rights or interests in Oak Flat from the Apaches, nor extinguished the Apaches' rights or interests in Oak Flat.

177.  The United States' land patent, a quitclaim deed, did not transfer to Resolution Copper the Apaches' usufructuary, religious-use, or other rights in Oak Flat.

178.  By purporting to transfer all interest in Oak Flat to Resolution Copper for destruction, the United States violated its treaty promise to protect the Apaches' prosperity and happiness within their historical territories.

179.  The Treaty obligations are enforceable by individual Tribe members whose individual personal interests are affected by violation of the Tribe's treaty and trust rights.

180.  The membership of Apache Stronghold includes members of the San Carlos Apache Tribe and Apache members of other present-day tribes included under the Treaty of Santa Fe.

181.  The United States' ongoing violation of its Treaty promise has harmed and will continue to harm Apache Stronghold's members, including by preventing them from exercising their religion at Oak Flat ever again.

## COUNT VI
## Violation of Trust Obligation and Fiduciary Duties

182.  Plaintiff incorporates by reference all preceding paragraphs.

183.  The Treaty of Santa Fe created an enforceable trust between the United States and the Apaches. *See United States v. Mitchell*, 463 U.S. 206, 225 (1983).

184.  The Treaty places a specific duty upon the United States: to "designate, settle, and adjust [the Apaches'] territorial boundaries" and "pass and execute … laws" protecting "the prosperity and happiness of" the Apaches on their ancestral homeland. Treaty of Santa Fe, arts. 9, 11; *see Arizona v. Navajo Nation*, 599 U.S. 555, 563 (2023).

185.  There is a trustee, the United States; a beneficiary, the Apache; and a trust corpus, the reserved rights and interests of the Apache in and to their historical territory. *See Inter Tribal Council of Ariz. v. Babbitt*, 51 F.3d 199, 203 (9th Cir. 1995).

36

186. This trust relationship is judicially enforceable because it is coupled with "a substantive source of law"—the Treaty of Santa Fe—"that establishes specific fiduciary or other duties." *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003).

## COUNT VII
## Violation of Executive Order 13007
## Executive Order 13007; 16 U.S.C. § 539p; and 5 U.S.C. §§ 701-706

194. Plaintiff incorporates by reference all preceding paragraphs.

195. Executive Order 13007, "Indian Sacred Sites," 61 Fed. Reg. 26,771 (May 24, 1996), provides that "[i]n managing Federal lands," federal agencies "shall, to the extent practicable, permitted by law, and not clearly inconsistent with essential agency functions, (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid adversely affecting the physical integrity of such sacred sites."

196. The land-transfer statute mirrors Executive Order 13007 by requiring that the EIS "assess the effects of the mining and related activities … on the cultural and archeological resources that may be located on the Federal land." 16 U.S.C. § 539p(c)(9)(C)(i); *see, e.g.*, *Te-Moak Tribe of W. Shoshone Indians of Nev. v. DOI*, 565 F. App'x 665, 667 (9th Cir. 2014); *S. Fork Band Council of W. Shoshone of Nev. v. DOI*, 588 F.3d 718, 724 (9th Cir. 2009).

197. The land-transfer statute additionally requires that the EIS "identify measures that may be taken, to the extent practicable, to minimize potential adverse impacts on those resources." 16 U.S.C. § 539p(c)(9)(C)(ii).

198. The EIS repeatedly invokes Executive Order 13007 and lists it as an applicable legal authority underpinning the document's cultural resources impacts analysis.

199. Nonetheless, the EIS failed to properly analyze the effects and minimization measures of

37

the land transfer under Executive Order 13007, as incorporated by the land-transfer statute.

200.   The EIS and Decision Notice also failed to comply with Executive Order 13007, as incorporated by the land-transfer statute, as Defendants, "to the extent practicable," failed to "avoid adversely affecting the physical integrity" of Oak Flat. 61 Fed. Reg. at 26,771.

201.   The land-exchange conveyances by the government also violated Executive Order 13007, as incorporated by the land-transfer statute, as Defendants, "to the extent practicable," failed to "avoid adversely affecting the physical integrity" of Oak Flat. 61 Fed. Reg. at 26,771.

202.   Thus, because the EIS and the land-exchange conveyances violate Executive Order 13007, they are "arbitrary and capricious" under the APA. *Cmtys. Against Runway Expansion, Inc. v. F.A.A.*, 355 F.3d 678, 688-89 (D.C. Cir. 2004).

## COUNT VIII
## Violation of the National Environmental Policy Act

203.   Plaintiff incorporates by reference all preceding paragraphs.

204.   The National Environmental Policy Act, 42 U.S.C. §§ 4321–4370, is designed to ensure that the government's actions are consistent with the "broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989).

205.   NEPA realizes its "sweeping policy goals" "through a set of 'action-forcing' procedures that require that agencies take a '"hard look" at environmental consequences'" before engaging in certain projects. *Id.* at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)).

206.   The land-transfer statute instructs the government to "carry out the land exchange in accordance with the requirements of the National Environmental Policy Act" in "a single environmental impact statement." § 3003(c)(9)(A)-(B), 128 Stat. 3735.

38

207. By expressly incorporating NEPA, Congress indicated that the government must take a hard look at the intended land transfer's environmental consequences and then show its work in a "reasonable and reasonably explained" EIS. *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 180 (2025).

208. In 2023, Congress amended NEPA through the BUILDER Act, Pub. L. 118-5, div. C, tit. III, § 321, 137 Stat. 38, which sets a default rule that an EIS "shall not exceed 150 pages." 42 U.S.C. § 4336a(e)(1)(A); *accord Seven Cnty.*, 605 U.S. at 181 n.3.

209. For projects of "extraordinary complexity," an EIS "shall not exceed 300 pages." 42 U.S.C. § 4336a(e)(1)(B).

210. The EIS in this case is subject to NEPA's page limits.

211. The EIS in this case is over 1,000 pages. It also includes appendices adding approximately 1,400 more pages. Thus, the EIS exceeds NEPA's length limitation.

212. NEPA further requires that agencies "include in every recommendation or report on … major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on … a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal." 42 U.S.C. § 4332(C).

213. NEPA also requires that agencies "study, develop, and describe technically and economically feasible alternatives" to proposed plans. 42 U.S.C. § 4332(F).

214. The EIS and Decision Notice here do not comply with NEPA's requirement to consider reasonable alternatives. Instead, the EIS admits that "alternative underground mining methods" "could physically be applied" to recover the copper without

39

disturbing the surface, surface-supporting geology, perched aquifers, and surface waters of Oak Flat, but declines to even consider them based on Resolution Copper's claim that these alternatives would have "higher operational costs" and "reduce the amount of ore that could be profitably mined." 4-EIS-F-3. The failure to consider reasonable alternatives violates NEPA.

**COUNT IX**
**Violation of the National Historic Preservation Act**

215. Plaintiff incorporates by reference all preceding paragraphs.

216. In 1966, Congress enacted the National Historic Preservation Act—now codified at 54 U.S.C. §§ 300101 et seq.—with the goal of identifying and protecting the nation's historical treasures.

217. The NHPA requires federal agencies to consider the impact of any undertaking on properties of historical significance, including traditional religious and cultural importance to an Indian tribe.

218. Section 106 of the NHPA requires that, prior to issuance of a federal permit or license, federal agencies shall take into consideration the effects of an "undertaking" on "historic propert[ies]." 54 U.S.C. § 306108. Agencies "must complete the section 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license.'" 36 C.F.R. § 800.1(c). The NHPA established the ACHP, an independent federal agency with the primary mission to encourage historic preservation in the government and across the nation.

219. The NHPA defines undertaking as "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a Federal agency, including – (1) those carried out by or on behalf of the Federal agency; (2) those carried out with Federal financial assistance; (3) those requiring a Federal permit, license, or approval; and (4) those subject to State or local regulation administered

40

pursuant to a delegation or approval by a Federal agency." 54 U.S.C. § 300320; 36 C.F.R. § 800.16(y).

220. The NHPA Section 106 process requires federal agencies involved in undertakings to make a reasonable and good faith effort to identify and disclose historic properties within affected areas, evaluate the potential adverse effects of the federal undertaking to the historic properties, "and seek ways to avoid, minimize or mitigate any adverse effects to the historic properties." 36 C.F.R. §§ 8.001, 800.4-800.6.

221. The Section 106 process requires consultation with Indian Tribes on federal undertakings that potentially affect sites that are culturally significant to Indian Tribes. 36 C.F.R. § 800.2(c)(2); 54 U.S.C. § 302706 (properties "of traditional religious and cultural importance to" a Tribe may be included on the National Register, and federal agencies "shall consult with any Indian Tribe … that attaches religious and cultural significance" to such properties).

222. If the agency finds that historic properties are affected, it must provide notification to all consulting parties and invite their views to assess adverse effects. 36 C.F.R. § 800.2(c)(2). Any adverse effects to historic properties must be resolved, involving all consulting parties and the public. *Id.* § 800.6. If adverse effects cannot be resolved, the process is elevated again to the ACHP and the head of the agency undertaking the action. *Id.* § 800.7. Until this process is complete, the action in question cannot go forward.

223. If adverse effects on historic sites are identified, the agency must continue consulting with the parties and avoid or mitigate any adverse effects.

224. If an agreement between the ACHP and the agencies cannot be reached as to a plan for mitigation, the agency "must make clear in the record that the ACHP's comments were taken seriously." *Friends of the Atglen-Susquehanna Trail v. Surface Transp. Bd.*, 252 F.3d 246, 265 (3d Cir. 2001) (quoting *Concerned Citizens All., Inc. v. Slater*, 176 F.3d 686, 696 (3d Cir. 1999)).

41

225. The government failed to coordinate with the ACHP before it issued the first EIS in 2021.

226. In 2025, before issuing the second EIS, the government purported to respond to the ACHP's comments and advice suggesting mitigation efforts to preserve Oak Flat.

227. However, the agency's response failed to seriously consider the ACHP's recommendations and refused to avoid, minimize, or mitigate the harm to Oak Flat and other historic properties that will be destroyed by the mine, and failed to properly consult regarding resolution of the adverse effects to Oak Flat. 36 C.F.R. § 800.7. This violated the NHPA.

## COUNT X
### Violation of Appraisal Requirements
### 16 U.S.C. § 539p; 5 U.S.C. §§ 701-706

228. Plaintiff incorporates by reference all preceding paragraphs.

229. 16 U.S.C. § 539p sets out specific, non-discretionary requirements governing the appraisals of the federal and non-federal lands to be exchanged before the land transfer may legally proceed.

230. The land transfer cannot occur until "the final appraised values of the Federal land and non-Federal land are determined and approved by the Secretary." 16 U.S.C. § 539p(c)(4)(B)(ii).

231. The appraisals must be conducted "in compliance with the requirements of section 254.9 of title 36, Code of Federal Regulations." 16 U.S.C. § 539p(c)(4)(A).

232. The federal exchange and appraisal regulations at 36 C.F.R. § 254.9, as incorporated by the land-transfer statute, require that all values of the exchanged lands be factored in, including minerals. *See* 36 C.F.R. § 254.9(b)(1).

233. An appraisal must provide "the market value of Federal and non-Federal properties involved in an exchange." 36 C.F.R. § 254.9(a)(1). Market value means "the most probable price in cash, or terms equivalent to cash, which lands or interest in lands should bring in a competitive and open market under all conditions requisite to a fair sale, where the buyer and seller each acts prudently and knowledgeably,

42

and the price is not affected by undue influence." 36 C.F.R. § 254.2.

234. In addition to the requirements of 36 C.F.R. § 254.9, the appraisals must also be conducted "in accordance with nationally recognized appraisal standards, including (I) the Uniform Appraisal Standards for Federal Land Acquisitions ["UASFLA"], and (II) the Uniform Standards of Professional Appraisal Practice." 16 U.S.C. § 539p(c)(4)(B).

235. The UASFLA likewise requires that "[t]he federal land [be] appraised as if in private ownership, to its highest and best use," and that "the appraiser must avoid estimating a property-specific investment value to a particular owner instead of developing an opinion of the market value of the property if it were placed for sale on the open market."

236. The land-transfer statute further requires that "[t]he value of the Federal land and non-Federal land to be exchanged under this section shall be equal or shall be equalized in accordance with this paragraph." 16 U.S.C. § 539p(c)(5)(A). If the appraised value of the federal lands exceeds the value of the non-federal lands, Resolution Copper was required to convey additional non-federal land to the United States, make a cash payment, or both. 16 U.S.C. § 539p(c)(5)(B)(i).

237. The Forest Service prepared two appraisals for the federal lands to be exchanged: one covering the 766-acre Mineral Withdrawal Area ("MWA") parcel and one covering the 1,655-acre Mining Claim Zone ("MCZ") parcel.

238. The appraisal for the MWA parcel assigned an estimated value for the approximately 5 billion pounds of copper under the surface.

239. But the appraisal for the MCZ parcel valued the 35 billion pounds of copper beneath the surface at zero dollars.

240. The decision to assign a $0 value to the copper ore beneath the MCZ violates the land-transfer statute's appraisal requirements.

43

241. The Secretary's approval of the appraisals violates the land-transfer statute's appraisal requirements.

242. The land conveyance violates the statute's "Equal Value" requirements because the federal lands were more valuable than the non-federal lands. Resolution Copper was thus required to convey additional non-federal land to the United States, make a cash payment, or both. 16 U.S.C. § 539p(c)(5)(B)(i). It failed to do so, and the government failed to require it as a necessary condition for the land exchange.

243. The Secretary's acceptance, approval, and conveyance based on the unlawful appraisals, and as compounded by the illegal omission of the requirement of making an equal value exchange, is arbitrary, capricious, an abuse of discretion, not in accordance with the law, and contrary to the land-transfer statute itself. 5 U.S.C. §§ 701-706; 16 U.S.C. § 539p.

## COUNT XI
## Violation of Indian title

244. Plaintiff incorporates by reference all preceding paragraphs.

245. As enrolled members and descendants of the Treaty of Santa Fe tribes, Apache members of Apache Stronghold have aboriginal rights under the law of Indian title to continue to use and occupy Oak Flat for purposes of religious exercise.

246. The Treaty of Santa Fe tribes and their descendants, Apache members of Apache Stronghold, had actual, exclusive, and continuous use and occupancy of lands that included Oak Flat for a long time prior to the 1850s and thus established Indian title to Oak Flat.

247. A variety of evidence—archaeological, oral tradition, and other sources—shows the actual, exclusive, and continuous use and occupancy by Apaches of lands that included Oak Flat for a long time prior to the 1850s.

248. The Apache's Indian title has not been extinguished by treaty, agreement, congressional

44

action, or other authorized actions of the federal government.

249. The United States has never compensated the Treaty of Santa Fe tribes or any of their descendants as holders of Indian title for Oak Flat.

250. The Indian title of the Treaty of Santa Fe tribes and their descendants has not been extinguished by voluntary abandonment.

251. Individual Apache members of Apache Stronghold also hold individual Indian title to the use and occupancy of Oak Flat for purposes of religious exercise.

252. Individual Apache members of Apache Stronghold can show that their lineal ancestors held, used, and occupied, as individuals, Oak Flat for purposes of religious worship, with the right and power to exclude all others, from time immemorial, until temporarily removed involuntarily.

253. Individual Apache members of Apache Stronghold can therefore show that they have Indian title to Oak Flat.

254. The title of individual Apache members of Oak Flat has not been extinguished by the government or by voluntary abandonment.

255. A notice of Lis Pendens is recorded in the property records of the Pinal County Recorder's Office as of January 13, 2021. *See* Dkt. 58.

256. Resolution Copper's possession of Oak Flat is thus null, or subject to the Indian title of the Treaty of Santa Fe tribes and of individual Apache members of Apache Stronghold, who are descendants of the Treaty of Santa Fe tribes.

257. Any permits for mining Oak Flat granted by the federal government are subject to and in violation of the Indian title of the Treaty of Santa Fe tribes and of individual Apache members of Apache Stronghold.

258. Activities supporting the physical destruction of Oak Flat are in violation of the Indian title of the Treaty of Santa Fe tribes and of individual Apache members of Apache Stronghold.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs respectfully request that the Court:

1. Declare that ~~the Defendants violated the Plaintiff's Fifth Amendment Right to Due Process (Adequate and Effective Notice), and violated the Plaintiff's First Amendment Right to Petition for Redress and Remedy~~;

2. Declare that ~~the parcel of land containing Chi'chil Biłdagoteel ("Oak Flat") is Apache land with treaty and property rights reserved by and to the Apaches in accordance with the terms of the 1852 Treaty of Sante Fe, and that the Defendant United States of America does not own that land, and does not have the power or authority or any right in law or in equity to convey that Apache land to anyone~~;

3. ~~Declare that the Mandate and Defendants' actions and enforcement of the Mandate against Plaintiff and its members violate the First and Fifth Amendments to the United States Constitution~~;

4. ~~Declare that the Mandate and Defendants' actions and enforcement of the Mandate against Plaintiff and its members violate the Religious Freedom Restoration Act~~;

5. ~~Declare that Defendants breached their trust responsibilities and duties as fiduciaries, and caused damage to the Plaintiff and its members, and order a full and accurate accounting~~;

6. ~~Issue a permanent injunction prohibiting the Mandate~~;

7. Award Plaintiff ~~damages, and~~ the costs of this action and reasonable attorney's fees and expert witness fees; and

8. Award such other and further relief as the Court deems equitable and just.

Wherefore, Plaintiff respectfully request that the Court:

a. Declare that <u>the transfer and destruction of Oak Flat violates and is invalid and void under federal law, the United States Constitution, the Treaty of Santa Fe, and other laws noted herein</u>;

b. Declare that <u>the Treaty of Santa Fe tribes and their descendants, including the relevant members of Apache Stronghold, have Indian title to Oak Flat</u>;

c. <u>Issue a permanent injunction prohibiting Defendants from conveying any right, title, or interest of the United States in Oak Flat to Resolution Copper or otherwise allowing or authorizing Resolution Copper to take any action affecting the surface or subsurface physical integrity of Oak Flat</u>;

d. <u>Issue a permanent injunction requiring the United States and Resolution Copper to restore the status quo that existed prior to the purported completion of the land exchange in March 2026, including but not limited to reversing or rescinding the purported land conveyance and remediating any damage to Oak Flat</u>;

e. <u>Set aside and vacate the United States' actions and the EIS and void any actions or decisions based on the EIS, including but not limited to the purported land conveyance</u>;

f. <u>Award Plaintiff compensatory and nominal damages for the loss of their rights as protected by the United States Constitution, the Treaty of Santa Fe, and federal law</u>;

g. Award Plaintiff the costs of this action and reasonable attorney's and expert witness fees; and

h. Award such other and further relief as the Court deems equitable and just.

**JURY DEMAND**

Plaintiff requests a trial by jury on all issues so triable.

Plaintiff requests a trial by jury on all issues so triable.

46

~~Dated: January 12, 2021~~       Respectfully submitted,    Respectfully submitted this 22nd day of April, 2026.

/s/Michael Nixon
Michael V. Nixon (OR Bar #
893240) (*pro hac vice*
application pending) 101 SW
Madison Street #9325
Portland OR 97207
Telephone: 503~~.~~522~~.~~4257
Email: michaelvnixon@yahoo.com

/s/Clifford Levenson
Clifford Levenson (AZ Bar # 014523)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: 602~~.~~258~~.~~8989
Fax: 602~~.~~544~~.~~1900
Email: cliff449@hotmail.com

*Attorneys for* ~~*Apache Stronghold*~~

Respectfully submitted,

/s/ Luke W. Goodrich
Luke W. Goodrich, *pro hac vice*
(DC Bar #977736)
Joseph C. Davis, *pro hac vice*
(DC Bar #1047629)
Amanda L. Salz, *pro hac vice*
(DC Bar #1671976)
Amanda G. Dixon, *pro hac vice*
(DC Bar #90021498)
The Becket Fund for Religious Liberty
1919 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006
Telephone: (202) 955-0095
Email: lgoodrich@becketfund.org

Michael V. Nixon, *pro hac vice*
(OR Bar #893240)
101 SW Madison Street #9325
Portland, OR 97207
Telephone: (503) 522-4257
Email: michaelvnixon@yahoo.com

Clifford Levenson (AZ Bar #358287)
5119 North 19th Avenue, Suite K
Phoenix, AZ 85015
Telephone: (602) 258-8989
Email: cliff449@hotmail.com

*Attorneys for Plaintiff*

47